IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO

| | |
|---|---|
| E.T. MEIJER and MARCEL WINDT, In their Capacity as Trustees in Bankruptcy for KPNQwest N.V., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> QWEST COMMUNICATIONS INTERNATIONAL, INC., JOHN A. McMASTER, JOSEPH P. NACCHIO, ROBERT S. WOODRUFF, <br><br> *Defendants*. | Civil Action No. <br><br> COMPLAINT AND JURY DEMAND |

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................. 1

PARTIES............................................................................................................... 8

JURISDICTION AND VENUE .......................................................................... 10

PRIOR LITIGATION.......................................................................................... 12

FACTUAL ALLEGATIONS ............................................................................... 14

    I.      The Qwest Business Model........................................................ 14

    II.     The KPNQwest Opportunity...................................................... 16

    III.    Qwest's Business Model In The United States Fails, and It
          Resorts To Fraud To Conceal That Failure. ............................... 20

          A.     Qwest Was Under Enormous Financial Pressure In
                  Its Own Core Business................................................... 21

          B.     Rather than Abandon Qwest's Collapsing Model,
                  Defendants Resort to Fraud to Maintain The
                  Appearance Of Financial Strength. ............................... 23

          C.     Qwest's  Fraudulent Accounting Methodology for
                  IRU Transactions............................................................ 25

    IV.    Having Chosen To Engage In A Massive And Fraudulent
          Cover-Up Of The Failure Of Its Own Business In The
          United States, Qwest Felt Compelled Also To Conceal The
          Failure of KPNQwest. ................................................................ 32

          A.     Defendants Engaged in a Pattern of Racketeering To
                  Gain And Maintain Control of KPNQwest.................... 36

B.    To Maintain Control, Defendants Breached Their Duty Of Loyalty And Other Duties Owed To KPNQwest. ........................................................ 41

C.    Defendants Use Their Control To Subordinate The Interests of KPNQwest To Their Own Interests.......................... 44

D.    Defendants Continued To Maintain Their Control By Actively and Fraudulently Manipulating And Misleading KPNQwest And Its Supervisory Board...................... 47

E.    As KPNQwest's Business Came Increasingly To Rely On Artificial "Swap" Transactions, The Board Continued To Be Misled.................................................. 71

    1.    The Growth of a Swap Culture at KPNQwest .................. 71

    2.    The Use of Swaps Became Pervasive. ................................ 75

    3.    The Impact of Swaps is Concealed from the Supervisory Board ................................................. 100

F.    Defendants Also Used Their Control to Siphon Cash and Needed Assets Away from KPNQwest. ..................... 111

G.    Defendants Further Maintain Their Control And Conceal Their Fraud and Mismanagement By Forcing Out Those Who Might Dissent....................................... 119

V.    Misled Into Believing KPNQwest Was Thriving, The Supervisory Board Permitted KPNQwest To Pursue A Failed Business Model Toward Inevitable Insolvency. .......................... 125

A.    In Order to Conceal the Fraud, KPNQwest Had to "Dress for Success" and Be Managed as if It Had the Resources of a Successful Company....................................... 125

B.    At Nacchio's Direction, The Supervisory Board Refused To Authorize Necessary Acquisition of Capital................................................................................ 133

C.      Eventually, KPNQwest Ran Out Of Cash.................................. 135

VI.    In Addition To Fraud And Deceit, Defendants Engaged In
        Acts Of Mismanagement And Breach Of Duty Contrary
        To Their Obligations Under Dutch Law. ................................. 145

        A.      Defendants Failed to Keep the Books Such that the
                "Rights and Obligations of [KPNQwest Could] Be
                Ascertained at Any Time."........................................... 146

        B.      Defendants' Mismanagement Was Broad And Deep. ................ 149

VII.   The Final Chapter – Defendants' Desperate Effort at
        Concealment Fails, and Is Replaced by Even More Blatant
        Fraud and Looting.......................................................... 156

VIII.  The Injuries Suffered. ...................................................... 165

CLAIM I: RICO, 18 U.S.C. §§ 1962(a)-(d) ................................... 168

        A.      Section 1962(a) .................................................... 176

        B.      §1962(b).............................................................. 177

        C.      § 1962(c) ............................................................ 179

        D.      § 1962(d) ............................................................ 180

CLAIM II: MISMANAGEMENT and BREACH OF DUTY .................................. 181

PRAYER FOR RELIEF................................................................ 191

JURY DEMAND........................................................................ 192

## INTRODUCTION

1.      The Plaintiff trustees in bankruptcy for KPNQwest N.V. and for certain of its wholly owned subsidiaries (collectively, "KPNQwest") bring this action arising out of the fraud, deceit, corporate mismanagement and other misconduct of Defendant Qwest Communications International, Inc. ("Qwest") and three of its former executives, Joseph P. Nacchio, Robert S. Woodruff and John A. McMaster, which resulted in the financial destruction and bankruptcy of KPNQwest.  Certain allegations contained herein are made on information and belief.

2.      Since at least 1999, Defendant Qwest engaged throughout the United States in a pattern of fraudulent activity by which knowingly false revenues were reported, fictitious profits were manufactured, assets were overstated and accounting procedures were knowingly manipulated, all in order to make Qwest appear more profitable and valuable than it really was and to conceal the stark failure of core elements of its business.

3.      As it was commencing this fraud in the U.S., Qwest was also joint venturing in Europe to create a new company—KPNQwest—patterned on a similar business model.  The similarity of the Qwest/U.S. and KPNQwest/Europe business models presented a profound dilemma for Qwest and the individual Defendants. Knowing how completely the U.S. business model was failing, Defendants could (and

should) have warned KPNQwest about the tremendous challenges it would face pursuing this same model in Europe. Instead, however, Defendants chose the opposite course. Qwest and the Individual Defendants embarked on a separate scheme to force management of KPNQwest, including its Supervisory Board, to run the business as if nothing was wrong, based on a set of assumptions that Defendants knew were false and unrealistic, and to drain needed cash from KPNQwest in a manner that led inexorably to growing insolvency and ultimately the bankruptcy of KPNQwest. These acts of fraud and mismanagement, directed and orchestrated from the United States and having their impact both in the United States and Europe, are the subject of this Complaint.

4.      Qwest had evolved in the mid- to late-1990s from a modest, privately held regional telecommunications company into a publicly traded telecommunications giant, ultimately ranking as one the United States' largest telephone companies. Central to Qwest's evolution was construction of a new nationwide fiber optic telecommunications network. To finance this massive undertaking, Qwest would enter into indefeasible right of use ("IRU") agreements with other telecommunications companies under which those companies would make up-front payments to Qwest in exchange for the right to use specific "dark fibers" in the network Qwest was constructing. Qwest then would use those up-front payments to

finance construction of the network.  In many instances, Qwest would "pre-sell" large portions of the network before construction had been completed or even begun, thus eliminating much of the need to resort to the capital markets to finance construction of those routes.

5.     In addition to substantial "one-time" dark fiber sales that would result in "non-recurring" revenues, Qwest's business plan also anticipated rapid growth of "recurring" revenue from sales of fiber optic telecommunication services over its new network.

6.     By at least 1999, however, both the recurring and non-recurring revenue cornerstones of Qwest's business plan had lost their viability.  The dark fiber market all but disappeared, and rosy predictions of recurring revenue growth had proven unfounded.  With the basic assumptions underlying Qwest's business plan no longer realistic, Qwest faced a cross-roads.

7.     Rather than publicly admit its failure, however, Qwest embarked on a massive pattern of fraud.  Instead of sound and ethical business management, Qwest substituted fraudulent books and records and false and misleading financial reporting. When this was eventually discovered, Qwest was forced to restate its earnings by more than $1 billion.

8.    Prior to the detection of this fraudulent scheme, however, and buoyed by its initial apparent success, Qwest and the individual Defendants also launched a separate scheme directed at KPNQwest.  Initially established as a joint venture by Qwest and Koninklijke KPN N.V. a/k/a Royal KPN N.V. ("KPN") (a large, Netherlands-based telecommunications company), KPNQwest was initially conceived, in the model of Qwest, as a "new" telecommunications company that would pursue in Europe the same business plan that Qwest had touted within the United States.  Defendants came to realize, however, that as conceived, the KPNQwest business plan did not comport with the basic economics of the telecommunications market and, unless dramatically revised, could not succeed. Already engaged in a massive fraud to cover-up and conceal its own business failure within the United States, however, Qwest could not countenance the revelation from an affiliated company that similar business practices in Europe were encountering profound difficulties.  Defendants became convinced that the affiliation and overlapping management structures of the two companies demanded that a consistent line should be adopted by both.

9.    This posed a quandary for Qwest, however, because Defendants initially lacked the control to ensure such consistency.  Rather, the joint venture structure  was premised on sharing of joint responsibility between Qwest and KPN.  In pursuit of

fraudulent objectives designed ultimately to cripple KPNQwest, however, Qwest and the individual Defendants quickly assumed control of the joint venture and used fraudulent practices, described more specifically herein, to essentially displace KPN and the independent directors of KPNQwest from their proper roles and functions of corporate oversight.  In their place, Defendants substituted fraudulent practices that victimized KPNQwest and ultimately led to its financial failure and bankruptcy. Qwest insiders, installed to manage KPNQwest, knowingly misled others in KPNQwest's senior management team to accomplish these objectives.

10.    In furtherance of this scheme, Qwest installed several Qwest officials in senior management roles at KPNQwest.  For example, Defendant Joseph P. Nacchio served as both Qwest Chairman and Chief Executive Office ("CEO") and as Chairman of KPNQwest's Supervisory Board.  Defendant Robert S. Woodruff, Qwest's Chief Financial Officer ("CFO"), also served on KPNQwest's Supervisory Board.  Defendant John A. McMaster moved from his position as Qwest's Executive Vice President of International Business to become KPNQwest's CEO.  McMaster also acted as the sole member of KPNQwest's Management Board, which functioned as the company's executive body, and was supported in this respect by several former Qwest executives in key financial and accounting positions.  As sole member of the

Management Board, McMaster served as the gatekeeper for what information could be provided to the Supervisory Board.

11.     Through their positions of interest and control, Defendants began to operate KPNQwest for Qwest's self-interest and in a manner antithetical to KPNQwest's interests.  Defendants maintained that interest and control over KPNQwest through a pattern of deception by which they breached their duties of loyalty to KPNQwest.  Defendants further maintained that interest and control by distorting or concealing key data from other Supervisory Board members or senior KPNQwest managers, in order to misrepresent the financial health of KPNQwest, and by making KPNQwest financially dependent upon Qwest as a partner for engaging in improper IRU transactions.  Defendants did this in a manner that drove KPNQwest deeper and deeper into insolvency and, ultimately, bankruptcy.

12.     At no time did Defendants Nacchio, Woodruff and McMaster, as members of KPNQwest's Supervisory Board or Management Board, reveal that they were disregarding their own duties of loyalty to KPNQwest and were instead operating the company in disregard of KPNQwest's interests.  Instead, Defendants engaged in a pattern of fraudulent conduct designed, among other things, to induce KPNQwest to pursue a business model that Defendants knew was unworkable.

13.    Plaintiffs E.T. Meijer and Marcel Windt, in their capacity as trustees in bankruptcy for KPNQwest, bring this action seeking to hold Defendants jointly and severally liable for the fraud and financial ruin they wrought upon KPNQwest. Plaintiff Trustees seek substantial damages from Qwest and the individual Defendants on account of this fraud and mismanagement which ultimately caused KPNQwest's bankruptcy.

14.    Plaintiffs bring two categories of claims.  First, Plaintiffs will prove that Defendants engaged in a pattern of racketeering to acquire and maintain control of KPNQwest and fraudulently mislead key members of its Supervisory Board, in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. 1962(a)-(d).  Second, Plaintiffs will demonstrate that Defendants mismanaged KPNQwest in derogation of requirements of Dutch law by which they were bound and which provide express remedies that the Trustees are now entitled to pursue.

15.    Plaintiffs' RICO claims are narrowly focused on frauds directed at KPNQwest and involving Defendants' implementation of a plan to control KPNQwest for their own illicit purposes.  Defendants sought to control KPNQwest to conceal from KPNQwest's Supervisory Board and other managers the facts that demonstrated the impending failure of the KPNQwest business plan.  This fraud was directed solely at KPNQwest.

16.     The pattern of racketeering that forms the basis for Plaintiffs' RICO claims may also form, but is not a necessary basis for, Plaintiffs' Dutch law mismanagement and breach of duty claims.  Apart from Defendants' RICO fraud, Defendants also systematically engaged in improper acts of mismanagement and breach of duty, in violation of Dutch law, as more specifically set forth herein.

## PARTIES

17.     Plaintiffs E.T. Meijer and Marcel Windt are court-appointed "Curatoren" (or "Trustees") in bankruptcy for KPNQwest N.V. and certain wholly owned subsidiaries.  Although KPNQwest was organized with 130 separate corporate entities, these entities operated *de facto* as a single enterprise, in which the various entities did not function as separate companies, but as "business units" of a single KPNQwest.  The KPNQwest group effectively was one company, having one centralized management without any relevant independent management at the subsidiary level.  Trustees bring this action solely in their capacity as trustees, on behalf of and for the benefit of the bankruptcy estate(s) of KPNQwest N.V. and the subsidiaries they represent (collectively, "KPNQwest"), to recover the deficit of the estate (*i.e.*, the unpaid claims of creditors), and not in any personal capacity.

18.     Prior to bankruptcy, KPNQwest was a Dutch corporation, with its principal place of business in Hoofddorp, Netherlands.  KPNQwest operated as a data communications services company offering Internet connectivity, remote access,

website hosting, Internet broadcasting, and other telecommunications services in 15 European countries and more than 50 cities. KPNQwest filed for protection under Dutch moratorium law (the Dutch equivalent of bankruptcy) on May 23, 2002 and was declared bankrupt on May 31, 2002. Any claims that KPNQwest has against the Defendants in this action are the property of the bankruptcy estate and enforceable by the Trustees.

19.     Defendant Qwest Communications International, Inc. ("Qwest"), is a Delaware corporation with its principal place of business at 1801 California Street, Denver, Colorado. Qwest is one of the largest telecommunications companies in the United States, and provides telecommunications, voice, video, wireless Internet, network and/or data services to over 25 million customers and businesses in the U.S. and abroad.

20.     Defendant Joseph P. Nacchio ("Nacchio") is an adult resident of the State of New Jersey, residing at 1 Manor Hill Drive, Mendham, NJ. Nacchio previously served as Chairman and Chief Executive Officer of Qwest and as Chairman of the Supervisory Board of KPNQwest.

21.     Defendant Robert S. Woodruff ("Woodruff") is an adult resident of the State of Colorado, residing at 4965 S. Elizabeth Circle, Englewood, CO 80110.

Woodruff previously served as Chief Financial Officer of Qwest and as a member of the Supervisory Board of KPNQwest until approximately May 2001.

22.    Defendant John A. McMaster ("McMaster") is an adult resident of the State of New Jersey, residing at 34 Jeffrey Court, Basking Ridge, NJ 07920. McMaster previously served as Qwest's Executive Vice President of International Business. He also served as KPNQwest's Chief Executive Officer and functioned as the sole member of KPNQwest's Management Board.

## JURISDICTION AND VENUE

23.    Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1332.

24.    Venue is proper in the District of Colorado pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, as Colorado is where "a substantial part of the events or omissions giving rise to [the Trustees' claims] occurred," 28 U.S.C. § 1391(a).

25.    The United States is a proper and convenient forum for this litigation. Significant U.S. interests are at stake in this dispute. Each of the named Defendants resides in the United States. Much of the fraudulent conduct and mismanagement alleged herein occurred in the United States. Defendants Nacchio, Woodruff and Qwest (through Nacchio, Woodruff and others) participated in the management and direction of KPNQwest via telecommunications while in the United States. Meetings of the KPNQwest Supervisory Board regularly occurred in the United States (*e.g.*, on March 3-4, 1999, March 22, 2000, December 7, 2000, and January 19, 2001) or with

Qwest members of the Supervisory Board participating by phone from the United States (*e.g.*, on July 13, 2000, April 18, 2001, July 19, 2001, October 26, 2001, and March 7, 2002). Qwest participated in IRU transactions and swaps involving KPNQwest from the United States, as described in this Complaint. Defendants' direction and control of KPNQwest were accomplished predominantly as the result of actions and communications occurring in the United States, or made at the direction of persons in the United States. Most or many of the witnesses to the fraud are located in the United States and many of the documents that the Trustees are seeking to supplement their claims and prove assist in proving their case are located in the United States. Thus, this is the venue in which all of the Defendants and many key witnesses reside, where many of the key documents that the Trustees seek are located, and where a substantial part of the Defendants' unlawful conduct occurred or was initiated.

26.     Colorado in particular is a convenient and appropriate venue because, among other things, and as detailed in the pleadings below:

a.     Colorado is where Qwest – the intended beneficiary of the unlawful conduct described in this Complaint – is located, and it was Colorado where the benefits of such unlawful conduct were received;

b.      Colorado is the specific location from which a substantial part of the unlawful conduct described in this Complaint was directed by Qwest and the other Defendants;

c.      Colorado is where important meetings of the KPNQwest Supervisory Board were held and important conferences were initiated

d.      Colorado is the location from which, or to which, e-mails, telephone calls, and other inter-company communiques directing or regarding the management of KPNQwest were written or sent;

e.      Colorado is where the substantial majority of relevant documents are located;

f.      Colorado is the location in which a substantial number of witnesses and other potentially relevant personnel resided and worked when, typically through their affiliation with Qwest, they participated in or witnesses acts of fraud, and, on information and belief, Colorado is where many or most of them continue to reside or work.

## **PRIOR LITIGATION**

27.    The Trustees originally filed suit in the United States District Court for the District of New Jersey on June 29, 2004, naming the same Defendants and raising

the same claims set forth below.  Defendants moved immediately to compel arbitration, but that motion was denied by the assigned Magistrate Judge in a decision that was ultimately affirmed by the District Court Judge.  In the interim, discovery commenced and the parties engaged in the exchange of documents.  About 18 months into the New Jersey litigation, Defendants moved to dismiss on grounds of *forum non conveniens*.  That motion was granted by the District Court on October 17, 2006, and affirmed on appeal by the Third Circuit in a decision issued on June 10, 2008.

28.    In affirming the dismissal on grounds of *forum non conveniens*, the Third Circuit limited its consideration of the convenience of the domestic forum to the New Jersey forum, and made it clear that its decision was not to be construed as affecting the right of the Trustees to file suit in another federal district court.  It said:

> It would be problematic if granting a motion to dismiss for *forum non conveniens*, based on local considerations, precluded a plaintiff from filing the suit in another, convenient district.  Thus, the conclusion we reach in this case does not necessarily mean that this action may not be maintainable in another federal district.

29.    In explaining its finding that New Jersey was not a convenient forum, the Third Circuit highlighted the absence of specific connections to New Jersey and the fact that New Jersey "is not the home forum of the corporate defendant [*i.e.*, Qwest]."  Defendant Qwest resides in the District of Colorado.

- 13 -

30.     A petition for rehearing or rehearing *en banc* was denied by the Third

Circuit on July 14, 2008, and the Supreme Court denied certiorari on January 12, 2008.

## STATUTE OF LIMITATIONS

31.     The RICO statute of limitations was tolled as of the filing of the New

Jersey action.

## FACTUAL ALLEGATIONS

### I.     The Qwest Business Model

32.     Qwest was founded in the late 1980s as a subsidiary of the Southern

Pacific Transportation Co. ("Southern Pacific").  Initially known as "SP Telecom,"

Qwest began primarily as a construction company, building telecommunications

facilities along railroad rights-of-way in the western United States for existing

telecommunications companies, such as MCI.

33.     Qwest was "spun off" from Southern Pacific in approximately 1991,

becoming a wholly owned subsidiary of the Anschutz Company, which was owned, in

turn, by Southern Pacific's then-largest single shareholder, Philip F. Anschutz.  Mr.

Anschutz and/or his wholly owned corporation, the Anschutz Company, are the

largest shareholders of Qwest.

34.     Beginning in the mid-1990s, Qwest began transitioning itself from a

regional construction company to a major telecommunications company.  Qwest

began plans to build its own state-of-the-art national fiber optic telecommunications

- 14 -

network.  A construction project of that scope presented significant costs, and

required Qwest to generate a significantly increased net cash inflow to finance the

build.

35.     To finance network construction, Qwest developed a two-part financing

model.  Under the first, more-traditional part of the model, Qwest would borrow

money or finance in the capital markets (through, for example, the company's initial

public offering, which occurred in June 1997).

36.     The second part of the model was a form of "self financing."  Qwest

would enter into IRU agreements with other telecommunications companies pursuant

to which Qwest agreed to provide those companies with the use of certain numbers

of "dark fibers" for certain segments in a fiber optic telecommunications cable that

Qwest would install as part of its network.  (The fibers were referred to as "dark"

because they did not carry telecommunications traffic and, indeed, were not

connected to the electronics necessary to allow them to carry such traffic, which

eventually would be supplied by the customer when it wanted to use the fibers.)  In

exchange, the purchasers agreed to pay Qwest cash up front – often before the route

was built – and, in some instances, as certain construction milestones or other

conditions were met.

37.     Since Qwest typically planned to install 96 or more fibers in a cable along each route, but needed only 48 fibers for its own network, Qwest could enter IRU transactions providing scores of dark fibers to various third parties and still retain enough fibers to operate its own telecommunications traffic.  And because these dark fiber IRUs involved up-front cash payments, Qwest could finance a significant portion of its construction costs without having to borrow funds.

38.     By late 1998, Qwest had hired former AT&T executive Joseph Nacchio as its President and CEO.  Qwest continued to expand its operations and acquire interests in other telecommunications companies.  By the end of 2000, Qwest had become the fourth largest telecommunications company in the United States, behind AT&T, MCI Worldcom, and Sprint.  By that time, however, as discussed below, Qwest was engaged in one of the largest financial frauds in U.S. corporate history.

## II.     The KPNQwest Opportunity

39.     In November 1998, during the height of Qwest's expansion, Qwest began exploring a potential joint venture with KPN, a Dutch telecommunications company, to form a new European-based telecommunications business, to be known as "KPNQwest."  That entity would operate in Europe on essentially the same business model that Qwest was using in the United States.

40.     The potential venture was announced on November 19, 1998.  Qwest and KPN finalized their joint venture agreement in April 1999.

41.    Pursuant to the terms of the joint venture agreement, Qwest and KPN each initially received 50% of KPNQwest's stock.[1]  Qwest and KPN together contributed cash or assets valued at several hundred million dollars to the venture and, shortly after its establishment, KPNQwest was able to raise another several hundred million in high yield debt.

42.    KPNQwest conducted an initial public offering ("IPO") on November 9, 1999, selling 11.4% of its shares to the public.  After the IPO, Qwest and KPN each maintained ownership of 44.3% of KPNQwest's total stock.

43.    In November 2001, Qwest purchased an additional 3.2% of KPN's shares, bringing Qwest's total ownership stake up to 47.5% of KPNQwest's total shares.  At Qwest's request, Qwest's principal shareholder, the Anschutz Company, simultaneously purchased an additional 1.5% of KPNQwest stock from KPN.

44.    When the potential KPNQwest joint venture was announced in November 1998, Qwest and KPN reported that KPNQwest would "build and operate a high capacity European fiber optic Internet Protocol-based network in Europe, linked to Qwest's North American network for data, video and voice services."  Thus, a key component of KPNQwest's initial business plan – just as had

--------

[1]    Qwest owned its KPNQwest shares through its wholly owned and controlled Dutch subsidiary Qwest B.V., while KPN owned its shares through its wholly owned
(continued…)

been the case with Qwest – was to construct its own state-of-the art fiber optic

network.  In particular, KPNQwest planned to begin offering telecommunications

services on the existing "EuroRings" fiber optic network operated by KPN, and add

to that existing network by constructing new facilities throughout Europe.

45.    KPNQwest needed cash (or at least the promise of a positive net cash

inflow) to finance construction of its network.  Because its efforts in the financial

markets would cover only a portion of anticipated construction costs, KPNQwest

planned to follow the "Qwest model" – *i.e.*, it would enter into dark fiber IRUs to

provide third parties with rights to certain of the telecommunications facilities

KPNQwest would build in exchange for up-front payments that would be used to

finance a significant portion of the build.  (As with the Qwest model, the remaining

financing would come from borrowings, the sale of bonds, and capital market

financing, as well as from retail telecommunications services being provided on those

portions of KPNQwest's network that were operational.)

46.    KPNQwest articulated this financing theory in various public reports.

For example, as KPNQwest explained this theory in its 1999 Annual Report:  "Our

most basic service offering, Dark Fibre, allows us to reduce the effective cost of

---

(…continued)

subsidiary, KPN Telecom B.V. of the Netherlands.

deploying the EuroRingsTM network.  The current sales campaign puts us on target to achieve the savings in the cost of building the network."

47.     In fact, the internal business plans presented to and approved by the KPNQwest Supervisory Board placed tremendous reliance upon a successful dark fiber strategy.

    a.    A January 1999 Supervisory Board presentation represented that the sale of dark fiber would finance network construction and in turn allow KPNQwest to reach its market quickly.  That presentation represented that the European dark fiber market was in an "embryonic state" and that demand was increasing. Working on those assumptions, the Supervisory Board was told that KPNQwest could expect to recover 50% of its investment by selling 33% - 50% of its available dark fibers.

    b.    At its March 1999 meeting, the Supervisory Board was presented with a KPNQwest "Strategy Statement & Business Plan" in which dark fiber sales were budgeted to be € 86 million in 1999 (21% of 1999 revenue), € 205 million in 2000 (24% of 2000 revenue), and € 141 million in 2001 (14% of 2001 revenue).  The presentation further represented that in 2000 and 2001, dark fiber sales would

cover 50% and 30% of the network construction costs,

respectively, in those years.

c.    During its June 21, 1999 meeting, the Supervisory Board was told

that KPNQwest could expect dark fiber sales of about € 218

million in 2000 and € 163 million in 2001.

### III.    Qwest's Business Model In The United States Fails, and It Resorts To Fraud To Conceal That Failure.

48.    As KPNQwest was launched, Qwest's own fortunes were in decline.

Rather than seeking to address that decline, Qwest management engaged in a massive

cover-up to continue to tout Qwest as a thriving enterprise.

49.    In Qwest's U.S. business, two dramatic trends emerged.  First, the dark

fiber and capacity IRU markets went into steep decline.  Prices dropped precipitously,

driven by serious overcapacity.  Second, recurring revenues from the provision of

telecommunications services, which had been forecast to displace IRUs as the driving

source of Qwest's revenues from its new network, failed to materialize at anywhere

near the volume or price levels that were forecast.

50.    It soon became apparent to Qwest management, including Defendants

Nacchio and Woodruff, that these trends were not temporary but rather were

endemic in the structure of the industry.  Qwest management came to understand that

the explosive growth trends that they had predicted and "promised" to the market were now unachievable.

51.    Faced with the failure of its business model, Qwest determined nevertheless that it must manufacture ever increasing revenues and profits, even if this required unethical and ultimately fraudulent behavior.

**A.    Qwest Was Under Enormous Financial Pressure In Its Own Core Business.**

52.    The market changes – and the resultant inefficacy of the Qwest model – could not have come at a more inopportune time for Qwest.

53.    First, in 1999, Qwest had begun the process of acquiring US West – a regional Bell operating company providing local telephone service in several Western states – for $40 billion.  Qwest began its acquisition of US West by virtue of a merger agreement announced on July 18, 1999.  The US West Merger Agreement specified that for each share of US West stock held, US West shareholders would receive a share of Qwest common stock having a value of $69.  The companies' respective shareholders voted on and approved the merger on November 2, 1999 – just before KPNQwest's IPO.

54.    However, the deal was contingent upon maintaining the average trading price of Qwest's shares in a specified range from the time of the Merger Agreement (July 1999) through closing of the transaction in mid-2000.  Had Qwest not

maintained its stock price at the specified levels, then Qwest could not have completed the merger as structured, and would have been forced to pay additional cash to close the deal.

55.     Moreover, by acquiring US West and otherwise, Qwest had taken on enormous debt, exceeding $25 billion.  This staggering debt imposed significant capital and financing burdens on Qwest, which required Qwest almost continuously to seek or draw down funds from various loans or debt offerings.  On information and belief, these financing arrangements were subject to significant covenants and constraints that required Qwest to achieve or maintain certain financial performance measures.

56.     In addition, Qwest needed to maintain its strong financial appearance in order to obtain financing necessary to complete its own network and pay for other capital projects.  In the existing telecommunications climate, where many of Qwest's competitors were struggling financially and, in some instances, declaring bankruptcy, Qwest wished to appear financially strong in order to obtain access to funds.  As Qwest's former CFO Robin Szeliga later admitted in Congressional Hearings on September 24, 2002, the competitive landscape, along with the added pressure of the U.S. West merger, "made it extremely difficult and there was certainly a heightened

sense of pressure for everyone in the company . . . to keep" making the quarterly numbers that Wall Street had come to expect.

**B.    Rather than Abandon Qwest's Collapsing Model, Defendants Resort to Fraud to Maintain The Appearance Of Financial Strength.**

57.    Despite being faced with the reality that its business model was no longer viable, Qwest refused to acknowledge that failure publicly.  Instead, as described below, Qwest embarked on various fraudulent schemes designed to foster the impression of a strong and vibrant business, despite the ever-worsening reality of the situation.  As Qwest's financial condition deteriorated, Qwest resorted to more and more fraud and misrepresentation to conceal what actually was transpiring in its business.

58.    More specifically, Qwest entered into various transactions and manipulated its books to make it appear as if Qwest's revenues, cash flow, and earnings before interest, taxes, depreciation and amortization ("EBITDA") were much greater than they actually were.  These actions were intended to, and had the effect of, securing necessary debt financing, allowing Qwest executives to cash out personal stock in the company at inflated prices, and permitting Qwest to pursue continued acquisitions.

59.    The remarkable nature and scope of Qwest's fraud is well-established. Qwest has been the subject of Congressional inquiries and numerous investigations,

criminal proceedings, and civil suits brought by and/or on behalf of the SEC, the U.S. Attorney's Office, the New York State Attorney General, shareholders of Qwest and U.S. West, and others.  As SEC Chairman William H. Donaldson summed it up:

> [Qwest personnel] engaged in fraudulent accounting that allowed Qwest to meet aggressive financial projections. In other words, the defendants played with the numbers so investors would believe the company was doing better than it actually was … Simply put, the defendants couldn't make the numbers work by following the rules, so they cheated. They cheated Qwest's shareholders, and they betrayed the trust of the investing public … that conduct … simply has no place in our capital markets.

60.    Qwest's fraudulent scheme was so pervasive that it would be difficult to list every instance in which Qwest took steps to distort its financial health and outlook.  However, Qwest executed its scheme primarily by:

a.    Recognizing revenue immediately from multi-year IRU capacity agreements, while knowing that US GAAP standards for such revenue recognition could not be satisfied;

b.    Engaging in capacity sales at artificially inflated prices which customers would pay only because Qwest would agree to buy services or capacity from the same customers at similarly inflated prices;

c.    Engaging in capacity swap transactions that had no economic substance merely to inflate revenue; and

d.   Failing to disclose the nature of these transactions or the role such

transactions played in inflating Qwest's reported revenue.

61.   By early 2000, Qwest's senior financial managers had determined that

the inflated revenues Qwest was reporting from IRU transactions had reached a

material level that should be disclosed.  However, Nacchio and Woodruff, then

Qwest's CEO and CFO, respectively, made the specific decision to continue the

pattern of non-disclosure and concealment.

### C.   Qwest's  Fraudulent Accounting Methodology for IRU Transactions.

62.   While Qwest's frauds took many forms, central to Qwest's scheme was

its accounting treatment of capacity IRUs and "swap" transactions in which Qwest

knowingly violated the governing accounting rules and wildly overstated its present

revenues.  In a capacity IRU agreement, Qwest would agree to provide another

telecommunications company with enumerated quantities of capacity on "lit" fibers

on which Qwest already would be carrying traffic.  Thus, capacity IRU transactions

did not involve the sale of a specific physical asset, but involved merely the lease of an

undivided partial interest in the asset, in the form of wavelengths of light that would

carry traffic, which amounted to merely the provision of a service.

63.   While capacity IRU agreements typically contemplated service over

multiple years (*e.g.*, 20 years), Qwest nevertheless began a process of recognizing the

entire multi-year value of the contract as "revenue" in the first year of the agreement. In a scheme of artifice and deceit, Qwest personnel persuaded Arthur Andersen, based on a set of false assumptions, to bless this scheme for up-front revenue recognition in a February 29, 2000 "White Paper."

64.    In its "White Paper," Arthur Andersen strained to construe the governing accounting rules and develop criteria that still would permit IRU transactions to be treated as revenue-recognizing "sales type" leases in certain circumstances.  However, specific conditions had to be satisfied.  For example, Arthur Andersen required that the IRU contract be the final understanding between the parties; that there be a transfer of title to the underlying assets; that at the time of sale, there could be no contemplated "buy back" or reciprocal arrangement, and no contemplated substitution of assets; that the capacity must be reserved to a specific fiber and a specific amount of capacity; that substantial cash be received up front; and that the circuits in question must prior to the time of the transaction have been held for sale (rather than "held for swap") and thus intended for cash sale, at least in most cases.

65.    Qwest repeatedly and knowingly violated even these relaxed rules by treating IRU transactions as "sales-type" leases even when it did not transfer title or exclusive use to the customer, merely swapped capacity that was not needed (often in

contemplation of a "buy back" or substitution arrangement), or otherwise failed to meet the criteria prescribed by Arthur Andersen.

66.    For example, the White Paper provided that "not only must there be a provision providing for transfer [of] an undivided interest in the cable at the end of the IRU but also it must give the purchaser a right in perpetuity for the *particular wave length/circuit* it had under the IRU . . . . *[T]itle to that specific asset has to be transferred.*"[2] Qwest knew, however, that in any telecommunication network, the capacity being sold could not be associated exclusively with a particular wave length circuit on a particular route, but inevitably would, from time to time, be transmitted over various circuits and/or routes.  As Global Crossing's Jackie Armstrong acknowledged in a June 24, 2001 email to numerous Qwest and certain KPNQwest recipients: "Degradation of fiber is not really relevant in a capacity sale as capacity can be routed in different ways unlike buying a fiber so there is no comparison. . . ."  An Arthur Andersen partner similarly advised in September 1999: "[A]re we very comfortable that we can (in fact) transfer title to the fiber within the IRU[?]  My national office was told this is a legal impossibility for other companies.  How comfortable are the lawyers that they can in fact transfer title[?]"  A KPNQwest employee advised that

---

[2]    Unless otherwise indicated, all emphasis herein is supplied.

"[w]e talked to our attorneys and they said that capacity wasn't specifically identifiable and therefore, we can't pass title." But, Qwest nevertheless continued the practice.

67.    Numerous other deficiencies in Qwest's ability to conform even to the Arthur Anderson criteria were well understood. For example, the rule that the purchaser must have an exclusive right to the specific capacity sold was flagrantly violated, because it was in fact technologically impossible to reserve particular capacity within a fiber to a single user. Qwest's entire system was programmed to route traffic over the most convenient or available channels, such that no fiber or channel could be deemed "exclusive" to only one customer.

68.    Qwest's treatment of IRUs was most egregious in so-called "swap" transactions, in which two or more companies would exchange capacity, with each recognizing immediate revenue from the "sale" of capacity. Because these swap transactions often involved the exchange of capacity for which there in fact was no business purpose or need, swaps sometimes were accompanied by equally egregious "portability" agreements, pursuant to which the transacting companies would agree to allow the purchasing party to trade in its capacity at some future date for new capacity, frequently undefined at the time of the original transaction.

69.    In a swap transaction, both parties ostensibly receive immediate value – represented by the nominal "selling" price on each party's side of the transaction –

even though the parties merely exchange capacity and no (or only relatively small) net payments are made.  Moreover, each "swapper" has an incentive to inflate the value of the even exchange in order to recognize *more* up-front revenue.  Indeed, swappers have an incentive to engage in such transactions whether or not the acquisition has any benefit to the company at all, simply to realize "revenue" (*i.e.*, the "sale" price) at inflated prices.

70.    Global Crossing's Robin Wright succinctly summarized the mechanics and purpose of swap transactions between Qwest and Global Crossing in a June 25, 2001 e-mail to Qwest's Susan Chase and Kimberly Stout:  "This is an issue that keeps raising its ugly head.  As we've agreed, because we are both being delivered what we probably don't want in the long term, we have agreed, on both sides, that the repurchase price is the actual amount paid, not the fair market value.  You both know the issue, we are taking capacity in order to help with revenue recognition issues."  Qwest's Susan Chase responded:  "I agree with your comments."

71.    Qwest expressly acknowledged its inability to meet recognized criteria in capacity swap transactions, and knew that swaps were causing Qwest to acquire capacity that served no business purpose.  In general, there was not even any *stated* business purpose for Qwest's IRU purchases and swaps – much less *actual* business purpose.  This was particularly true of Qwest swaps for international capacity.  For

example, as reflected in comments from Qwest President Afshin Mohebbi in an April 3, 2001 email to Qwest's Ross Lau regarding the lack of business purpose for swap transactions: "I am hoping that you are working with Greg Casey, Susan Chase and team to establish quotas for your guys to sell the international circuits we have taken on as [a] result of trades with other carriers that we do not intend to use ourselves." Or, as a Qwest senior vice president of network planning, engineering, and technology observed: "[i]t just blew my mind when I found how much [international capacity and fiber] we had…." In an email exchange between the principal architects of swap transactions at Qwest – Mr. Mohebbi and Mr. Casey – regarding a potential deal for transatlantic capacity, Mr. Casey candidly stated: "We need more transatlantic like a duck needs an earring."

72.     Many of these transactions were, in reality, simply place-holders for possible future deals, with no business substance and merely the promise—conveyed through improper "portability" clauses—that a more desirable transaction might be worked out in the future. While the IRU contract language was in some cases drafted to create the appearance that portability rights were limited, this was merely a charade. For example, as a Global Crossing official said in a September 25, 2001 e-mail regarding Qwest and its boilerplate "portability clause," "everyone involved knows the portability language [in the actual contract] is not great – we need their consent to the

swap – but we had [Qwest's] word that they would consent." An earlier (August 16, 2001) Global Crossing e-mail said the same, pointing out that while Qwest's "strict accounting requirements demand that the buy back language [in the actual contract] be couched in very specific language . . . what was actually agreed to (and we went through this a million times to there is no misunderstanding) was that they would allow us to sell the circuits back to them . . . and to swap them for capacity we actually want for the same price."

73. Because swaps so clearly violated even the Arthur Andersen White Paper criteria, Qwest also recognized that to engage in these swap transactions, it was imperative that the true nature of the swap be concealed so that the economically senseless nature of the transaction was not discovered. Qwest would orchestrate the reciprocal transactions to be completed at different times and/or through third-party facilitators (such as KPNQwest), thereby allowing each swapper to recognize revenue without it being apparent that there was to be an "equal and opposite" transaction that the parties understood had no commercial benefit, no economic substance, and was being conducted purely to recognize fictitious revenues.

74. But, Qwest could not conceal this practice forever.

75. On July 28, 2002, Qwest admitted that it had "determined that it [had] in some cases applied its accounting policies incorrectly with respect to certain optical

capacity asset sale transactions in 1999, 2000 and 2001." Specifically, Qwest later admitted that "we did not meet the criteria for up-front revenue recognition" in accounting for its capacity IRUs.

76.    On September 22, 2002, Qwest announced that it would restate $950 million in IRU revenues that occurred in 2000 through 2001 (after the US West Merger). In 2003, Qwest further re-stated its revenues, acknowledging that it overstated its capacity IRU revenues by more than $1.4 billion in 2000 and 2001 alone, more than $900 million of which were recorded in "contemporaneous" or swap capacity transactions.

**IV.    Having Chosen To Engage In A Massive And Fraudulent Cover-Up Of The Failure Of Its Own Business In The United States, Qwest Felt Compelled Also To Conceal The Failure of KPNQwest.**

77.    As Qwest was engaged in a massive fraud regarding its own business, it came to recognize that KPNQwest presented a separate problem. Given the close link between the business plans of the two companies, Qwest quickly came to realize the need to carefully control KPNQwest, both to prop up KPNQwest as a supposedly successful example of this business plan and to exploit the company for Qwest's own benefit. As discussed below, KPNQwest was effectively infiltrated by Qwest, controlled by Defendants, used to generate and/or disguise improper IRU transactions, and otherwise victimized by Defendants' fraud.

78.    By the time of KPNQwest's initial public offering in November 1999, the business model on which it was conceived was already under intense strain. By the end of 1999, dark fiber IRU sales were largely a thing of the past. KPNQwest budgeted nearly $80 million in dark fiber sales in 1999, for example, but only was able to record revenue of less than $2 million for such sales. Indeed, as early as June 21, 1999, internal KPNQwest documents noted that a "[d]ark fiber risk emerges from [a] market change." That "market change" was an evolution of customer demand to purchase only "lit fiber" or "capacity," often at lower prices than dark fiber offerings, and there was little or no demand in the marketplace for significant additional dark fiber IRU transactions.

79.    Because many of the IRU transactions were international in character, increasingly involving exchanges among the various carriers, Qwest's U.S.-based management was well aware that trends within the United States were or would be mirrored by similar trends in Europe. If KPNQwest were allowed to acknowledge these trends, and refused to engage in accounting devices designed to conceal them, this could be, at a minimum, of considerable embarrassment to Qwest. Defendants thus determined that control of KPNQwest must be acquired and maintained to prevent this from happening.

80.    Accordingly, directed primarily from Qwest's headquarters in Denver,
Defendants engaged in a pattern of frauds within KPNQwest – entirely separate from
Qwest's fraud upon its own shareholders and the public – to deceive and thereby
neutralize non-Qwest managers and Supervisory Board members that could threaten
Qwest's control over KPNQwest.  In particular, Defendants misrepresented or failed
to disclose material information regarding KPNQwest's financial condition and
business outlook to non-Qwest members of the KPNQwest Supervisory Board and
other KPNQwest managers.  By distorting information about the failures in
KPNQwest's business plan and the company's financial health, Defendants
maintained control over KPNQwest's business strategy, effectively neutralized KPN's
veto power, and curtailed any dissent from other non-Qwest decision-makers at
KPNQwest.  Defendants then exercised their control over KPNQwest to engage in
further frauds – all in Qwest's interests and designed to create injury for KPNQwest.

81.    In particular, Defendants knew that, due to market changes, KPNQwest
could not expect to receive revenues from dark fiber IRUs at the volume or prices
contemplated by its business model.  In light of that shift in the market, the prudent
management course would have been to "tighten the belt" and pursue more
conservative business strategies and/or to seek alternative sources of funding.
However, Defendants wanted to conceal that shift in the market (and the

corresponding shortcomings in the business model).  So, Defendants pursued at least

two different fraudulent avenues.

82.    *First,* at meetings of the KPNQwest Supervisory Board,  Defendants

continued to project significant revenues from dark fiber IRU transactions into the

future, even though they knew that such projections were utterly unrealistic.  For

example, in January 2000, the Supervisory Board received projections for

approximately €215 million in dark fiber revenues for 2000.  At the July 13, 2000

meeting, those numbers were revised upwards, and the Supervisory Board was told

that KPNQwest had "closed" dark fiber sales worth € 464 million, had a signed letter

of intent worth another € 60 million, and could look forward to € 250 million worth

of additional prospects.  In fact, by December 2000, the "actual" internal projections

were for year-end dark fiber revenues of about € 22 million.

83.    *Second*, Defendants sought to substitute *capacity* IRU revenues in place

of dark fiber IRU revenues, but did so in a manner that was knowingly false and

deceptive in reports to the Supervisory Board.  Although dark fiber and capacity IRU

agreements took a similar form, the "revenues" from "sales" of the latter were

purposefully disguised in reports to the Supervisory Board.  Rather than reporting

them to the Board as IRU or infrastructure sales—in the same manner that dark fiber

sales were reported—Defendants instead developed a reporting structure in which

IRU capacity sales were included in a more general category of "communications services" revenues. By thus combining capacity IRU revenues with various forms of "recurring revenue" (*i.e.*, revenue from transactions that could be expected to recur), Defendants were able to create the impression of steady growth in recurring revenue from the company's retail telecommunications business. Thus, throughout 2000 and into 2001, the independent non-Qwest members of the Supervisory Board were led to understand that there were consistent increases in recurring "communications services" revenues and profits, even though this was in fact not the case. To the contrary, targets for recurring revenue growth were repeatedly not achieved.

84.     Defendants' ability to deceive non-Qwest Supervisory Board members in this fashion was further aided by requiring KPNQwest to use of fraudulent accounting methodologies for IRU transactions, as described herein.

## A.     Defendants Engaged in a Pattern of Racketeering To Gain And Maintain Control of KPNQwest.

85.     In order to manipulate KPNQwest and control the flow of information to its Supervisory Board, Defendants recognized that they must establish and maintain control of the KPNQwest enterprise. By installing Defendant McMaster as the sole member of the Management Board of KPNQwest, by installing Defendant Nacchio as the Chairman of the Supervisory Board, by installing Defendant Woodruff on the Supervisory Board, and by installing other Qwest personnel in key positions at

KPNQwest, Qwest began a process that eventually led to virtually total control over the decision-making of KPNQwest, effectively enabling Qwest to operate from the United States (and particularly Colorado) as a *de facto* managing director of KPNQwest.

86.    A primary obstacle to establishing this complete level of control over KPNQwest was that the majority of members of the KPNQwest Supervisory Board were not employees of Qwest.  Prior to KPNQwest's IPO, the KPNQwest Supervisory Board consisted of six members, three from both Qwest and KPN. Resolutions of the Supervisory Board related to ordinary business matters required at least one affirmative vote of a KPN member to pass, while resolutions related to certain extraordinary matters required unanimous approval.  Following KPNQwest's IPO, two independent members were added to the Supervisory Board, for a total of eight board members.  Following Qwest's acquisition of additional shares from KPN in October 2001, Qwest maintained three members on the Supervisory Board, KPN had just one, and the remaining two slots were filled by independent board members.

87.    Until late 2001, therefore, the KPN-appointed and independent members of the Board had a majority, which had to be effectively neutralized for Defendants to assume the level of control they sought.  While Defendant McMaster

had broad powers as the sole member of the Management Board, the Supervisory

Board retained seminal authority over virtually all major aspects of the business.

88.     In order to neutralize non-Qwest members of the Supervisory Board,

Defendants resorted to distorting and concealing material information regarding

KPNQwest's business performance and financial condition from these Board

members.  Defendants engaged in similar practices with respect to other non-Qwest

managers or supervisors who could have threatened Qwest's control.  In short, as

described below, Defendants gained and maintained their interest and control over

KPNQwest through nothing less than a prolonged series of frauds upon the

KPNQwest Supervisory Board and other, non-Qwest managers at KPNQwest.

89.     Even after beginning his tenure at KPNQwest, McMaster continued to

receive his compensation directly from Qwest, and his appointment letter for his

position at KPNQwest specifically stated that he would "continue to be employed by

Qwest."  McMaster was, therefore, in the employ of Qwest while ostensibly owing a

complete duty of loyalty to KPNQwest.   Indeed, his assignment required him to

report "directly to Joe Nacchio" and, in fact, McMaster frequently spoke with and

received instruction from Nacchio via phone (using the U.S. wires).  The appointment

letter also specified that McMaster would "[u]pon completion of this assignment," be

"return[ing] to [his] current position . . . or a comparable position" at Qwest.  In

addition, McMaster continued to have a substantial economic interest in Qwest by virtue of stock options granted to him in connection with his employment at Qwest. McMaster knew, therefore, that his long-term loyalty belonged with Qwest.

90.    Likewise, during the time they served on KPNQwest's Supervisory Board, Nacchio and Woodruff, based in Colorado, continued to serve as senior executives at Qwest, and they received compensation directly from Qwest and continued to have a substantial economic interest in Qwest by virtue of significant stock options granted to them in connection with their employment at Qwest.

91.    In addition to McMaster, Woodruff, and Nacchio, Qwest also installed other of its employees as important managers and executives at KPNQwest.  For example, at various times, Qwest installed its Executive Vice President, General Counsel and Secretary, Drake Tempest, and its Senior Vice President and Treasurer, Scott Berman on the KPNQwest Supervisory Board.  Each of these Qwest officers and/or directors served in their capacities at Qwest, received compensation from Qwest (including Qwest stock or stock options), and acted as agents of Qwest while serving on the KPNQwest Supervisory Board.

92.    Similarly, other former Qwest executives or managers, including Jeff von Deylen and Brendan Keating, were installed in key KPNQwest roles on the KPNQwest "Management Team" and/or in roles overseeing the financial and

accounting functions at KPNQwest. For example, Mr. Keating played a key role in coordinating improper accounting of IRU transactions in his capacity as Controller and, later, Senior Vice President of Finance. Similarly, Mr. von Deylen (formerly Qwest's Vice President and Corporate Controller) was installed as KPNQwest's CFO on June 1, 2001.

93.    Defendants further encouraged KPNQwest to use Qwest's accountants/auditors, the firm of Arthur Andersen, to serve also as KPNQwest's financial advisors. Under Dutch GAAP, KPNQwest was required to keep its books and records in a manner reflecting the company's "true and fair" financial condition. KPNQwest was likewise required to comply with applicable U.S. laws and requirements.

94.    Consistent with Qwest's influence over the KPNQwest Supervisory Board, the Supervisory Board meetings routinely either physically occurred in the United States or occurred via phone conference with the Board's Qwest members participating from offices in the United States, Colorado in particular. The meetings were carefully orchestrated in ensure that critical information was withheld or distorted.

**B.    To Maintain Control, Defendants Breached Their Duty Of Loyalty And Other Duties Owed To KPNQwest.**

95.    By virtue of their relationships to KPNQwest, each Defendant owed a duty to act in the best interests of KPNQwest.  This duty included the duty of loyalty to KPNQwest, the duty to perform properly his/her/its assigned duties, the duty to abide by the principle of reasonableness and fairness, the duty not to mislead or conceal material information, and the duty to act as prudent, careful, diligent, and skillful managing directors and supervisory directors should act.

96.    Each member of the Supervisory Board of KPNQwest, including Defendants Nacchio and Woodruff, was under a duty to abide by law and the principles of reasonableness and fairness, and to act as a careful, diligent, and skillful supervisory director.  Supervisory board members were obligated to be guided by the best interests of KPNQwest and to perform their duties autonomously, as representatives of the company.  As shareholder and the controlling policymaker, principal and *de facto* manager of KPNQwest, Defendant Qwest also owed a duty of loyalty to KPNQwest and was responsible for the management  of KPNQwest. Defendants  Nacchio and Woodruff  likewise acted as *de facto* managers and policymakers of KPNQwest.

97.    As KPNQwest's CEO and as the lone member of KPNQwest's Management Board, Defendant McMaster assumed certain duties of care and loyalty

- 41 -

and other fiduciary responsibilities to KPNQwest, and was required to manage the company in KPNQwest's best interests.  In his management role, Defendant McMaster was under a duty to abide by the law, the principles of reasonableness and fairness, and to act as a careful, diligent, and skillful management director.  Defendant McMaster had the continuing obligation to engage in actions in the best interest of KPNQwest and to secure the continuity of the corporation.

98.     Notwithstanding the duties they owed to KPNQwest, each of the Individual Defendants instead clearly bore allegiance to Qwest, took instruction from Qwest, and subordinated KPNQwest's interests to those of Qwest.

99.     Qwest's control and influence over KPNQwest is evident from the following:

a.     Qwest's President and CEO, Joseph Nacchio, served as Chairman of the KPNQwest Supervisory Board.

b.     While serving as the CEO and sole Managing Director of KPNQwest, Defendant McMaster was in the employ of Qwest and obligated to report to Defendant Nacchio, Qwest's Chairman and CEO.  McMaster was a close associate of Nacchio, having worked for Nacchio at AT&T for many years prior to joining Qwest.

c.     During McMaster's tenure at KPNQwest, there was considerable and consistent contact between Nacchio and McMaster, often via use of the U.S. mail and wires, with Nacchio providing direction from Colorado and McMaster serving the policies and interests of Qwest and Nacchio. Throughout most periods from 1999 through May 2002, McMaster was in contact with Nacchio at least weekly and at times daily.

d.     Similarly, Defendant Woodruff was Nacchio's principal advisor on accounting and financial issues. Woodruff played a principal role in working with Arthur Andersen on developing IRU accounting criteria for Qwest, and was knowledgeable of Qwest's own (fraudulent) accounting practices. He provided guidance to KPNQwest on its accounting and financial reporting through his role on the Supervisory Board, the Audit Committee to the Supervisory Board, and otherwise.

e.     Several key KPNQwest positions were filled by other Qwest executives, including Qwest Executive Vice President, General Counsel and Secretary Drake Tempest and Qwest Senior Vice President and Treasurer Scott Berman, both of whom served on the KPNQwest Supervisory Board. Each of these Qwest officials received

- 43 -

compensation from Qwest (including Qwest stock options) and acted as agents of Qwest while serving on the KPNQwest Supervisory Board.

f.    Other key KPNQwest managerial positions were filled by former Qwest executives or managers, including Jeff von Deylen and Brendan Keating, who served roles overseeing the financial and accounting functions at KPNQwest.

g.    Defendants caused KPNQwest to use Qwest's accountants/auditors, the firm of Arthur Andersen, to serve also as KPNQwest's financial advisors.

h.    Qwest played an active role in the IRU transactions in which KPNQwest participated, both as a swapping "partner" and as an agent, often charging a sizeable commission for requiring KPNQwest to enter IRU transactions that were solely for Qwest's benefit.

100.    Moreover, to the extent Nacchio, Woodruff, McMaster and/or other KPNQwest officials functioned as employees of Qwest, Qwest was legally responsible for their actions and inaction as directors and/or officers of KPNQwest.

## C.    Defendants Use Their Control To Subordinate The Interests of KPNQwest To Their Own Interests.

101.    Defendants' actions consistently reflected a disregard for or subordination of KPNQwest's interests in order to benefit Qwest. Numerous e-mail

exchanges (using U.S. wires) between high-ranking Qwest officials, prominently among them Qwest President Afshin Mohebbi and Vice President of Global Wholesale Markets Greg Casey, illustrate how Qwest regarded KPNQwest as a second-class Qwest property (or worse) that could be exploited to generate revenues or other benefits for Qwest. For example:

a.    A January 16, 2001 internal KPNQwest e-mail received by Defendant McMaster referred to speculation about a potential capacity swap transaction described as "a classic Casey swap (*where he knows he can flip to us)* ...." (Emphasis added.)

b.    In email correspondence between Qwest's Jan Schreuder and Ross Lau on May 29, 2001, Schreuder inquired: "The question I have is *should we allow KPNQwest to develop and operationalize a relationship with HKT* while we will shortly be offering connectivity *ourselves* ... and be forced to negotiate our own resale arrangements." (Emphasis added.) When the email string reached Mohebbi, he responded "wow! *we can't let this happen.*" (Emphasis added.)

c.    In a June 26, 2001 e-mail to Joe Nacchio, Greg Casey highlighted one of the ways in which Qwest exploited KPNQwest. Instead

- 45 -

of allowing KPNQwest to deal directly with other parties, Casey explained that KPNQwest would sell assets directly to Qwest. "Qwest then takes our new assets, marks them up and resells them to our customer.  Our cost basis is KPNQwest's revenue." He then offered as an illustration involving a "straw" sale from KPNQwest to Global Crossing via Qwest (the straw man). "KPNQwest sells $41.57 million to Qwest.  Qwest takes those assets and sells them to Global Crossing for $53.3 million. Qwest's revenue is $53.3 million, our [cost of goods sold] is $41.57 million, our EBITDA is 11.726, or 22%."

d. Similarly, when a transatlantic cable consortium in which KPNQwest had a small ownership interest (TAT-14) became operational in mid-2001, Mohebbi told Casey in a July 5, 2001 e-mail to "quickly sell something on it."  When Casey responded that "we don't own it, it's KPNQ's isn't it?," Mohebbi replied "that's our company."

102. Each Defendant breached his/her/its fiduciary and other duties to KPNQwest by secretly acting in Qwest's interest, falsely reporting on the economic condition of KPNQwest, and causing KPNQwest to engage in transactions that they

knew not to be in the best interest of KPNQwest.  These breaches resulted in

KPNQwest's decline into insolvency and, ultimately, KPNQwest's bankruptcy.  By

improperly and impermissibly favoring Qwest's interests to the detriment of

KPNQwest, Defendants breached their fiduciary duties and mismanaged KPNQwest.

> **D.    Defendants Continued To Maintain Their Control By Actively and Fraudulently Manipulating And Misleading KPNQwest And Its Supervisory Board.**

103.    As noted earlier, while Defendants fully recognized the

underperformance of KPNQwest, they actively sought to conceal this, and the

reasons for it, from the Supervisory Board.  This fraud and deceit enabled Defendants

to maintain their control of KPNQwest until the ultimate demise of the company.

104.    Prior to each formal meeting of the KPNQwest Supervisory Board,

there were in fact informal meetings and discussions.  During the course of such

discussions, Defendants Nacchio, Woodruff and/or McMaster, together with other

Qwest representatives, discussed what should and should not be submitted to the

Supervisory Board.  Nacchio, in particular, advised McMaster on the information that

should be shared with other Supervisory Board members.

105.    The Qwest Defendants of course knew the true nature of KPNQwest's

dependency on illicit IRU revenues inasmuch as Qwest was directly instrumental in

generating those revenues.  But, in numerous submissions to the Board, including on

March 22, 2000, May 16, 2000, July 13, 2000, September 26, 2000, December 6, 2000,

January 18, 2001, April 2001, May 15, 2001, July 19, 2001, September 2001, October 26, 2001, December 11, 2001, January 30, 2002, and February 2002, this and other information regarding KPNQwest's IRU transactions and swaps, the corresponding accounting treatment, and KPNQwest's general cash position and financial condition was concealed from the Supervisory Board as a whole.  These meetings, discussions and concealments were coordinated from the United States, aided by the use of the U.S. mails and/or wires, and several of the meetings either took place in the United States (for example, the March 22, 2000, January 2001, and December 11, 2001 meetings were held in Denver and the December 2000 meeting was held in New York) or via telephone conference with Nacchio, Woodruff and/or other Qwest personnel participating from Colorado or elsewhere within the United States (for example, the July 13, 2000, April 2001, July 2001, September 2001, October 2001, January 2002, and February 2002 meetings were held via conference call).

106.   At quarterly meetings, reports to the Supervisory Board purposefully blurred distinctions between recurring and non-recurring revenue, reporting both in a lump sum of "communications services" revenue, without disclosing that those revenues were in some respects fictitious and were "growing" only because artificially inflated one-time IRU "sales" were overcoming a complete lack of growth in recurring revenue.

107.    Reports to the Supervisory Board also continued to predict substantial

dark fiber revenues into the future when no such revenues could be expected.  For

example:

    a.    The January 20, 2000 presentation to the Supervisory Board still

budgeted € 215 million in dark fiber sales for 2000.  That

unrealistic projection was reported to the Supervisory Board again

at its meetings on May 16 and July 13, 2000.

    b.    At the July 13, 2000 meeting, the Supervisory Board was informed

that KPNQwest had "closed" dark fiber sales worth € 464

million, had a signed letter of intent worth another € 60 million,

and could look forward to € 250 million worth of additional

prospects.  These figures were highly misleading.  Not only did

they include revenue derived from certain ongoing service

components that even Defendants acknowledged would have to

be recognized over the lifetime of the provided service, but the

reported deals, for the most part, were not "closed" at all and in

fact did not materialize.

    c.    Materials presented to the Supervisory Board in September 2000

included projections of € 415.9 million for dark fiber revenues

from 2000-2009 even though Defendants knew those targets were not attainable. As observed by one of the outside firms retained by KPNQwest to assist in evaluating potential business options, dark fiber revenue projections were "significantly revised upwards" from earlier company estimates and "significantly higher than [Schroder Salomon Smith Barney] or Bear Stearns Research estimates."

d.    The wildly overstated dark fiber figures reported to the Supervisory Board stand in stark contrast with the more realistic internal projections prepared by certain KPNQwest personnel. Despite what was being reported to the Supervisory Board (and others within KPNQwest management), by December 2000, the "actual" internal projections were for year-end dark fiber revenues of about € 22 million, nearly €200 million less than the budget figure presented to the Supervisory Board in January 2000 and several hundred million dollars less than the purported "closed" deals and "prospects" reported to the Supervisory Board in July.

108.    Defendants clearly recognized the fraudulent and misleading nature of their reports to the Supervisory Board. They nevertheless continued in this course of

conduct, even as they saw that so long as the failure of the business model was effectively concealed from the Supervisory Board, corrective action would not be taken and KPNQwest was sinking inexorably into deeper insolvency. Despite this knowledge, Defendants repeatedly formulated, made, and/or participated in the making of untrue statements of material fact regarding KPNQwest's revenues and financial condition and concealed an accurate assessment of KPNQwest in order to maintain their interest and control in KPNQwest and to continue their scheme.

109. Non-Qwest members of the Supervisory Board relied on these misrepresentations and omissions in performing their managerial and supervisory functions for KPNQwest. Defrauded by Defendants into believing that KPNQwest had greater revenues and a stronger cash position than it actually had, the Supervisory Board approved various transactions, expenditures and assumptions of debt (discussed below) that KPNQwest could not truly afford and failed to seek "real" alternative funding sources, thereby deepening the company's insolvency and, ultimately, causing its bankruptcy.

110. Underlying these misleading reports to the Supervisory Board were a further series of financial improprieties designed to hide or obscure the lack of necessary cash flow for KPNQwest's planned network construction and other capital projects.

111.    Defendants ultimately took some steps to reduce, but not eliminate, the misleading nature of their reports to the Supervisory Board regarding dark fiber IRUs. Certain reports to the Supervisory Board broke out dark fiber revenues in a separate category and, by year-end 2000, KPNQwest recognized revenue from at least some dark fiber transactions on a ratable basis over the term of the contracts – rather than on an up-front basis.

112.    A totally different approach was adopted, however, for capacity IRUs, even though capacity IRUs were even less amenable to "sales-type" accounting treatment.  This approach was orchestrated from the United States.  Members of Qwest's management team in Denver, including Qwest President Afshin Mohebbi and Vice President of Global Wholesale Markets, Greg Casey, explained to KPNQwest that Qwest had perfected IRUs, and the accounting for IRUs, and that such accounting treatment had been deemed acceptable by the accounting industry and the SEC.  In fact, as these Qwest managers knew, this was not the case.

113.    In addition, from the outset, Qwest effectively controlled and orchestrated KPNQwest's capacity IRU transactions.  This resulted from three principal factors.

114.    *First*, KPNQwest's sales force rarely extended its selling efforts beyond Europe.  Accordingly, IRU transactions involving the rest of the world (*i.e.*, the

United States, Asia, etc.), were organized and effectuated by Qwest personnel in Denver. Thus, when sales or swaps involved non-European assets, Qwest was involved and, in fact, often completely displaced KPNQwest in the negotiations. As described in a March 5, 2001 e-mail, "Qwest . . . did the negotiations" and "at the last moment handed the deal over to KPNQwest." For example:

a. With respect to virtually all Cable & Wireless IRU deals, the deal-making activity involved Qwest personnel in Denver, generally including Mr. Mohebbi and Mr. Casey. Even though aspects of the overall transactions would involve KPNQwest IRUs, the deals were originated and formulated in Denver, and KPNQwest was simply advised as to what sales or purchases were or were not necessary from or by KPNQwest. Indeed, internal KPNQwest documents noted that "C&W is a Qwest deal." Put bluntly by KPNQwest's CFO Jeff von Deylen in a June 21, 2001 e-mail to Qwest CFO Robin Szeliga: "As part of a couple 4Q [2000] and 1Q [2001] Qwest revenue deals, KPNQwest was obligated to buy UK network from Cable and Wireless. This network is not required by KPNQwest, nor is it part of our business plan."

b.    But it was not only Cable & Wireless deals that Qwest arranged. In June 2000, Qwest sold Global Crossing capacity to KPNQwest that KPNQwest did not need but which, in turn, KPNQwest re-sold to FLAG. Qwest orchestrated this deal because the secondary sale from KPNQwest to FLAG provided KPNQwest with revenue (albeit phony) that Qwest was able to count toward its revenue commitments to KPNQwest. Qwest's Kimberly Stout even directed KPNQwest's Graham King on when to date the signature blank on the FLAG/KPNQwest acceptance letter in order to recognize revenue.

c.    Similarly, in connection with a capacity swap deal between Qwest and Teleglobe, Qwest's Joe Corner told KPNQwest officials in a January 29, 2001 e-mail that Qwest's Roger Hoaglund "has conveyed on behalf of Afshin Mohebbi that it is expected that KPNQwest purchase $30 million over next four years from Teleglobe."

115.    *Second*, Defendants kept tight control over the need for KPNQwest to "meet its numbers" each quarter, and actively controlled the use of capacity IRUs to achieve that objective. Mr. Mohebbi and/or Mr. Casey sent emails and had regularly

- 54 -

scheduled telephone conferences each quarter from Qwest's offices in Denver in

which they explained to KPNQwest representatives, including Defendant McMaster,

Rhett Williams and others, the IRU deals that Qwest was arranging and those in

which Qwest expected KPNQwest to participate.  For example:

    a.    In a December 13, 2000 e-mail, Qwest President Mohebbi tells

McMaster, "I am still planning on a number to be worked out for

you [to help Qwest meet its quarterly goals], but the amount is in

Joe [Nacchio]'s hand!!!!"

    b.    In a May 31, 2001 e-mail, McMaster advised Mohebbi that he

needed to speak with Mohebbi and Qwest CFO Robin Szeliga "to

finish cleaning up the Q1/Q4 balance sheet" and expressed "[his]

understanding that Q2 [2001] is shaping up as another 'swap'

quarter for Q to make its commitments."

    c.    KPNQwest's Rhett Williams observed in an August 27, 2001

email to KPNQwest's Bill Freeze and Jeff von Deylen that,

"[r]ight or wrong, the entire process of making the quarters has

taken over – and that means swaps.  FYI, Qwest will do $150

million of them for Q3 alone in order to get (you guessed it) $150

million in revenue."

116. *Third*, Defendants ensured that, within KPNQwest, there was a lack of information-sharing between persons involved in the sale of IRUs and people involved in the purchase of IRUs. From the outset, Defendants undertook an effort to disguise the real nature of the "swap" transactions in which capacity IRU sales were made only in exchange for reciprocal purchases. Defendants explained to KPNQwest that in order to ensure proper IRU accounting treatment, all purchases had to be separated from counter-purchases, not only in terms of separate documents but also in terms of separate personnel and organizations that would negotiate the arrangements. Accordingly, the organization within KPNQwest that was responsible for IRU sales, headed up by Rhett Williams, often sought, at least ostensibly, to refer IRU purchase inquiries to finance and network personnel. This included Brendan Keating, who, as an ex-Qwest manager, had been placed in the KPNQwest organization by Qwest.

117. As a result of Defendants' scheme, very few people within KPNQwest had any real understanding of the overall capacity IRU transaction picture, and this included members of the management team and Supervisory Board. Although reports to the management team contained certain information specifically regarding capacity IRUs and IRU revenues, Defendant McMaster's reporting to the Supervisory

Board omitted this information throughout 2000 and several months into 2001.  For example:

a.  The June 2000 Financial Close Report distributed to McMaster's management team pointed out that "KPNQwest is relying on IRU sales in order to make its gross margin" and that gross margins generally were "below budget due to a shortfall in revenues on an inelastic cost base."  That report was not provided to the Supervisory Board (or at least certain non-Qwest members of the Board).  To the contrary, the contemporaneous reports to the Supervisory Board for its July 13, 2000 conference call did not separate out capacity IRU revenue from "Communications Services" revenue and instead focused heavily on dark fiber.  Structured in this way, the Supervisory Board would have not been able to recognize KPNQwest's capacity IRU dependency.

b.  An August 2000 report received by McMaster's management team stated that, "[d]uring the last month of each quarter the percentage of retail sales compared to total sales decreases due to recognition of large IRUs within the carrier segment.  The percentage of retail sales in August is high as a result of the fact

- 57 -

that no IRUs were recognized during the month.  For September, we expect a large decrease against of this percentage due to the recognition of large IRUs (GTS, Seahorse)."  That information, however, was not conveyed to the Supervisory Board (or at least certain non-Qwest members of the Board).  Indeed, the Supervisory Board report for September 26, 2000 does not discuss IRU revenue, or describe the components of "Communications Services" in which IRU revenues were included, or even show revenues on a monthly basis (in such a way that would have revealed end-of-quarter spikes).  Rather, the revenues are shown on a quarterly basis, which obscures high IRU sales at the end of each quarter.  Thus, the amount of capacity IRUs generated at the end of each corner was effectively hidden from, at least, non-Qwest members of the Supervisory Board.

c.     An October 2000 report to McMaster's management team notes that the KPNQwest's Managed BroadBand Services ("MBBS") division was overperforming "as a result of IRUs," and that if the IRU revenue in September 2000 was eliminated, it was readily observable "that the recurring base has increased only slightly."

However, in the next "Financial Highlights" report to the Supervisory Board (submitted on December 7, 2000), those IRU revenues were combined with recurring retail telecommunications services revenue under the heading "Communications Services." Thus, the Supervisory Board could not tell from the report it received that "the recurring base has increased only slightly."

d.    Under "Actions to Improve Gross Margins," the October 2000 Operations Financial Package provided to McMaster's management team also admonished that KPNQwest should "reduce significant dependency on IRUs by increasing recurring revenues." However, the Supervisory Board was not made aware of this material concern. The December 7, 2000 Supervisory Board report failed to mention KPNQwest's ongoing dependency on IRUs. Indeed, by continuing to hide the IRU revenues under "Communication Services," the Supervisory Board was kept in the dark about KPNQwest's IRU dependency.

e.    The February 2001 Operations Financial Package received by McMaster's management team stated that "dependency on IRU

sales continues." However, that information was omitted from the January 18, 2001 materials provided to the Supervisory Board.

    f.    Similarly, the February 2001 "Close Report" to McMaster's management team indicated that IRUs would be necessary to make up for shortfalls in first quarter (2001) MBBS revenue projections and that: "The shortfall to budget in other product offerings is not expected to improve in the short-term based on current order intake, therefore there will be a continued reliance on upfront IRUs in the following quarters." That information was not included in the materials given to the Supervisory Board on January 18, 2001.

118.    Defendants also concealed from the Supervisory Board the huge negative cash flow that KPNQwest was experiencing. As discussed below, capacity IRU transactions that were on a swap basis had little or no positive cash impact (and could have negative cash flow implications), but this fact was concealed by Defendants in reports to the Supervisory Board, and was in fact kept closely guarded by Defendant McMaster. Instead, the responsibility for "netting out" IRU sales and purchases, and understanding the resultant impact of those transactions *(i.e., lack* of

cash flow), was limited to a few individuals who were primarily (if not exclusively) Qwest insiders.

119.    Thus, non-Qwest managers and Supervisory Board members were deceived into believing that KPNQwest could continue with its network build-out and other plans – largely on the basis of fictitious capacity IRU revenues created by Defendants – when in fact KPNQwest lacked the cash flow necessary to do so.

120.    In furtherance of this scheme, Defendants (and those under their control) engaged in regular communications in which they purported to advise the less-knowledgeable KPNQwest personnel on the proper structure of various transactions and the related accounting treatment, but in essence were doing little more than directing these personnel to avoid the proper application of GAAP and the Arthur Andersen criteria (and, in some instances, to conceal such avoidance from Arthur Andersen and other outside auditors).  In numerous communications extending over a multi-year period, involving and/or aided by use of U.S. wires and mails, Defendants or their agents made representations to KPNQwest personnel regarding various transactions and accounting methods that KPNQwest relied upon, but that in fact only served to camouflage and conceal the inherently fraudulent nature of the dealings from within KPNQwest that Defendants were orchestrating. For example:

a.      Qwest had direct input in the form of the IRU agreements to be used by KPNQwest.  In a series of April 2000 e-mails, KPNQwest's Graham King detailed how Qwest pressured KPNQwest to devise a "standard" IRU form contract that was subject to Qwest's review and approval.  King acknowledged the pressure directly from Qwest and "internally (as driven by Qwest) to produce the draft."  King then provided a draft to Qwest's Richard Bush for approval, noting that it had been reviewed from an accounting/revenue recognition standpoint and acknowledging the "cooperation and coordination" between Qwest and KPNQwest in developing the draft.

b.      By e-mail of December 18, 2000, as part of a "battleplan" to "turn around things very quickly" through a multi-party swap transaction between Qwest, KPNQwest, and Cable & Wireless, Qwest's Jan Schreuder directed various Qwest and KPNQwest employees to prepare a "swap document for KPNQwest to deliver to Qwest and for Qwest to deliver capacity to KPNQwest," and that  "revenue recognition" for such a transaction was appropriate.

c.    In that same e-mail, Qwest's Schreuder represented to KPNQwest's Rene Zaal that Qwest's swap proposal could (and should) be broken down to appear as if each individual component were an isolated revenue event. In Schreuder's words, Zaal was to apportion the transaction "in nice baskets . . . to create any number on which people [can agree]."

d.    In a series of e-mails and telephone conversations transmitted over the wires between Qwest personnel in the United States and KPNQwest personnel in Europe July and August 2001, Qwest personnel (including William Heil, Russell Nordstrom, and others) represented to various KPNQwest personnel (including Jan Louwes, Bernard-Jan van Maanen, Graham King, and others) that both Qwest and KPNQwest could recognize up-front revenue on IRU capacity sales in the so-called "TAT-14" cable, which was jointly owned by a consortium of several companies that included KPNQwest. In response to a proposed three-way IRU capacity transaction in which KPNQwest would sell capacity to Qwest, who would then sell it to AOL, KPNQwest had raised a concern that (due to the consortium ownership structure) KPNQwest

could not transfer legal title to the capacity to Qwest and,

therefore, neither KPNQwest nor Qwest could recognize up-

front revenues on their respective capacity IRU sales.  However,

because Qwest wanted to immediately recognize the revenue, the

above-referenced Qwest personnel represented that up-front

revenue recognition was appropriate (when it was not), and

KPNQwest relied on that representation.

121.    The above examples are merely illustrative of Defendants' repeated use

of U.S. wires and mails to make, or aid in the making of, misrepresentations to

KPNQwest and its Supervisory Board.  Moreover, in following this course,

Defendants chose to ignore  obstacles particularly relevant to KPNQwest that barred

treatment of capacity IRUs as "sales-type" leases (for which revenue could be

recognized up front), including the requirement that title to the assets pass to the

purchaser.  As Defendants knew or should have known, the laws of many countries

generally did not recognize a right to pass "title" in capacity.  For example, an IRU

agreement concerning certain transpacific capacity that KPNQwest bought in June

2000 and immediately re-sold to FLAG (for a revenue event) acknowledged in the

body of the contract that the law of the governing regulatory jurisdiction, Japan,

probably did not recognize IRUs as valid, legal instruments.

122.    The law in Europe – which governed most of the transactions involving KPNQwest – was even more troubling.  At one point, a legal opinion was requested from a law firm for KPNQwest on whether, in relation to a capacity IRU agreement, the granting party could register its continuing title to the underlying physical assets (*i.e.*, the equipment which "lights" the capacity and the underlying ducts and conduits) so as not to be divested of its interest in that capacity should the purchasing party go bankrupt.  As noted in the legal opinion, "the company which has built the network infrastructure and grants the IRU contractually retains title to the underlying asset."  The entire premise for the opinion was that KPNQwest was merely conveying a service through a contractual agreement, and it wanted to make certain a bankruptcy court would recognize as much.

123.    Later, in early 2002, a second legal opinion was sought from the same law firm on KPNQwest's ability to *pass* title (in effect, revisiting a question, the answer to which Qwest and a select number of KPNQwest employees had known since at least late 1999).  The question presented for the law firm's opinion was phrased, however, in a manner which even then misstated the actual form of a capacity IRU transaction.  As posed to the law firm, the question asked whether, under the laws of various European companies, title could pass to the physical

conduits, cables, and fibers.  The response did not condone the proposition that title could pass for capacity on the fibers.

124.    Nevertheless, despite the many respects in which Defendants knew that capacity IRUs were being improperly employed and accounted for, and that the KPNQwest business model was a failure, Defendants continued to represent to the KPNQwest Supervisory Board that KPNQwest's accounting practices were fully above board and that the revenue figures provided to the Board were fully accurate.

125.    This pattern of deception continued until the final demise of KPNQwest.   For example:

      a.    In September 2001, one of the independent Supervisory Board members, Pierre Everaert, requested that McMaster provide certain financial information regarding a proposed transaction with GTS.  McMaster e-mailed his financial projections to Everaert and his fellow independent director Richard Liebhaber, representing that KPNQwest could expect $600 million in recurring revenues in 2002.  McMaster referred to that revenue figure as "directionally correct and achievable," when in fact he knew that it was completely unrealistic and unattainable.

b.    In anticipation of the February 8, 2002 Supervisory Board

meeting and apparently at Defendant McMaster's request, former

Qwest executive and then-KPNQwest CFO Jeff von Deylen e-

mailed certain materials to the Supervisory Board members,

representing that "we have met the accounting, auditing, and

business disclosure issues in order to maintain the revenue and

results of operations [for 2001] consistent with the numbers we

discussed last week."  In fact, KPNQwest had not satisfied the

relevant accounting, auditing and business disclosure requirements

for its 2001 revenue numbers and "the numbers … discussed last

week" with the Supervisory Board were inaccurate and

misleading.

126.    As a result, and as repeatedly was the case, non-Qwest members of the

Supervisory Board were misled into managing KPNQwest in reliance on overstated

revenue numbers and distorted financial outlooks, and precluded from seeking

alternative sources of funding needed to sustain the company.

127.    Defendants' manipulation and control of the Supervisory Board was

accomplished not merely by omission, but by outright distortion and concealment.

128.    Examples of intentionally misleading submissions to the KPNQwest

Supervisory Board include the following:

a.    A March 22, 2000 submission to the Supervisory Board projects

"Communications Services Revenue" of more than €478 million, but

fails to disclose that a significant (if not a majority) of that

Communications Services revenue was derived from non-recurring IRU

capacity transactions that, in fact, could not be accounted for as

immediate revenue and would not contribute significant cash flow.

b.    The same submission to the Supervisory Board projects more than €214

million in "Dark Fiber & Other Revenue," even though Defendants

knew dark fiber IRU sales were largely a thing of the past and even

though KPNQwest had recorded less than $2 million in dark fiber

revenues in 1999.

c.    On May 11, 2000, Defendant McMaster submitted materials to the

Supervisory Board in anticipation of their May 16, 2000 meeting in

which "Communications Services" revenues and "Revenue" in general

are reported, without indicating that those figures included – and,

indeed, were largely driven by – IRU capacity revenues that properly

could not be recognized as revenue in 2000.

d.    Prior to submitting materials to the Supervisory Board for its January 18,

2001 meeting, Defendant McMaster deleted a presentation slide

revealing that KPNQwest's "[p]roducts will realise [sic] lower gross

margin than expected by analysts … Additional IRUs needed to

compensate."

e.    A January 18, 2001 "Budget 2001 Update" provided to the Supervisory

Board projected "Communications Services" revenues, total "Revenue,"

"EBITDA" and "Net Cash provided by operating activities" without

revealing the impact of the improper recording of capacity IRUs on

those figures.  Indeed, the report expressly was dependent upon certain

"Assumptions" regarding IRU capacity agreements and "infrastructure

sales" (including dark fiber sales).

f.    In May 2001, the Supervisory Board was presented with revenue

projections that included $30 million more in projected recurring

revenues than what KPNQwest's own financial personnel believed was

attainable.  On May 21, 2001, KPNQwest's Jos van Schaik inquired in an

internal email about the origins of this additional $30 million and

remarked, "I don't see that happening unless there is some new

information."  In fact, there was no "new information."  Defendants

simply were overstating recurring revenue projections to the Supervisory Board.

g.   A 2002 "Budget Overview" presentation made at a December 11, 2001 meeting of the Supervisory Board reports positive EBITDA of €12 million and more than €440 million in IRU revenue for 2001, despite the fact that much of that reported EBITDA and IRU "revenue" was derived improperly from improperly recorded non-cash swap transactions.  The same presentation projects positive EBITDA of €171 million and €400 million in IRU revenue for 2002, despite Defendants' knowledge that such figures could be derived only from fraudulent IRU transactions (and perhaps not even then).

h.   An internal KPNQwest document entitled "Scenario Analysis Management Briefing 21 January 2002" revealed that it would be "[d]ifficult to represent to the banks [providing financing to KPNQwest] that we are on business plan with such a low cash balance."  However, because Defendants wanted to proceed with the bank financing – regardless of what KPNQwest could truthfully "represent" to the banks – when the same presentation was made to the Supervisory Board nine days later, the above-quoted statement was deleted and replaced by the

representation merely that "[a]ggressive cash management is required to meet minimum cash position to close on the bank facility."

i.   A February 2002 Supervisory Board Meeting presentation projects IRU revenue for 2002 based, in part, on the assumption of €65 million in third party "Cash IRU's," when – as Defendants well knew – at this time, IRU transactions could not be completed on a cash basis, but only as part of a swap.

**E.   As KPNQwest's Business Came Increasingly To Rely On Artificial "Swap" Transactions, The Board Continued To Be Misled.**

**1.   The Growth of a Swap Culture at KPNQwest**

129.   While KPNQwest lacked the cash flow to proceed with the aggressive business plan that it had been forced to adopt, Defendants increasingly chose ever more aggressive means to conceal this lack of adequate cash flow from the Supervisory Board.  Central to this effort was the use of swap transactions designed purposefully to conceal the absence of a sustainable underlying business.

130.   Qwest was the originator of the swap concept.  On information and belief, Defendants Nacchio and Woodruff, or others under their direction, entered into communications with counterparts at other telecommunication companies to obtain their "pre-agreement" to the concept of swaps.  In the initial stages of

implementing this agreement, Qwest organized the swap transactions, not only on

Qwest's behalf, but on KPNQwest's behalf as well.

131.   Once the agreement was in place and functioning, KPNQwest personnel

were advised by Defendants or their agents that capacity IRU sales, designed to boost

"end of quarter" results, were available with "end of quarter" partners.  On

information and belief, however, relevant KPNQwest personnel were never informed

of the full nature of the swap conspiracy that Defendants had arranged, much less

that Defendants' purpose in arranging these swaps was to distort the true image of

KPNQwest's financial condition.

132.   Over time, however, several KPNQwest employees were essentially co-

opted into supporting (albeit unknowingly) these fraudulent schemes.  At the heart of

this capacity swap process was Defendants' continuing insistence that KPNQwest

would meet its quarterly budget projections at all costs.  Defendant Nacchio, for

example, repeatedly communicated to Defendant McMaster that KPNQwest

employees must do whatever it takes to meet their quarterly "numbers."  McMaster

regularly reiterated this instruction to his management team.  Indeed, an internal

KPNQwest presentation, entitled "Revenue Recognition," expressly states that the

first of three issues of "Importance" regarding revenue recognition on IRU

transactions was "Revenue targets."  The message sank in with KPNQwest personnel,

who – as illustrated in an August 27, 2001 email – recognized that "[r]ight or wrong, the entire process of making the quarters has taken over – and that means swaps."

133.    As Defendants knew, if KPNQwest continued to appear to meet its targets, non-Qwest supervisors and managers would have little reason to question the business plan or the direction Defendants were taking the company.

134.    Defendant Nacchio also continued to give assurances, and was widely quoted for the proposition, that Qwest's own IRU transactions were proper even though he knew otherwise.  Neither McMaster nor any of the employees who worked for him were prepared to cross "the boss" on this important subject or suggest anything was amiss at KPNQwest.

135.    To the contrary, McMaster directed that KPNQwest join Qwest as a partner in IRU swap transactions (with Qwest and third parties) and otherwise act so as to ensure that improper accounting treatment could be implemented, often in such a manner that would disguise and conceal the swap.  This was done both to conceal the true nature of KPNQwest's finances and, in some instances, purely to benefit Qwest.

136.    For example, in reference to Qwest's demand that KPNQwest provide certain "revenue opportunities for Qwest" in the fourth quarter of 2001 and the first quarter of 2002, Qwest's Matthew Scott informed KPNQwest's Jeff von Deylen that

*"[i]n order to avoid possible revenue or asset classification issues it is preferred that KPNQwest source the purchases to third parties and not make the purchases directly from Qwest."* (E-mail, October 10, 2001.)

137.    Similarly,  in an e-mail to Defendant McMaster, dated December 20, 2001, Qwest President Afshin Mohebbi outlined a multi-party capacity IRU "sale" by which he expressly acknowledged that KPNQwest would serve as the tool for "creating a revenue event for Qwest" by purchasing U.S. capacity from Qwest (which KPNQwest was then to re-"sell" to Flag, "potentially" creating a second "revenue event" for itself).

138.    Similarly, Qwest purported to fulfill its funding commitments to KPNQwest primarily through orchestrating swaps.  As McMaster commented to Qwest President Afshin Mohebbi in a May 5, 2001 e-mail:  "It is my understanding that Q2 is shaping up as another 'swap' quarter for [Qwest] to make its commitment." A May 2, 2001 e-mail similarly recognized that gaps in KPNQwest's revenue would "have to be generated by swaps, largely driven by KPN and Qwest."

139.    Internal Qwest emails tell a similar story.  In a December 21, 2000 e-mail from Qwest President Afshin Mohebbi to Qwest's Roger Hoaglund, Greg Casey, Joe Dalton, and Shaun Gilmore, Mohebbi congratulates the others for arranging a swap between Qwest, KPNQwest, and Cable & Wireless, and then concludes by asking

Greg Casey to "work with Jack [McMaster] on a three way deal with FLAG getting us capacity in Asia without cash!!!!!!!"

140.    In a follow-up e-mail of December 22, 2000, Mohebbi told Casey that in the first quarter of 2001 he would "have a great opportunity" to "sit[] down with Jack [McMaster]" and show him "how three way deals work better magic."

141.    A week later, Qwest acknowledged KPNQwest's increasing dependence on IRU swaps with Qwest.  Reacting to a description of potential swap deals being pursued by KPNQwest's Jan Louwes, Casey remarked to Mohebbi in a December 29, 2000 e-mail that "this guy appears to get it."  Mohebbi responded, "you got it.  It's good to see they figured out together we can win big and *alone THEY lose big!!!!*"

### 2.    The Use of Swaps Became Pervasive.

142.    Among the instances in which Defendants caused KPNQwest to enter into fraudulent IRU transactions directly or (through a third-party facilitator) indirectly with Qwest, or with a third party on Qwest's behalf, thereby allowing both parties (Qwest or KPNQwest) to recognize fictitious revenues and skew their financial pictures, in knowing disregard of GAAP, were the following:

a.    In September 2000, Qwest and KPNQwest swapped capacity that both had acquired from other telecoms.  Qwest "sold" trans-Pacific capacity on Global Crossing's network that Qwest had previously acquired from Global Crossing, in exchange for trans-Atlantic capacity on Cable &

Wireless' network that KPNQwest had previously acquired from Cable & Wireless in March 2000. Both parties recognized revenue on the swap of like-kind capacity even though neither actually needed the capacity it acquired – the Global Crossing capacity sat on KPNQwest's balance sheet because KPNQwest had no customers in the Pacific market for which it could put the capacity to use. Indeed, KPNQwest even considered whether it could sell the capacity back to Qwest as part of a subsequent swap. On top of all this is the fact that the Cable & Wireless capacity that KPNQwest sold to Qwest was the very capacity that KPNQwest had purchased from Cable & Wireless in March 2000 at Qwest's direction to stimulate a larger capacity swap between Qwest to Cable & Wireless, on which Qwest recognized $60 million in revenue.

b.     On December 8, 2000, Qwest engineered another swap with KPNQwest. This transaction, too, involved Qwest acquiring Cable & Wireless capacity from KPNQwest which KPNQwest had only just "purchased" from Cable & Wireless in June 2000 – again at Qwest's behest, and again as part of a larger Qwest-Cable & Wireless swap. In exchange, KPNQwest acquired more trans-Pacific capacity on the Global Crossing network that it did not need. In fact, this capacity was

still on KPNQwest's books classified as "assets for sale" as of March

2002 (after originally having been classified as "assets for own use" to

justify up-front revenue recognition).

c.  In December 2000 and March and June of 2001, Defendants

orchestrated a series of swap sales between KPNQwest, Qwest and

Global Crossing.  In particular:

- In December 2000, KPNQwest recorded over $45 million in

  revenue on a sale of Euroring capacity to Qwest which Qwest did

  not need and proceeded immediately to resell to Global Crossing,

  at an inflated price, as part of its own much larger capacity swap

  with Global Crossing, thereby allowing all parties to book

  revenue.  This was the first of several Qwest-Global Crossing

  swap agreements in which Qwest used KPNQwest to help churn

  capacity and drive up phony revenue.

- In a related December 2000 transaction, KPNQwest and Global

  Crossing "sold" each other certain ducts in what a KPNQwest e-

  mail sent to McMaster and others at KPNQwest referred to as a

  €60 million duct swap.  The ducts "sold" by KPNQwest had

  recently purchased from Louis-Dreyfus Communications in

October 2000 with the intent of reselling them to Global

Crossing.  Both parties paid out cash to the other, and

KPNQwest recognized €6.8 million in revenue on this part of the

deal.

- In March 2001, as part of an "amendment" to the December 2000

  Qwest-KPNQwest capacity IRU agreement, Qwest recorded $45

  million in revenue on Global Crossing's "purchase" of additional

  KPNQwest capacity from Qwest, which Global Crossing agreed

  to "purchase" in exchange for Qwest's swap purchase of capacity

  from Global Crossing.   In order to book revenue of its own,

  Qwest first had KPNQwest sell its capacity to Qwest, for $32.9

  million, which KPNQwest booked up front as revenue.  Qwest

  then turned around and sold the same capacity to Global Crossing

  after marking it up over 36%.  Furthermore, because Global

  Crossing did not need the capacity it acquired from KPNQwest,

  and in order to conceal the swap nature of the transaction, the

  parties entered into a side agreement (dated March 27, 2001),

  which allowed Global Crossing to later exchange the unneeded

capacity it was purchasing for other (as yet unspecified) Qwest or KPNQwest capacity or telecommunications facilities.

- Then, in June 2001, as part of a second "amendment" to the December 2000 capacity IRU agreement, KPNQwest, Qwest, and Global Crossing engaged in a swap whereby KPNQwest provided additional unneeded capacity to Global Crossing, once again with Qwest serving as a straw middleman in order to recognize revenue on the re-sale to Global Crossing. As with the March 2001 swap transaction, the parties reached a written side agreement and an additional oral agreement (confirmed through e-mail) to allow Global Crossing to later exchange what it purchased for something it wanted or needed and to make Global Crossing "whole."

- The June 2001 transaction between KPNQwest, Qwest, and Global Crossing was not limited to the sale of capacity, however. As part of the larger transaction between Qwest and Global Crossing, KPNQwest also sold to Qwest several dark fiber IRUs and ducts. As it did with the capacity, Qwest immediately re-sold the dark fiber and ducts to Global Crossing as part of a "separate"

agreement.  KPNQwest recognized up-front revenue of over €50 million from its part of this "sale," but was deprived of any value from the marked up price captured by Qwest.

- KPNQwest had acquired the ducts which it sold to Global Crossing via Qwest as part of a separate duct swap with Memorex in March 2001.  Although the €50 million in revenue that it recognized on the sale to Global Crossing (via Qwest) was mostly fictitious, KPNQwest had to actually pay out of pocket an additional $15 million in cash to Memorex to close unresolved issues related to the March 2001 duct swap through which it acquired the ducts it was reselling to Global Crossing via Qwest.

d.  In a similar transaction in June 2001, Qwest caused KPNQwest to make and book full up-front revenue on a $41 million capacity sale to Tycom, again establishing itself as the straw purchaser for KPNQwest, thus allowing it to resell the capacity to Tycom at a marked up price – for over $53 million

e.  Qwest arranged yet another straw sale in September 2001, setting itself up as an intermediary purchaser of European capacity from KPNQwest,

on which KPNQwest booked up-front revenue, which Qwest immediately resold to America Online at inflated prices.

f.    In 2001, Defendants organized a series of transactions between Qwest, KPNQwest, KPN, and FLAG Telecom (the purchasing agent for Verizon) designed to allow KPNQwest to recognize additional revenues for the quarter:

- KPNQwest sold EuroRing capacity to Qwest in an IRU transaction on September 28, 2001, for $22 million;

- The same day, Qwest sold the same capacity to FLAG in an IRU transaction for $26 million (thereby in effect taking a "commission" of $4 million from KPNQwest);

- FLAG sold separate Europe Asia capacity to KPNQwest on October 1, 2001, for $43.2 million;

- KPNQwest turned around and sold this same capacity to Qwest and KPN in the third and fourth quarters, booking about €70 million up front.  In fact, Defendants caused KPNQwest to book most of that revenue on its sales to Qwest and KPN in the third quarter even though KPNQwest did not finalize its own purchase from FLAG until the fourth quarter, in October 2001.

g.    In mid-2000, Defendants orchestrated a multi-party swap transaction (or "circle transaction") involving Qwest, KPNQwest, FLAG and Global Crossing, as follows:

- Qwest initially purchased trans-Pacific capacity from Global Crossing and then "sold" that capacity to KPNQwest, allowing Qwest to recognize the nominal purchase price ($25,230,960) just before the end of the second quarter in 2000. KPNQwest, for its part, "sold" to Qwest certain EuroRing capacity, intentionally left undefined.

- Immediately, KPNQwest turned around and "sold" the Global Crossing capacity it had acquired from Qwest to FLAG.

- The parties to the transaction did not actually need the capacity they were acquiring – as is evidenced by the fact that the parties did not retain the acquired capacity for any length of time. The sole purpose of the transaction was to generate revenue recognition events for the involved parties.

h.    In another end-of-quarter series of asset swaps, in the fourth quarter of 2000, Defendants arranged the following:

- On December 29, 2000, at Qwest's behest, KPNQwest entered into two separate purchase agreements with Cable & Wireless whereby KPNQwest agreed to "purchase" IRU capacity and dark fiber from Cable & Wireless for $15 million and $35 million, respectively. The capacity KPNQwest "purchased" from Cable & Wireless in fact was intended for Qwest. KPNQwest documents and e-mails make it clear that the capacity was not needed as part of KPNQwest's business plan and, per its arrangement with Qwest, KPNQwest expected that Qwest would buy back (or swap for) this capacity (which it never did).

- In a third and related swap agreement between KPNQwest and Cable & Wireless, KPNQwest agreed on March 28, 2001 to "purchase" additional IRU capacity from Cable & Wireless – again at Qwest's behest – for approximately $22.5 million, subject to a "side letter" that allowed KPNQwest to "sell back" certain of the capacity to Cable & Wireless within the first two years of the agreement in exchange for alternative capacity. As part of the March 2001 swap agreement, Cable & Wireless "purchased" Euroring capacity of roughly equal value. Again, because the

Cable & Wireless capacity was not needed by KPNQwest, and was only taken at Qwest's direction, KPNQwest expected Qwest to accept assignment of this capacity, as well (which it never did).

- By the end of September 2001, by which time Qwest had yet to honor its commitment to accept an assignment of the Cable & Wireless capacity, Mohebbi told McMaster in an e-mail that a $60 million payment to KPNQwest in consideration for the Cable & Wireless capacity would "be way too big to hide, you know that." In December 2001, McMaster informed Mohebbi by e-mail that KPNQwest's auditors "have been told repeatedly that those assets will be moving to Q for the last three quarters." Similarly, reports to the KPNQwest Supervisory Board through 2001 portrayed the assets as ones that would be acquired by Qwest.

143. Each of these transactions was organized and/or consummated, in whole or in part, in the United States. Moreover, Defendants caused KPNQwest to enter into additional illicit swap transactions with the foregoing parties and/or additional third parties for the purpose of generating even greater fraudulent revenues.

144. Often, these transactions were closed at the end of the quarter – frequently in the last several days of the quarter – solely to make up the "gap"

between projected revenues and actual revenues.  As the August 2000 Financial Close

Report prepared for McMaster's management team pointed out: "During the last

month of each quarter the percentage of retail sales compared to total sales decreases

due to recognition of large IRUs within the carrier segment."  Revenue charts

prepared for McMaster and his management team graphically illustrate such end-of-

quarter spikes in revenue and make it plain that these spikes were the result of

capacity IRU up-front revenue, relied upon to make up for the shortfall in sales of

KPNQwest's legitimate retail products.  Thus, capacity IRUs and swaps served to

conceal that other, cash-generating aspects of KPNQwest's business were

underperforming.

145.   The impropriety of these transactions is admitted.  For example,

documents uncovered in recent congressional inquiries into Global Crossing's

fraudulent accounting practices and resultant bankruptcy confirm that, with respect to

the Global Crossing, Qwest, and KPNQwest transactions described in ¶ 138:  (i) there

was no *bona fide* business purpose for many or all of these transactions; (ii) neither

KPNQwest, Qwest, nor Global Crossing needed the capacity they acquired from the

others (underscored by the fact that the purchased capacity in some instances was

unspecified) or, if they did, they would have acquired it without a reciprocal purchase

from the other party; (iii) the transactions were two-sided, reciprocal swaps, with each

side's purchase made solely in exchange for the other side's purchase; (iv) the parties would arrange side deals to allow for further exchanges or swaps and to make each side "whole"; and (v) the purpose of these transactions was to artificially boost the revenues of each side.  As the parties involved in these transactions candidly stated in internal e-mails, memoranda and correspondence:

a.      To: Patrick Joggerst.  From: Brian Fitzpatrick: "We need the top line revenue by the close of the quarter.  In order to get it we have to spend a *reciprocal amount* with key carriers.  In this case Qwest."  (Global Crossing internal e-mail, June 28, 2001.)

b.      To: Robin Wright.  From: Steve Sherman.  In response to an August 24, 2001 Global Crossing internal memorandum regarding a swap transaction with Qwest:  "Do we want to continue on a course of *dollar for dollar reciprocal deals with Qwest …*."

c.      To/cc: Various.  From: Robin Wright.  Subject: "1Q Reciprocal deals: Right now it looks like we'll need to make network purchases in the neighborhood of $250M-$350M in order to *meet the revenue target*." (Global Crossing internal e-mail, March 13, 2001.)

d.      From: Robin Wright.  To: Various.  "Apparently *Qwest is on track to meet their quarterly numbers, but KPN/Qwest is struggling*.  They would like us to

allocate $25M of the $100M for purchases in Europe … Right now it looks like *Europe needs to step up and commit to $25M to KPN/Qwest in order to move the deal along.*" (Global Crossing e-mail, March 13, 2001.)

e.     To: Peter Alavanja. From: Peter Calis. "I understand that *we commit for 45 M for 'wavelengths' in Europe but to be converted into fiber and/or duct at a later stage* … April 10 *I have a meeting scheduled with KPNQwest to discuss those details* … so at this point in time *I don't know which fibers or ducts* …'" (Global Crossing e-mail, March 29, 2001.)

f.     To: Jamie Delorimier and Peter Alavanja. From: Jackie Armstrong. "Under the side letter … *we have the right to exchange these routes for what we actually want.*" (Global Crossing e-mail, forwarded by Delorimier to Robin Wright, September 25, 2001.)

g.     To: Susan Chase (Qwest). From: Robin Wright (Global Crossing). "As we've agreed, because *we are both being delivered what we probably don't want* in the long term, we have agreed … that the repurchase price is the actual amount paid, not the fair market value. *You both know the issue, we are taking capacity in order to help you with revenue recognition issues.* Can you kindly tell Erin Wray [of KPNQwest] … that we have already agreed on

- 87 -

this …"  (E-mail, June 25, 2001.)  In response, Chase indicated that "[i]t is our intention to keep you whole."

h.    To:  Robin Wright.  From:  Jackie Armstrong.  *"[W]hat the agreement actually says and what we very clearly agreed with Qwest is not the same.*  This is because [of] Qwest's strict accounting requirements … what was actually agreed (and we went through this a million times so there is no misunderstanding) was that *they would allow us to sell the circuits back to them at the price we paid and to swap them for capacity we actually want for the same price* …"  (Global Crossing internal e-mail, August 16, 2001.)

146.   Similarly, November 2001 e-mail communications to Qwest admit the swap IRU transactions described in ¶105(b) were for an inflated price and involved capacity that none of the parties wanted or needed.  As Jeff von Deylen, the former Qwest Vice President and Corporate Controller who had been installed as CFO of KPNQwest, acknowledged in a message to Qwest's Matthew Scott, the entire deal was "structured as a three way transaction for both KPN and Qwest to make revenue targets."

147.   Similarly, an internal KPNQwest email and attachment from January 7, 2002 describes the details of a December 2001 swap between Cable & Wireless and KPNQwest and notes that C&W accepted capacity for which they had no need: "For

C&W we have delivered all kinds of stuff that they want to have changed for their real requirement."

148.    With respect to the capacity KPNQwest purchased from Cable & Wireless in the fourth quarter of 2000 and first quarter of 2001, von Deylen admitted to Qwest's Robin Szeliga that the capacity was "not required by KPNQwest" and was not "part of its business plan."  Indeed, Defendants caused KPNQwest to routinely pursue IRU transactions in which KPNQwest (or others) would be required to purchase unneeded capacity.  For example, in August 6, 2001 e-mail, KPNQwest's Steve Cooney indicated to Rene Zaal regarding potential new terms for a proposed IRU capacity purchase from Fibernet that, "if we're going to buy something that *we don't need*, and may not be able to use in a few years, then we have to be ruthless."

149.    Defendants (or individuals under their control) concealed the fact that much of the capacity acquired in swap transactions served no legitimate business purpose for KPNQwest by misleadingly classifying those assets as "productive assets" (or "assets for own use").  In truth, as the following examples make clear, there was no business need for those assets other than to provide a nominal justification for revenue recognition on the sale side of the swap transaction.

a.    A July 11, 2001 e-mail from Qwest's William Heil addressed to a number of recipients, including Afshin Mohebbi, Robin Szeliga,

and Ewoud Mogendorff references and attaches what is labeled as a "KPNQwest Swap Inventory Report."  That report contains a laundry list of dark fiber and lit capacity acquired by KPNQwest in swap agreements.  Rather than list that fiber and capacity as "for productive use" or "capital assets," the report lists the fiber and capacity received pursuant to those swap transactions as "for sale," thereby confirming that KPNQwest had no business purpose for acquiring those assets and that up-front revenue recognition on the related transactions was inappropriate.

b.  An internal KPNQwest document titled "Draft Asset Plan" divided acquired assets into three categories: "Assets for Sale"; "Assets for Own Use"; and "Miscellaneous Assets."  The "Draft Asset Plan" reveals that, regardless of the nominal classification of capacity and dark fiber received in swap transactions, KPNQwest was receiving "surplus capacity" for which it had no need.

150.  Accordingly, capacity or fiber acquired in swap transactions some times was classified as "productive assets" in order to assist in obtaining up-front revenue recognition for the associated "sale" side of the swap, only to later be switched to "assets for sale" to recognize the lack of any business purpose for those "assets."  Yet,

when those switches were made, no changes were made to the initial up-front revenue recognition for the sale side. All of this was concealed from the KPNQwest Supervisory Board.

151. Among the swap deals in which Defendants caused KPNQwest to acquire capacity or fiber that served no business purpose for KPNQwest and that therefore had to be simply held for resale, were the following:

    a.    KPNQwest paid $47 million and $94.4 million to Global Crossing for 116 STM-1s of AC-1 capacity in two separate transactions, in September 1999 (partial swap) and December 1999, respectively. While some of this capacity appears to have been needed for KPNQwest's own use, 42 STM-1s ($50.4 million worth) was subsequently transferred from "productive assets" to "assets for sale" and re-sold; as of February 2002, two STM-1s were still sitting on KPNQwest's books as "assets for sale," reflecting that KPNQwest in fact had no business purpose for acquiring this capacity.

    b.    KPNQwest acquired 4 STM-1s of PC-1 (Global Crossing) capacity valued at $12 million for which it appears to have paid up to €13.7 million as part of a swap with Qwest in September 2000

(for C&W Gemini capacity).  As of June 2001, the capacity

acquired was still on KPNQwest's books, confirming that

KPNQwest had no business purpose for that capacity.

c.    KPNQwest paid $9 million in cash to Qwest in December 2000

for 3 more STM-1s of PC-1 capacity as part of a swap (Euroring

capacity).  As of March 2002, the capacity was still sitting on

KPNQwest's books (albeit re-classified as "assets for sale" from

"productive assets").

d.    KPNQwest acquired the rights to 3 STM-1s of FA-1

(transatlantic) capacity valued at $42.5 million from FLAG as part

of a swap (for dark fiber) with FLAG in February 2001.

Defendant McMaster and various Qwest personnel openly

acknowledged that KPNQwest (and for that matter, Qwest) had

no business need whatsoever for this transatlantic capacity.

Qwest's Greg Casey, commenting on FLAG's insistence that

KPNQwest or Qwest purchase transatlantic capacity in exchange

for FLAG's purchase of Euroring fiber, stated in a January 26 e-

mail that "we need more transatlantic like a duck needs an

earring."  McMaster agreed, stating that "more transatlantic is not

anything I am desperate for."  Qwest President Afshin Mohebbi also questioned the need to take on more transatlantic capacity in a February 11 e-mail.  And, as of March 2002, the transatlantic capacity KPNQwest acquired in the swap transaction with FLAG was still on KPNQwest's books.

e.     The following month, using a loan from Qwest (which it paid back with interest days later), KPNQwest paid $50 million in cash to 360 Networks for additional transatlantic capacity as part of a swap[3] – even though the March 2001 "Operations Financial Package" to McMaster's management team noted that for transatlantic "[s]eacables," KPNQwest had plenty of capacity on stock, even outside [its] own footprint."  Indeed, e-mails demonstrate that, by March 2001, officials at Qwest and KPNQwest, including Mohebbi and McMaster, recognized that KPNQwest had no need for 360's transatlantic capacity, that 360 was on shaky financial footing, and that the only reason for entering into the deal was to facilitate a reciprocal sale to 360.

------------------

[3]  This deal was a re-negotiation of the June 2000 deal pursuant to which KPNQwest paid $9.7 million.

Specifically, in analyzing the business environment for the 360

deal, Qwest's Frank Lucas wrote in a March 23, 2001 email to

McMaster, Mohebbi and others that "[w]e have plenty of

transatlantic capacity for the near term.... We will need more

capacity in late 2002 and into 2003 when there will be these newer

systems coming on line. So we would only buy more capacity

now at rock bottom prices." McMaster then commented to

Mohebbi in a March 26, 2001 email that "I think the real

questions are in the back of Frank's analysis. How low do prices

go in next [generation] cables and how stable is 360?" Mohebbi

replied: "I agree. If indeed we are set until 2002 AND we don't

need this guy's revenue, then I would pass. But if you can book

the exact amount you have to commit to this guy, then I would

buy the stuff and very aggressively flip it at smaller increments."

McMaster did as Mohebbi instructed, but shortly thereafter, 360

Networks went bankrupt and left KPNQwest unsecured as to its

$59.7 million and without any assets. KPNQwest eventually sold

its rights to this capacity to C&W for $40 million (as part of a

December 2001 swap).[4]

f.    KPNQwest entered into a capacity swap with Carrier 1 in March

2001 pursuant to which KPNQwest committed to purchasing

"metro rings" on Carrier 1's European network.  KPNQwest had

no use for this capacity, as reflected in the fact that – as of March

2002 – the "committed" capacity had not even been defined.  But,

internal KPNQwest documents at least confirmed that the

capacity KPNQwest was acquiring (as part of the swap) would

"not be classified as productive assets."

g.    As part of a March 2001 duct swap, KPNQwest paid at least €13

million in cash to Memorex for four ducts, two of which it

intended to use on its Eastern Ring but two of which it intended

to, and in fact did, re-sell to Global Crossing in June 2001

(pursuant to which KPNQwest was required to pay an additional

$15 million to Memorex to close the first deal).

---

[4]  In a second part to the March 2001 transaction, KPNQwest paid 360 $25 million
down on a $100 million spend commitment on 360's Asian and South American
networks; shortly thereafter, 360 went bankrupt and left KPNQwest unsecured as to
its $25 million and without any assets.

h.  In June 2001, KPNQwest acquired what it dubbed "redundant" capacity from Helsinki to Stockholm from Sonera in exchange for Helsinki to Stockholm capacity from KPNQwest. It is unclear whether KPNQwest paid any cash, but it received about €1.7 million from Sonera and booked €5.2 million up-front in June 2001 and another €3.6 million in September as part of a related swap. Although KPNQwest listed this capacity as "for own use" in a document titled "Draft Asset Plan," that document states that while "during the purchase process" KPNQwest stated the assets would be for its own use, the company later stated they were for resale. In fact, KPNQwest never had any use for the capacity acquired as part of this swap and initially classified it as "for own use" only to aid in revenue recognition for the associated sale side of the swap.

i.  KPNQwest paid $43.2 million in cash to FLAG in September 2001 for 9 STM-1 of FEA (Europe-Asia) capacity as part of a swap (for Euroring capacity, purchased from Qwest after Qwest purchased from KPNQwest). KPNQwest sold IRUs for 7 of these STM-1s to KPN and Qwest, but still had two on its books

as of February 2002 – reflecting the fact that it never had any business purpose for that capacity in the first place.

j.  In September 2001, KPNQwest acquired UK capacity from Fibernet as part of a swap (for Euroring capacity). As of March 2002, the capacity was still sitting on KPNQwest's books as "assets for sale," reflecting that there was no business purpose for acquiring this capacity from Fibernet (other than to aid Defendants in generating fictitious revenues associated with the swap).

k.  KPNQwest paid €45 million in cash to GTS in October 2001 for 5 STM-1s of FA-1 (FLAG transatlantic) capacity (possibly in return for GTS returning 16 STM-1 of AC-1 capacity free-of-charge in Nov. 2000, which GTS had acquired from KPNQwest in June 2000). KPNQwest did not use, but rather re-sold at least five of these STM-1s of capacity by March 2002.

152.  Internal KPNQwest and Qwest documents and correspondence reveal that, from the beginning, transactions like those described above were simply swaps of unneeded capacity orchestrated by Qwest and spurred by promises that KPNQwest would somehow be made whole. For example:

a.      To: Christel Rutten (KPNQwest). From: Jan Schreuder (Qwest). cc: Ewoud Mogendorff (KPNQwest). "We are supposed to play a major role in a large deal which should *help us making the Quarter with over 50 mio in revenue. Your help is needed* as we are excited to buy: TAT-14 Backhaul and London Dublin capacity ... I look forward to work with you in getting this done in the best possible way for us all." (E-mail, November 23, 2000.)

b.      To: Various at KPNQwest. From: Jan Schreuder (Qwest). "[C]an you coordinate to have the bulk done with regards to: 3 Legal contracts prepared: [1] *KPNQwest buying* Irish wavelength, *based on Q-C&W's negotiations* [2] *KPNQwest buying* UK Dark Fibre, *based on Q-C&W's negotiations* [and 3] *KPNQwest selling* US-wavelength, *based on Q-C&W's negotiations*[.] *For revenue recognition we need* a lign [sic] like: '25% of the upfront to be paid on contract date' in all contracts ... And also: *We need a Swap document for KPNQwest to deliver capacity to Qwest and for Qwest to deliver capacity to KPNQwest*." (E-mail, December 18, 2000.)

153.    Similarly, other internal KPNQwest e-mail correspondence reveals the general nature and intent of the transactions with C&W, Flag and others:

a.  To: Erin Wray.  From: Brendan Keating (a former Qwest executive installed in KPNQwest Corporate Control).  "Erin, I understand that the Q deal includes a *swap* of some of the colours we acquired from C&W between London and Dublin for some US Capacity.  We will then turn around and sell the US capacity to Flag.  I understand the deal value to be $17.5M.  I believe the cost basis in the Irish colours to be around $7M.  *Please review the swap accounting to ensure that we will be able to achieve the desired effect to the transaction.*"  (KPNQwest internal e-mail, December 20, 2001.)

154.    Separating the dates of these transactions was important to concealing the fraudulent nature of what were, at bottom, economically meaningless swap transactions.  In reference to a fourth quarter 2001 swap transaction, KPNQwest's Erin Wray noted by e-mail dated December 1, 2000 that KPNQwest needed to create separate buy and sell contracts with C&W, with different dates, in order to conceal the true nature of those swap transactions.  Similarly, Qwest instructed KPNQwest on how to date documents associated with the Flag swap transaction.

a.  To: Graham King (KPNQwest) and Jan Schreuder.  From: Kimberly Stout (Qwest).  "I need to speak with you regarding the logistics of *dating the signature blank* on the Flag/KPNQwest acceptance letter, as we cannot

have that dated before the KPNQwest Acceptance letter is finalized (*and we're still determining internally the date on which we need for you to accept that circuit*)." (E-mail, June 28, 2000.)

155. Even though capacity IRUs were not eligible for up-front revenue recognition, in 2000, Defendants had caused KPNQwest to recognize approximately €179 million in revenues (nearly 40% of its total reported revenues) from IRU capacity sales. This figure rose dramatically to €438 million in 2001, roughly 54% of the company's total reported revenues. Out of this €438 in capacity sales, more than half (about €240 million) were derived from customers from whom KPNQwest had itself purchased assets, *i.e.,* generally swaps. As a result, KPNQwest's "true" revenues and financial condition, as reported to the Supervisory Board, were vastly overstated.

### 3. The Impact of Swaps is Concealed from the Supervisory Board

156. The foregoing swap transactions were extraordinarily subversive in their impact on KPNQwest, but the Supervisory Board was never informed of this effect. In particular, the Board was given no appreciation that the substantial "revenue" figures it was seeing were not providing any of the cash needed for the network build-out. The Board was not apprised that KPNQwest was being forced to spend millions of dollars, and to pay out significant cash, to purchase IRU capacity that was completely unneeded in the system. Perhaps most importantly, these swaps permitted

- 100 -

Defendants to report to the board a steadily increasing revenue and profit stream. The Board was thereby lulled into believing that the business was energetic, when in fact it was failing.

157.    For example, in some cases, KPNQwest expended significant actual cash on the purchase side of the swap.  By way of illustration, the dark fiber and capacity swap transactions with 360 Networks in June 2000 and March 2001 caused KPNQwest to assume €115 million in excess capital expenditures and resulted in actual cash outflows of $84.7 million.  While these capital expenditures often were intended to be offset by the corresponding "sale" side of the swap, in some cases that did not occur or the corresponding cash inflow was delayed or less than the amount of the cash outflow on the purchase side.  For example, the 360 Networks deal alone left a cash imbalance of negative $35 million, even though KPNQwest booked over €26 million in "revenue".

158.    At no point did Defendants (or their agents) reveal the true nature and scope of these accounting misrepresentations and swap transactions to non-Qwest members of the Supervisory Board.  To the contrary, in December 1999, when KPNQwest personnel began observing "[c]apacity/fiber swaps [as a] growing trend," the reporting to the KPNQwest Supervisory Board was that such swaps were "off-strategy from KQ plan."

- 101 -

159. Throughout 2000 and for several months in 2001, reports to the Supervisory Board did not address capacity IRU revenues at all. To the contrary, capacity IRU revenues were lumped together with revenues from recurring, retail telecommunications services and reported under the single item of "Communications Services Revenue." Thus, non-Qwest members of the Supervisory Board could not determine from the reports just how significant one-time capacity IRUs and swaps had become to KPNQwest's total revenue. Instead, it appeared as if KPNQwest was generating significant revenues from the sorts of recurring telecommunications services that could generate sustained cash inflow. Reporting in this manner was all the more misleading because materials given to the Supervisory Board did separately break out revenues for dark fiber transactions.

160. These reports to the Supervisory Board stand in stark contrast to contemporaneous information provided to Defendant McMaster from his subordinates. McMaster essentially acted as a Qwest gate-keeper to the Supervisory Board, editing out unfavorable information that he received and substituting misleading or even fictitious data for consumption by the Board. The management team reports that he received are noticeably more candid than the information transmitted to the Board. For example:

a.    KPNQwest had not budgeted *any* IRU capacity revenue in its 2000 budget.   However, by June 2000, internal management reports (not disclosed to the Supervisory Board) were noting that capacity IRU sales had become the life blood of the enterprise. The "Financial Close Report" for that month noted, for example, that "KPNQwest is relying on IRU sales in order to make its gross margin" and that gross margins on recurring revenues generally were "below budget due to a shortfall in revenues on an inelastic cost base."

b.    The October 2000 "Operations Financial Package" similarly noted that the company's revenue and profit targets could not be met without "required quarterly IRU gross margin increases…, quarter to quarter"; and that there was a "significant risk of not being able to sustain this growth in IRU revenues."

c.    The February 2001 Operations Financial Package to McMaster's management team stated that "dependency on IRU sales continues."

d.    The February 2001 Close Report stated: "The shortfall to budget in other product offerings is not expected to improve…,

therefore there will be a continued reliance on upfront IRUs in the following quarters."

e.     The March 2001 Close Report stated that "due to the focus on IRUs, the recurring MBBS business did not grow."

f.     The April 2001 repeated these same concerns, stating once again that the "shortfall to budget in other product offerings is not expected to improve in the short term based on current order intake, therefore, there will be a continued reliance on upfront IRUs in the current quarter."

g.     The September 2001 Operations Financial Package stated that "pressure on IRU revenue increases, while remaining capacity to sell as IRU is declining."

161.    Indeed, what happened quarter after quarter was that KPNQwest failed to generate sufficient revenue of any sort in the first two months of each quarter, but then resorted to capacity IRUs to generate (often fictitious) revenue to "fill in the gap" and "make the numbers" for the quarter.  This trend was made clear in regular internal reports to Defendant McMaster, which came out monthly and depicted sharp spikes in revenue every three months (at the end of each quarter) – predominantly attributable to capacity IRUs.

162.    But, McMaster did not provide this same information to the Supervisory
Board.  The Supervisory Board reports contained end-of-quarter results or
projections, and did not include the month-by-month breakdown showing how
revenues repeatedly dragged for two months and then magically spiked in the last
month of each quarter – indeed, often in the last few days of each quarter.

163.    To the contrary, for much of KPNQwest's existence, McMaster's
reporting to the Supervisory Board concealed capacity IRU revenues, how significant
they had become to the company's overall revenues, and the lack of growth in "real"
recurring revenue or cash flow.

164.    McMaster personally acted as the filter for what materials were
presented to the Supervisory Board.  For example, prior to submitting materials to the
Supervisory Board for its January 18, 2001 meeting, Defendant McMaster deleted a
presentation slide that would have revealed to Supervisory Board members that
KPNQwest's "[p]roducts will realise [sic] lower gross margin than expected by
analysts … Additional IRUs needed to compensate."

165.    Accordingly, when Defendants finally provided information about the
volume of KPNQwest's IRU revenues to the Supervisory Board in April 2001, the
Supervisory Board "was totally surprised to see this 'dependency' on IRUs in Q1."
But, even then, Defendants did not reveal that these capacity IRUs and swap

transactions could not properly be accounted for on an up-front basis.  Nor did they reveal that a significant percentage of the reported IRU revenues were from swaps that did not generate the net cash inflows necessary to fund KPNQwest's planned network construction and operations.

166.    From that point on, McMaster's reporting to the Supervisory Board – directed and/or approved by Nacchio – simply misrepresented the recurring revenues that KPNQwest could expect to receive from telecommunications services offerings. For example:

a.    An April 20, 2001 email exchange between certain KPNQwest finance department personnel suggests that McMaster had submitted revised revenue projections to the Supervisory Board that included € 27 million more in revenues than the finance people had discussed for inclusion in the report.

b.    On May 9, 2001, KPNQwest CFO Willem Ackermans emailed other members of the KPNQwest finance department – including Brendan Keating – and asked for the KPNQwest cash flow forecast because he needed to "present the SVB the real story," rather than what the Supervisory Board was receiving from McMaster.

c.   On May 11, 2001, Ackermans emailed McMaster and commented that the revised projections provided to the Supervisory Board for 2001 were "really stretched."  He indicated that they needed to "inform the SVB about the risks we are facing and how we work those risks."

d.   Ackermans did not get that chance, and he was forced out of the company shortly after his email to McMaster.  Instead of receiving the "real story" about KPNQwest's revenue projections, on May 21, 2001, the SVB was presented with revenue projections that included at least $30 million more in projected recurring revenues than what even KPNQwest's own financial personnel believed was optimistically attainable.  One of those members of KPNQwest's financial department, Jos van Schaik, questioned the additional $30 million in projected recurring revenue in a May 21, 2001 email, flatly stating "I don't see that happening unless there is some new information."  There was no "new information"; Defendant McMaster instead simply was knowingly submitting overstated recurring revenue projections to the Supervisory Board.

e.    Similarly, in an October 4, 2001 email, KPNQwest's Alex Grootveld emailed Brendan Keating and others within KPNQwest indicating that "I'm a little bit concerned on the revenue targets" in the current company projections.  Grootveld noted that the recurring revenue projections were "too aggressive" in light of current performance.  He stated that the projected recurring revenue numbers would "increase the current run-rate significantly" and asked "[h]ow realistic should the recurring revenue targets be?"

f.    Rather than acknowledge any suggestion that the recurring revenue projections were unrealistic, McMaster moved to silence any questioning of what was being presented to the Supervisory Board.  In an October 17, 2001 email, McMaster indicated that the last management team meeting "was, to be blunt, unacceptable."  He criticized his team for discussing realistic projections that McMaster knew were long on expense and short on revenue.  McMaster told the management team "to rethink the scenarios … and come back to the targets for this business."  McMaster indicated that he had "set the new targets for us so that

you can focus your energies on getting to those targets instead of trying to come up with new ones." Thus, realistic revenue projections were tossed aside and actual trend lines ignored.

167.    To overcome the repeated shortfalls in recurring revenues, Defendants caused KPNQwest to increase its reliance on end-of-the-quarter IRU swaps to make up the difference.  For example:

a.    As the June 2001 "Financial Close Report" received by McMaster's management team acknowledged, despite the increased recurring revenue projections given to the Supervisory Board in April and May 2001, that "[r]ecurring revenues … are flat from April to May … [t]he shortfall will be compensated by IRU's in June."

b.    Similarly, despite the increased recurring revenue projections provided to the Supervisory Board, a June 25, 2001 management team "Forecast Update" noted that "[s]hortfall in recurring revenue must be made up with IRU's …."

c.    On October 4, 2001, KPNQwest's Lee Nichols acknowledged an "[o]verall concern on the level of IRU's in the plan" among the

KPNQwest financial personnel. "This is an issue for the [Executive Management Team] and the SVB."

d.  The December 2001 "Condensed Close Report" prepared "For Internal KQ Management Only" indicated that KPNQwest had missed its budget for recurring revenues for the fourth quarter by 57% (€ 112 million) and for the year by 44% (€ 235 million). To make up the difference, IRU revenues were 249.2% higher for the fourth quarter than the budget provided to the Supervisory Board. For the year, IRU revenues were nearly € 200 million higher than the Supervisory Board budget.

168.  But, even then, McMaster specifically enlisted and instructed other Qwest "insiders" at KPNQwest to conceal the swap nature of certain transactions. For example, on July 20, 2001, McMaster emailed then-KPNQwest CFO Jeff von Deylen providing approval for a proposed swap transaction with GTS. McMaster told von Deylen that the swap nature of the transaction had to be concealed from the Supervisory Board: "This [proposed transaction] has the look of a win-win. I am ok moving forward, but it cannot be directly linked. Our board would not accept the linkage."

169.    Thus, Defendants continually provided a skewed picture of KPNQwest's revenues and cash position to non-Qwest members of the Supervisory Board.  Instead, the Supervisory Board received assurances via e-mail and in Board presentations as late as February 2002 that the relevant IRU accounting and disclosure requirements had been met, that KPNQwest had recognized revenue upfront only on IRU transactions that qualified as sales type leases and that, in the case of non-monetary (swap) IRUs, "[r]evenue is realized only when the earnings process is complete and the exchange has taken place."

170.    Non-Qwest members of the Supervisory Board relied upon these representations and omissions regarding KPNQwest's financial condition in supervising the company.  As discussed *infra*, had Defendants revealed the true nature of KPNQwest's revenues and financial state, KPN or the non-Qwest majority of the Board could have exercised its veto power and/or otherwise not have approved the profligate management of the business which Defendants were orchestrating.

### F.    Defendants Also Used Their Control to Siphon Cash and Needed Assets Away from KPNQwest.

171.    In addition to misrepresenting and concealing KPNQwest's financial condition, Defendants also caused KPNQwest to enter into transactions in which KPNQwest, without receiving anything needed of value, paid out cash to Qwest (or other parties) or provided Qwest with some other tangible benefit on the promise of

some future reciprocation, payment or benefit to KPNQwest that never came.  In these instances, Defendants essentially siphoned money and other assets from KPNQwest for the benefit of Qwest, leading to KPNQwest's insolvency.

172.    In many cases, these forced purchases were part of Qwest's broader overall IRU strategy designed to facilitate and/or conceal fraudulent transactions. While Qwest, including Messrs. Nacchio and Woodruff, was knowledgeable of the overall scheme that Qwest had orchestrated with others in the industry, this knowledge was not shared with non-Qwest insiders at KPNQwest.  Thus, KPNQwest personnel were not always made privy to, or fully informed, regarding how a particular IRU sale or purchase by KPNQwest fit into an overall swap transaction negotiated by Qwest.

173.    On numerous occasions, Qwest negotiated IRU agreements ostensibly on KPNQwest's behalf but, in fact, in disregard of KPNQwest's interests.  These negotiations were conducted by Qwest personnel using U.S. mails, wires, and/or telecommunications media.  These negotiations frequently were conducted by Greg Casey or by Thomas Schmuke, Director-Global Pricing and Offer Management for Qwest in Denver, Colorado.  During the course of these negotiations, Mr. Schmuke, Mr. Casey and other Qwest personnel negotiated unnecessary or undesirable transactions on behalf of KPNQwest, or accepted on KPNQwest's behalf greater

risks and fewer benefits than were in KPNQwest's interests (*e.g.*, by accepting

unwarranted price reductions), in order exclusively  to further Qwest's interests.

174.   Defendants required KPNQwest to purchase IRU capacity from Qwest

(or others), often without any business purpose that would benefit KPNQwest.

Instead, these IRU purchases were designed solely to draw needed cash away from

KPNQwest and convey it to Qwest.   As Qwest's Matthew Scott bluntly stated in an

October 2001 e-mail regarding a series of such transactions,  "[i]t is Qwest's

expectation that KPNQwest will generate $17.8M in revenue opportunities for Qwest

in 4Q01 and an additional $12.0M for Qwest in 1Q02."

175.   Along these lines, beginning in 2000, Defendants caused KPNQwest to

purchase over $100 million of capacity from Cable & Wireless.  On information and

belief, some or all of these purchases were made in order to persuade C&W to

purchase IRUs from Qwest.  In this manner, Qwest would be able to show significant

revenues and profits on sales to C&W, "paid for" by KPNQwest.

176.   Defendants effectively mandated that KPNQwest make these purchases

from C&W, ostensibly seeking to ease the pain by agreeing to repay monies directly to

KPNQwest or purchase reciprocal IRUs from KPNQwest to effectively "even out"

the transaction.  To add insult to injury, however, Qwest did not subsequently honor

these agreements and undertakings.

177.    Thus, as of the end of 2000 or early 2001, KPNQwest had made an unreciprocated net cash payout or commitment of over $100 million for C&W purchases, it had received Qwest's "promise" to pay at least some of this back (through IRUs or otherwise) – and this promise was never fulfilled.

178.    The KPNQwest records reflect KPNQwest's expectation that Qwest would fulfill its part of the agreement.  For example, at an October 26, 2001 Supervisory Board Audit Committee meeting, "the assignment of an outstanding Cable [&] Wireless IRU to Qwest" was specifically reviewed by members of this committee and the Independent Auditors.  Drake Tempest, the Chairman of the Committee and a Senior Qwest executive, was present at this meeting, along with McMaster and former Qwest executive (and then-current KPNQwest CFO) Jeff von Deylen.

179.    This C&W asset assignment was also part of the "2002 Budget Overview" presented at the Supervisory Board Meeting on December 11, 2001.  In the "Expected Receipts" category, the C&W assignment was valued at €78 million. Accordingly, there can be no doubt that Qwest, Nacchio and McMaster were aware of KPNQwest's expectation that Qwest would fulfill its obligation to KPNQwest and assume the assignment of the C&W IRU or otherwise repay KPNQwest for its earlier (unwanted) IRU purchases from C&W.

- 114 -

180.   An internal Qwest document titled "Strategic Transactions" (dated May 30, 2001) evidences that Defendants knew and understood that "KPNQwest … would not have made these purchases without Qwest's request to do so" and that "KPNQwest want[ed] . . . to get these assets off of their balance sheet and allow them to reclaim the capital expenditures they made to be able to reuse those on their network build out plans as budgeted."

181.   In a January 29, 2002 email, however, Qwest (through its General Counsel Drake Tempest, who also served on KPNQwest's Supervisory Board) informed KPNQwest that it was under "no obligation to take an assignment of any C&W assets," thus confirming that it had in effect siphoned cash from KPNQwest based on false pretenses in connection with the C&W transactions.

182.   In addition, with respect to certain IRU transactions, Defendants caused KPNQwest to pay Qwest a fee, further allowing Qwest to record revenues (while draining funds from KPNQwest).  On numerous occasions in 2000 and 2001, Defendants caused KPNQwest to agree to a 22% fee for Qwest for arranging various IRU transactions involving third parties and, in some instances, Qwest itself, even though such transactions lacked any real business substance.  As Qwest's Jan Schreuder reminded Rene Zaal and other KPNQwest sales and marketing personnel in a September 2001 e-mail regarding one of the improper swaps with Cable &

Wireless:  "PLEASE KEEP IN MIND THAT QWEST NEEDS THEIR 22%

MARGIN AS WELL."  (Capitalization in original.)

183.    Accordingly, in 2000, Defendants caused KPNQwest to agree to pay

Qwest more than $1.6 million in fees for IRU transactions, including more than $1.5

million in fees for deals with Globix, Startec, and Primus.  In the first quarter of 2001,

Defendants caused KPNQwest to agree to a $3.2 million fee payable to Qwest

stemming from IRU transactions involving Cable & Wireless, Global Crossing and

Qwest.  Defendants caused KPNQwest to agree to pay Qwest a "normal distribution

fee" of 22% on at least four other transactions scheduled to be completed in the first

quarter of 2001.  Similarly, in the third quarter of 2001, KPNQwest incurred the

obligation to pay Qwest a $2.6 million fee in connection with an IRU involving Cable

& Wireless.  These fees were required even though nothing of value was provided to

KPNQwest.

184.    Even where it did not nominally charge KPNQwest a 22% fee, Qwest

gouged KPNQwest indirectly by orchestrating straw sales, whereby KPNQwest

would sell assets to a third party via Qwest, who had no need for the assets other than

to make an easy buck at KPNQwest's expense.  As Qwest's Greg Casey explained to

Joe Nacchio in a June 26, 2001 email, regarding a straw deal involving Global

Crossing: "KPNQwest sells assets to $41.57 million to Qwest.  Qwest takes those

assets and sells them to Global Crossing for $53.3 million. Qwest's revenue is $53.3 million, our [cost of goods sold] is $41.57 million, our EBITDA is 11.726, or 22%."

185.   A March 5, 2001 email describes how Qwest manipulated KPNQwest into capacity IRU transactions for its own benefit with hardly any involvement of KPNQwest itself. As Rene Zaal told David Hough, Qwest would do the negotiating of the terms and at the "last moment" would hand the deal over to KPNQwest "so the contract was between KPNQwest and the customer," thus allowing Qwest to take a 22% "referral" fee.

186.   Agreeing to pay a 22% fee to Qwest in connection with these transactions served no business purpose for KPNQwest, inasmuch as the underlying IRU transactions themselves had no legitimate purpose and/or a 22% charge was grossly disproportionate to the services provided by Qwest. Defendants caused KPNQwest to accede to such an arrangement solely to provide additional cash to benefit Qwest. Moreover, the fees not only failed to serve any justifiable business purpose for KPNQwest, but KPNQwest's cash position made it difficult to pay such fees to Qwest. As exhibited by the following excerpt from a May 2001 email from KPNQwest's Matthew Gough to Rene Zaal, Willem Ackermans, Erin Wray and others, KPNQwest was in a desperate cash position and could only seek to delay payment of Qwest's 22% IRU fees:

> [T]o build up our Q2 cash position KQ wants … to pay
> the distribution fee etc. in Q3.  We do not want to
> communicate this cash strategy to a lot of people therefor
> [sic] my suggestion was that Willem could manage this with
> his counterpart at Qwest.  So other levels within Qwest
> would … stop asking for fee payments until Q3.

187.    The payment of these  fees effectively was coerced by Qwest.

Defendants continuously emphasized to KPNQwest managers that they must at all

costs "meet their numbers," and Defendants knew this could be accomplished only

through illicit swaps.  On information and belief, the Qwest Defendants alone

understood the scope of the broad IRU conspiracy that they had orchestrated with

other companies, and concealed from KPNQwest that all IRU sales or purchases

would be reciprocated in one fashion or another, sooner or later.  KPNQwest knew

only that IRU transactions were available, that their occurrence generally depended on

Qwest's cooperation, and that therefore any "finders fee" imposed by Qwest would

have to be paid.

188.    The transactions described above are merely a few examples reflective of

a broader pattern of acts pursuant to which Defendants siphoned cash and other

benefits from KPNQwest for Qwest's benefit, thereby contributing to KPNQwest's

cash flow problems and deepening KPNQwest's insolvency.

### G.    Defendants Further Maintain Their Control And Conceal Their Fraud and Mismanagement By Forcing Out Those Who Might Dissent.

189.    The likely failure of the Qwest business model as applied to KPNQwest was readily apparent to Defendants.  At first, their response was to conceal this knowledge and instead express optimism based upon knowingly inflated projections. As the months passed, ever more concealment was required to perpetuate the fraud and maintain control over KPNQwest.

190.    One of Defendants' principle concerns was that the Supervisory Board would discover the fraud and deception that was taking place, and discover KPNQwest's deepening insolvency.  This was particularly a risk because although Defendant McMaster was the sole member of the KPNQwest Management Board, and kept a tight grip on information sent to the Supervisory Board, it was inevitable that other senior managers at KPNQwest would from time to time assist in some reports to the Board.  The risk that other KPNQwest managers would realize the failings of the KPNQwest business model and communicate it to the Supervisory Board was a risk Defendants intended to avoid at all costs.

191.    In addition, because the Independent Directors frequently dealt with the auditors, Defendants made sure that the full scope of the fraud was concealed even from KPNQwest's own auditors, Arthur Andersen.  Thus, the KPNQwest personnel responsible for formulating its IRU contracts were instructed to conceal from the

outside auditors various "side letters" that KPNQwest entered into with its IRU customers to hide certain features of their agreements that would have defeated the desired accounting treatment had they been revealed. As Erin Wray noted in an April 3, 2001 email to various KPNQwest personnel regarding a side letter for a particular proposed IRU agreement, PricewaterhouseCoopers ("PwC") – KPN's auditor – had engaged in a review of Arthur Andersen's KPNQwest files and "[i]f PwC is aware of the side letter, there is a good chance that they will bring forward this information to Arthur Andersen. I wouldn't go there!"

192.    Indeed, when Defendant McMaster learned of an internet posting detailing the "dangerously deceptive" IRU accounting practices at KPNQwest, he emailed KPNQwest's von Deylen and others on July 28, 2001, noting that the posting was "[v]ery disturbing and much too well informed and well timed" and asked that they "discuss next steps" to deal with this possible disclosure.

193.    Similarly, at meetings within KPNQwest, or between KPNQwest and Qwest, Defendant McMaster actively forbid or discouraged honest consideration of stark realities, and KPNQwest employees were not permitted to express their doubts regarding KPNQwest's financial mismanagement or fraudulent IRU transactions. Honest consideration of these circumstances was not permitted.

194.    Most significantly, however, Defendants made numerous personnel changes to ensure that the fraud – and their control over KPNQwest – would continue.  For example, under pressure from Defendants or resulting from Defendants' actions, non-Qwest management people were either driven out or demoted.  This included Henjo Groenewegen, Paul van Doorn, Frans Roosen, Paul Smits, and Willem Ackermans.  All were at one time senior managers and executives for KPNQwest.  With their departure, dissent and sound management practice were thereby further stifled.

195.    The departure of former KPNQwest CFO Willem Ackermans is illustrative.

a.    On April 12, 2000, Ackermans raised a number of concerns regarding KPNQwest's financial condition in an email to KPNQwest's Chief Marketing Officer, including his conclusion that "the revenue mix is not what it should be."  Ackermans indicated that he had "a lot of questions," but that "the only thing you have been telling me up to now is that we at Finance do not do our work properly.  We should … change our (cost) accounting method and overall we should be more financially innovative."  Ackermans objected to the pressure he had received on how to handle KPNQwest's accounting, and candidly

observed that KPNQwest's sales and marketing approach would not be sustainable without real cash inflow, regardless of how the accounting was handled. "*This is all about 'CASH,' not about accounting* and let me tell you this, *your ideas about Finance will not solve the sales problem you have*."

b.      In September 2000, Ackermans e-mailed KPNQwest's Matthew Gough and Brendan Keating (a former Qwest executive), again raising the issue of KPNQwest's potential cash problems. Ackermans compared the company's existing funds with its significant cash outlays for capital spending (and in general) – writing that "[o]ur cash burn rate now stands at Euro 200 mln. per month" – and concluded that, "[w]ith these facts it is not difficult to draw certain conclusions. Therefore, I'm sounding the alarm bell on this."

c.      Due to his concerns, Ackermans asked for weekly cash flow updates in April and May 2001.

d.      In May 2001, KPNQwest's Norbert Hoogers prepared a memorandum detailing numerous assumptions in the current KPNQwest financial forecast that could not be sustained or otherwise be supported. Mr. Hoogers noted the "rather remarkable" treatment of selling, general, and

administrative ("SG&A") expenses, noting that the profit and loss projection was based on the assumption that no SG&A would be paid until 2002, even though 70% of the SG&A account represented direct and indirect personnel costs.  His conclusion was that the assumption "had been entered simply to pump up the cash balance."  These conclusions were transmitted to Ackermans, who happened to be one of the few key KPNQwest decision-makers who did not previously work for Qwest.

e.    The same day, Ackermans was advised by another KPNQwest employee – with the preface that this was not new news – that KPNQwest "is pushed more and more towards IRU's (with our parents) quarter by quarter," that without IRUs, "current order intake is way too low to make recurring revenue target for the year," and that "this trend is not sustainable."

f.    Shortly thereafter, Ackermans advised others in his group, including former Qwest executive Brendan Keating, that he intended to bring the issue of KPNQwest's cash flow to the attention of the Supervisory Board, writing in a May 9, 2001 email that "Next week *I need to present the SVB the real story*."

g.    Two days later, Ackermans raised some of his concerns with Defendant McMaster, noting in an email that KPNQwest's efforts to preserve cash were based on assumptions that were "all very risky" and that "we can't miss one of them!"  He also noted that, although the current KPNQwest projections assumed significant cash-generating IRUs from Qwest and KPN, "KPN and Qwest can only do swaps and because of that KQ will be cash constrained."

h.    Ackermans concluded that either KPN or Qwest would have to create a "back stop" facility to provide needed cash in the event of a shortfall or he, in his capacity as CFO, would have to attempt to obtain a syndicated bank deal.

i.    The warnings by KPNQwest personnel such as Mr. Hoogers and Mr. Ackermans, both of whom were not under Qwest's direct control, proved a significant threat to Defendants' scheme.

j.    Within a few weeks of Mr. Ackermans' memorandum, he was fired or forced to resign.  He was replaced on June 11, 2001, by Jeff von Deylen, who previously had been employed as Vice President and Corporate Controller of Qwest.  Internal dissent and the threat of disclosure of the true state of affairs was thereby stifled.

196.    Thereafter, other KPNQwest employees expressed concern for their careers should they write down anything regarding potentially "sensitive" accounting or reporting issues or discuss them outside the Finance Department.  As KPNQwest's Matthew Gough advised in a September 9, 2001 e-mail to KPNQwest's David Monnat, who had raised an issue regarding accounting for IRU transactions: "[Y]ou should call me directly when you have a sensitive topic that involves my reporting.  Do not e-mail several people, do not call other people first, do not set meetings prior to discussing with me … I see emails floating around which could impact OUR future careers."

**V.    Misled Into Believing KPNQwest Was Thriving, The Supervisory Board Permitted KPNQwest To Pursue A Failed Business Model Toward Inevitable Insolvency.**

197.    Despite the failings of its business model, the KPNQwest Supervisory Board was never apprised of reasons to be concerned.

**A.    In Order to Conceal the Fraud, KPNQwest Had to "Dress for Success" and Be Managed as if It Had the Resources of a Successful Company.**

198.    As part of their plan of concealment, Defendants caused KPNQwest to adopt a different business model that touted and depended upon the level of growth fraudulently reported within and by the company.  This model consistently hailed KPNQwest's plans for continued broad expansion and disregarded the absence of

necessary cash flow.  It was the fraudulently induced pursuit of this business model that ultimately led to KPNQwest's bankruptcy.

199.    The KPNQwest business model recognized that full construction and expansion could be achieved only if partially funded by "real" IRU revenues from *bona fide* third party transactions – *i.e.*, transactions which generated actual cash payments or the promise of cash payments in the near future.  But when "real revenues" proved unattainable, Defendants nevertheless conspired to ensure that KPNQwest acted so as to at least create the appearance of adequate cash.

200.    In very simple terms, capital projects like KPNQwest's planned network construction required the expenditure of real cash going out.  KPNQwest therefore needed sufficient cash – "real revenues" – coming in to cover those costs.  But, Defendants repeatedly disguised from the Supervisory Board the fact that KPNQwest was not attaining "real revenues."

201.    As noted above, cash-generating dark fiber transactions had largely disappeared from the landscape.  While KPNQwest occasionally was able to make some capacity IRU sales that generated cash, Defendants – including McMaster – knew that capacity IRUs were, in many respects, one-time events, usually did not involve any net cash infusion,  and could not be counted on to produce sustained "real" revenues into the future.  Indeed, an October 2000 "Operations Financial

Package" received by McMaster and certain members of his management team noted that there was a "significant risk of not being able to sustain this growth in IRU revenues." KPNQwest's Senior Vice President of Investor Relations echoed this sentiment in an email to McMaster on February 8, 2001, noting that KPNQwest was doing "too much wholesale" and that "such revenues are not sustainable."

202. These assessments accurately reflected the fact that as the capacity IRU market increasingly shifted to swaps and non-cash transactions – even in transactions KPNQwest engaged in with its parents – they became essentially cashless transactions.

203. By January 4, 2001, Qwest President Afshin Mohebbi acknowledged to Defendant McMaster and certain Qwest employees that "few people have cash these days" and that conducting IRU transactions on a swap basis "is how the new world works."

204. Similarly, in May 2001, KPNQwest's Chief Financial Officer emailed Defendant McMaster and advised him that, despite the inclusion of significant cash-generating IRUs from Qwest and KPN in the then-current KPNQwest projections, "KPN and Qwest can only do swaps and because of that KQ will be cash constrained."

205.    Indeed, Qwest president Afshin Mohebbi acknowledged in a July 29, 2001 email to Defendant McMaster that "*we have not been able to do [cash transactions] in 2 years*" and that plans for additional such transactions would have to be considered unrealistic.  This fact was known to Defendant Nacchio as well.

206.    Similarly, in an August 27, 2001 email, KPNQwest's Rhett Williams told Bill Freeze and Jeff von Deylen: "Right or wrong, the entire process of making the quarters has taken over – and that means swaps."

207.    However, precisely because true swaps did not generate any net cash inflow, the Supervisory Board had long before been advised that "[c]apacity/fiber swaps" were "off-strategy from KQ plan."

208.    Moreover, KPNQwest – like Qwest – was unable to generate any significant cash-generating recurring revenue from its retail telecommunications services.  KPNQwest's inability to generate recurring revenue was evident by the beginning of 2000.  With Defendants concealing that fact, and thereby limiting any corrective measures, recurring revenues remained flat for most of KPNQwest's existence.

        a.    Handwritten notes to a December 11, 1999 KPNQwest financial presentation state that "total recurring revenue is not very exciting."

b.  In an April 2000 email exchange, KPNQwest CFO Willem Ackermans, who was later forced out of the company, noted that – because recurring revenues were lagging – "the revenue mix is not what it should be."

c.  In a July 21, 2000 memo from Arthur Andersen to PriceWaterhouseCoopers, Arthur Andersen noted that KPNQwest's "recurring revenue decreased by approximately €5.6 million" and attributed the decrease to "a smaller customer base and a price decrease in the industry."

d.  The August 2, 2000 "Financial Close Report" provided to certain KPNQwest managers explained that "[r]eported recurring revenues *decreased by 9%"* (emphasis in original).

e.  Mohebbi reported to Nacchio in the Fourth Quarter of 2000 that KPNQwest's ability to meet its recurring (*i.e.*, non-IRU) revenue targets was highly doubtful and that "if we don't crank up recurring growth by April [2001], we got big problems."  Mohebbi reported that not even one-time IRU sales would be enough to save KPNQwest on paper by the end of 2001 if recurring sales did not pick up.

f.    Following up by email with Robin Szeliga on January 2, 2001, Mohebbi stated about his recent discussions with Nacchio, "I told him we have done a great job of doing the one time things and that cannot continue.  We need recurring to take off big time by the end of the first quarter or we are screwed."

g.    An internal February 13, 2001 email summarizing KPNQwest's first quarter revenue numbers indicated that recurring revenues were below target and that IRUs were needed to compensate.

h.    A June 18, 2001 report to McMaster's management team contained a chart noting that KPNQwest's "[r]ecurring revenue has been flat for 17 months."

i.    Qwest President Afshin Mohebbi acknowledged in a July 29, 2001 email to Defendant McMaster that "[t]he mix was never supposed to be 99% wholesale, 1% retail.  Retail sales come with cash and we need to increase these.  The problem is we have not been able to do it in 2 years. . . .  This is really our fundamental problem. We have relied entirely on [wholesale, *i.e.*, capacity IRUs] . . . and it has left us without an answer."

j.  An August 6, 2001 internal KPNQwest chart notes that "[r]ecurring revenue has been flat for 19 months," even though recurring revenues were budgeted to steadily increase during that time.

k.  In an August 7, 2001 email, KPNQwest's David Monnat emailed von Deylen, Keating and others and stated that "*Real Recurring revenue over the last 18 months has gone up by only 2.8 M since February 2000 … the lack of recurring revenue is making the margin picture very bleak…. Recurring revenue was 54% below budget for July. That is ominous.*" (Emphasis in original.)

209.  Indeed, KPNQwest consistently generated cash only through financing activities, such as its IPO, bond offerings, and borrowing.

210.  However, rather than acknowledge these problems, Defendants conspired to at least create the appearance of adequate cash – not only reporting to the Supervisory Board the inflated revenues described above, but also inflating EBITDA, which often was used as a shorthand for profitability. For example:

- Although October 2001 internal projections anticipated positive EBITDA of €14.2 million for 2001, IRU EBITDA alone (based on exaggerated IRU revenue reports) was calculated at €297.1 million.

- 131 -

Thus, without the benefit of the exaggerated IRU EBITDA, total company EBITDA would have been dramatically different – switching from positive €14.2 million to hundreds of millions in the negative.

- In fact, while KPNQwest reported actual EBITDA growth for the third and fourth quarters of 2001 of a staggering 548%, when IRUs and infrastructure sales were excluded, EBITDA actually *shrank* by 8%.

211.    By exaggerating KPNQwest's revenues and EBITDA figures as reported to the Supervisory Board, Defendants camouflaged the lack of real cash coming into the company from IRU transactions and thereby misled non-Qwest Supervisory Board members, and other non-Qwest insiders within KPNQwest, into believing (a) there was sufficient cash to continue KPNQwest's expansive network build and capital expenditures and (b) that other sources of revenue (other than IRUs) were not necessary (or as necessary) to sustain KPNQwest's cash needs.  As a result, KPNQwest was left with serious cash flow issues by Spring of 2000 that ultimately worsened over time and culminated in bankruptcy.

212.    In April 2000, KPNQwest CFO Willem Ackermans – who would later be forced out of the company – began raising concerns regarding KPNQwest's cash

position.  In an April 12, 2000 email exchange with KPNQwest's Chief Marketing Officer, Ackermans stressed that "This is all about 'CASH,' not about accounting." Nevertheless, internal KPNQwest financial projections from May 2000 anticipated that KPNQwest's cash position would be negative € 38 million within six months.

213.    An August 21, 2000 "Condensed Financial Review" provided to certain KPNQwest managers projected a year-end cash balance for KPNQwest of negative € 87.5 million.

214.    On September 11, 2000, Ackermans emailed others in the KPNQwest financial department regarding a conversation he had with Defendant McMaster regarding "capital spending/cash flow in general."  Ackermans noted KPNQwest's "cash burn rate" of € 200 million per month and the lack of available cash on hand, equating the situation to "sounding the alarm-bell" regarding KPNQwest's cash position.

**B.     At Nacchio's Direction, The Supervisory Board Refused To Authorize Necessary Acquisition of Capital.**

215.    Because of his concerns, Mr. Ackermans organized a team, assisted by consultants, to evaluate KPNQwest's cash needs over time.  Although hampered by a lack of information, due in part to Defendants ongoing concealments, a detailed study was performed regarding the amounts of additional capital that KPNQwest would need to meet its financial (including capital) commitments.  Beginning in the spring of

2000, this group on multiple occasions presented to the Supervisory Board the results of its studies. These results and recommendations were code-named "Project Horizon."

216. More specifically, in its June and September 2000 presentations to the Supervisory Board, the Project Horizon team recognized an additional capital expenditure need of € 1.9 billion and recommended raising € 1.5 billion in high yield notes and an additional € 280 million in committed credit facilities.

217. These recommendations were all the more remarkable because those who prepared them had still not been fully informed by Defendants of the collapse in the IRU market. Thus, Project Horizon focused on the need for dramatic growth in recurring revenues (as distinguished from IRU revenues), and the additional capital needed to facilitate that growth. Defendants, who knew of the significant problems with both recurring and non-recurring revenues, should have – but did not – act affirmatively on the Project Horizon recommendations.

218. Rather than obtain the recommended and necessary amounts, Defendants directed that KPNQwest obtain only € 500 million in credit facilities to meet the company's pressing cash needs. This significantly prejudiced KPNQwest's solvency and ultimate ability to survive.

## C. Eventually, KPNQwest Ran Out Of Cash.

219.    At the time the Project Horizon study was commenced, it was anticipated that KPNQwest would run out of cash by November 2000.  Although the € 500 million credit facility delayed that temporarily, the handwriting was now on the wall.  Even with the € 500 million credit facility influx in January 2001, by April 2001, KPNQwest's cash position already was in jeopardy.

220.    Internal KPNQwest draft projections from April 2001 projected a year-end cash balance of negative € 555 million.  Revised projections on April 13, 2001 note a "[y]ear-end cash balance risk position" of at least negative € 283 million.

221.    In private communications between Defendant McMaster and Qwest in July 2001, transmitted via U.S. wires, McMaster freely acknowledged that "I do not have sufficient cash on hand" due to significant capital expenditures and the lack of legitimate cash-based IRU transactions.  By email of July 29, 2001, Qwest President Afshin Mohebbi acknowledged that "KQ needs cash just like we do, but we both are making a significant number of non-cash wholesale [*i.e.*, capacity] transactions." Mohebbi further conceded that "*we have not been able to do [cash transactions] in 2 years*" and plans for additional such transactions would have to be considered unrealistic. This fact was known to Defendant Nacchio as well.  Defendants therefore knew that real revenues from future IRU transactions would not be available.

222.    Similarly, an August 3, 2001 internal KPNQwest "Cash Planning" document estimated that KPNQwest would be in a negative cash position by the end of the fourth quarter of 2001.

223.    By November 1, 2001, KPNQwest CFO Jeff von Deylen considered KPNQwest's cash position to be "very alarming."  He emailed other members of KPNQwest's finance department that day, noting that "[w]e need to stop the payments going out … At this rate it appears it is only cash out and no cash in."

224.    Four days later, McMaster emailed KPNQwest's Czechoslovakian subsidiary and admitted that "[o]ur company is way off the benchmarks needed to become profitable."

225.    Defendants sought to conceal these warning signs and purposely ensured that the full Supervisory Board or other managers within KPNQwest were not fully apprised of KPNQwest's dire cash flow problems, thereby encouraging the Board and KPNQwest to continue a "business as usual" approach to decision-making.  Accordingly, various personnel within KPNQwest (including non-Qwest Supervisory Board members), continued to rely on the expectation of ongoing "real" IRU revenue – from Qwest and others – in their cash planning and company management.  In the meantime, ongoing expenditures, which were often unnecessary

or exceeded KPNQwest's business needs, drew KPNQwest deeper into insolvency and are reflective of Defendants' mismanagement.  For example:

a.    By their insistence that separate people within the KPNQwest organization be involved in IRU sales versus IRU purchases, and that neither should understand the net effect of such reciprocal transactions, Defendants ensured that accurate cash flow accounting was obstructed;

b.    A January 18, 2001 presentation to the Supervisory Board regarding "Forecasted 2000 Cash Flows" reported nearly €300 million in "cash and cash equivalents," based in part on "Assumptions" concerning IRU revenues and that infrastructure revenues (*i.e.*, sales of dark fiber IRUs and other assets) would "generate cashflow of Eur520M in 2001," even though Defendants knew that dark fiber IRUs were largely non-existent by 2001.  (In fact, KPNQwest recorded less than €70 million in infrastructure revenues in 2001.)

c.    Relying on Defendants' misrepresentations and omissions, in an October 17, 2001 email, KPNQwest's Corporate Treasurer, Anno Kamphuis, requested a detailed overview of the expected IRU deals for the fourth quarter for inclusion in the KPNQwest cash planning summary, even though in reality – as Defendants knew, but failed to

disclose – any expected IRUs would not generate "real revenues" impacting cash planning.

d.    The same day, KPNQwest's Matthew Gough emailed Kamphuis and Jos Korsen (with a cc to David Monnat, Casper Keizer, and Jeff von Deylen), suggesting the inclusion of a provision in the KPNQwest cashflow forecast to the effect that "[a]ll KPN and Qwest IRU's should NOT be swaps, but rather cash deals," even though Defendants knew (and failed to disclose) that KPNQwest would not receive cash from IRU transactions with Qwest (or anyone else).

226.    In quarter after quarter, substantial cash reserves were suddenly made to materialize, solely to beef up quarterly financial results. But Defendants – and those operating at their direction – concealed their manipulations of KPNQwest's cash position from others within the company and from the Supervisory Board.

227.    For example, on March 30, 2001, KPNQwest received a "loan" from Qwest. Ostensibly, the payment, in the amount of more than $56 million, was to relieve KPNQwest's earlier IRU obligation to 360 Networks. In reality, however, it was merely a device to prop up KPNQwest's reportable cash on hand in its first quarter financial report. On April 2, 2001, the loan was repaid to Qwest, thereby eliminating more than $56 million of the cash that had supposedly been on hand two

days earlier.  The cash was on the books just long enough to be included in

KPNQwest's Q1 cash position.

228.    In a May 7, 2001 internal email, KPNQwest's Matthew Gough noted the

efforts to build up KPNQwest's cash position, but directed that "[w]e do not want to

communicate this cash strategy to a lot of people."

229.    Pursuant to this strategy, in May 2001, KPNQwest's financial forecast

included what was described as "rather remarkable" treatment of selling, general, and

administrative ("SG&A") expenses.  In essence, the projections were premised on the

notion that no SG&A would be paid until 2002 – even though 70% of the SG&A

account represented direct and indirect personnel costs – apparently in order "simply

to pump up the cash balance."

230.    Similarly, outgoing payments were either stopped or delayed until after

the end of the quarter to pump up the cash balance.  For example, a May 4, 2001

"Cash Management Report" notes several initiatives to meet the end-of-the-quarter

cash balance target of €500 million, including stopping all payments due to KPN and

Qwest and refinancing with vendors.  Internal KPNQwest email correspondence

from June 2001 confirms that, as part of a "cash preservation effort," KPNQwest was

deferring outstanding payments until the third quarter in order to preserve the second

quarter cash position.  In a July 19, 2001 email, KPNQwest finance department

personnel noted that cash preservation initiatives with vendors were not going well and that, "together with enormous outflow of cash (EUR 140 m in the first three weeks of July), should put us again on all alerts." Therefore, it was proposed that KPNQwest stop all payments to its vendors Cisco and Nortel. By September 2001, KPNQwest had stopped or delayed payment to many of its vendors in order to preserve the cash balance.

231.    KPNQwest also participated in one or more interest rate swap transactions to yield additional cash at the end of the quarter (including specifically the second quarter of 2001), and conceal other cash problems.

232.    The need to report inflated revenues and conceal financial distress resulted in an invidious scheme of mismanagement. KPNQwest had to "dress for success" in a way that would conceal problems with its business model. At Defendants' insistence, conservative or otherwise prudent management choices consistent with actual financial realities were not permitted. Instead, KPNQwest was not permitted to pursue alternative, "real" revenue streams – whether they be in the form of additional recurring revenues, borrowing, or other capital market financing. As Jan Schreuder summarized in an October 27, 2001 email to Ewoud Mogendorff, "After spending our capital on the needed and wanted projects, we need to find other ways to realize revenue." Instead, despite "real" revenue and cash shortfalls, at the

insistence of Defendants, KPNQwest incurred debt and continued on an aggressive program of expansion.

233.    Thus, Defendants caused KPNQwest to pursue (and deceived the Supervisory Board into approving) expansive construction and acquisition strategies and to incur corresponding debts and obligations as if KPNQwest was actually making the fraudulently overstated revenues.  By contrast, to dramatically scale back could only have been done with some explanation, which inevitably would have led to acknowledgement of the failings of the Qwest business model adopted by KPNQwest and, ultimately, the lack of a real and reliable revenue stream.  Notwithstanding their legal duties to KPNQwest, Defendants sacrificed the viability of KPNQwest as a going concern in order to preserve the façade of a successful business.

234.    The most egregious result of Defendants' misrepresentation of KPNQwest's financial condition and mismanagement was KPNQwest's "full scale" network build-out, which occurred even though Defendants were fully aware that KPNQwest lacked the cash flow necessary to accomplish it.  KPNQwest's business model always had depended on a substantial cash inflow from IRU transactions, initially contemplated in the form of dark fiber IRUs and later as capacity transactions. Even though this had dried up (and Qwest in fact was siphoning cash away from KPNQwest), the "grand plan" continued.  Defendants realized that to do otherwise

would jeopardize Defendants' control over KPNQwest and acknowledge or lead to the discovery of the underlying fraud.

235.    Thus, in June of 2000, KPNQwest announced that it was "increasing its investment in France with the construction of a 670 mile extension of its EuroRings fiber-optic network." Defendant McMaster, in explaining why KPNQwest was making the investment, noted: "KPNQwest is investing in the expansion of its European footprint *at a time when other data communications and Internet companies are beginning to scale back their commitments*." In other words, at Defendants' behest, KPNQwest was pursuing expansion strategies to differentiate itself from and appear stronger than the struggling competition, despite its own dire cash shortage.

236.    Thereafter, KPNQwest engaged in the following expansive network projects, even though they contributed little or nothing to the company's operations and even though KPNQwest was facing serious cash shortfall issues:

a.    KPNQwest constructed massive Internet "CyberCentres" much greater than could be utilized by KPNQwest's existing or potential customers. For example, KPNQwest opened a "Mega-Cyber Centre" in Munich on July 31, 2000 that simply was too big; it was 10,000 square meters, when only 100 square meters or less would have been sufficient to satisfy KPNQwest's needs. KPNQwest continued its investment in the Cyber

Centers, which were utilized at about 2% and cost 3 to 5 times what had been estimated and budgeted – even though, by 2001, Qwest itself had halted construction on its own Cyber Centers because of a "slowing economy and the current excess capacity for Web hosting."

b.      KPNQwest acquired far more capacity (through IRU agreements) than it needed to operate its network, which resulted in additional capacity management and maintenance and effectively removed funding from other, better sources.  In order to finance these capacity acquisitions, KPNQwest was forced to borrow money from Qwest and other sources, which it had to pay back plus interest.  Among these transactions was a series of IRU transactions into which Defendants caused KPNQwest to enter in December 2001, whereby Defendants caused KPNQwest to commit to the purchase of $136.5 million of capacity.  Referring to this series of purchases, KPNQwest's Norbert Hoogers acknowledged that it "will have an effect on the financial model as agreed with the banks who committed to the Euro 500 mln credit facilities," and might cause the banks to ask KPNQwest "to provide them a revised model demonstrating that" it was "fully funded taking into consideration the C&W transaction."

- 143 -

c.     Ultimately, at Defendants' urging and in reliance upon certain promises of financial support from Qwest (discussed *infra*), KPNQwest acquired the assets of its largest competitor, GTS, incurring debts and obligations that it could not afford.

237.    Defendants engaged in other acts of fraud, mismanagement and concealment as well.  For example, pursuant to a March 2001 agreement with 360 Networks, Defendants caused KPNQwest to acquire $67 million of transatlantic capacity that KPNQwest simply did not need under a loan financing arrangement with Qwest that would result in significant interest payments from KPNQwest to Qwest.  KPNQwest already had more transatlantic capacity that it needed for its operations and, in light of 360 Networks' precarious financial condition (it would soon declare bankruptcy), it was doubtful that 360 Networks would even be able to provide the capacity.

238.    By simultaneously overstating KPNQwest's IRU revenues and assets and encouraging expansive build-out plans and expenditures in these and other instances, Defendants created insurmountable cash flow problems at KPNQwest.  As KPNQwest's Bill Freeze summarized in a September 12, 2001 email regarding dealing with certain of KPNQwest's unpaid vendors, "I do understand its [sic] frustrating to

deal with the 'ramifications' of some poor management decisions we have made in the past (e.g. too many expenditures vs. too small a revenue stream)."

239.    But, the responsibility for those "poor management decisions" rested with Defendants.  As Defendant McMaster acknowledged in a January 29, 2002 e-mail to Qwest's Drake Tempest – sent in anticipation of a meeting of the KPNQwest Supervisory Board – "I have to explain how I got the company into this [cash] shortfall."

## VI.    In Addition To Fraud And Deceit, Defendants Engaged In Acts Of Mismanagement And Breach Of Duty Contrary To Their Obligations Under Dutch Law.

240.    In addition to bringing claims on the basis of the foregoing pattern of fraud and deceit, Trustees also bring claims for mismanagement under Dutch law. Defendants engaged in manifestly improper management, which was an important cause of the bankruptcy, and – as the statutory and *de facto* managers, supervisors and policymakers of KPNQwest – Defendants are liable under Dutch law for the liquidation deficit in the bankruptcy.

241.    Much of Defendants' mismanagement has been described above, but Trustees' mismanagement claims also rely on other wrongful acts, including Defendants securing unjustified personal benefits, concluding agreements knowing that KPNQwest would not be able to fulfill its contractual obligations, failing to ascertain the financial trustworthiness of KPNQwest's contractual partners, engaging

in irresponsibly expensive investments on behalf of the company, and neglecting proper credit control.  In addition, Defendants' failures to keep proper books and records and failure to publish proper annual accounts results in the presumption of improper management under Dutch law and a presumption that Defendants are responsible for the entire liquidation deficit.

**A.    Defendants Failed to Keep the Books Such that the "Rights and Obligations of [KPNQwest Could] Be Ascertained at Any Time."**

242.    Paralleling the pattern of frauds was a pattern of mismanagement by Defendants, pursuant to which, *inter alia*, KPNQwest's revenues (from IRUs and other transactions) were misstated, unnecessary assets were acquired and overvalued, imprudent transactions were pursued, and the true and fair view of the company's financial status could not be ascertained.

243.    This mismanagement was again orchestrated largely from the United States, through the actions of Nacchio, Woodruff and other Qwest personnel in the United States, Colorado in particular, as well as through the actions of Defendant McMaster.

244.    For example, the obligations of management under Dutch law require that the books be kept such that the rights and obligations of the company may be fairly ascertained at all times.  While knowing that KPNQwest was suffering huge shortages in cash flow, Defendants caused KPNQwest's books instead to be

manipulated in such a way that the appearance of available cash at the end of each quarter suddenly "spiked," based on improper accounting and financial reporting practices.

245.    Defendants' mismanagement also caused KPNQwest's books and records to show ten consecutive quarters of significant revenues and revenue growth that resulted from phony IRU revenues and were simply false and misleading. Defendants, because of their positions of control and authority at KPNQwest and as a result of their deception upon the company, were able to and did control and influence the contents of KPNQwest's books and records and caused KPNQwest to record the following:

a.    First quarter 2000:  revenues and first quarter sales more than doubled.

b.    Second quarter 2000:  revenues increased by more than 137% compared to second quarter 1999 and by more than 34% compared to first quarter 2000.

c.    Third quarter 2000:  revenue increased more than 25% over the second quarter of 2000.

d.    Fourth quarter 2000:  increase in fourth quarter revenues of 78.4% over the same period in 1999.

     e.      First quarter 2001:  total revenue increased by 12.6% over the fourth

quarter 2000.

     f.      Second quarter 2001:  second quarter revenue of €229.9 million, an

increase of 117.5% over second quarter 2000.

     g.      Third quarter 2001:  total revenue for the quarter grew 48.9% to €197.6

million compared to third quarter 2000.

246.   In reality, KPNQwest was not enjoying the strong financial performance

that Defendants caused to be recorded.  To the contrary, as discussed above, a

significant portion – and, in some periods, a majority – of the revenue recorded by

KPNQwest in fact was fictitious capacity IRU revenue.  Those transactions did not

generate the cash that KPNQwest needed to fulfill its business plan.

247.   At the same time, KPNQwest did not receive – and despite Defendants'

contrary assertions to the Supervisory Board, could not expect – any significant cash

from dark fiber transactions.  Moreover, KPNQwest's recurring revenues from retail

telecommunications services – which would have generated actual cash – remained

flat for most of the company's existence.  Thus, without sufficient cash from other,

alternative sources, when Defendants continued to manage KPNQwest as if it were

performing as well as they suggested – pursuing various network construction and

other capital projects – KPNQwest became cash poor.

248.    Defendants' mismanagement ensured that reliable data necessary to enable the company to change course was not available.  KPNQwest's deepening insolvency was thus camouflaged even from those within KPNQwest who were in a position to put a halt to these activities.  In short, KPNQwest failed to keep its books and records so that its "rights and obligations [could] be  ascertained at any time," which constituted clear mismanagement under Dutch law.  Under Dutch law, that failure to keep proper books and records (and failure to publish proper annual accounts) results in a statutory presumption that Defendants are liable for entirety of the bankruptcy deficit.

### B.    Defendants' Mismanagement Was Broad And Deep.

249.    While KPNQwest was reporting various financial victories, the reality was markedly different.  Rather than a booming company meeting and surpassing its publicly and privately stated goals and business plan objectives, KPNQwest was in a financial freefall so significant that it was deferring payments to all non-critical vendors in order to preserve cash.  This, however, was not what KPNQwest reported in its accounting summaries.

250.    Among other things, as described in detail above, in violation of U.S. and Dutch Accounting Rules, Defendants deliberately booked revenue incorrectly when accounting for the IRU capacity transactions.  This misstatement of revenues

and assets resulted in KPNQwest's "books and records" not reflecting the true financial status of the company.

251.    Defendants falsely represented KPNQwest's financial position by setting up loan agreements with KPN and Qwest at the end of a quarter and stopping all non-critical payments beginning in the summer of 2001.  As a result, KPNQwest's books and records did not reflect the true liquidity position of KPNQwest.

252.    Defendants either directly caused KPNQwest to make unnecessary, careless, and irresponsible expenditures or caused others within KPNQwest to do so based on the inaccurate portrayal of KPNQwest's financial position.  Such expenditures included additional IRU transactions, network construction projects, and other acquisitions (*e.g.,* GTS).

253.    In addition, KPNQwest's bookkeeping contained significant errors.  For example, the KPNQwest accounting systems for which Defendants were responsible were seriously deficient.  The accounting failures rendered it impossible to ascertain the rights and obligations of KPNQwest.  A draft memorandum from Arthur Andersen in October 2001 stated:

> Currently KPNQwest lacks established and stable processes and systems.  The challenges faced with the CIP is to ensure that these systems and processes are put in place.  Should these systems or procedures not be in place, a significant F&A headcount reduction as targeted has a very high potential of creating adverse consequences for

KPNQwest.   In other words, a very high risk.   You recognize this overall risk.

254.   Inter-company balances between KPNQwest and its affiliated companies, including the parent companies, showed significant differences.  A memorandum titled "Intercompany Invoices," dated May 11, 2001, stated that "current intercompany invoices is a constant and continuing source of intercompany differences in the financial system."  A September 28, 2001 email from Dennis de Vreede, VP Finance-International Control to various KPNQwest employees further explained the intercompany invoice situation: "Intercompany balances for the individual business units are not correct.  This causes problems with the auditors and basically means that the figures filed with our local authorities may be materially inaccurate . . . .  There is no common process across the companies."  Under Defendants' management, intercompany billing issues rendered it difficult to ascertain the rights and obligations of KPNQwest.

255.   Irrespective of any frauds, Defendants are guilty of mismanagement under Dutch law.  Defendants Nacchio, Woodruff and McMaster are liable for mismanagement in their roles as members of KPNQwest's Supervisory and Management Boards, respectively.  Nacchio, moreover, not only served as the chairman of the KPNQwest Supervisory Board, but as a *de facto* manager and policymaker of the company.  Defendant Qwest likewise is liable for mismanagement

as a controlling shareholder and *de facto* manager and policymaker of KPNQwest and

as the employer of Nacchio, Woodruff, McMaster, and/or other KPNQwest

Supervisory Board members and executives.

256.    In these roles, Defendants assumed certain supervisory and/or

managerial duties and obligations to KPNQwest.  For example, Dutch corporations

must maintain their books in accordance with Article 2:10 of the Dutch Civil Code,

and the management board must maintain the books such "that the rights and

obligations of the legal entity," in this case, KPNQwest, "can be ascertained at any

time."  The presence of important defects in the books and records is indicative of a

violation of Article 2:10.

257.    Similarly, Defendants were under an obligation to ensure that

KPNQwest's annual accounts gave the public a "true and fair" view of KPNQwest's

financial status.  Pursuant to Article 2:394 of the Dutch Civil Code, the annual

accounts had to be filed with the appropriate Chamber of Commerce and could not

be inaccurate or misleading.  Under Dutch law, failure to file annual accounts or the

filing of false accounts raises a presumption of mismanagement and a presumption

that mismanagement is the cause of an ensuing bankruptcy.

258.    However, despite these requirements and Defendants' duties to

KPNQwest, Defendants (mis-)managed KPNQwest in such a manner that important

defects existed in the books and records.  The company's annual accounts were misleading and failed to give a "true and fair" view of the company.  Because of these defects, the rights and obligations of KPNQwest could not be ascertained at all times such that, in effect, it is as if Defendants wholly failed to file proper accounts at all.

259.    Defendants failed to properly record the value of KPNQwest's assets. For example, KPNQwest recorded acquired capacity from IRU swap transactions as assets on its books, but thereafter improperly accounted for such assets and failed to acknowledge that KPNQwest had no use for such capacity.

260.    Similarly, Defendants caused KPNQwest not to write down the value of certain Rembrandt cables on its books, which KPNQwest had purchased originally for €37 and ultimately for €75 million, even though the cables failed to operate properly and, during the short time they were in operation, broke numerous times – either entirely or partially.  By failing to write down the value of these cables, as is required for broken or defective assets, Defendants effectively inflated the value of KPNQwest's assets by approximately €75 million, thereby presenting a false picture of KPNQwest's assets.

261.    In addition, due to Defendants' mismanagement, KPNQwest failed to put forth a contractual or legal claim for repairs and damages for these broken cables, even after the Supervisory Board reviewed potential claims against the responsible

party at its March 22, 2000 meeting.  Shortly after the purchase (and the resulting failure of the cables), KPNQwest secretly shut down the broken Rembrandt cables. Thereafter, KPNQwest continued to send its customers invoices for the use of a reserve capacity.

262.    Under Defendants' management, KPNQwest also engaged in various administrative and bookkeeping practices with respect to many of its foreign subsidiaries without obtaining necessary formal government approval and, in many instances, failed to complete or file the requisite accounting statements for these subsidiaries.  For example, KPNQwest failed to properly file financial statements and tax returns in Norway for the year ended December 31, 2000, exposing the company to potentially negative consequences relating to tax audits.

263.    Under Defendants' management, KPNQwest also experienced significant errors in its invoicing, resulting in unpaid sales invoices and/or uncollected proceeds.  For example:

a.    A report titled "KPNQwest NV First Quarter 2000 Report Arthur Andersen," found that "[a]s of June 30, 2000 44 % (67 million) of the total accounts receivable of the Company is comprised of unbilled accounts receivable.  The amounts are primarily attributed to amounts due for IRU sales."

b.    In a large KPNQwest e-mail that went out to several employees on

October 16, 2001 regarding "Central Booking Q4/ Solving the unbilled

position" the ongoing revenue recognition was discussed: "Herbie

allowed us to recognise [sic] revenue as soon as a service was ready for

service, also when no invoice was sent.  By doing this, we accrued for

revenue that was not picked up correctly by the billing process."

264.    The invoicing problems resulted in revenue being recorded, but never

collected.  The books were therefore inaccurate as they reflected the presence of

revenue that had not been (and may never have been) collected.

265.    Under Defendants' management, KPNQwest budgets and estimates of

projects differed significantly in terms of projected expenses and the ultimate

outcome and contained considerable mathematical errors.  KPNQwest often

significantly overspent its annual capital expenditure budget.  For example, in 2001,

during a year in which there were rising liquidity and cash position concerns, the

Supervisory Board set the capital expenditure ("CapEx") budget at €626 million.

KPNQwest, however, apparently spent between € 723 and € 880 million, which is

significantly over the budget approved by the Supervisory Board.

266.    Under Defendants' management, KPNQwest also entered into

agreements without using a purchasing order, which enabled it to make unrestricted

purchases and to avoid the procurement process.  This made it difficult to track

contract commitments.  On February 26, 2001, KPNQwest's then-CFO Willem

Ackermans noted:

> Now we have to wait until the outside world informs us
> (the hard way) that KQ entered into certain commitments
> because WE DO NOT KNOW ABOUT THESE
> COMMITMENTS IN THE FIRST PLACE …….!  How
> in the world can we get to the contractual information on
> the commitments made by somebody in our organization
> although we in Finance have no idea that these
> commitments were made?

267.    What resulted from this unmanaged bookkeeping process, as seen in the

preceding paragraphs, was an out-of-control system that frequently contained errors

and that did not present comparable information between each of the systems.  The

use of these systems had only one consistent result:  the accounts for which

Defendants were responsible were consistently wrong.  Thus, the impact of

Defendants' ongoing misconduct was concealed, and KPNQwest's financial demise

was camouflaged from all but the Defendants.

## VII.    The Final Chapter – Defendants' Desperate Effort at Concealment Fails, and Is Replaced by Even More Blatant Fraud and Looting.

268.    Defendants' fraud and mismanagement described in the preceding

paragraphs were important causes of KPNQwest's bankruptcy.  Defendants' fraud

and mismanagement caused KPNQwest to rely heavily on fictitious IRU revenues,

misrepresent revenues to its own Supervisory Board, and engage in transactions

designed solely for Qwest's benefit (to the detriment of KPNQwest) and left

KPNQwest with significant debt and tremendous liquidity problems.  Defendants

operated KPNQwest – and deceived others into operating KPNQwest – as if the

company were making the fictitious IRU revenues and otherwise enjoying the

financial "success" that Defendants were manufacturing, often out of whole cloth.

This caused the company to embark on a series of expansions and acquisitions

without the wherewithal to finance them, which resulted in KPNQwest's insolvency

deepening over time.

269.   The final such transaction was the unjustifiable acquisition of a bankrupt

company, GTS.  In the course of obtaining the financing and approval to

consummate that transaction, Defendants continued their pattern of fraudulent

misrepresentation and omission.

270.   KPNQwest and GTS executed a Stock Purchase Agreement on October

18, 2001, pursuant to which KPNQwest would acquire the Ebone and Central

Europe divisions of GTS.  In order to facilitate the acquisition, KPNQwest had

engaged Salomon Brothers International, Ltd. to serve as the sole coordinator of a

bank credit facility.  Five banks in Europe and the United States (ABN AMRO Bank

N.V., Bank of America N.A., Citibank, N.A., Deutsche Bank AG London, and

Dresdener Bank AG London Branch) submitted a Commitment Letter to

KPNQwest, each pledging €100 million. The Commitment Letter conditioned the bank credit facility upon:

a.      KPNQwest and GTS executing a Facility Agreement to effectuate their deal on or before March 15, 2002;

b.      no materially adverse change in the business, condition (financial or otherwise), operations, performance, properties or prospects of KPNQwest;

c.      the accuracy of the materials KPNQwest supplied to the lead arrangers, including KPNQwest financial reports;

d.      the payment of all fees, expenses and other amounts under the Commitment Documents; and

e.      the Group (KPNQwest and its subsidiaries) having sufficient liquidity to fully fund the risk adjusted long term business plan ("RALTBP") approved by the Banks.

271.    The Commitment Letter required KPNQwest to make certain Financial Covenants, tested on a quarterly basis and calculated off the consolidated financial statements of KPNQwest. These Financial Covenants required KPNQwest to meet, *inter alia*, a minimum operating EBITDA of €45 million in the first quarter of 2002 and a total EBITDA of €150 million for 2002, and minimum aggregate cash proceeds

from "Dark Fiber/Conduit Disposition" in the amount of €45 million in 2002 and €

50 million in 2003.

272.    Defendants knew but did not reveal to the banks that these

commitments could not be met.  Indeed, although reporting EBITDA to the

consortium on the assumption of real IRU revenues, KPNQwest internally reported

"pre-IRU" EBITDA as well, in recognition that little actual revenue was likely to be

realized from such transactions.

273.    Defendants were fully aware – as reflected in a September 26, 2001 email

from McMaster to von Deylen – that, in order to comply with the financial covenants

required by the banks underwriting the GTS acquisition, KPNQwest would need €

350 million in IRU revenues in 2002.  However, Defendants knew that it was

impossible to deliver legitimate IRU transactions anywhere near that amount.

274.    In a separate letter from McMaster to Qwest and prepared at the

direction of Qwest, McMaster was particularly blunt about the need for cash in order

to complete the GTS transaction without going bankrupt.  McMaster noted that there

were four "scenario[s]" for KPNQwest's future.  Only two of them had KPNQwest

avoiding bankruptcy.

275.    Thus, internal projections made during the period January 2002 to April

2002 evidenced that the sales and EBITDA figures quoted in the Management Case

of November 2001 could not be met, and that Financial Covenants could only be met by radically cutting costs and postponing or, indeed, canceling investments.

276.    Despite knowing that KPNQwest could not meet these Financial Covenants, Defendants deceived the banks and KPNQwest's own Supervisory Board, which approved the GTS transaction and directed KPNQwest to proceed with the acquisition.

277.    Under the GTS Stock Purchase Agreement, Defendants caused KPNQwest to take on a net debt load and capital lease obligation of €645 million for the assets of a bankrupt company and, in order to finance the transaction, took on bank loans that committed KPNQwest to achieving unrealistic EBITDA and cash-flow positions by the end of the first quarter of 2002.  This transaction deepened KPNQwest's insolvency, and bankruptcy quickly followed.

278.    This was a self-interested transaction in part because Qwest's largest and controlling shareholder, the Anschutz Company, was on both sides of the transaction.  Indeed, the acquisition deal called for an Anschutz Company subsidiary to receive $33 million worth of notes in KPNQwest, or 17 percent of the notes being loaned, essentially to bail the Anschutz Company out of its prior investment in GTS.

279.    The announcement of this transaction also furthered Defendants' goal to continue the illusion that Qwest was a vibrant, global corporation.  Qwest further

benefited by announcing that it was increasing its stake in KPNQwest, a company embarking on a massive expansion plan with the acquisition of GTS.  By so doing, Defendants could point to KPNQwest as a company moving forward with plans for "global expansion."  Indeed, Qwest touted KPNQwest's acquisition of GTS as allowing KPNQwest to expand its network to over 60 cities and add 48,000 European accounts and 17 Web hosting centers.  Nacchio described the increase in Qwest's shares of KPNQwest and the pending GTS purchase as designed to mold KPNQwest so as to "mirror Qwest on the far side of the Atlantic."

280.    For these reasons, at all times Defendants encouraged and pushed KPNQwest to enter into and complete the GTS transaction.

281.    KPNQwest senior managers, and independent members of the Supervisory Board, were led to believe not only that KPNQwest was financially strong enough to enter into the transaction, but that Qwest could be depended on to fulfill its commitments and support the transaction.  Qwest, however, had no intention of doing so.  Instead, it defaulted on key obligations and sought to siphon cash from KPNQwest for its own self-interest.

282.    Beginning in the summer of 2001, KPNQwest personnel began requesting assurances from Qwest that it would fulfill certain financial promises it had made to KPNQwest.  For example, in an August 8, 2001 email, KPNQwest's Jeff von

Deylen stated that he had "the lead on collecting the cash for the 2Q IRU deals with Qwest as well as reimbursement of cash for the C&W assets we took in Q1 and Q4 last year."

283.   In February 2002, Anno Kamphuis, KPNQwest's Senior Vice President and Corporate Treasurer, requested assurances that Qwest would deliver its promised financial support to KPNQwest.  In an email dated February 15, 2002, McMaster responded to Kamphuis and confirmed that he had spoken to Qwest and Qwest had "explicitly assured" him that it would comply with its commitments for both the first quarter and the remainder of 2002.  Accordingly, on February 18, 2002, KPNQwest's Dean Mullane indicated that KPNQwest would proceed with cash disbursements on the assumption that Qwest (and KPN) "will deliver cash for IRU's."

284.   At the time KPNQwest announced the GTS transaction, Defendants knew that KPNQwest lacked the financial resources to proceed with the transaction. But, while Qwest, contemporaneously with the GTS transaction, had promised KPNQwest another $100 million in IRU purchases, Defendants knew this would be impossible, and those commitments were in fact never satisfied.

285.   When Qwest reneged on its obligations, it had important consequences, as recognized in the following e-mail dated April 9, 2002 between Anno Kamphuis (KPNQwest) and Ewoud Mogendorff (KPNQwest):

I have in the cash planning receipts of EUR 29 m and EUR 27 m from Qwest and KPN respectively on April 29. We need receive the money in our bank account latest that day, since we have a large range of payment commitment for early May!!! **Also, I hear that Qwest is already deducting part of their Q4 2001 IRUs this Quarter and paying only USD 20 m (EUR 22 m), rather than the EUR 29 m. This leaves a hole of EUR 7 m in the plan and is a big problem!!!**

286.    Instead, Defendants undertook to get money out of KPNQwest before the bottom fell out and the company was forced to declare bankruptcy. For example, Defendants – knowing that KPNQwest soon would be unable to meet its financial commitments – caused KPNQwest to (a) return certain monies to Qwest that Qwest previously had paid KPNQwest, including at least $14 million in January 2002; and (b) forgive certain obligations previously agreed to by Qwest, including forgiveness of at least $17 million in Qwest's IRU commitments to KPNQwest.

287.    In addition, Defendants oversaw a payout of substantial corporate bonuses throughout the period of KPNQwest's decline, including bonuses in the fourth quarter of 2001 and the first quarter of 2002, just before KPNQwest filed for bankruptcy protection. Bonuses issued for the first quarter of 2002 apparently totaled more than €1 million. This was done despite KPNQwest's precarious financial situation.

288.    Specifically, on March 8, 2002, McMaster announced payment of corporate bonuses for the fourth quarter of 2001, even while admitting that

KPNQwest did not meet street expectations for total revenue for the quarter, and did not meet the EBITDA performance expectations set by the Supervisory Board.

289.   On May 17, 2002, KPNQwest announced that bonuses for the first quarter of 2002 would be paid.  KPNQwest acknowledged that it was "confronting a cash shortage in 2002" and that "KQ might run short of cash later this year," that "customers are shying away," and that "our banks, upon whose funding we were always dependant, have signaled that they are no longer willing to risk funding us." Yet, bonus payments for the first quarter of 2002 were made.

290.   The GTS transaction was the culmination of and final chapter in Defendants' fraud.  Left with ever-decreasing financial support from Qwest and Qwest's failure to assume the C&W assignment, KPNQwest was nevertheless directed by Defendants to close the Facilities Agreement, thus completing the GTS acquisition.  This deepened the insolvency of KPNQwest and, as predicted by KPNQwest, without Qwest's promised support, KPNQwest failed to meet its financial covenants to its lenders.  The banks withdrew their support of KPNQwest, and the company was left with no option but to file for bankruptcy.

291.   On May 23, 2002, KPNQwest filed for protection under the Dutch moratorium laws.  On May 31, 2002, the court-appointed Trustees filed a bankruptcy application on KPNQwest's behalf in the district court in Haarlem, Netherlands.

There were no objections to the application, the court granted the request, and KPNQwest was declared insolvent.

292.    With reduced revenues and cash flow following the insolvency, the delicate balance by which KPNQwest had hoped to survive – in which adequate cash would tide it over until the full revenue-generating potential of its network could be realized – was disrupted.  Ultimately, the company was forced to liquidate.  The bankruptcy deficit eventually reached in excess of $2 billion.

## VIII.  The Injuries Suffered.

293.    Defendants' improper actions resulted in KPNQwest's deepening insolvency, including numerous acquisitions, expenditures, loans and payments past the point of insolvency.

294.    Defendants' improper actions constituted mismanagement and were an important cause of KPNQwest's bankruptcy, the result of which is a liquidation deficit of approximately $2.4 billion.

295.    Defendants' responsibility for this liquidation deficit is presumed under Dutch law in the case of mismanagement, but in any case will be easily demonstrated. KPNQwest suffered injury by reason of Defendants' misconduct, including the following:

       a.    Cash was drained from KPNQwest in order to purchase Qwest (or other telecom) capacity for which KPNQwest had no legitimate use;

b.     To generate the illusion of revenue via swaps, KPNQwest acquired assets which it did not need;

c.     KPNQwest was forced to agree to pay significant cash (or equivalent) commissions to Qwest for arranging transactions that lacked any legitimate business purpose;

d.     KPNQwest was required to return significant monies previously paid by Qwest to KPNQwest, and/or KPNQwest was required to forgive certain significant Qwest financial obligations to KPNQwest;

e.     KPNQwest for forced to forego reasonable opportunities for significant cash infusions, through equity offerings, borrowings, or other means for raising needed capital;

f.     KPNQwest was required to conceal its lack of revenues and cash flow, and thereby could not and did not undertake the management initiatives necessary to survive in a weakening market, including but not limited to pursuing alternative sources of revenue and cash;

g.     KPNQwest was deprived of the reasonable and prudent management necessary to maintain the company's records and accounts in a proper manner, resulting in unpaid sales invoices and/or uncollected proceeds;

h.  KPNQwest was deprived of the loyal and dedicated management to which it was entitled, and was instead managed by self-interested agents of Qwest;

i.  Loyal and dedicated employees of KPNQwest were kept in the dark or, if necessary, fired in order to perpetuate Defendants' fraudulent activities;

j.  KPNQwest was deprived of reasonable and prudent management acting in the best interests of KPNQwest and not controlled by the self-interested fraudulent designs of Qwest and Qwest insiders;

k.  KPNQwest was made dependent on Qwest, and induced to take actions by promises of future commitments that Qwest knew would not be met;

l.  KPNQwest was forced to go forward with acquisitions and transactions that could not be justified and which required KPNQwest imprudently to expend significant amounts of money, and assume increased debts;

m.  KPNQwest was forced to participate in a pattern of concealment that helped perpetuate the fraud and  siphoned off KPNQwest's energies for managing its own very real problems;

n.  KPNQwest failed to publish proper yearly accounts; and

o.     KPNQwest's books and records were not kept in accordance with

Dutch law and in such a manner that reflected the "true and fair"

financial state of the company or such that "the rights and obligations of

[KPNQwest could] be ascertained at any time," thereby raising the legal

presumption that Defendants' acts and omissions were an important

cause of KPNQwest's bankruptcy.

## CLAIM I:
## RICO, 18 U.S.C. §§ 1962(a)-(d)
## (Qwest, Nacchio, Woodruff, McMaster)

296.    Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.  Plaintiffs do not, however,

incorporate into their RICO claims any conduct that is or could be deemed actionable

as securities fraud.

297.    KPNQwest is a RICO enterprise, as defined by 18 U.S.C. § 1961(4), for

purposes of 18 U.S.C. § 1962(a), (b), (c) and (d).  Alternatively, for purposes of

Section 1962(c), the association-in-fact comprised of Defendants Qwest, Nacchio,

Woodruff and McMaster constituted an enterprise for purposes of the statute, or, the

KPNQwest Supervisory Board constituted such an association-in-fact enterprise.

298.    Each Defendant is a "person" as defined in 18 U.S.C. § 1961(3).

299.    Each Defendant is separate and distinct from the RICO enterprise alleged herein (*i.e.*, KPNQwest) and was individually involved in the pattern of racketeering alleged herein.

300.    Defendants engaged in a pattern of racketeering as follows.  Defendants, with specific intent to effect a scheme or artifice to defraud KPNQwest, as well as creditors of KPNQwest, of money, credit, assets, goodwill, and other property, tangible or intangible, and the honest services of its officers, directors and fiduciaries, did devise or intend to devise a scheme or artifice

a.    to use the United States Postal Service and private or commercial interstate carriers to commit multiple acts of mail fraud, in violation of 18 U.S.C. § 1341 (mail fraud);

b.    to use wire communications in interstate and foreign commerce to commit multiple acts of wire fraud, in violation of 18 U.S.C. § 1343 (wire fraud); and

c.    to defraud certain financial institutions, and obtain monies, funds, credits, assets, securities, and/or other property owned by, or under the custody or control of, certain financial institutions, by means of false or fraudulent pretenses, representations, or promises, in violation of 18 U.S.C. §§ 1344(1) & (2) (bank fraud).

301.    In furtherance of their scheme and artifice, Defendants, individually or collectively, committed the following acts with knowledge and intent to defraud, through the use of United States Postal Service and other private or commercial carriers and wire services, operating in interstate or foreign commerce, and by means of false or fraudulent pretenses, representations, or promises, in violation of 18 U.S.C. §§ 1341, 1343, and 1344(1)-(2):

    a.    Defendants concealed on a continuing basis from the loyal employees of KPNQwest and certain members of the Supervisory Board that, although Defendants purported to act in the interests of KPNQwest, their true purpose secretly was to manage KPNQwest for Defendants' self-interests, and specifically for the self-interest of Qwest, as set forth in this Complaint, so as to deprive KPNQwest of the value of their honest services.  Defendants' concealment of their true purpose for managing KPNQwest for their own self-interest and the self-interest of Qwest constituted an ongoing omission of a material fact that Defendants had a legal and fiduciary duty to disclose to KPNQwest, and upon which such omission KPNQwest reasonably relied to its detriment, in that, had non-Qwest members of the KPNQwest Supervisory Board known Defendants' true purpose of managing

- 170 -

KPNQwest, KPN and/or a majority of the Supervisory Board could have exercised its rights, including its veto power, to ensure that Defendants relinquished their control of KPNQwest to avoid the influence of Defendants' improper schemes.

b.    In furtherance of the foregoing breach of loyalty, Defendants caused KPNQwest to engage in various transactions, as described in this Complaint, for the purpose of falsely and fraudulently exaggerating the financial viability and revenue of KPNQwest in order to maintain their control over KPNQwest and cause KPNQwest to continue to engage in projects and incur debt and other obligations in order to further maintain the illusion of the value of KPNQwest and that KPNQwest was being successful. These transactions were in violation of Defendants' duty to act in the best interests of KPNQwest and were intended to, and did in fact, further the self-interests of Qwest and defraud KPNQwest and its creditors.

c.    As described above, Defendants provided misleading and incomplete financial information, including inaccurate information about IRU transactions, to Supervisory Board members and other KPNQwest managers. The false internal reporting of financial results and conditions

caused KPNQwest to expend funds, incur debt, and waste assets in a manner that would not have occurred if the false reports had not been made. In addition, the false reports ensured that certain members of the Supervisory Board and important members of KPNQwest's management team would lack vital information necessary to take or suggest corrective action or put a halt to the improper acquisitions. The misleading statements and omissions were relied upon and caused the adoption and continued pursuit of a business model that resulted in waste of assets, continued unnecessary expenditures, and incurrence of excessive debt.

d.    In furtherance of their breach of loyalty, Defendants caused KPNQwest to purchase unnecessary and unwanted IRU capacity "for Qwest's account" even after Defendants knew that Qwest would not honor its reciprocal commitments. Defendants had an obligation to disclose their knowledge and intent regarding these facts. Defendants' failure to disclose the fact that Qwest would not honor its commitment to purchase reciprocal capacity (and other commitments to KPNQwest) constituted an ongoing omission of a material fact, upon which KPNQwest reasonably relied to its detriment.

e.  Defendants caused KPNQwest to borrow money and incur obligations in connection with the acquisition of GTS by using false and fraudulent financial information about KPNQwest, and by failing to disclose that Qwest would not make good on its promises and commitments (set forth in the immediately preceding subparagraphs).  The use of that financial information, and the failures to disclose, were material misrepresentations of material facts upon which the financial institutions that financed the acquisition of GTS reasonably relied to their detriment, as did KPNQwest, as set forth in this Complaint.

f.  Defendants invested income derived from fraudulent IRU transactions in KPNQwest, and utilized such investments to acquire financial interests in the KPNQwest enterprise (including KPNQwest's facilities), and to operate that enterprise utilizing reciprocal IRU transactions.  This included, but was not limited to, acquisition of rights to capacity on the KPNQwest network, loans made to KPNQwest, and the acquisition of KPNQwest stock.

g.  Having infiltrated and obtained *de facto* control of KPNQwest, and invested proceeds of the fraudulent scheme in KPNQwest, Defendants also and thereafter maintained their interest in and control of

KPNQwest by deceiving KPNQwest Supervisory Board members and employees, by creating and presenting false financial reports, as discussed above, and by ensuring that the enterprise remained dependent on and a participant in Defendants' fraudulent scheme.

302.    In carrying out the aforementioned predicate acts, Defendants continuously used interstate and foreign postal, carrier and wire services.  Defendants and KPNQwest, including subsidiaries of Qwest and KPNQwest, operating between Europe and the United States, exchanged or engaged in interstate and foreign telephone calls, emails, facsimiles, teleconferences, mail, and other forms of interstate or foreign mail and wire communications in order to coordinate their transactions and reports.  Defendant McMaster had telephonic communications with Defendant Nacchio and other Qwest managers in the United States on a weekly and at times daily basis.  Defendant Qwest also engaged in such communications with the financial institutions described in this Complaint.

303.    The predicate acts form a pattern of racketeering activity in that (i) they were all done at the direction of Defendants; (ii) they took place over an extended period of time and had considerable continuity and duration and/or posed the threat of considerable continuity and duration; (iii) they were all directed at KPNQwest, and KPNQwest's creditors, in such a manner as to cause KPNQwest direct harm and

injury; (iv) they all related to each other in furtherance of a common objective to engage in a continued and concerted course of conduct directed at KPNQwest, and for the purpose and effect of sustaining Qwest and defrauding KPNQwest, and others of money, assets, goodwill, and other property, and of depriving KPNQwest the honest services of its fiduciaries; (v) they all shared the same participants; and (vi) they were all carried out pursuant to common methods.

304.    KPNQwest is distinct from the pattern of racketeering activity directed at it by the Defendants.  Although KPNQwest was controlled by the Defendants, was victimized by the Defendants, and was at times used as an instrument of the Defendants to carry out their pattern of racketeering, KPNQwest would have existed as an entity in the absence of those activities for purposes of carrying out its legitimate business operations.

305.    Supervisory Board members, management team members, and loyal employees of KPNQwest were fraudulently deceived and misled by Defendants' fraudulent acts and omissions, on which such members and employees justifiably relied.  By reason of such reliance, adequate objections were not raised, full appreciation of the problems was not understood, actions and acquisitions were approved, and corrective action was not taken.

306.    The frauds perpetrated by the Defendants through their pattern of racketeering and the gains they obtained therefrom have enriched the Defendants at the expense of KPNQwest and its lenders and creditors in the amount of money, credit, assets, goodwill, and other property, tangible or intangible, taken or diverted from KPNQwest, and resulted in the deepening insolvency and ultimately the bankruptcy of KPNQwest.

307.    Through their pattern of racketeering and commission of the predicate acts which constitute the pattern of racketeering, the Defendants violated 18 U.S.C. § 1962(a), (b), (c) and (d).

### A.    Section 1962(a)

308.    The Defendants, individually and collectively, received income, or the proceeds of income, derived (directly or indirectly) from the pattern of racketeering described above.

309.    The Defendants, individually and collectively, used and/or invested the income, or proceeds of income, derived from the pattern of racketeering described above in the acquisition of interests in or the operation of KPNQwest by, for example, purchasing IRU interests in KPNQwest, providing one or more loans to KPNQwest, and purchasing an additional 3.2% share of KPNQwest in 2001.

310.    As a direct result of the use and/or investment of income, or proceeds of income, derived from the pattern of racketeering described above in the acquisition

of interests in or the operation of KPNQwest, the Defendants proximately caused

KPNQwest the injuries described in this Complaint.

311.    Defendants are jointly and severally liable for causing KPNQwest injury.

312.    Accordingly, Plaintiffs seek treble damages in such amount as may be

determined at trial, recovery of the costs of this litigation, and an award of reasonable

attorneys' fees as provided under 18 U.S.C. § 1964(c).

**B.    §1962(b)**

313.    Defendants, individually and collectively, acquired or maintained

(directly or indirectly) an interest in and/or control of KPNQwest.

314.    In particular, the Defendants, individually and collectively, through the

pattern of racketeering described above, acquired or maintained interests in or control

of KPNQwest by:

a.    causing Qwest to purchase shares of KPNQwest stock, and to purchase

IRU interests in KPNQwest fiber-optic facilities;

b.    causing Defendants to be placed in positions of responsibility within

KPNQwest, so as to control its activities;

c.    using their positions of responsibility to restrict and control the flow of

information, and to conceal the ongoing failure of the KPNQwest

business plan, from the Supervisory Board and other non-Qwest

personnel;

d.    affirmatively misleading the KPNQwest Supervisory Board, and in particular, non-Qwest members, such that the Board was lulled into relinquishing its duties and responsibilities to Defendants, or otherwise prevented from ensuring effective oversight of Defendants;

e.    establishing and maintaining their interest and control in KPNQwest by establishing a business model for KPNQwest under which KPNQwest was dependent on Qwest as a partner for IRU or swap/transactions as a principal source of fictitious revenues as a matter of financial necessity;

f.    concealing from KPNQwest their true purpose of managing KPNQwest for the self-interest of Defendants, in breach of their duty of loyalty, so as to cause KPNQwest to continue to rely upon Defendants to manage KPNQwest;

g.    falsely reporting on KPNQwest's lack of recurring revenue, inflated IRU revenues, lack of profitability and lack of adequate cash flow in order to allow them to retain their interest and control by causing KPNQwest to continue to believe that it was well-managed and financially sound;  and

f.    removing or otherwise silencing uncooperative employees of KPNQwest, including potential whistle-blowers who might have otherwise sounded the alarm.

315.    As a direct result of the Defendants' direct or indirect acquisition or maintenance of interests in and/or control of KPNQwest, the Defendants proximately caused KPNQwest the injuries noted above in this Complaint.

316.    Defendants are jointly and severally liable for causing KPNQwest injury.

317.    Accordingly, Plaintiffs seek treble damages in such amount as may be determined at trial, recovery of the costs of this litigation, and an award of reasonable attorneys' fees as provided under 18 U.S.C. § 1964(c).

**C.    § 1962(c)**

318.    Defendants were employed by or associated with KPNQwest.

319.    Defendants, individually and collectively, conducted or participated (directly or indirectly) in the conduct of the affairs of KPNQwest and its Supervisory Board through the pattern of racketeering activity described above in this Complaint, and directed KPNQwest and its Supervisory Board as they chose and saw fit, in breach of their duties to KPNQwest.

320.    As a direct result of the Defendants' conducting or participating in the conduct of the affairs of KPNQwest and its Supervisory Board through the pattern of racketeering activity described above, and the predicate acts described herein, the Defendants proximately caused KPNQwest the injuries noted above in this Complaint.

321.    Alternatively, Defendants participated in the conduct of their association-in-fact enterprise, and/or in the conduct and affairs of the Supervisory Board, through a pattern of racketeering activity, which caused KPNQwest the injuries set forth in this Complaint.

322.    Defendants are jointly and severally liable for causing KPNQwest injury.

323.    Accordingly, Plaintiffs seek treble damages in such amount as may be determined at trial, recovery of the costs of this litigation, and an award of reasonable attorneys' fees as provided under 18 U.S.C. § 1964(c).

**D.    § 1962(d)**

324.    Section 1962(d) of RICO prohibits a person from conspiring to violate § 1962(a), (b), or (c).

325.    Defendants knowingly and deliberately agreed and conspired between and among themselves and others (i) to commit the predicate acts as alleged herein, (ii) to defraud KPNQwest, and its lenders, of money, assets, goodwill, and other property, tangible and intangible, (iii) to deprive KPNQwest of the honest services of its fiduciaries, and (iv) to violate knowingly and intentionally the statutory provisions noted in Counts I-II.

326.    In furtherance of their conspiracy, Defendants committed the predicate acts alleged herein, in violation of 18 U.S.C. §§ 1962(a), (b) and (c).

327.    As a direct result of the Defendants' conspiracy to harm KPNQwest and its lenders, the Defendants proximately caused KPNQwest the injuries noted above in this Complaint.

328.    Defendants are jointly and severally liable for causing KPNQwest injury.

329.    Accordingly, Plaintiffs seek treble damages in such amount as may be determined at trial, recovery of the costs of this litigation, and an award of reasonable attorneys' fees as provided under 18 U.S.C. § 1964(c).

**CLAIM II:**
**MISMANAGEMENT and BREACH OF DUTY**
**(UNDER DUTCH LAW)**
**(Qwest, Nacchio, Woodruff, McMaster)**

330.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, but excluding any allegation of fraudulent intent, and further allege as follows.

331.    Pursuant to Dutch Civil Code Article 2:248/138, the Third Abuse Act, Defendants are liable for mismanagement because (1) their conduct constitutes manifestly "improper management," which (2) was an "important cause of the bankruptcy." Defendants therefore are jointly and severally liable for the bankruptcy deficit.

332.    Under Dutch law, manifestly improper management occurs where a manager acts (or fails to act) in a manner that no reasonable manager or director

would have acted (or failed to act). Defendants' manifestly improper acts of mismanagement include, but are not limited to, the following:

    a.    In breach of duty under Dutch law, Defendants caused KPNQwest's financial records to falsely misstate the true financial condition of KPNQwest, and caused KPNQwest to issue reports and statements of its financial condition that were false, inaccurate and misleading. Such financial statements, including those specifically identified in this Complaint, reflected revenue from (i) multi-year "capacity" IRU transactions that were not eligible for such revenue recognition, and (ii) "swaps" that did not generate properly recognizable revenue, lacked economic substance, and recognized excessive amounts of revenue (unrelated to the economic value of the capacity that was subject to the transactions). In addition, Defendants caused the value of the company to be inflated by the overvaluation of assets. Defendants took all of these actions in violation of their affirmative duties to fully, accurately and properly report on the financial condition of the company. These false reports were relied upon by KPNQwest.

    b.    In violation of U.S. and Dutch Accounting Rules, Defendants made false transactions and/or deliberately booked revenue incorrectly,

including, but not limited to: (i) booking IRU transactions upfront instead of ratably; (ii) conducting operationally useless transactions lacking any real business purpose in order to book upfront revenue; (iii) booking upfront revenue for unfinished routes; (iv) breaking deals up into multiple parts in order to increase the margin; (v) concealing the improper purpose of transactions by using different contract dates, and placing third parties between transactions; (vi) relying on side letters, portability clauses, and oral agreements to buy back or trade sold capacity after the transaction was finalized.

c.     Defendants falsely presented KPNQwest's liquidity position, including, but not limited to: (i) setting up loan agreements with KPN and Qwest at the end of a quarter to artificially boost KPNQwest's cash position; (ii) manipulating SG&A; and (iii) stopping or delaying non-critical payments.

d.     Defendants registered assets (fiber optic cables and repeater stations) as properties in KPNQwest's balance sheet and as assets held for sale when it was uncertain as to whether KPNQwest actually owned them.

e.  Defendants failed to address an ongoing accounting problem resulting in significant differences between the intercompany balances of KPNQwest and the group companies.

f.  Defendants failed to address ongoing significant errors in KPNQwest's sales invoicing, resulting in unpaid or uncollected proceeds.  For example, Defendants incorrectly invoiced clients for their use of the Cyber Centers and failed to seek cancellation fees from customers when otherwise appropriate.

g.  Defendants' budgets and estimates contained important and significant faults; for example, the average cost for each Cyber Center was almost five times as much as initially budgeted.

h.  Defendants failed to correct the automation programs used by KPNQwest that did not connect with each other and contained important gaps.

i.  Defendants failed to take into account repeated concerns with respect to these issues flagged by KPNQwest's accounting firm, Arthur Andersen.

j.  Defendants failed to file proper, accurate and timely yearly accounts;

k.  Defendants improperly booked the Rembrandt cables.

l.     Defendants caused KPNQwest to enter into transactions (including, *inter alia*, "purchasing" unnecessary "capacity" from Qwest or others), incur debt, and engage in aggressive expansion plans and failed to properly manage and to accurately report on the revenues, liquidity and financial condition of KPNQwest, often for the purpose of artificially inflating KPNQwest's apparent financial position and Qwest's value (or otherwise benefiting Qwest) and/or to conceal fraudulent activity by Qwest and/or the Individual Defendants.

m.     Defendants generated unearned commissions to Qwest as part of certain IRU transactions.

n.     Defendants failed to keep an administration of the financial situation of KPNQwest and committed numerous administrative errors, including, but not limited to: (i) errors in the human resources administration; (ii) the payment of important accounts twice; (iii) insufficient insight regarding the foreseeable cash flow; and (iv) important calculation errors in the estimates and budgets regarding important (investment) projects.

o.     Defendants caused KPNQwest to return certain monies paid by Qwest to KPNQwest and to forgive certain financial obligations Qwest owed to KPNQwest without any reasonable business justification.

p.  Defendants caused KPNQwest to borrow funds, make unnecessary, careless and irresponsible expenditures, incur ill-advised obligations, and pursue aggressive and expansive business acquisitions and strategies that were imprudent and unreasonable in the circumstances (including, *inter alia*, IRU transactions, network construction projects (including, but not limited to, Cyber Centers and the Scandinavian fiber ring), and other acquisitions), driving KPNQwest deeper and deeper into insolvency, and ultimately into bankruptcy.

q.  Defendants precluded KPNQwest from seeking reasonable alternative sources of revenues and cash that could have relieved the company's cash concerns.

r.  Defendants caused KPNQwest to enter into transactions in which KPNQwest assumed an unreasonable level of risk associated with the transaction.

s.  The purchasing process did not contain sufficient internal control measures to ensure that exclusively authorized obligations were entered into.

t.  Defendants provided misleading information and concealed necessary information from KPNQwest, banks, lenders, creditors, and others in

order to benefit Qwest, while unreasonably exposing KPNQwest to potential liability.

u.    Defendants failed to take opportunities to downsize KPNQwest or otherwise operate the company in a manner so as to prevent its bankruptcy and involuntary liquidation, although such action would have been reasonable and prudent, all for the sake of benefiting their personal interests and the interests of Qwest.

v.    Defendants oversaw and caused KPNQwest to consent to the payout of bonuses in the two full quarters prior to the filing for bankruptcy.

w.    Defendants caused KPNQwest to engage in the GTS transaction and incur the corresponding debt and obligations with the full knowledge that KPNQwest would not be able to those obligations.

x.    Defendants secured  unjustified personal benefits, concluded agreements knowing that the company could not fulfill its obligations under those agreements, failed to ascertain the financial trustworthiness of contractual partners, engaged in irresponsibly expensive investments, took decisions with far-reaching financial consequences without sufficient preparation, failed to provide for timely coverage against clearly foreseeable risks, and neglected proper credit control.

333.    Defendants' mismanagement, as detailed above, was an important cause of KPNQwest's bankruptcy, and caused enormous and irreparable injury to KPNQwest and its creditors.

334.    Moreover, pursuant to Article 2:138(2) of the Dutch Civil Code, Defendants' mismanagement is *presumed* to have been an important cause of the bankruptcy because, as detailed above, Defendants have not complied with their obligations under (a) Article 2:10 of the Dutch Civil Code, which requires that the management shall maintain the books and records of the company in such a manner that its rights and obligations can be ascertained at any time, or (b) Article 2:394 of the Dutch Civil Code, which requires management to publish timely and accurate annual accounts for the company.

335.    Defendant McMaster is liable for mismanagement in his role as the sole member of KPNQwest's management board.  Defendants Nacchio and Woodruff are liable for mismanagement in their roles as members of the KPNQwest Supervisory Board and as *de facto* managers and policymakers for KPNQwest.  Defendant Qwest is liable for mismanagement as the employer of Defendants McMaster, Nacchio and Woodruff and as a *de facto* manager and policymaker of KPNQwest.

336.    These liabilities arise under Article 2:138 of the Dutch Civil Code. Defendant McMaster is liable as the sole member of KPNQwest's management

board.  With respect to Defendants Nacchio and Woodruff,  Article 2:149 of the

Dutch Civil Code expressly recognizes that the provisions of Article 2:138 shall apply

to the Supervisory Board's performance of the duties.  Article 2:140(2) of the Dutch

Civil Code further provides that Supervisory Board members shall be responsible for

the supervision of the policy of the company's management and of the general course

of affairs of the company.  In that role, members of the Supervisory Board are to be

guided by the interests of the company.  Moreover, under Article 2:150, Supervisory

Board members shall be jointly and severally liable with the company's managers or

directors for the publication of misleading accounts.

337.    Defendants Nacchio, Woodruff and Qwest are also liable under Article

2:138 as *de facto* managers and policymakers of KPNQwest and, pursuant to Article

2:138(7), are considered to be equivalent to the members of the Management Board.

Nacchio, Woodruff and Qwest determined or jointly determined the policy of the

company and acted as if they were managers of KPNQwest.  Nacchio, Woodruff and

Qwest issued instructions to Defendant McMaster, the statutory manager of

KPNQwest, who followed those instructions and/or otherwise permitted Nacchio,

Woodruff and Qwest to direct the company's policy.  Indeed, McMaster's

employment contract provided that, in his role at KPNQwest, McMaster would

report directly to Nacchio.

338.    Qwest likewise is liable as the employer of and controlling authority over Defendants McMaster, Nacchio and Woodruff pursuant to Articles 6:170 and/or 6:171 of the Dutch Civil Code, and therefore is liable to the bankrupt estate for the individual Defendants' mismanagement of KPNQwest.

339.    As the sole member of the KPNQwest Management Board, Defendant McMaster owed certain duties to the company under Articles 2:8, 2:9 and 2:10 of the Dutch Civil Code.  These duties include the duty to abide by the principle of reasonableness and fairness vis-à-vis the corporation (Article 2:8), to perform properly his assigned duties (Article 2:9), and to report honestly on all matters material to the corporation, allowing insight into the rights and obligations of the corporation in compliance with Title 9, Book 2 of the Dutch Civil Code (Article 2:10).

340.    These duties arose with respect to Defendants Nacchio and Woodruff, as members of the Supervisory Board of KPNQwest, under Article 2:140, Section 2 of the Dutch Civil Code, which placed upon them a duty to supervise the management of KPNQwest.

341.    Defendant Qwest shared liability for these duties on account of its role as employer of McMaster, Nacchio and Woodruff and/or as *de facto* policymaker for KPNQwest.

342. Each Defendant is jointly and severally liable to the bankrupt estate in the amount of any liability that cannot be satisfied out of the liquidation proceeds, presently estimated to be $2.4 billion.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, in their capacity as trustees in bankruptcy for KPNQwest, pray for relief as follows and respectfully request that the Court:

A.   Grant judgment in Plaintiffs' favor and against Defendants on Claims I and II;

B.   Award damages to Plaintiffs in an amount equal to the liquidation deficit of the bankruptcy estate;

C.   Award Plaintiffs such other damages to be proven at trial;

D.   Make an award of treble damages, pursuant to 18 U.S.C. § 1964(c);

E.   Impose punitive damages against Defendants in an appropriate amount to be determined at trial;

F.   Award Plaintiffs their reasonable costs and expenses in bringing this action;

G.   Award Plaintiffs their reasonable attorney's fees; and

H.   Grant such other and further relief which the Court may determine to be just and equitable under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

January 27, 2009

Respectfully submitted,

Richard W. Daily LLC

By _Richard W. Daily_

Richard W. Daily
621 17th Street, Suite 1535
Denver, Colorado 80293-1501
Telephone: (720) 963-1121
Facsimile: (720) 897-2802

Of Counsel:
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Attorneys for Plaintiffs

Plaintiffs' address:

E. T. Meijer
Marcel Windt
Trustees of KPNQwest N.V.
Houthoff Buruma N.V.
P. O. Box 1507
3000 BM Rotterdam
The Netherlands