**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-162-REB-KLM

E.T. MEIJER and MARCEL WINDT,
In their Capacity as Trustees in Bankruptcy
For KPNQwest N.V., *et al.*,

        Plaintiffs,

    v.

QWEST COMMUNICATIONS
INTERNATIONAL, INC., JOHN A.
McMASTER, JOSEPH P. NACCHIO,
ROBERT S. WOODRUFF,

        Defendants.

---

**DEFENDANTS' MOTION TO
DISMISS AND SUPPORTING MEMORANDUM**

        BOIES, SCHILLER & FLEXNER LLP
        Jonathan H. Sherman
        Jonathan M. Shaw
        William C. Jackson
        5301 Wisconsin Avenue, N.W.
        Washington, D.C. 20015

        ROTHGERBER, JOHNSON & LYONS LLP
        Kenneth F. Rossman IV
        1200 Seventeenth Street, Suite 3000
        Denver, Colorado 80202

        ***Attorneys for Defendant Qwest
        Communications International Inc.***

        *(Additional counsel on signature block)*

Document Filed Electronically

{00670738 / 1}

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES ....................................................................................iii

PRELIMINARY STATEMENT ................................................................................ 1

    A.    Background ..................................................................................... 4

    B.    Related Proceedings ...................................................................... 7

ARGUMENT .......................................................................................................... 9

I.    THIS COURT SHOULD DISMISS ON *FORUM NON CONVENIENS* GROUNDS ..................................................................................... 9

    A.    Tenth Circuit *forum non conveniens* law is the same as the Third Circuit law applied in affirming dismissal of the New Jersey case ................................................................................. 9

    B.    Plaintiffs should not get a second bite at *forum non conveniens* ....... 10

        1.    Preclusion principles apply to *forum non conveniens* rulings ....... 10

        2.    This Court should not revisit the earlier ruling because no new facts undercut its rationale ............................... 11

        3.    Even if Plaintiffs were free to attack his ultimate conclusion, Judge Brown's rulings on subsidiary issues are preclusive ............................................................. 14

    C.    Preclusion aside, this case should be dismissed on *forum non conveniens* grounds ......................................... 15

        1.    This case satisfies the two threshold questions: the Netherlands is an adequate forum and foreign law will apply ...... 15

        2.    This Court should give Plaintiffs' forum choice little deference .... 16

        3.    The private interest factors heavily favor dismissal...................... 18

4.  The public interest factors likewise heavily
favor dismissal ............................................................................... 19

II.   THIS COURT SHOULD DISMISS PLAINTIFFS' RICO CLAIM ...................... 20

A.   Plaintiffs' RICO claim is barred by the PSLRA because it
relies on conduct actionable as securities fraud................................ 21

1.  Plaintiffs' RICO claim is based on conduct
actionable as securities fraud ...................................................... 22

2.  Plaintiffs' disclaimers do not preclude dismissal ........................... 25

3.  Similar securities claims brought by others and Plaintiffs'
characterizations of their own claims confirm that the conduct
alleged is actionable as securities fraud ...................................... 28

B.   Plaintiffs' RICO claim is time-barred................................................. 29

C.   Plaintiffs lack standing to sue under RICO because KPNQwest
suffered no "direct injury".................................................................. 32

1.  Plaintiffs lack standing to sue for harms allegedly suffered by
others, including some who have asserted their own claims ....... 33

2.  Plaintiffs' "deepening insolvency" damages theory
is not valid under RICO ................................................................ 39

CONCLUSION.................................................................................................... 42

## TABLE OF AUTHORITIES

**CASES**                                                                               **PAGE**

*555 Corp. Ventures, Inc. v. Ash Grove Cement Co.*, Case No. 04-2169,
    2005 U.S. Dist. LEXIS 8814 (D. Kan., Mar. 2, 2005) ................................... 10, 14

*Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24 (D.C. Cir. 1987) .......................... 38

*Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996 (2d Cir. 1993) ........................ 19

*Amore v. Accor, S.A.*, 484 F. Supp. 2d 124 (D.D.C. 2007) ....................................... 11-12

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ................................ 34-35, 40, 42

*Bald Eagle Area Sch. District v. Keystone Fin., Inc.*,
    189 F.3d 321 (3d Cir. 1999) ....................................................................... *passim*

*Barrantes Cabalceta v. Standard Fruit Co.*, 667 F. Supp. 833 (S.D. Fla. 1987) ............ 12

*Baron v. Chehab*, Case No. 05-3240,
    2006 WL 156828 (C.D. Ill., Jan. 20, 2006) .......................................................... 26

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) .................................... 27

*Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959 (10th Cir. 1991) .................. 30

*Bryson v. City of Edmond*, 905 F.2d 1386 (10th Cir. 1990) ........................................... 31

*Burnett v. Amrein*, Case No. 06-cv-564,
    2006 WL 2859625 (D. Colo., Oct. 3, 2006) ......................................................... 21

*Burton v. Ken-Crest Servs. Inc.*, 127 F. Supp. 2d 673 (E.D. Pa. 2001) ........................ 27

*Butler v. Pollard*, 800 F.2d 223 (10th Cir. 1986) ............................................. 2, 10-11, 15

*Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999) ................................................... 39

*Canyon Co. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) ......................... 35-36

*Chico-Velez v. Roche Prods., Inc.*, 139 F.3d 56 (6th Cir. 1998) ................................... 31

**CASES**                                                                    **PAGE**

*China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*,
    91 F. Supp. 2d 1106 (N.D. Ohio 2000) ........................................................ 10, 12

*Christians v. Grant Thornton LLP*, 733 N.W.2d 803 (Minn. Ct. App. 2007) .................... 41

*Ciralsky v. C.I.A.*, 355 F.3d 661 (D.C. Cir. 2004) ........................................................... 31

*Comm. Fin. Servs., Inc. v. J.P. Morgan Secs., Inc.*,
    152 P.3d 897 (Okla. Civ. App. 2006) ....................................................................... 41

*Coroles v. Sabey*, 79 P.3d 974 (Utah Ct. App. 2003) ..................................................... 41

*Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226 (10th Cir. 2006) ..................................... 30

*Dahl v. United Techs. Corp.*, 632 F.2d 1027 (3d Cir. 1980) ............................................ 16

*Dillard-Crowe v. Citibank, N.A.*, Case No. 07-cv-2172,
    2008 WL 4223271 (D. Colo., Sept. 10, 2008) .......................................................... 3

*Dow Chemical Co. v. Exxon Corp.*, 30 F. Supp. 2d 673 (D. Del. 1998) ........................ 36

*Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987) ......................................... 38

*Eagletech Communications, Inc. v. Citigroup, Inc.*, Case No. 07-60668,
    2008 WL 3166533 (S.D. Fla., June 27, 2008) ................................................ *passim*

*Elmore v. Henderson*, 227 F.3d 1009 (7th Cir. 2000) .................................................... 31

*Erikson v. Pawnee County Board of County Comm'rs*,
    263 F.3d 1151 (10th Cir. 2001) ................................................................................ 21

*Galbreath v. Dudas*, Case No. 04-2222,
    2006 WL 156701 (D.D.C., Jan. 20, 2006) ................................................................ 31

*Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602 (10th Cir. 1998) ........................... *passim*

*Hollinger Int'l, Inc. v. Hollinger Inc.*, Case No. 04-C-0698,
    2004 WL 2278545 (N.D. Ill., Oct. 8, 2004) .............................................................. 25

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ..................................... *passim*

*Howard v. Am. Online Inc.*, 208 F.3d 741 (9th Cir. 2000) ........................................ 25, 27

**CASES**                                                                                      **PAGE**

*Hunt v. Hanifen Imhoff Inc.*, 671 F. Supp. 715 (D. Colo. 1987)......................................37

*In re Air Crash Off Long Island, New York*, 65 F. Supp. 2d 207 (S.D.N.Y. 1999) ..........32

*In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006) ........................................................41

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) ................................................................25

*In re Felt Mfg. Co.,* 371 B.R. 589 (Bankr. D.N.H. 2007)..................................................41

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481 (E.D. Pa. 2000) ...........29

*In re Jamuna Real Estate, LLC*, 392 B.R. 149 (Bankr. E.D. Pa. 2008)...............38-39, 42

*In re Qwest Communications Int'l, Inc. Sec. Litig.*,
    387 F. Supp. 2d 1130 (D. Colo. 2005) ................................................................23

*In re SI Restructuring, Inc.,* 532 F.3d 355 (5th Cir. 2008) ..............................................41

*In re Teledyne Def. Contracting Derivative Litig.*,
    849 F. Supp. 1369 (C.D. Cal. 1993)....................................................................37

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001).......................................17-18

*James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396 (7th Cir. 2006) .......35-36, 38

*Jones v. Nat'l Communication and Surveillance Networks*,
    409 F. Supp. 2d 456 (S.D.N.Y. 2006) .................................................................21

*Keeler v. Cereal Food Processors*, 250 Fed. Appx. 857 (10th Cir. 2007).....................32

*Kuiper v. Busch Entm't Corp.*, 45 F.3d 284 (8th Cir. 1995)............................................32

*Longmont United Hosp. v. Saint Barnabas Corp.*,
    305 Fed. Appx. 892 (3d Cir. 2009).........................................................35-36, 39

*Marathon Oil Co. v. A.G. Ruhrgas*, 145 F.3d 211 (5th Cir. 1998) ....................................2

*McNally v. Colo. State Patrol*, 122 Fed. Appx. 899 (10th Cir. 2004) ..............................17

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ......................24

**CASES**                                                                                          **PAGE**

*O'Donnell v. Vencor, Inc.*, 466 F.3d 1104 (9th Cir. 2006) ................................. 31

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) .................................................................... 40

*Pastewka v. Texaco, Inc.*, 565 F.2d 851 (3d Cir. 1977) .................................. 11

*Paul v. Winco Holdings, Inc.*, 249 F.R.D. 643 (D. Idaho 2008) ....................... 36

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ...................................... 18-19

*Pollux Holding, Ltd. v. The Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) ........... 17

*Reed v. Norfolk and Western Ry. Co.*, 635 F. Supp. 1166 (N.D. Ill. 1986) .................... 32

*Rotella v. Wood*, 528 U.S. 549 (2000) ........................................................... 30

*Scott v. The Boeing Co.*, 48 Fed. Appx. 730 (10th Cir. 2002) ......................... 31

*SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) .................... 23

*SEC v. Zandford*, 535 U.S. 813 (2002) ............................................... 22, 24-25

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985) ...................................... 33

*Sharp v. United Airlines, Inc.*, 967 F.2d 404 (10th Cir. 1992) .......................... 38

*Strang v. Visa U.S.A., Inc.*, Case No. 03-cv-11323,
    2005 WL 1403769 (Wis. Cir. Ct., Milwaukee Co., Feb. 8, 2005) ........................ 38

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) ............ 35-36, 38

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) .............................................. 21

*Torreblanca v. Boeing Co.*, 806 F. Supp. 139 (E.D. Tex. 1992) ................... 11-12

*Treadway v. Lisotta*, Case No. 08-1375,
    2008 WL 3850462 (E.D. La., Aug. 15, 2008) ........................................ 38

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006) ............................................................ 40

**CASES**                                                                                                    **PAGE**

*Villar v. Crowley Maritime Corp.*, 780 F. Supp. 1467 (S.D. Tex. 1992) ........................... 11

*Villar v. Crowley Maritime Corp.*, 990 F.2d 1489 (5th Cir. 1993) ......................... 2, 11, 14

*Walstrom v. City of Altoona*, Case No. 3:2006-81,
    2008 WL 5411091 (W.D. Pa., Dec. 29, 2008) ..................................................... 31

*Windt v. Qwest Communications Int'l, Inc.*, 544 F. Supp. 2d 409 (D.N.J. 2008) ..... *passim*

*Windt v. Qwest Communications Int'l, Inc.*, 529 F.3d 183 (3d Cir. 2008) ................ *passim*

*Yavuz v. 61 MM, Ltd.*, 465 F.3d 418 (10th Cir. 2006) .............................................. 10, 16

**STATUTES AND RULES**

18 U.S.C. § 1367(d) ................................................................................................... 31

28 U.S.C. § 1782 ......................................................................................................... 9

18 U.S.C. §§ 1962(a)-(d) ............................................................................................. 4

18 U.S.C. § 1964(c) ............................................................................................... 22, 33

Pub. L. No. 104-67, § 107, 109 Stat. 737 (1995) ......................................................... 22

**MISCELLANEOUS**

H.R. Conf. Rep. No. 104-369 (1995) ........................................................................... 22

*S. Willett, The Shallows of Deepening Insolvency,* 60 Bus. Law. 549 (2005) .......... 39-41

J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (2005) ..................................... 41

H. McDonald, et al., *Lafferty's Orphan: The Abandonment of
    Deepening Insolvency*, 26-10 Am. Bankr. Inst. J. 1 (Jan. 2008) ......................... 41

Note, *A Critique of "Deepening Insolvency," a New Bankruptcy Tort Theory*,
    12 Stan. J.L. Bus. & Fin. 536 (2007) ................................................................... 41

## PRELIMINARY STATEMENT

This Dutch-centered case—brought by Dutch bankruptcy trustees who allege mismanagement of a Dutch company—belongs in the Netherlands. Chief Judge Brown of the District of New Jersey has already so held, dismissing on *forum non conveniens* grounds Plaintiffs' substantively identical lawsuit against the same Defendants there. *Windt v. Qwest Communications Int'l, Inc.* ("*Windt I*"), 544 F. Supp. 2d 409, 425 (D.N.J. 2008) (reissued opinion). The Third Circuit affirmed and the Supreme Court declined to review the matter. *Windt v. Qwest Communications Int'l, Inc.* ("*Windt II*"), 529 F.3d 183 (3d Cir. 2008), *cert. denied*, 129 S. Ct. 904 (U.S., Jan. 12, 2009).

In 1998, Qwest Communications International Inc. ("Qwest") and Koninklijke KPN, N.V. ("KPN"), a Dutch telecommunications company, formed KPNQwest, a Dutch joint venture to provide telecommunications services in Europe. Four years later, the European telecom market crashed and KPNQwest filed for bankruptcy protection in the Netherlands. Plaintiffs are Dutch lawyers appointed by the Dutch bankruptcy court to serve as the KPNQwest estate's trustees.

Although KPNQwest was a Dutch company whose demise spawned multiple lawsuits and an investigation in Plaintiffs' home forum, Plaintiffs have spent nearly five years trying to keep this lawsuit in the United States—first in New Jersey and, when that failed, in this Court. The reason is obvious: in addition to their $2.4 billion claim for mismanagement and breach of duty under eleven articles of the Dutch Civil Code, Plaintiffs seek the foreign litigant's Holy Grail—treble damages under RICO. As we show below, Plaintiffs' RICO claim fails as a matter of law. But even if this Court were

to assume a valid RICO claim for purposes of the *forum non conveniens* analysis—as the New Jersey district court and Third Circuit did—it should nevertheless dismiss this Dutch-centered case.

In deciding this motion, this Court does not write on a clean slate. "[A] plaintiff may not relitigate a *forum non conveniens* issue [already decided by another district court] unless he can show some objective facts that materially alter the considerations underlying the previous resolution." *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1498 (5th Cir. 1993), *abrogated on other grounds by Marathon Oil Co. v. A.G. Ruhrgas*, 145 F.3d 211, 222 (5th Cir. 1998) (citation and quotation omitted); *see also Butler v. Pollard*, 800 F.2d 223, 225 (10th Cir. 1986) (when, as here, its prerequisites are satisfied, "issue preclusion is required"). The basis for Judge Brown's ruling remains the same:

(a) As in New Jersey, "[t]he gist of the case at bar concerns the allegations of fraud and mismanagement of a Dutch business entity by a board member and executives of *that* corporation, and by *that* corporation's controlling holder." *Windt I,* 544 F. Supp. 2d at 423 (emphasis in original);

(b) Plaintiffs' claims are substantively identical to those presented in New Jersey and will require this Court to construe and apply eleven Dutch Civil Code provisions;

(c) Plaintiffs have no connection to the United States or to this district;

(d) foreign witnesses and Dutch documents will predominate; and

(e) given the pendency of ongoing, related litigation and an investigation in the Netherlands (together with Defendants' need to assert contribution claims against Dutch entities and against other individuals likely to contest the jurisdiction of American courts) forcing Defendants to litigate simultaneously on both sides of the Atlantic would be oppressive or vexatious.

In truth, the only differences between the New Jersey litigation and this case are either

neutral (New Jersey was home to two Defendants; Colorado is home to the other two) or strengthen the case for dismissal (there is less KPNQwest-related litigation in the U.S. and more KPNQwest-related litigation in the Netherlands today than there was when the New Jersey case was dismissed).

This Court should likewise dismiss this Dutch-centered action in favor of a Dutch forum. But if this case stays here, this Court should dismiss Plaintiffs' RICO claim. In New Jersey, and before they realized that they were admitting that their RICO claim is statutorily barred, Plaintiffs candidly explained that their lawsuit:

> alleges…a massive financial fraud. The purpose of this fraud, insofar as it affected KPNQwest, was to artificially prop up the value of both Qwest and KPNQwest in order to ensure that Qwest's and KPNQwest's outrageously optimistic revenue projections could be concealed and Qwest's and KPNQwest's inflated stock price preserved or enhanced.

Pls.' Opp. to Defs.' Mot. to Compel Arb. at 4.[1] Defendants moved to dismiss that claim as barred by the Private Securities Litigation Reform Act ("PSLRA"), which bars civil RICO actions based on conduct actionable as securities fraud. Plaintiffs responded with cosmetic amendments, but the Third Circuit saw through that tactic, noting that the amended complaint "asserted the same essential facts and claims as [the Plaintiffs'] original complaint." *Windt II*, 529 F.3d at 187. So does their Complaint here.

Plaintiffs allege that Defendants engaged in racketeering activity by committing

---

[1]  The relevant excerpt from this pleading is attached as Exhibit G to the Declaration of Jonathan Sherman ("Sherman Decl.") dated Feb. 21, 2006, a copy of which (together with Exhibits A - H), has been submitted as Exhibit 1 to the Supplemental Declaration of Jonathan Sherman, dated April 30, 2009 ("Suppl. Sherman Decl."). This Court may consider Plaintiffs' admission about their RICO claim without converting this to a Rule 56 motion. *Dillard-Crowe v. Citibank, N.A.*, Case No. 07-cv-2172, 2008 WL 4223271, at *1 (D. Colo., Sept. 10, 2008) (finding it appropriate to "take judicial notice of the pleadings and other filings" from plaintiff's prior lawsuit, which the Court "consider[ed] to be incorporated in Plaintiff's complaint").

predicate acts of wire fraud, mail fraud, and bank fraud and that, through these predicate acts, Defendants violated 18 U.S.C. §§ 1962(a)-(d).   (Compl. ¶¶ 296-329) Specifically, Plaintiffs allege that Defendants defrauded KPNQwest by:

- concealing from KPNQwest and some Supervisory Board members that their true purpose was to manage KPNQwest to further Qwest's domestic fraud;
- causing KPNQwest to engage in various transactions to exaggerate its financial viability and to assume debt;
- providing KPNQwest and some Supervisory Board members (and the public) with false and misleading information about fiber optic capacity transactions and KPNQwest's financial health;
- causing KPNQwest to misstate its financial condition;
- causing KPNQwest to purchase unnecessary and unwanted fiber optic capacity;
- deceiving KPNQwest, KPN, and some Supervisory Board members to ensure that KPNQwest remained dependent on Defendants' fraudulent scheme; and
- causing KPNQwest to fraudulently obtain loans to finance its purchase of Global Telesystems, Inc. ("GTS").

(*Id.*)

These allegations—which Defendants dispute but assume true for purposes of this motion only—are insufficient to state a RICO claim for the following reasons:

1. Plaintiffs' RICO claim relies on alleged conduct that is actionable as securities fraud and hence is barred by the PSLRA's RICO bar;

2. Plaintiffs' RICO claim is time-barred; and

3. Plaintiffs lack standing due to their failure to plead any injury compensable under RICO.

Accordingly, if this Court does not dismiss the entire case on *forum non conveniens* grounds, it should dismiss the RICO claim for failure to state a claim.

### A.  Background

In November 1998, KPN B.V., a wholly owned subsidiary of KPN, and Qwest

announced the organization of KPNQwest, a joint venture to "form a new European-based telecommunications business." (Compl. ¶ 39). KPN, which was partly owned by the Dutch government until September 2006 and is the leading Dutch telecommunications company, provided KPNQwest's infrastructure and many of its employees. KPNQwest was to "operate in Europe on essentially the same business model that Qwest was using in the United States." (*Id.*). The parties "finalized their joint venture agreement in April 1999," and each company received 50% of KPNQwest's stock. (*Id.* at ¶¶ 40, 41).

KPNQwest's six-member Supervisory Board—similar to a U.S. corporation's board of directors—was originally split evenly between KPN's and Qwest's nominees. (*Id.* at. ¶ 86). KPN nominated Dutch employees of KPN or its subsidiaries. Qwest nominated Defendants Joseph P. Nacchio ("Nacchio") and Robert S. Woodruff ("Woodruff") and later others. (*Id.* at ¶ 10). Defendant John A. McMaster ("McMaster") was appointed CEO of the company. (*Id.*). KPNQwest conducted an initial public offering in late 1999, selling 11.4% of its shares to the public, with Qwest and KPN each maintaining ownership of 44.3% of KPNQwest's stock. (*Id.* at ¶ 42). Two years later, in November 2001, Qwest purchased 3.2% of KPNQwest's shares from KPN, "bringing Qwest's total ownership stake up to 47.5% of KPNQwest's total shares." (*Id.* at ¶ 43). After this transaction, the Supervisory Board comprised three Qwest nominees, one KPN nominee, and two independent members. (*Id.* at ¶ 86).

From its principal place of business in Hoofddorp, Netherlands, KPNQwest sought to develop a state-of-the-art, pan-European fiber-optic network, and it operated

as a "data communications services company . . . in 15 European countries and more than 50 cities." (Compl. ¶ 18). But by May 2002, the European telecommunications market had collapsed, and KPNQwest filed for bankruptcy protection in the Netherlands, which resulted in numerous ongoing Dutch proceedings. (*Id.;* Sherman Decl. ¶ 4).

Plaintiffs, the trustees of KPNQwest's bankruptcy estate, assert two claims: (1) that Defendants violated eleven articles of the Dutch Civil Code by mismanaging KPNQwest and breaching duties owed to it (Compl. at ¶¶ 331-342); and (2) a RICO claim seeking treble damages (*Id.* at ¶¶ 297-329). Plaintiffs allege that McMaster, Nacchio, Woodruff (collectively the "Individual Defendants") and Qwest ran KPNQwest using a "similar business model" (*Id.* at ¶ 3) as that allegedly used by Qwest—namely, a "pattern of fraudulent activity by which knowingly false revenues were reported, fictitious profits were manufactured, assets were overstated and accounting procedures were knowingly manipulated, all in order to make Qwest appear more profitable and valuable than it really was and to conceal the stark failure of core elements of its business." (*Id.* at ¶ 2). This alleged scheme had "the purpose and effect of sustaining Qwest." (*Id.* at ¶ 303).

Plaintiffs asserted the same claims in the District of New Jersey, which dismissed the lawsuit on *forum non conveniens* grounds. Specifically, Judge Brown found that: (1) "the Netherlands present[ed] an adequate alternative forum for Plaintiffs' action"; (2) Plaintiffs' choice of an American forum was not driven by their convenience; (3) but rather was "'oppressive or vexatious'" to Defendants who would be forced to litigate related issues simultaneously on both sides of the Atlantic; (4) the United States has

"little interest in the resolution of this case" while "the Netherlands' interest in the matter is very substantial"; and (5) the balance of the private and public interest factors 'clearly points towards trial in the alternative forum.'"[2]  *Windt I*, 544 F. Supp. 2d at 422-25, 429. The Third Circuit affirmed:

> [W]e are satisfied that the District Court did not abuse its discretion in according the [Plaintiffs'] forum choice a low degree of deference, that the District Court did not abuse its discretion in balancing the public and private interest factors, and that the District Court did not abuse its discretion in determining that continuing with this lawsuit in New Jersey would be oppressive or vexatious to the Defendants out of all proportion to the convenience of the [Plaintiffs].

*Windt II,* 529 F.3d at 197-98.  Two weeks after the Supreme Court denied *certiorari*, Plaintiffs refiled their case in this Court.

## B.  Related Proceedings

Seven KPNQwest-related proceedings are currently pending in the Netherlands. Regardless of this Court's disposition of this motion, those proceedings will remain in the Netherlands; they cannot be brought to the United States.  They are:

(1) An investigation by the Enterprise Chamber, a branch of the Civil Court in Amsterdam with jurisdiction over corporate mismanagement claims, into the causes of KPNQwest's bankruptcy.  All Defendants, plus KPN, KPN's nominees to KPNQwest's Board, and others are involved in that proceeding.   Sherman Decl. ¶ 4c; Das Decl. ¶¶ 9-12; Suppl. Das

---

[2]  In making these determinations, Judge Brown relied on evidence concerning the location of witnesses and documents, the related Dutch and American proceedings, and the location of entities who will be subject to contribution claims, that was presented in the Sherman Decl., the Declaration of Maarten Das ("Das Decl.," dated Feb. 21, 2006) and a letter from counsel Thomas R. Curtin ("Curtin Letter," dated Sept. 13, 2006).  Defendants offer those same declarations in support of this motion, together with the Suppl. Sherman Decl. and the Supplemental Declaration of Maarten Das ("Suppl. Das Decl.," dated April 29, 2009) that primarily update the status of the related Dutch and American proceedings. Attached as Exhibits 1 and 2 to the Supplemental Sherman Declaration are the original Sherman Declaration and the Curtin Letter, respectively, and related exhibits.   Attached as Exhibit 1 to the Supplemental Das Declaration is the original Das Declaration and related exhibits.

Decl ¶¶ 4-5.

(2) Certain pre-filing investigative/discovery proceedings, overseen by the Dutch courts at the instance of an organization representing KPNQwest shareholders, in the course of which witnesses have testified in court in a proceeding referred to as a "preliminary witness examination." Suppl. Das Decl. ¶¶ 6-7.

(3) A "significantly related" lawsuit brought by the successors-in-interest to KPNQwest's lenders against Qwest, Nacchio, McMaster, KPN, and others to recover unpaid proceeds of a loan made to KPNQwest in 2002 that "involves some of the same issues as this litigation, namely the Defendants' representations concerning KPNQwest's financial condition and the mismanagement of KPNQwest." *Windt II,* 529 F.3d at 197; Suppl. Sherman Decl. ¶ 3, Exh. 2 (Curtin Letter at p. 1); Suppl. Das Decl. ¶¶ 8-10.

(4) A separate action for third-party discovery from KPNQwest's lenders to allow Qwest, Nacchio, McMaster, KPN and others defend themselves in the lawsuit identified in item (2), above. Suppl. Das Decl. ¶¶ 11-12.

(5) A separate action for third-party discovery from KPNQwest's financial advisor and the agent of KPNQwest's lenders to allow Qwest, Nacchio, McMaster, KPN and others to defend themselves in the lawsuit identified in item (2), above. Suppl. Das Decl. ¶¶ 13-15.

(6) Insurance coverage litigation that "names all of the individuals in this lawsuit and contains many of the same issues raised in this litigation." *Windt II,* 529 F.3d at 197; Sherman Decl. ¶ 4b.

(7) The ongoing KPNQwest bankruptcy. Compl. ¶ 18.

In addition, Defendants intend to pursue contribution claims against KPN, its nominees to the KPNQwest board, and others, many of whom are not subject to the jurisdiction in the U.S. Sherman Decl. ¶ 2; Suppl. Sherman Decl. ¶ 5. Those claims will "result in additional, related litigation in the Netherlands." *Windt II*, 529 F.3d at 195.

By contrast, the three other KPNQwest-related American lawsuits that were pending during the New Jersey action have been reduced to just one. Two have settled

and the last, a state court action that the Third Circuit noted was "not . . . as significant or substantial as this litigation or the litigation in the Netherlands," *Windt II*, 529 F.3d at 197, has now been dismissed and is on appeal. Suppl. Sherman Decl. ¶¶ 6(b) – 6(d).[3]

## ARGUMENT

I.    **THIS COURT SHOULD DISMISS ON *FORUM NON CONVENIENS* GROUNDS.**

   **A. Tenth Circuit *forum non conveniens* law is the same as the Third Circuit law applied in affirming dismissal of the New Jersey case.**

The Tenth Circuit stated the *forum non conveniens* test in *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602 (10th Cir. 1998). "There are two threshold questions in the *forum non conveniens* determination: first, whether there is an adequate alternative forum in which the defendant is amenable to process, and second, whether foreign law applies." *Id.* at 605 (citations omitted). If both are answered affirmatively, "the court goes on to weigh the private and public interests[4] bearing on the *forum non conveniens* decision." *Id.* at 606. "Although there is ordinarily a 'strong presumption in favor of hearing the case in the plaintiff's chosen forum,' a foreign plaintiff's choice of forum 'warrants less deference.' 'When the plaintiff is foreign, the private and public interest

---

[3] Pursuant to 28 U.S.C. § 1782, Qwest has also sought to subpoena documents from various American witnesses for use in the Dutch lawsuit by KPNQwest's lenders described in item (3) on page 8 above. The only such proceeding that remains pending is Qwest's appeal of an order quashing its subpoena to Citigroup. Suppl. Sherman Decl. ¶ 6(e).

[4] Under *Gschwind*, the private interest factors are: "(1) the relative ease of access to sources of proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious and inexpensive." *Gschwind*, 161 F.3d at 606 (citation omitted). And the public interest factors include: "(1) administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is familiar with the governing law." *Id.*

factors need not so heavily favor the alternate forum.'" *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 426 (10th Cir. 2006) (*quoting Gschwind*, 161 F.3d at 606). The Third Circuit law applied in the New Jersey case is essentially identical. *Windt II*, 529 F.3d at 189-90.

### B.  Plaintiffs should not get a second bite at *forum non conveniens.*

The District of New Jersey, applying the same factors enunciated by the Tenth Circuit, has ruled that this case belongs in the Netherlands and has been affirmed by the Third Circuit.  Plaintiffs can point to no different facts to justify revisiting that ruling. Accordingly, this Court should summarily dismiss.

### 1.  *Preclusion principles apply to* forum non conveniens *rulings.*

Plaintiffs may not relitigate Judge Brown's determination that this case belongs in the Netherlands.  "As a general rule, a federal court's determination that a matter should be resolved in a foreign forum precludes all other federal district courts from adjudicating the action."  *China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1110 (N.D. Ohio 2000); *accord, e.g., 555 Corp. Ventures, Ltd. v. Ash Grove Cement Co.*, Case No. 04-2169, 2005 U.S. Dist. LEXIS 8814, at *10-11 (D. Kan., Mar. 2, 2005) (holding that plaintiffs were precluded from relitigating an Oregon federal court's decision that "this lawsuit should be pursued in British Columbia").  Like other preclusion principles, this sensible rule "not only promotes judicial efficiency and repose but also prevents the embarrassment resulting from inconsistent determinations of the same question."  *Butler*, 800 F.2d at 225 (discussing issue preclusion).  Indeed, as the Tenth Circuit has emphasized, application of preclusion principles is mandatory:

> Issue preclusion or estoppel prevents the inconsistent determination of the
> same issues. Estoppel comes into play when an issue involved in a prior

decision is the same issue involved in a subsequent action; the issue is actually decided in the first action after a full and fair opportunity for litigation; it was necessary to decide the issue in disposing of the first action; the later litigation is between the same parties; and the role of the issue in the second action was foreseeable in the first action. When these conditions are met, *issue preclusion is required.*

*Butler,* 800 F.2d at 224-25 (reversing failure to apply issue preclusion) (citation omitted; emphasis added). *See also, e.g., Amore v. Accor, S.A.*, 484 F. Supp. 2d 124, 128 (D.D.C. 2007) (holding that in the *forum non conveniens* context, preclusion principles "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and [ ] prevent serial forum-shopping and piecemeal litigation") (quotation and citation omitted).

### 2. This Court should not revisit the earlier ruling because no new facts undercut its rationale.

"To avoid the preclusive effect of a prior *forum non conveniens* determination, 'the plaintiff in the new forum must do more than ask for a rebalancing of *forum non conveniens* considerations underlying the previous consideration.  He must show objective facts relevant to the issue that materially alter the considerations underlying the previous resolution.'" *Torreblanca v. Boeing Co.,* 806 F. Supp. 139, 141-42 (E.D. Tex. 1992) (*quoting Villar v. Crowley Maritime Corp.*, 780 F. Supp. 1467, 1482 (S.D. Tex. 1992), *aff'd* 990 F.2d 1489 (5th Cir. 1993)).  In *Pastewka v. Texaco, Inc.*, 565 F.2d 851 (3d Cir. 1977), the Third Circuit similarly held that plaintiffs who refiled their lawsuit in another district were bound by an earlier *forum non conveniens* ruling that the case should be heard in England:

[Plaintiffs'] contention amounts to no more than a wish that, in applying the objective criteria to the undisputed facts, a different judge would make the

> discretionary *forum non conveniens* determination. If appellants expected the district judge in Delaware to exercise a more discreet discretion than his judicial brother in the Southern District of New York, then they should have begun their litigation in Delaware. Having now finally lost in New York, they cannot relitigate the same factual and legal issues in Delaware.

*Id.* at 854. *See also, e.g., Amore,* 484 F. Supp. 2d at 130 (dismissing second action *sua sponte* and holding that "it is of no moment that one complaint was brought in New York and one was brought in the District of Columbia because Judge Cederbaum's *forum non conveniens* dismissal is a determination that the merits of the case should be adjudicated in a court abroad [France], rather than in the United States."); *Torreblanca*, 806 F. Supp. at 142 (plaintiffs estopped from relitigating *forum non conveniens* issues); *Barrantes Cabalceta v. Standard Fruit Co.*, 667 F. Supp. 833, 838 (S.D. Fla. 1987) (same) (reversed on other grounds); *China Tire,* 91 F. Supp. 2d at 1110-11 (same).

Plaintiffs assert that the "Third Circuit limited its consideration of the convenience of the domestic forum to the New Jersey forum, and made it clear that its decision was not to be construed as affecting the right of the [Plaintiffs] to file suit in another federal district court."  (Compl. ¶ 28).  That assertion is wrong for three reasons.

First, Plaintiffs mischaracterize the Third Circuit's ruling, which considered not only this case's lack of connection to New Jersey, but also its lack of connection to the United States as a whole, as well as other factors that favor the Netherlands over *any* American court.  Specifically, the Third Circuit approved the district court's conclusion that the tangential connections of this Dutch-centered dispute to the United States

"'cannot transform the case into an "American" dispute.'"[5]  *Windt II*, 529 F.3d at 193.  It also expressly weighed (a) other lawsuits filed in other U.S. forums and (b) the national interest of the United States in redressing the allegedly wrongful conduct of an American corporation and American executives. *Id.* at 188, 193-94.  But it found all of those factors outweighed by, among other things, the Netherlands' far stronger interest in this matter and the oppression and vexation inherent in forcing Defendants to litigate related proceedings simultaneously in both forums.  *Id.* at 193, 197-98.

Second, the Third Circuit did *not* rule, as Plaintiffs would have it, that its decision should not preclude this second bite.  Rather, that court correctly observed only that the scope of the preclusive effect to be accorded its decision was not before it.  *See Windt II*, 529 F.3d at 192 ("Thus, the conclusion we reach in this case does not *necessarily* mean that this action may not be maintainable in another federal district") (emphasis added).  Moreover, the Third Circuit cited cases discussing preclusion in the *forum non conveniens* context, *id.,* thus foreshadowing the result here.

While the Third Circuit properly declined to consider the preclusive effect of the earlier ruling, that issue is squarely before this Court.  Judge Brown made clear that this case should be pursued in the Netherlands—where Plaintiffs reside, where KPNQwest did business and went bankrupt, and where Defendants are already embroiled in

---

[5]  Judge Brown likewise held that this case is substantially unrelated to the United States as a whole. *See, e.g., Windt I,* 544 F. Supp. 2d at 419 ("Plaintiffs, Dutch attorneys appointed by a Dutch court to act as bankruptcy trustees for a Netherlands-based entity, are indeed foreign plaintiffs that have neither personal or business contacts with the United States"); *id.* at 423 ("The fact that two of these defendants are domiciled in New Jersey does not transform the case into a 'local dispute,' same as the facts that four Board meetings took place somewhere in the United States and Defendants, while being present in the United States, took part in five international conference calls, cannot transform the case into an 'American' dispute."); *id.* at 423 ("the United States . . . ha[s] little interest in the resolution of this case").

multiple related proceedings.  Because Plaintiffs can point to no "objective facts" that "materially alter the considerations" underlying the earlier dismissal, *Villar*, 990 F.2d at 1498, this Court should dismiss in favor of the Netherlands.

Finally, Plaintiffs ignore that Judge Brown did not state simply that proceeding in New Jersey would be inconvenient; rather, he expressly held that this lawsuit belongs in the "alternative forum" of the Netherlands:

> Viewed through the prism of conveniences available to Plaintiffs in Plaintiffs' home forum and potential dire exhaustion of Defendants' resources through a cluster of transatlantic litigations, Plaintiffs' action appears to be "oppressive or vexatious," and the balance of the private and public interest factors *"clearly points towards trial in the alternative forum,"* thus, supporting dismissal.

*Windt I*, 544 F. Supp. 2d at 429 (emphasis added).  Where, as here, the first court has "specifically held that this lawsuit should be pursued in [the alternative forum]," as opposed to merely holding that the first U.S. forum is inconvenient, that holding bars relitigation about where the case belongs:

> Once a court of competent jurisdiction has squarely passed on an issue between the same parties, on the merits of the cause or otherwise, that issue may not be relitigated. In this case, the District Court of Oregon squarely decided the issue of which jurisdiction is proper in this litigation . . . . The court therefore holds that, in these circumstances, 555 is precluded from relitigating the issue of *forum non conveniens*.

*555 Corporate Ventures, supra,* at *11-12 (rejecting plaintiff's contention that it should be permitted to argue that the defendant's and the case's greater ties to Kansas than to Oregon entitled it to relitigate the Oregon court's *forum non conveniens* dismissal).

### 3. Even if Plaintiffs were free to attack his ultimate conclusion, Judge Brown's rulings on subsidiary issues are preclusive.

Even if Plaintiffs were not precluded from attacking Judge Brown's ultimate

conclusion (which both the Third Circuit and Supreme Court have now declined to disturb), the findings of fact and conclusions of law underlying his decision are binding on them because Plaintiffs had a full and fair opportunity to litigate those issues and are not entitled to another one.  *See Butler,* 800 F.2d at 225*.*  Accordingly, Plaintiffs may not relitigate Judge Brown's rulings (expressly affirmed on appeal) that:

(1) The Netherlands is an adequate alternative forum, *Windt I*, 540 F. Supp. 2d at 422;

(2) Plaintiffs' choice of a U.S. forum is entitled to only "a low degree of deference," *id.* at 421;

(3) "the balance of private interests . . . unambiguously favor[s] dismissal," *id.* at 428;

(4) "the balance of the public interest factors heavily favors dismissal," *id.* at 425; and

(5) in view of the ongoing Dutch proceedings and Defendants' intent to bring contribution actions against various entities in the Netherlands, requiring Defendants to litigate simultaneously on both sides of the Atlantic would be "oppressive or vexatious." *Id.* at 429.

## C. Preclusion aside, this case should be dismissed on *forum non conveniens* grounds.

Even absent preclusion principles, application of well-settled *forum non conveniens* law would lead to the same conclusion here as it did in New Jersey:  this case belongs in the Netherlands and should be dismissed.

### 1. This case satisfies the two threshold questions: the Netherlands is an adequate forum and foreign law will apply.

In New Jersey, Plaintiffs did not contest the adequacy of a Dutch forum.  For the reasons stated by Judge Brown, *see Windt I*, 544 F. Supp. 2d at 422, they could not plausibly do so.  Nor can Plaintiffs plausibly contest that foreign law applies since their Complaint asserts claims for mismanagement and breach of duty under the Dutch Civil

Code.[6]   Thus, this case satisfies the Tenth Circuit's two threshold requirements for *forum non conveniens* dismissal.  *Gschwind*, 161 F.3d at 605.

### 2.  This Court should give Plaintiffs' forum choice little deference.

"Although there is ordinarily a 'strong presumption in favor of hearing the case in the plaintiff's chosen forum,' a foreign plaintiff's choice of forum 'warrants less deference.'"  *Yavuz*, 465 F.3d at 426 (quoting *Gschwind,* 161 F.3d at 606).  That Plaintiffs are Dutch citizens with no connection to the United States is undisputed.  *Windt I,* 544 F. Supp. 2d. at 419-20 ("there appears to be no dispute that Plaintiffs, Dutch attorneys appointed by a Dutch court to act as bankruptcy trustees for a Netherlands-based entity, are indeed foreign plaintiffs that have neither personal nor business contacts with United States.").  Because he found that Plaintiffs' forum choice was not driven by convenience, Judge Brown properly accorded it only a "low degree" of deference.  *Windt II*, 529 F.3d at 191 ("the District Court did not abuse its discretion in according the [Plaintiffs'] choice of forum a low degree of deference.").

Plaintiffs can be expected to raise two arguments for according them greater deference.  First, they will likely contend (as they did without success on appeal) that

---

[6]  Plaintiffs' effort to partially Americanize their lawsuit by including a RICO claim does not change this conclusion.  "Federal courts have refused to afford RICO claims special treatment in *forum non conveniens* inquiries and have found dismissal on this basis proper in cases involving RICO claims."  *Windt II,* 529 F.3d at 193 (collecting cases); *Yavuz*, 465 F.3d at 426-27 (Tenth Circuit remanded a case involving both Swiss law claims and a RICO claim for decision on *forum non conveniens* dismissal).  And, as shown in Section II below, the RICO claim is precluded by the PSLRA's RICO bar, is time-barred, and fails due to Plaintiffs' lack of RICO standing.  Such facially defective American claims should not weigh in the *forum non conveniens* analysis.  *See Dahl v. United Techs. Corp.*, 632 F.2d 1027, 1032 (3d. Cir. 1980) ("[T]he mere presence of a count pleaded under [American] law but which may have little chance of success does not warrant a . . . conclusion [that *forum non conveniens* dismissal is inappropriate].  If we were to hold otherwise, the plaintiffs could avoid dismissal on *forum non conveniens* grounds by the inclusion of a substantive count based on American law regardless of the merits of that claim.").

Judge Brown's ruling did not take into account the Treaty of Friendship, Commerce, and Navigation between the United States and the Netherlands (the "FCN Treaty"), which grants Dutch citizens "national access"—that is, the same treatment accorded to U.S. citizens—to our courts.  But the only reason that Judge Brown did not consider the FCN treaty is because Plaintiffs failed to raise the issue in the district court.  *Windt I*, 544 F. Supp. 2d at 419 n.14 ("Plaintiffs similarly do not assert that, under any [FCN] treaty, Plaintiffs qualify for 'national access'").[7]  In any event, the FCN treaty does not entitle Plaintiffs' forum choice to more deference.   Although Dutch citizens get the same treatment as American citizens in the *forum non conveniens* analysis, American citizens do not automatically receive the highest level of deference to their forum choice regardless of where they live.  The forum choice of expatriate Americans—and non-resident foreigners enjoying "national access" treaty rights—has long been accorded less *presumptive* deference than that of U.S.-resident American citizens.  *See, e.g., Pollux Holding, Ltd. v. The Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 n.5 (2d Cir. 2001) (*en banc*).

Second, Plaintiffs will presumably claim enhanced deference because Colorado is home to Defendants Qwest and Woodruff.  The Third Circuit, however, rejected the parallel argument that Plaintiffs' choice of New Jersey merited deference because that State was home to Defendants Nacchio and McMaster.  *Windt II,* 529 F.3d at 191.

---

[7]  Having waived any treaty-based argument by failing to raise it in New Jersey, Plaintiffs cannot escape preclusion by advancing that argument here.  *See, e.g., McNally v. Colo. State Patrol*, 122 Fed. Appx. 899, 904-05 (10th Cir. 2004) (rejecting argument that issue preclusion can be avoided by raising matters that could have been raised in the earlier proceeding).

Equally important, the Tenth Circuit has also rejected this argument where, as here, the forum district was home to only half the defendants. *Gschwind*, 161 F.3d at 609.

And Plaintiffs' forum choice is entitled to little deference because it is motivated by forum-shopping rather than convenience. *See, e.g., Windt I,* 544 F. Supp. 2d at 417; *Iragorri*, 274 F.3d at 72 ("the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands"). Plaintiffs' manifest desire to seek treble damages under RICO provides no reason to keep this Dutch-centered case here. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981) (rejecting argument that application of less favorable foreign law militated against dismissal).

### 3.    The private interest factors heavily favor dismissal.

Review of the Complaint makes clear that the key issues to be addressed in this case are what caused KPNQwest's bankruptcy and who, if anyone, is liable for it—in other words, liability, causation, injury, and damages. Although some liability-related documents and witnesses are here, many more documents and witnesses relevant to liability, causation, injury, and damages are in the Netherlands. (*Windt I*, 544 F. Supp. 2d at 425-26; Sherman Decl. ¶ 3).[8] Plaintiffs hold KPNQwest's records in the Netherlands (comprising 2000 boxes of documents and about 105 million pages of electronic documents), and the most important third-parties (*e.g.*, KPN and its nominees to KPNQwest's board, KPNQwest's auditors, its former employees, and its investment

---

[8]  To the extent that there are unwilling non-party witnesses in the United States, Dutch courts are, in appropriate cases, able to compel their testimony. Das Decl. ¶ 7; *Windt I*, 544 F. Supp. 2d at 427-28.

bankers and lenders) and their documents are in the Netherlands as well.  (*Windt I*, 544 F. Supp. 2d at 425-26; Sherman Decl. ¶ 3).  Given that this case is about the demise of a Dutch company, this is to be expected and favors dismissal.

More critically, the related proceedings pending in the Netherlands (Suppl. Das. Decl. ¶¶ 5-14) and Defendants' contemplated contribution claims against third-parties there (*e.g.,* KPN and its nominees to KPNQwest's board) strongly favor a Dutch forum, where the Dutch courts can coordinate proceedings as appropriate.  *See Windt II*, 429 F.3d at 195;[9] Supp. Das Decl. ¶ 15.   There is no way for Defendants to bring the ongoing Dutch proceedings here, and it is likely that foreign third-parties sued for contribution would resist this Court's jurisdiction, (Suppl. Sherman Decl. ¶¶ 5, 6(a)), which raises the spectre that Defendants "would have to pursue their cross-claims in [the Netherlands] while defending against [Plaintiffs'] claims in the United States.  Such a scenario not only represents a waste of judicial resources, but also creates a risk of inconsistent judgments."  *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993).   Indeed, the Supreme Court has held that the prospect of having to defend claims here while pursuing contribution claims abroad is sufficiently burdensome to justify dismissal.  *Piper*, 454 U.S. at 268.

### 4.    The public interest factors likewise heavily favor dismissal.

The District of New Jersey and the Third Circuit have correctly found the interest

---

[9]   As Judge Brown noted, "if this Court is to presume that Defendants are to follow Plaintiffs' advice by initiating *additional* related legal actions, the possibility of a mushrooming cluster of suits in the Netherlands only supports dismissal of Plaintiffs' Complaint, so the court in the Netherlands could execute a joinder of the actions, thus shortening the trial processes and making them less expensive." *Windt I*, 544 F. Supp. 2d at 428 (emphasis in the original).

of the Netherlands in this dispute far outweighs the interest of the United States. While this District has some interest in cases concerning Qwest, that generalized interest is outweighed by the "very substantial" interest of the Netherlands—already home to related proceedings concerning the alleged mismanagement of a Dutch company that did business in the Netherlands and went bankrupt there. This Court should not be forced to assume the burden of interpreting and applying numerous provisions of the Dutch Civil Code, which is all that would remain in this Court once the Plaintiffs' RICO claim is dismissed. Even a viable RICO claim would not justify retaining the case in Colorado when the *forum non conveniens* factors so clearly point to the Netherlands. As Judge Brown observed, there is "no reason to believe that [an American court] is better equipped to deal with eleven Dutch statutory provisions than the Dutch court is to deal with one American statute." *Windt II*, 544 F. Supp. 2d at 425.

* * * * *

Defendants respectfully submit that this Court, like the District of New Jersey, should dismiss this case in favor of a Dutch forum.

## II.    THIS COURT SHOULD DISMISS PLAINTIFFS' RICO CLAIM.

If this case is not dismissed in favor of a Dutch forum,[10] this Court should dismiss Plaintiffs' RICO claim for any of three independently sufficient reasons: (1) it relies on conduct that is actionable as securities fraud and hence is barred by the PSLRA; (2) it is time-barred; and (3) Plaintiffs lack standing because they fail to plead any injury

---

[10]  This Court need not reach this aspect of Defendants' motion if it dismisses on *forum non conveniens* grounds.

compensable under RICO.

In assessing the validity of Plaintiffs' RICO claim, only well-pleaded factual allegations should be considered as true; vague and conclusory statements must be ignored. *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006), cert. denied, 549 U.S. 1209 (2007); *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154-55 (10th Cir. 2001); *Jones v. Nat'l Communication and Surveillance Networks*, 409 F. Supp. 2d 456, 473-74 (S.D.N.Y. 2006) ("conclusory allegations are insufficient to survive a motion to dismiss RICO claims, especially given the '"inevitable stigmatizing effect"' a RICO claim can have on a defendant") (internal citations omitted).

Since the predicate acts require proof of fraud, the RICO allegations must be pleaded with particularity. *Tal*, 453 F.3d at 1263, 1269 (particularity requirement of Rule 9(b) applies to RICO); *Burnett v. Amrein*, Case No. 06-cv-564, 2006 WL 2859625, at *7 (D. Colo., Oct. 3, 2006) (Blackburn, J.) ("plaintiff must specify the time, place, and content of the alleged false representation and describe with particularity any allegedly fraudulent transaction, and how the particular mailing or transactions furthered the fraudulent scheme") (internal citation omitted).

### A. Plaintiffs' RICO claim is barred by the PSLRA because it relies on conduct actionable as securities fraud.

Plaintiffs' RICO claim is expressly barred by the PSLRA. Before the PSLRA, "a private plaintiff could assert a civil RICO claim for securities law violations sounding in 'garden variety' fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (citation omitted). As a result, "plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble

damages." *Id.* But Congress put a stop to that abuse in the PSLRA, amending Section 1964(c) of the civil RICO statute to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a [RICO violation]." 18 U.S.C. § 1964(c); Pub. L. No. 104-67, § 107, 109 Stat. 737, 758 (1995). Congress intended that amendment not simply "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369, at 47 (1995). "To prevent circumvention of congressional intent, courts have interpreted the PSLRA amendment broadly." *Eagletech Communications, Inc. v. Citigroup, Inc.*, Case No. 07-60668, 2008 WL 3166533, at *9 (S.D. Fla., June 27, 2008) (citations omitted).

### 1. Plaintiffs' RICO claim is based on conduct actionable as securities fraud.

Fraud "in connection with the purchase or sale of securities," *SEC v. Zandford*, 535 U.S. 813, 819 (2002), is actionable under the securities laws, and hence "cannot support a civil RICO claim after enactment of the PSLRA." *Bald Eagle*, 189 F.3d at 330. Plaintiffs' RICO claim relies upon such alleged conduct. Specifically, the Complaint alleges a scheme actionable as securities fraud when it asserts that Qwest:

- engaged in "pattern of fraudulent activity" "to make Qwest appear more profitable and valuable than it really was…" (Compl. ¶ 2);
- manipulated KPNQwest to prevent "revelation" of the "massive fraud and cover-up" by Qwest in the United States (*Id.* at ¶¶ 8, 220, 303);
- manipulated KPNQwest to maintain Qwest's own "stock price" at the "specified levels" needed to complete the US WEST acquisition (*Id.* at ¶ 54);

- "substituted fraudulent books and records" and provided "false and misleading financial reporting" regarding KPNQwest to mislead the investing public about KPNQwest's (and Qwest's) value (Compl. ¶¶ 7, 256-57; *see id.* at ¶¶ 242-51); and

- gained control of KPNQwest and used fraudulent business and accounting practices to "prop up" KPNQwest and thereby inflate the apparent value (and stock prices) of both KPNQwest and Qwest. (*See, e.g., id.* at ¶¶ 2-3, 7-11, 54, 59-61, 108, 134-136, 142-43, 154, 172, 186, 197, 230, 241-52, 265-6, and 332 (alleging that "Defendants caused the value of the company to be inflated by the overvaluation of assets")).

Plaintiffs claim Qwest committed this fraud because it "needed to maintain its strong financial appearance in order to obtain financing necessary to complete its own network and to pay for other capital projects." (*Id.* at ¶ 56).  To do so, Qwest allegedly: "resorted to more and more fraud and misrepresentation to conceal what actually was transpiring in its business" (*Id.* at ¶ 57) and "'engaged in fraudulent accounting that allowed Qwest to meet aggressive financial projections . . . . so investors would believe the company was doing better than it actually was." (*Id.* at ¶ 59).   In short, this alleged scheme was "for the purpose and effect of sustaining Qwest" (*Id.* at ¶ 303).[11]

Plaintiffs even allege that this alleged scheme directly involved the *purchase* and *sale* of securities.  They contend that Qwest increased its control over KPNQwest by buying additional KPNQwest stock in 2001. (*Id.* at ¶¶ 43, 88, 309).  A fraudulent scheme to purchase securities to control a company is actionable as securities fraud.  *See, e.g., SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 608 (S.D.N.Y. 1993). Furthermore, Plaintiffs assert that the fraudulent scheme permitted "Qwest executives to

---

[11]   Indeed, some securities plaintiffs have alleged that Qwest improperly boosted its own valuation by inflating KPNQwest's.  *See, e.g., In re Qwest Communications Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1142 (D. Colo. 2005) (discussing the "controversy concerning the valuation of Qwest's investment in KPNQwest").

cash out personal stock in the company at inflated prices." (Compl. ¶ 58).

Thus, as Plaintiffs acknowledged in New Jersey (*see* page 3, above, and Sherman Decl, Ex. G), they allege a RICO claim based on a scheme to inflate the value, and hence the stock prices, of both Qwest and KPNQwest and to conceal ongoing securities fraud at Qwest. Such conduct more than meets the Supreme Court's "in connection with" test, since that test requires only "that the scheme to defraud and the sale of securities *coincide.*" *Zandford*, 535 U.S. at 822 (emphasis added). "[F]raudulent manipulation of stock prices . . . unquestionably qualifies as fraud 'in connection with the purchase or sale' of securities as the phrase is defined in *Zandford* . . . ." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 89 (2006) (citations omitted).

Plaintiffs' allegations—that the alleged scheme (1) propped up Qwest's own stock price to, among other things, permit insiders to sell stock at fraudulently inflated prices; (2) prevented disclosure of Qwest's own alleged securities fraud; (3) involved the use of stock offerings and purchases to gain control of KPNQwest; and (4) involved financing activities (such as bond offerings) based on a fraudulently inflated stock price—demonstrate that Plaintiffs' RICO claim impermissibly relies on conduct actionable as fraud in the purchase or sale of securities and thus is barred by the PSLRA. *See, e.g.,* Compl. ¶¶ 2-3, 7-11, 54, 59-61, 108, 134-136, 142-43, 154, 172, 186, 197, 230, 241-52, 265-6, and 332; *see also Bald Eagle*, 189 F.3d at 330 (misrepresentations and omissions in accounting statements, which induced new investments, constitute conduct "undertaken in connection with the purchase of a

security…" as does "conduct undertaken to keep [an ongoing] securities fraud . . . scheme alive . . . ."); *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (affirming dismissal of RICO claim where plaintiffs "asserted that AOL misrepresented revenues, profits and number of subscribers; used improper accounting practices; and illegally sold stock at a profit"); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 649 (S.D. Tex. 2003) (dismissing RICO claims because "alleged acts are all offenses constituting misrepresentations or concealment of Enron's real financial condition to inflate the value of Enron stock and to keep investor money flowing"); *see also Hollinger Int'l, Inc. v. Hollinger Inc.*, Case No. 04-C-0698, 2004 WL 2278545, at *7 (N.D. Ill., Oct 8, 2004) (holding RICO claims barred under PSLRA, although "none of the allegations in the Complaint directly related to the purchase or sale of securities.").

Moreover, Plaintiffs assert that each purchase of KPNQwest stock by Qwest furthered its control over KPNQwest and thus made it more able to control and direct the alleged fraud and execute the other activities, which in turn "caused the value of the company to be inflated"—thus allowing Qwest and the Individual Defendants to benefit by inflating the value of Qwest's own stock.  (Compl. ¶ 332).  As the Supreme Court has stated, where the securities transactions and the alleged "fraudulent practices were not independent events," the conduct is actionable as securities fraud.  *Zandford*, 535 U.S. at 820.  Accordingly, the PSLRA clearly bars Plaintiffs' RICO claim.

### 2. *Plaintiffs' disclaimers do not preclude dismissal.*

Plaintiffs will undoubtedly argue—as they did in New Jersey—that the PSLRA's RICO bar does not apply because (1) they have disclaimed reliance on any securities

violations and (2) they lack standing to pursue securities claims.  Both arguments fail.

First, courts do not permit plaintiffs to "plead around" the RICO bar as Plaintiffs seek to do.  Plaintiffs purport to disavow any intent to "incorporate into their RICO claims any conduct that is or could be deemed actionable as securities fraud" (Compl. ¶ 296).  This attempt to avoid the RICO bar by disavowing a vaguely defined subset of their allegations is not only impermissible under Rule 9(b)—which requires Plaintiffs' RICO claim to be pleaded with particularity—it also cannot change the fact that the conduct alleged is actionable as securities fraud.

Despite their vague disclaimer, Plaintiffs allege a unitary scheme in which the predicate acts are "all related to each other in furtherance of a common objective to engage in a continued and concerted course of conducted directed at KPNQwest, and for the purpose and effect of sustaining Qwest." (*Id.* at ¶ 303.)  Courts routinely  decline to parse a plaintiff's allegations to determine if the RICO bar applies:  "courts view the complaint in its entirety and reject the invitation to parse the plaintiff's allegations . . . Thus, where the allegations in a complaint, taken as a whole, amount to conduct that can be actionable as [securities] fraud . . . federal courts have uniformly applied the PSLRA's bar."  *Eagletech Communications,* 2008 WL 3166533, at *9-12 (citations omitted) (collecting cases so holding); *Baron v. Chehab*, Case No. 05-3240, 2006 WL 156828, at *8 (C.D. Ill., Jan. 20, 2006) (refusing to parse plaintiff's claim to identify parts that might be separable from the securities fraud because Congress sought to eliminate RICO claims in securities fraud cases, and the careful parsing of the amended complaint would frustrate that Congressional goal). Indeed, "a plaintiff cannot avoid the

RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.  Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment." *Bald Eagle*, 189 F.3d at 329; *Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) ("Plaintiff cannot magically revive his claim by picking out discrete details of his allegations and then claiming that they are not actionable as securities fraud" where the "entire cause of action surrounding the . . . scheme involves some type of securities fraud . . . . ").

Nor does Plaintiffs' lack of standing[12] to pursue securities claims themselves permit them to evade the RICO bar.  That argument cannot be squared with the PSLRA's statutory language ("*no person* may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a [RICO violation]") and has accordingly been unanimously rejected by every district court that has considered the issue.  *See, e.g., Eagletech*, 2008 WL 3166533, at *12-13 (collecting cases rejecting this argument).  In the only appellate case on point, the Ninth Circuit held that, despite the plaintiff's lack of securities standing, the RICO bar applied because a securities claim "could be brought by a plaintiff with proper standing." *Am. Online*, 208 F.3d at 749.

---

[12]    *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 (1975) (only actual sellers or purchasers have standing to sue for securities fraud).

### 3. Similar securities claims brought by others and Plaintiffs' characterizations of their own claims confirm that the conduct alleged is actionable as securities fraud.

That Plaintiffs' RICO claim relies on conduct "actionable as securities fraud" is confirmed by the other cases alleging securities claims based on the same conduct alleged here.    In laying out the alleged scheme, the Complaint states that the "remarkable nature and scope of Qwest's fraud is well-established.  Qwest has been the subject of Congressional inquiries and numerous investigations, criminal proceedings, and civil suits brought by and/or on behalf of the SEC, the U.S. Attorney's Office, the New York State Attorney General, shareholders of Qwest and U.S. West, and others." (Compl. ¶ 59).  Indeed, the Complaint even quotes former SEC Chairman Donaldson's rhetoric concerning Qwest's alleged "fraudulent accounting."  And, as this Court knows well, numerous SEC and private civil actions have been based on Qwest's alleged accounting fraud, which Plaintiffs allege the conduct at issue here was intended to cover up, as the basis for alleging violations of the federal securities laws.  (*Id.* at ¶ 8.)[13]

Moreover, three KPNQwest-related securities fraud cases have been filed by other plaintiffs: *Taft v. Ackermans*, Case No. 02-cv-7951 (S.D.N.Y., filed Oct. 2002); *Grand v. Nacchio*, Case No. C-2002-5348 (Pima Co., Arizona, Superior Ct., filed Oct. 2002); and *Appaloosa Investment LP v. Qwest Communications Int'l, Inc.*, Case No. 05-cv-5674 (S.D.N.Y., filed June 2005).  The securities fraud counts in those cases rely on precisely the same alleged conduct—Qwest's purported control of KPNQwest and

---

[13]    And some of those who sued Qwest for securities fraud likewise alleged that it used fraudulently inflated valuations of its KPNQwest holdings to fraudulently inflate its own stock price. *See* note 11, *supra.*

Qwest's alleged use of fraudulent business and accounting practices to prop up KPNQwest's value (and thereby Qwest's own value)—that Plaintiffs rely on for their RICO claim.[14]

Such parallel securities claims are strong evidence that a RICO action relies on conduct actionable as securities fraud.  *See, e.g., Bald Eagle*, 189 F.3d at 328 (after comparing similarities between an SEC securities fraud action and a RICO claim, court concludes that the "same . . . scheme is at the heart of this RICO action"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 487 (E.D. Pa. 2000) ("[T]he underlying financial improprieties are actionable as securities fraud, as *clearly demonstrated* by the ERISA claim *and the Pennsylvania [state law securities fraud] complaint* as a whole.") (emphases added); *Eagletech,* 2008 WL 3166533, at *12 ("When facts underlying an SEC action are the same as the facts underlying a federal RICO action, the PSLRA bar applies.").  Moreover, as discussed on page 3, above, before they realized the import of their admission, Plaintiffs admitted that the alleged racketeering scheme was designed to "preserve[] and enhance[]" "Qwest's and KPNQwest's inflated stock price" (Sherman Decl., Ex. G)—both by inflating their apparent value and by concealing alleged securities fraud at Qwest. (*See, e.g.,* Compl. ¶¶ 2-3, 7-11, 54, 59-61, 108, 134-136, 142-43, 154, 172, 186, 197, 230, 241-52, 265-6, and 332 (alleging that "Defendants caused the value of the company to be inflated by the overvaluation of assets")).  Plaintiffs' belated attempts at cosmetic surgery cannot

---

[14]  Copies of the complaints in those cases are attached as Exhibits C – E to the Sherman Declaration, respectively. *Taft* and *Appaloosa* have settled. *Grand* has been dismissed and is on appeal. Suppl. Sherman Decl. ¶¶ 6(b) – 6(d).

change that. *Bald Eagle,* 189 F.3d at 329. Accordingly, Plaintiffs' RICO claim is barred by the PSLRA and should be dismissed.

### B. Plaintiffs' RICO claim is time-barred.

"The statute of limitations for a RICO action is four years." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1234 (10th Cir. 2006) (citing *Rotella v. Wood*, 528 U.S. 549, 552 (2000)). "While the Supreme Court has not settled upon a definitive rule for when the limitations clock starts running, it has announced two possibilities: either when the plaintiff knew or should have known of his injury (the injury-discovery rule); or when the plaintiff was injured, whether he was aware of the injury or not (the injury-occurrence rule)." *Id.* (citing *Rotella*, 528 U.S. at 553-54). This Court need not decide which rule applies because the result is the same under either. Plaintiffs undoubtedly knew of the alleged injury by May 31, 2002, the date on which KPNQwest "was declared bankrupt." (Compl. ¶ 18). But they did not file their Complaint until January 29, 2009— more than six-and-a-half years after KPNQwest's bankruptcy and more than four-and-a-half years after they filed the New Jersey action. Thus, the RICO claim is time-barred. *Cory*, 468 F.3d at 1234.

Plaintiffs baldly allege that "[t]he RICO statute of limitation was tolled as of the filing of the New Jersey action," which was filed on June 25, 2004, and finally dismissed in January 2009. (Compl. ¶ 31). As the Tenth Circuit has held, however, "[i]n the absence of a statute to the contrary, the limitation period is not tolled during the pendency of the dismissed action." *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 961 (10th Cir. 1991) ("dismissal without prejudice leaves the parties as

30

though the action had never been brought") (*abrogation on other grounds recognized by Keeler v. Cereal Food Processors*, 250 Fed. Appx. 857, 860-61 (10th Cir. 2007));[15] *Scott v. The Boeing Co.*, 48 Fed. Appx. 730, 731 (10th Cir. 2002) (same).[16] "[A]fter a complaint is dismissed without prejudice, 'the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing.'" *Galbreath v. Dudas*, Case No. 04-2222, 2006 WL 156701, at *2 (D.D.C., Jan. 20, 2006) (quoting *Ciralsky v. C.I.A.*, 355 F.3d 661, 672 (D.C. Cir. 2004)).

"[T]he general federal rule concerning the issue of tolling is that the commencement of one action does not toll the statute of limitations applicable to another. 'In other words, a suit dismissed without prejudice is treated for statute of limitation purposes as if it had never been filed.'" *Walstrom*, 2008 WL 5411091, at *12 (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000)). Thus, Plaintiffs' bald allegation that the New Jersey case tolled the statute is wrong and should be disregarded. *Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir. 1990) (district court need not accept "footless conclusions of law" in ruling on 12(b)(6) motion).

The common practice of conditioning *forum non conveniens* dismissals upon a waiver or tolling of the statute of limitations, *which did not occur here*, confirms that

---

[15] Examples of such "statute[s] to the contrary" include the state savings provisions at issue in *Brown*, 926 F.2d at 962, or the federal supplemental jurisdiction statute, which "tolls the running of a state statute of limitations while a state claim is pending before a federal court pursuant to the supplemental jurisdiction statute, and for an additional thirty days after the dismissal of such claim." *Walstrom v. City of Altoona*, Case No. 3:2006-81, 2008 WL 5411091, at *12 (W.D. Pa., Dec. 29, 2008) (citing 18 U.S.C. § 1367(d)). No such statutory tolling provision applies here.

[16] *Accord, e.g., Chico-Velez v. Roche Prods., Inc.*, 139 F.3d 56, 59 (6th Cir. 1998); *O'Donnell v. Vencor, Inc.*, 466 F.3d 1104, 1111 (9th Cir. 2006).

statute of limitations was not tolled in this case. *See, e.g., In re Air Crash Off Long Island, New York*, 65 F. Supp. 2d 207, 212 (S.D.N.Y. 1999) ("Conditional dismissals have frequently been used by courts to ensure that an alternative forum will exist."); *Reed v. Norfolk and Western Ry. Co.*, 635 F. Supp. 1166, 1168 (N.D. Ill. 1986) ("Courts . . . often require the defendant seeking the *forum non conveniens* dismissal to waive the statute of limitations if the new suit is refiled in a convenient forum within a designated period of time."). The practice of granting such conditional dismissals would be meaningless if, as Plaintiffs contend here, the limitations period were automatically tolled during the pendency of an action dismissed on *forum non conveniens* grounds.

Here, Plaintiffs neither requested nor received an order providing that the *forum non conveniens* dismissal of their New Jersey action be conditioned upon a tolling of the limitations period or Defendants' waiver of a limitations defense. See *Windt I*, 544 F. Supp. 2d 409 at 434, *aff'd*, 529 F.3d at 198. Instead, Plaintiffs made tactical choices to file in New Jersey and to litigate their asserted right to proceed in that forum all the way to the Supreme Court without seeking such a proviso, while the limitations clock ticked and then expired. The consequence of those tactical choices is that the statute of limitations now bars the claim. *See Kuiper v. Busch Entm't Corp.*, 45 F.3d 284, 285-87 (8th Cir. 1995) (holding that where the statute of limitations ran during plaintiff's appeal of a *forum non conveniens* dismissal and the plaintiff had, as here, "failed to obtain such protection [conditioned dismissal], despite opportunities to request it," the plaintiff's refiled claim was time-barred).

**C. Plaintiffs lack standing to sue under RICO because KPNQwest suffered no "direct injury."**

Plaintiffs' RICO claim also fails because the alleged injuries to KPNQwest are too "indirect" to establish RICO standing. The Supreme Court has made clear that only the "direct" victims of the alleged fraud, such as those who loaned money to KPNQwest in reliance on the alleged misrepresentations, have standing to sue under RICO. Here, Plaintiffs are Dutch lawyers appointed by the Dutch bankruptcy court to serve as the KPNQwest estate's trustees. They are prosecuting this suit "on behalf of and for the benefit of the bankruptcy estate(s)" of KPNQwest and its subsidiaries and they seek "to recover the deficit of the estate (*i.e.*, the unpaid claims of creditors)." (Compl. ¶¶ 17; 342). Plaintiffs rely on the so-called "deepening insolvency" damages theory, but this theory has never been applied to RICO and it has been rejected by most courts and commentators even with respect to state law tort claims.

**1. Plaintiffs lack standing to sue for harms allegedly suffered by others, including some who have asserted their own claims.**

Those who extended credit to KPNQwest (such as banks and bondholders) are the persons who were directly injured by the conduct alleged in the Complaint in this case—not the Plaintiffs. The RICO statute provides that any person injured *"in his business or property by reason of"* a defendant's violation of RICO may sue and recover treble damages, plus costs and attorneys' fees. 18 U.S.C. § 1964(c). Three Supreme Court cases have articulated the narrow contours of that statute. In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985), the Supreme Court held that a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation." *Id.* at 496.

In *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992), the Court focused on Section 1964(c)'s requirement that the claimed injury be "by reason of" a defendant's RICO violation. The Court held that a plaintiff could only recover damages to the extent that the defendant's RICO violation was both the "but-for" and the proximate cause of the injury. *Id.* at 268. The requirement of "proximate cause" demands "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

*Holmes* extended traditional, tort-law proximate-causation to RICO in light of: (1) the factual difficulty of measuring indirect damages and distinguishing among distinct independent causal factors; (2) the complexity of apportioning damages among plaintiffs "to obviate the risk of multiple recoveries"; and (3) the fact that "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law." *Holmes*, 503 U.S. at 269. The Court deemed the alleged injuries, which were contingent on harm to others, too remote to support a RICO claim. *Id.* at 271-74.

In its most recent RICO damages decision, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the Supreme Court again found the alleged violations too remote and indirect to be a "proximate cause" of the injuries. The *Anza* plaintiff sued a competitor under RICO on the theory that the competitor failed to charge sales tax and submitted fraudulent tax returns, thus enabling the defendant to undercut the plaintiff's price. *Id.* at 453-56. The Court held that the alleged tax fraud did not proximately cause plaintiff's injuries because the harm (offering lower prices) was "entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. The alleged RICO violation directly

caused the State to be defrauded of tax revenues, but only indirectly caused the plaintiff to lose money, which was not enough to satisfy the proximate cause requirement. *Id.* "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461.

Applying *Sedima*, *Anza,* and *Holmes*, courts have routinely dismissed civil RICO actions where, as here, the alleged racketeering activity injured the plaintiff indirectly, if at all. *See Longmont United Hosp. v. Saint Barnabas Corp.*, 305 Fed. Appx. 892, 895-96 (3d Cir. 2009) (defendant's overcharging of Medicare was not a proximate cause of plaintiff hospital's damages, even if defendant's conduct reduced the amounts received by plaintiff from Medicare because plaintiff's injuries hinged entirely on intermediary's administration of the Medicare reimbursement system); *Canyon Co. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982 (9th Cir. 2008) (plaintiff county's asserted injuries (increased demand for public health care and law enforcement services) held too remote from the alleged RICO violation (defendants' knowing hiring of undocumented workers)); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1147-49 (9th Cir. 2008) (record producer only damaged indirectly by competitor's copyright fraud); *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403-04 (7th Cir. 2006) (plaintiff only injured indirectly by bid-rigging scheme between its former employee and a competitor and noting availability of more direct victim who could bring suit).

This Court should dismiss Plaintiffs' RICO claim because the only alleged injuries are indirect and too remote to support a RICO claim.   (Compl. ¶¶ 17; 342 (seeking damages equal to the liquidation deficit owed to KPNQwest's creditors)).  Because

bondholders, banks, and other creditors were the direct victims of any alleged wrongful concealment of KPNQwest's true financial condition, Plaintiffs lack RICO standing, as they have failed to allege any compensable direct damages.[17]

In deciding whether alleged damages are sufficiently "direct" to be actionable under RICO, courts consider the three factors identified by the Supreme Court in *Holmes* as grounds for not allowing recovery of indirect damages and ask:

1. Are there more direct victims who can vindicate the law?
2. Would it be difficult to determine which portion of plaintiff's losses was attributable to defendant's wrongdoing and which was caused by other, independent, factors?
3. Would it be difficult to apportion damages among potential plaintiffs to obviate the risk of multiple recoveries?

*Holmes*, 503 U.S. at 269; *Longmont United*, 305 Fed. Appx. at 896; *Canyon Co.*, 519 F.3d at 982; *Sybersound*, 517 F.3d at 1148; *James Cape*, 453 F.3d at 403.

The first of these factors, the existence of more direct victims, is alone a "compelling" reason to deny RICO standing here.  *James Cape*, 453 F.3d at 403; *Paul v. Winco Holdings, Inc.*, 249 F.R.D. 643, 650 (D. Idaho 2008) ("proximate cause is defeated by the existence of more-direct victims who can be counted on to vindicate the law as private attorneys general").  *See Holmes*, 503 U.S. at 268-69 (harm flowing "from the misfortunes visited upon a third person by the defendant's acts" generally stands "at too remote a distance to recover"); *Dow Chemical Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 696 (D. Del. 1998) (plaintiffs lacked standing where another entity "was the direct

---

[17]    In applying *Sedima*, *Holmes* and *Anza*, some courts dismiss the RICO claims for lack of RICO standing, *e.g.*, *Canyon Co.*, *supra*, while others dismiss for lack of allegations of compensable damages, *e.g.*, *James Cape*, *supra*.  The result is the same in either case.

victim of the alleged racketeering as it was the party who suffered the first (i.e., most direct) economic loss as a result of the allegedly fraudulent conduct"); *cf. Hunt v. Hanifen Imhoff Inc.*, 671 F. Supp. 715, 717 (D. Colo. 1987) (dismissing claim because other "potential plaintiff[s]" were in a "better position to assert an antitrust violation").

Here, the supposedly "defrauded" lenders, bondholders, and other directly injured creditors would have been the appropriate plaintiffs. In fact, the banks who loaned KPNQwest the funds for the GTS acquisition have already sued these same Defendants and others. *Compare* Suppl. Sherman Decl. ¶ 3, Ex. 2 (an English translation of the complaint filed by KPNQwest's lenders and their assignees against three of the four defendants in this action and thirteen others, many of whom are European or Netherlands-based entities or persons, alleging that they were fraudulently induced to loan KPNQwest the funds needed for the GTS acquisition) *with* Compl. ¶¶ 269-77 (alleging that "in the course of obtaining the financing and approval to consummate" their "unjustifiable acquisition of a bankrupt company, GTS," "Defendants continued their pattern of fraudulent misrepresentation and omission"). And KPNQwest shareholders *and bondholders* have already brought—and settled—securities claims against Defendants here and others at least partly based on the same wrongdoing alleged in this case. Sherman Decl. ¶¶ 4-7; Suppl. Sherman Decl. ¶¶ 6(b) - 6(d). Under these circumstances, courts routinely dismiss to prevent the risk of duplicative recoveries. *See Holmes*, 503 U.S. at 273 (1992) (finding no right to sue under RICO when "the [more directly-injured] broker-dealers have in fact sued in this case."); *Longmont United*, 305 Fed. Appx. at 896 (denying standing where direct victim had

already brought and settled claims arising from the same facts); *In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369, 1377 (C.D. Cal. 1993) (dismissing claim that belongs to "more direct victims of the alleged RICO enterprise").[18]

The two remaining factors also favor dismissal. With respect to calculation of damages, while it would be "difficult to quantify what injuries [the debtor company] sustained as a result of the alleged racketeering acts," that is "certainly not the case" for lenders, bondholders, and other creditors. *In re Jamuna Real Estate, LLC*, 392 B.R. 149, 171 (Bankr. E.D. Pa. 2008). Those who gave loans or who provided goods or services on an account "which remains unpaid" suffered "discrete," easily quantifiable damages, but "[a]scertaining the damages to [the debtor company] is not so simple." *Id. See Sybersound*, 517 F.3d at 1148 (denying standing where court would need to "engage in a speculative and complicated analysis to determine what percentage of Sybersound's decreased sales, if any, were attributable" to the alleged racketeering); *James Cape*, 453 F.3d at 403 (same where damages could have occurred "for any number of reasons unconnected to the asserted pattern of fraud"); *Treadway v. Lisotta*, Case No. 08-1375, 2008 WL 3850462, at *6 (E.D. La., Aug. 15, 2008) (same where court would have to perform an "intricate, uncertain" inquiry to determine what portion of

---

[18] *Cf., e.g., Holmes*, 503 U.S. at 266-70 (applying antitrust causation principles to RICO); *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 410 (10th Cir. 1992) (denying antitrust standing to less directly injured plaintiff prevents the "risk of duplicative recoveries") (citing *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987) (plaintiffs lacked antitrust standing because, *inter alia*, "superior plaintiffs" had "already asserted claims in their own rights, received substantial settlement payments, and vindicated the public interest in antitrust enforcement")); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 n.2 (9th Cir. 1987) (denying antitrust standing because better plaintiffs had already sued "alleging the same antitrust violations alleged in the present case," posing the risk of duplicative recovery*)*; *Strang v. Visa U.S.A., Inc.*, Case No. 03-cv-11323, 2005 WL 1403769, at *4 (Wis. Cir. Ct., Milwaukee Co., Feb. 8, 2005) ("Succinctly stated, merchants are the class of individuals who are more directly injured by the antitrust activities and in a better position to prosecute a claim based upon that activity; in fact, they have done so.").

alleged injuries "could reasonably be attributed to the RICO violations, as opposed to other factors").

The third factor, apportionment of damages, arises from the "corollary problem" of "how should any monetary recover[y] be shared as between the directly injured [lenders, bondholders, and other creditors] and the collaterally aggrieved [debtor company]." *Jamuna Real Estate,* 392 B.R. at 171.  *See Longmont United*, 305 Fed. Appx. at 896 ("appreciable risk of duplicative recoveries" warranted dismissal); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 265 (3d Cir. 1999) ("Determining how to apportion damages between the wholesalers and the plaintiffs in this case would require exactly the same sort of apportionment determination condemned in *Holmes*").

In light of the presence of more direct victims of the alleged wrongdoing; the *Taft* case, which was brought specifically on behalf of KPNQwest bondholders (and others), and which settled their claims; the difficulty of determining which portion of KPNQwest's losses were caused by the alleged racketeering (as opposed to other factors, such as the admitted general economic downturn in the telecom industry as a whole, Compl. ¶¶ 49-50, 78); and the problems of apportionment and potential duplicative recoveries, Plaintiffs lack RICO standing under *Holmes* and *Anza*.

### 2. Plaintiffs' "deepening insolvency" damages theory is not valid under RICO.

Plaintiffs' RICO counts rely on the notion that Defendants' alleged misconduct damaged KPNQwest by pushing it into "deepening insolvency." (Compl. ¶¶ 11, 108-09, 188, 190, 225, 248, 268, 277, 290, 293, 306, 332).  The so-called "deepening insolvency" theory posits that a defendant who improperly keeps a company alive after

it becomes insolvent should be liable for such of its losses as are incurred between the time it should have been liquidated and the time it actually ceased to exist. *See generally* S. Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549 (2005).

Such a blanket assignment of responsibility for all losses is inconsistent with the Supreme Court's imposition of specific causation requirements on RICO plaintiffs in *Holmes* and *Anza*, has never been accepted in any RICO case, and has been roundly criticized even as applied to state law claims. Thus, even if Plaintiffs were found to have RICO standing, this Court should reject Plaintiffs' invalid RICO damages theory as a matter of law.

The "deepening insolvency" theory stems largely from the Third Circuit's decision in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001), even though the court's comments on the matter were entirely *dicta*. After a Ponzi scheme collapsed and filed for bankruptcy, the creditors' committee—acting on behalf of the bankrupt entity, not on behalf of the creditors themselves—sued an outside professional, Lafferty, under federal securities law and state law. The district court accepted Lafferty's *in pari delicto* defense and dismissed the case against him. The Third Circuit agreed and affirmed. *Id.* at 360. Before affirming, however, the court discussed "deepening insolvency" and concluded that the Pennsylvania Supreme Court would likely adopt it under Pennsylvania law. *Id.* at 349-350.

*Lafferty* has been much criticized. For example:

> Refusal to embrace deepening insolvency as a cause of action is required by settled principles of Delaware law. So, too, is a refusal to extend to creditors a solicitude not given to equityholders. Creditors are better

> placed than equityholders and other corporate constituencies (think employees) to protect themselves against the risk of firm failure.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007).[19]  In particular, the notion that damages may be based on the amount of the wrongfully-incurred debt has been shown to be illogical and inequitable.  *See* J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (2005) (theory is "unsupported in financial economics, inconsistent with traditional understandings of corporate injury, and generally incompatible with the economic functions of corporate injury"); Willett, *Shallows of Deepening Insolvency,* 60 Bus. Law. at 575 ("deepening of a firm's insolvency is not an independent form of corporate damage").

The Third Circuit itself pulled back sharply from *Lafferty* with its decision in *In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006).  The court held that *Lafferty* should not be interpreted as permitting a "novel" deepening insolvency "theory of damages for an independent cause of action like malpractice," *id.* at 677, or as "a valid theory of damages for any other cause of action, such as fraud," *id.* at 677 n.8, or as having any relevance to the law of any jurisdiction other than Pennsylvania.  *Id.* at 680 n.11.  The

---

[19]    *See also In re SI Restructuring, Inc.,* 532 F.3d 355, 363-64 (5th Cir. 2008) (rejecting deepening insolvency as a valid theory of damages); *Christians v. Grant Thornton LLP,* 733 N.W.2d 803, 810-12 (Minn. Ct. App. 2007) (same for accounting malpractice claim under Minnesota law); *Comm. Fin. Servs., Inc. v. J.P. Morgan Secs., Inc.,* 152 P.3d 897, 900 (Okla. Civ. App. 2006) (deepening insolvency not a recognized measure of damages under Oklahoma law); *In re Felt Mfg. Co.,* 371 B.R. 589, 623 (Bankr. D.N.H. 2007) ("New Hampshire Supreme Court would not recognize a new cause of action for deepening insolvency"); *Coroles v. Sabey*, 79 P.3d 974, 983 (Utah Ct. App. 2003) ("We decline Plaintiffs' invitation to recognize 'deepening insolvency' . . . as sufficient damages").  *See also, e.g.,* H. McDonald, et al., *Lafferty's Orphan: The Abandonment of Deepening Insolvency*, 26-10 Am. Bankr. Inst. J. 1 (Jan. 2008) (deepening insolvency has "not withstood in-depth analysis and scrutiny" and is "based on a brittle legal foundation that is quickly eroding away"); Note, *A Critique of "Deepening Insolvency," a New Bankruptcy Tort Theory*, 12 Stan. J.L. Bus. & Fin. 536 (2007) (the theory is "fundamentally flawed" and has "adverse policy implications").

court quoted the above-cited Willett article in support of its conclusion that "'[t]he deepening of a firm's insolvency is not an independent form of corporate damage.'" *Id.* at 678 (quoting Willett, *Shallows of Deepening Insolvency*, 60 Bus. Law. at 575).

In light of the unfairness and illogic of the "deepening insolvency" damages theory, and its inconsistency with *Sedima, Holmes,* and *Anza*, Plaintiffs' RICO counts should be dismissed to the extent they rely on this invalid theory. *See Jamuna Real Estate,* 392 B.R. at 172 ("even assuming that the Bankruptcy Trustees[] otherwise had RICO standing, they could not recover damages for an increased level of insolvency").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the case on *forum non conveniens* grounds or, if it does not, dismiss Plaintiffs' RICO claim for failure to state a claim.

Dated: May 1, 2009.                    Respectfully submitted,[20]

                                       BOIES, SCHILLER & FLEXNER LLP

                                       ____/s/Kenneth F. Rossman IV_____
                                       Jonathan H. Sherman*
                                       Jonathan M. Shaw*
                                       William C. Jackson
                                       5301 Wisconsin Avenue, N.W.
                                       Washington, D.C. 20015
                                       Telephone: (202) 237-2727
                                       Facsimile:   (202) 237-6131
                                       E-mail: jsherman@bsfllp.com
                                       E-mail: jshaw@bsfllp.com
                                       E-mail: wjackson@bsfllp.com

---

[20] Undersigned counsel hereby certify under REB Civ. Practice Standard V.I.1 that they have read and complied with the Practice Standards of this Court governing the formatting and marshalling of this motion to dismiss.

Kenneth F. Rossman IV
ROTHGERBER, JOHNSON & LYONS LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, Colorado 80202
Telephone: (303) 628-9584
Facsimile:   (303) 623-9222
E-mail: krossman@rothgerber.com

***Attorneys for Defendant Qwest
Communications International Inc.***
*not admitted in this District

HARNIK & FINKELSTEIN LLP

____/s/ Ira A. Finkelstein_____
Ira A. Finkelstein
645 Fifth Avenue
Suite 703
New York, NY 10022
Telephone: (212) 599-7575
Facsimile:    (212) 867-8120
E-mail: finkelstein@harnik.com

***Attorneys for Defendant John A. McMaster***

VANDENBERG & FELIU, LLP

___/s/ Jeffrey E. Gross_____
Jeffrey E. Gross
110 East 42nd Street, Suite 1502
New York, NY 10017
(212) 763-6800
(212) 981-9835 (fax)
Jgross@vanfeliu.com

***Attorneys for Defendant Robert S. Woodruff***

STERN & KILCULLEN, LLC

____/s/ Joel M. Silverstein_____
Joel M. Silverstein
75 Livingston Ave.
Roseland, New Jersey 07068

43

Telephone: (973) 535-1900
Facsimile: (973) 535-9664
Email:   jsilverstein@sgklaw.com

***Attorneys for Defendant Joseph P. Nacchio***

## CERTIFICATE OF SERVICE

I certify that on this 1st day of May, 2009, the foregoing was served on the

following through the Court's electronic filing transmission facilities:

Richard W. Daily
RICHARD W. DAILY LLC
621 17th Street, Suite 1535
Denver, CO 80293

Jeffrey E. Gross
VANDENBERG & FELIU, LLP
110 East 42nd Street, Suite 1502
New York, NY 10017

Ira A. Finkelstein
HARNIK WILKER & FINKELSTEIN LLP
Olympic Tower
645 Fifth Avenue, Suite 703
New York, NY 10022

And on the following by U.S. Mail (first class):

Richard McMillan
Clifton Elgarten
Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

Joel M. Silverstein
STERN & KILCULLEN, LLC
75 Livingston Ave.
Roseland, New Jersey 07068

_____ *s/ Kenneth F. Rossman, IV* _____