# Appendix of

# Unpublished

# Decisions



LEXSEE 2005 U.S. DIST. LEXIS 8814

**555 CORPORATE VENTURES, LTD., Plaintiff, v. ASH GROVE CEMENT COMPANY, INC., Defendant.**

CIVIL ACTION No. 04-2169-CM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

*2005 U.S. Dist. LEXIS 8814*

**March 2, 2005, Decided**

**COUNSEL:** [*1] For 555 Corporate Ventures, Ltd., Plaintiff: Elizabeth Drill Nay, Scott A. Wissel, Lewis, Rice & Fingersh, LC -- Kansas City, Kansas City, MO; G. Michael Gruber, Melinda W. Gilliam, Godwin Gruber, LLP, Dallas, TX.

For Ash Grove Cement Company, Defendant: Richard S. Gleason, Stoel Rives, LLP -- Portland, Portland, OR; Carl A. Gallagher, McAnany, Van Cleave & Phillips, P.A. -- KCK, Kansas City, KS.

**JUDGES:** CARLOS MURGUIA, United States District Judge.

**OPINION BY:** CARLOS MURGUIA

**OPINION**

**MEMORANDUM AND ORDER**

Plaintiff 555 Corporate Ventures, Ltd. (555) brings the instant action against Ash Grove Cement Company, Inc. (Ash Grove), alleging that it owns certain mineral rights on properties to which Ash Grove owns the surface rights. This matter is before the court on defendant's Motion to Dismiss (Doc. 7) and plaintiff's Request for Oral Argument (Doc. 17).

The court has discretion pursuant to D. Kan. Rule 7.2 to grant requests for oral argument on motions. The court believes that oral argument is not necessary in these circumstances. Accordingly, the motion at issue will be disposed of pursuant to this order and, therefore, the court denies plaintiff's request for oral argument.

[*2] **I. Standards**

The court will dismiss a cause of action for failure to state a claim only when it appears beyond a doubt that the plaintiff can prove no set of facts in support of the theory of recovery that would entitle him or her to relief, *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304 (10th Cir. 1998),* or when an issue of law is dispositive, *Neitzke v. Williams, 490 U.S. 319, 326, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, *Maher, 144 F.3d at 1304,* and all reasonable inferences from those facts are viewed in favor of the plaintiff, *Witt v. Roadway Express, 136 F.3d 1424, 1428 (10th Cir. 1998).* The issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183, 82 L. Ed. 2d 139, 104 S. Ct. 3012 (1984).*

**II. Facts**

Ash Grove is a Delaware corporation which maintains its [*3] principal place of business and company headquarters in Overland Park, Kansas. 555 is a British Columbia limited liability company with its principal place of business in British Columbia.

Ash Grove is the holder of surface rights and the owner of fee simple title to certain property located in Texada Island, British Columbia, Canada. Since 1983, Ash Grove has operated a limestone quarry on a portion of its Texada Island property. Limestone from the quarry is used by Ash Grove in the manufacture of cement and by customers for agricultural, chemical, and construction purposes. Approximately twenty-four percent of lime-

stone from the quarry is shipped to Ash Grove's lime plant in Portland, Oregon, and approximately forty percent is shipped to Ash Grove's cement plant in Seattle, Washington. The remaining thirty-six percent is shipped directly to customers.

555 alleges that it holds rights to certain minerals on some, but not all, of the property owned by Ash Grove on Texada Island. Specifically, 555 contends that Ash Grove has refused to either account for the metallic minerals it uncovers while quarrying and processing the limestone, return those minerals to 555, or compensate 555 [*4] for Ash Grove's taking of the minerals.

### A. British Columbia Lawsuit

In November 1997, 555 filed a lawsuit (BC Lawsuit) against Ash Grove in the Supreme Court of British Columbia, British Columbia's general trial court. In that lawsuit, 555 made claims regarding ownership of mineral rights. Ash Grove filed a "Statement of Defense" in the BC Lawsuit, in which it admitted that 555 owned certain mineral rights but denied that Ash Grove had interfered with those rights or had any liability to 555.

In March 2000, 555 initiated a proceeding against Ash Grove before the Gold Commissioner for British Columbia. [1] 555 claimed that Ash Grove was encountering mineral substances of value to 555 during expansion of the quarry and was denying 555 access to this material. After conducting an investigation, the Gold Commissioner issued an Order on February 27, 2002. In the Order, the Gold Commissioner concluded that Ash Grove owned the limestone on Ash Grove's property and that 555 held rights to gold, silver, and other minerals (not including limestone) on certain properties owned by Ash Grove. The Order further stated:

> It would be to the claim holder's 555's advantage to arrange [*5] with the quarry operator to monitor for metallic mineral occurrences in existing and new limestone quarries. Clearly, there exists a synergistic opportunity for the two companies to cooperate in the exploration and further development of the area. It should be kept in mind that the landowner's [Ash Grove] right to use the surface predates that of the mineral claim holder, and any dispute regarding access or use of the land must take this priority into consideration.

555 filed a Notice of Appeal of the Order, which remains pending. On November 4, 2002, 555 voluntarily dismissed the BC Lawsuit.

1   Under section 13 of the Mineral Tenure Act, RSBC 1996 chapter 292, disputes over rights to minerals must first be filed with the Gold Commissioner, a quasi-judicial official in the British Columbia Ministry of Energy and Mines.

### B. Oregon Lawsuit

Within a month after dismissing the BC Lawsuit, 555 filed an action against Ash Grove in federal district court in Portland, Oregon (Oregon Lawsuit). In the [*6] Oregon Lawsuit, 555 alleged that it holds rights to certain minerals on some, but not all, of the property owned by Ash Grove on Texada Island and brought claims for conversion, trespass, accounting, and declaratory relief.

555 also alleged that much, if not all, of the mineralized limestone, which was the subject of the Oregon Lawsuit, is shipped to Portland. Ash Grove moved to dismiss the Oregon Lawsuit on forum non conveniens grounds. After considering the briefs, hearing oral argument, and weighing the forum non conveniens factors, the District of Oregon concluded that "[British Columbia] is the more convenient forum" and dismissed the action on July 7, 2003. [2] 555 did not appeal the dismissal.

> 2   The Findings and Recommendation were issued by Magistrate Judge Dennis J. Hubel on May 5, 2003 and adopted by District Judge Robert E. Jones.

### C. Kansas Lawsuit

In April 2004, 555 filed the instant lawsuit, claiming that it holds rights to certain minerals on some of the property owned by Ash Grove [*7] on Texada Island. The relief sought in the BC and Oregon Lawsuits is virtually identical to the relief 555 seeks in the present action: (1) an accounting by Ash Grove of minerals it has extracted from certain properties; (2) general and punitive damages; (3) a declaration of the parties' rights; and (4) (in Canada and Oregon) an injunction against Ash Grove's alleged trespassing on 555's property or (in Kansas) a "declaration by the Court of the . . . method and means by which [the parties'] rights and duties will be determined as mining the Property proceeds." In essence, 555 seeks substantially the same relief in this court as it sought in the Oregon Lawsuit.

### III. Discussion

### A. Issue Preclusion

Ash Grove contends that 555 is estopped from relitigating the forum non conveniens issue in this court because the issue was decided by the District Court of Oregon. 555 argues that the Oregon court only decided the

Case 1:09-cv-00162-REB-KLM    Document 22-18    Filed 05/01/2009    USDC Colorado    Page 4 of 89

Page 3
2005 U.S. Dist. LEXIS 8814, *

convenience of the *Oregon courts* and that, as a result, this court is not bound by the Oregon court's decision.

Federal circuit courts have held that a plaintiff cannot relitigate a forum non conveniens dismissal unless the relevant facts have changed. [*8] *Pastewka v. Texaco, Inc., 565 F.2d 851, 853-54 (3d Cir. 1977)* (affirming application of "direct estoppel by judgment" to preclude relitigation of forum non conveniens dismissal when plaintiff pointed to "no objective fact establishing that, unlike New York, Delaware would be a more convenient forum than England or that Delaware would be even as convenient as New York"); *Exxon Corp. v. Chick Kam Choo, 817 F.2d 307, 314 (5th Cir. 1987)* (affirming trial court's preclusion of relitigation of forum non conveniens issue, affirming sanctions, and applying rule that plaintiff cannot relitigate unless it can "show objective facts relevant to the [forum non conveniens] issue that materially alter the considerations underlying the previous resolution"), *rev'd on other grounds, 486 U.S. 140, 100 L. Ed. 2d 127, 108 S. Ct. 1684 (1988)*; *Villar v. Crowley Maritime Corp., 990 F.2d 1489 (5th Cir. 1993)* (affirming res judicata dismissal of wrongful-death action shopped in three forums, and affirming sanctions and sua sponte injunction against subsequent actions); *Aguilar v. Boeing Co., 11 F.3d 55, 59 (5th Cir. 1993)* (affirming application of issue preclusion [*9] to dismiss case when plaintiffs "made no showing of 'objective facts that materially alter the considerations underlying the previous [forum non conveniens dismissals]'" (citation omitted)).

555 asserts that the underlying facts of the case have changed. Specifically, 555 argues that, when deciding to file in Oregon, it was operating under the assumption that the Ash Grove offices in Oregon and Kansas were essentially the same. 555 directs the court's attention to an affidavit originally filed with the Oregon court and subsequently re-filed with this court, by Eileen Flink, Ash Grove's assistant secretary and assistant general counsel, stating that "all senior management" is located in Overland Park, Kansas, all contracts "emanate" from Kansas, and "the headquarters provide companywide direction and support." 555 contends that it is therefore entitled to relitigate the Oregon court's previous forum non conveniens determination

In support, 555 points to *Mizokami Bros. of Arizona, Inc. v. Mobay Chemical Corp., 660 F.2d 712 (8th Cir. 1981)*. *In Mizokami Bros.*, the case was dismissed without prejudice on the basis of forum non conveniens from an Arizona court [*10] and re-filed in Missouri. The Missouri court held that Athe convenience of the Arizona forum has been fully litigated and finally determined. Under the rules of issue preclusion Mizokami may not reopen that issue [in Arizona]. The dismissal is conclusive, however, only as to the availability of an Arizona forum. Further litigation on other procedural questions and the merits of the claim are not precluded." *Mizokami Bros., 660 F.2d at 716-17.*

Foremost, the court does not believe the underlying facts have materially changed. The only fact that has changed is 555's purported realization that Ash Grove's corporate headquarters are located in Kansas. However, this is not a "change." Ash Grove's offices have not moved from or to Overland Park, Kansas, and its location has never been a secret to 555. Indeed, 555's president wrote to Ash Grove's then president in Overland Park, Kansas as early as 1998.

Moreover, the court distinguishes *Mizokami Bros.* from the facts in this case. In *Mizokami Bros.*, the court determined only that Arizona was not a convenient forum. The court, however, neither discussed nor decided which forum would in fact pass the forum non conveniens [*11] test. The case at hand differs, in that the Oregon court specifically held that this lawsuit should be pursued in British Columbia. After an exhaustive analysis, the court concluded:

> I find that B.C. [British Columbia] is the more convenient forum because (1) the claims arose in B.C.; (2) access to evidence, particularly identified witnesses, is more readily available in B.C.; (3) B.C. law will be applied to the case; (4) any injunctive relief affecting the land would be ordered and enforced in B.C., the jurisdiction where the land is located; and (5) adjudicating the case in B.C. avoids the possibility of this court interfering in the ongoing proceedings before the Gold Commissioner in B.C.

(Findings and Recommendation at 20).

Once a court of competent jurisdiction has squarely passed on an issue between the same parties, on the merits of the cause or otherwise, that issue may not be relitigated. In this case, the District Court of Oregon squarely decided the issue of which jurisdiction is proper in this litigation. 555 neither appealed that decision, nor did 555 request a transfer to Kansas. The court therefore holds that, in these circumstances, 555 is precluded [*12] from relitigating the issue of forum non conveniens.

**B. Application of Forum Non Conveniens Doctrine**

Even if the court determined that 555 could relitgate the issue of forum non conveniens, dismissal would still be appropriate. In assessing the issue of forum non conveniens, the court considers the private interest factors, which are: (1) the relative ease of access to sources of

proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious and inexpensive. *See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947).* The public interest factors the court considers include: (1) administrative difficulties of courts with congested dockets caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is [*13] familiar with the governing law. *See id. at 508-09.*

The court also takes into consideration that, when the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, as is the case here, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference. *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981).*

555's Complaint alleges conversion and seeks a declaratory judgment, accounting, and constructive trust. The alleged conversion would have occurred, and would continue to occur, in British Columbia, where the limestone containing the minerals at issue are mined. Thus, the central claim in this case arose in British Columbia, and, without question, the access to sources of proof weigh in favor of trying this case in British Columbia. 555 is a British Columbia corporation, and its known principals reside in Vancouver, British Columbia. Ash Grove's quarry manager and quarry superintendent, presumably the employees most knowledgeable about the quarry operations, [*14] the composition of materials in the quarry, and access issues, reside on Texada Island in British Columbia. Other witnesses, including individuals who have provided geology and consulting services to 555, also reside in British Columbia. Ash Grove additionally proffers that records regarding ownership and operation of its Texada Island property are at Ash Grove's office on Texada Island, including (1) shipping

records; (2) tonnage-of-limestone records; (3) tonnage-of-waste records; (4) production drill analysis records; (5) core drill analysis records; and (6) analyses of quarry materials. In contrast, the extent of sources of proof available in the United States is uncertain at best.

In accordance with finding that the majority of witnesses are located in British Columbia, consideration of the availability of compulsory process for compelling attendance of witnesses and the cost of obtaining attendance of willing non-party witnesses favors litigation in British Columbia. Moreover, if there arose a possibility that the premises must be viewed, trial in British Columbia is most appropriate.

British Columbia's connection to the case is stronger than that of Kansas since the alleged [*15] conversion occurred and continues to occur in British Columbia. Accordingly, British Columbia has an interest in having this controversy decided there. The court finally considers the appropriateness of having diversity cases tried in a forum that is familiar with the governing law. British Columbia has a strong interest in enforcing mineral and real property rights according to its own laws and procedures. Canadian law likely would apply, specifically Canada's Mineral Tenure Act, and it is reasonable to assume that Canadian courts are more likely familiar with that governing law. Furthermore, the court is cautious about the possibility of interfering with the Gold Commissioner's proceeding in light of the fact that 555's appeal is still pending. On the whole, the factors weigh in favor of dismissing this action on the basis of forum non conveniens. The court, however, declines to issue an injunction enjoining further domestic filings by 555, nor is the court willing to award Ash Grove attorney's fees and costs.

**IT IS THEREFORE ORDERED** that plaintiff's Request for Oral Argument (Doc. 17) is denied, and defendant's Motion to Dismiss (Doc. 7) is granted. This case is hereby dismissed.

[*16] Dated this 2 day of March 2005, at Kansas City, Kansas.

CARLOS MURGUIA

United States District Judge

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
(Cite as: 2006 WL 156828 (C.D.Ill.))

**H**Only the Westlaw citation is currently available.

United States District Court, C.D. Illinois.
Thomas E. BARON, et al., Plaintiffs,
v.
Fayez CHEHAB, et al., Defendants.
No. 05-3240.

Jan. 20, 2006.

Howard W. Feldman, John Randall Cox, Feldman
Wasser Draper & Benson, Springfield, IL, Thomas E.
Dutton, Greenberg Traurig PC, Chicago, IL, for
Plaintiffs.

James D. Adducci, Marshall L. Blankenship, Ad-
ducci Dorf Lehner Mitchell & Blankenship PC, Chi-
cago, IL, Thomas Schanzle-Haskins, Brown Hay &
Stephens, Gordon W. Gates, Gates Wise & Schlosser,
Thomas H. Wilson, Sorling Northrup Hanna Cullen
& Cochran, Douglas J. Quivey, Londrigan Potter &
Randle PC, Springfield, IL, for Defendants.

Donald Mallette, Springfield, IL, pro se.

*OPINION*

JEANNE E. SCOTT, U.S. District Judge:

*1 This matter comes before the Court on Defendants
Bank of Springfield (Bank), Michael McGlasson,
James Kelley, William Chrans, Stephen K. Bentley,
and Better Business Systems of Montana, Inc.'s
(BBS) (collectively, the Moving Defendants) Mo-
tions to Dismiss Counts II-V, XV, and XVII of the
First Amended Complaint (d/e 39).*Bank of Spring-
field's Motion to Dismiss Counts II, III and V of the
First Amended Complaint Pursuant to Rule 12(b)(6)
(d/e 43),Bank of Springfield's Motion to Dismiss
Count XV-Unjust Enrichment (d/e 45),Bank of
Springfield's Motion to Dismiss Count XVII-
Conversion (d/e 47),Motion to Dismiss Counts II, III,
IV and V of the First Amended Complaint (d/e
49),Motion to Dismiss Count XVII of the First
Amended Complaint (d/e 50),Motion to Dismiss
Counts II, III, IV and V of the First Amended Com-
plaint (d/e 51),* and *Motion to Dismiss Count XVII of*

*the First Amended Complaint (d/e 53).* The Plaintiffs
attempt to allege claims in Counts II-V, XV, and
XVII for violation of the Racketeer Influenced and
Corrupt Organizations Act (RICO), 18 U.S.C. §
1962etseq., and state law theories of unjust enrich-
ment and conversion. The Plaintiffs fail to state
claims in these Counts against the Moving Defen-
dants. The Motions are therefore allowed.

*STATEMENT OF FACTS*

The Amended Complaint alleges that the Defendants
bilked the Individual Plaintiffs Thomas E. Baron,
M.D. and Linda S. Baron (husband and wife), Chris-
topher T. Mallavarapu, M.D. and Janet K. Mallava-
rapu (husband and wife), and Robert V. Trask, M.D.
and Mary L. Trask (husband and wife) (collectively
the Individual Plaintiffs) out of millions of dollars
through a multi-stage fraudulent investment scheme
involving several different aviation enterprises. The
remaining Plaintiffs, ROTFL, LLC (ROTFL), and
Alpha Foxtrot, LLC (Alpha Foxtrot), are two of these
enterprises. The facts set forth below in this Opinion
are taken from the allegations of the First Amended
Complaint. For purposes of deciding the pending
Motions, the Court must take these facts as true.

The circumstances that eventually led to the fraudu-
lent scheme began in 1990. At that time, Defendants
Randolph Martin, M.D. and Donald Mallette,
founded a company called Capital Aircraft. Capital
Aircraft initially sold aircraft parts. Capital Aircraft
later began selling aircraft and brokering aircraft.
Starting in 1998, Capital Aircraft started setting up
separate limited liability companies (Capital Aircraft
LLCs). Each Capital Aircraft LLC purchased either
aircraft or aircraft engines and leased them to airlines
located in South Africa and South America. Capital
Aircraft and Capital Aircraft LLCs borrowed funds to
finance the purchase of the aircraft and engines that
were then leased. Defendants Chrans, Bentley and
BBS provided management and accounting services
for Capital Aircraft and the related Capital Aircraft
LLCs. Dr. Martin used his connections in the Spring-
field, Illinois, medical community to solicit other
doctors to invest in the Capital Aircraft LLCs. The
Individual Plaintiffs did not invest in any of the Capi-
tal Aircraft LLCs.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
(Cite as: 2006 WL 156828 (C.D.Ill.))

Page 2

**\*2** In 1995, Defendant Fayez Chehab began operating an enterprise called American Falcon, S.A. (AMFAL). He incorporated AMFAL in Argentina in 1997. AMFAL provided charter airline services in Argentina. AMFAL operated a Fokker F-28-1000 aircraft leased from Capital Aircraft. In early 2000, AMFAL was a failing enterprise. If AMFAL failed, then Capital Aircraft would not receive its lease payments, and it in turn would default on the loan secured by the Fokker F-28-1000 aircraft. To stave off AMFAL's insolvency, Chehab, Chrans, Bentley, Mallette, and Martin developed a fraudulent scheme to lure unsophisticated investors into investing in AMFAL. Chehab agreed to give Chrans, Bentley, Mallette, and Martin stock in AMFAL in exchange for their participation in the fraudulent scheme.

Chrans, Bentley, Mallette and Martin recruited unsophisticated investors, including the Individual Plaintiffs into their scheme. Chehab, Chrans, Bentley, Mallette, and Martin made a series of written and oral presentations to the Individual Plaintiffs and other prospective investors. These presentations allegedly contained material misrepresentations and omissions of fact designed to deceive the prospective investors about the nature of AMFAL's financial condition and the nature of the proposed investment.

As part of the scheme, Chehab, Chrans, Bentley, Mallette, and Martin offered ten subscriptions for membership interests in a limited liability company called American Falcon Investment Company, LLC (AMFAL Investment). The investors would not pay cash for the membership interests; rather, each investor would sign a $300,000.00 personal guarantee, guaranteeing ten percent of a $3 million loan from the Bank to AMFAL Investment. AMFAL Investment, in turn, would purchase 33.33% of the stock of AMFAL for $2.2 million. AMFAL would use the $2.2 million to acquire new aircraft and expand its operations. AMFAL Investment would retain $800,000.00 to pay debt service during 2000. Thereafter, according to Chehab, Chrans, Bentley, Mallette, and Martin, AMFAL would generate sufficient income to service the debt and provide significant profits.

In May 2000, each of the three married Individual Plaintiff Couples, the Barons, Mallavarapus, and Trasks, purchased one of the ten subscriptions in

AMFAL Investment. The Individual Plaintiffs were unsophisticated investors. They allegedly relied on the Defendants' material misrepresentations and omissions to make these investments. The Individual Plaintiffs also relied on their familiarity with Dr. Martin and their awareness of other physicians in the Springfield community who had invested in the Capital Aircraft LLCs. Each Individual Plaintiff signed a personal guarantee.

Almost immediately, the Defendants allegedly deviated from the representations made to investors. The Defendants sold 14 memberships interests in AMFAL Investment, instead of 10. AMFAL Investment borrowed $4.2 million from the Bank, instead of $3 million. AMFAL Investment acquired 47% of AMFAL, instead of 33.33%. The written guarantee documents did not contain a $300,000.00 limit on the guarantee. According to the documents, each of the Individual Plaintiffs personally guaranteed the full $4.2 million loan. AMFAL Investment paid $3.1 million to AMFAL instead of $2.2 million. AMFAL used a substantial portion of these funds to pay old debts rather than investing in expansion of the business. AMFAL Investment did not use the remaining $1.1 million from the loan for debt service. Rather, the money was distributed to AMFAL in November 2000. AMFAL did not issue stock to AMFAL Investment. Rather, after a significant delay, AMFAL issued stock directly to investors, including the Individual Plaintiffs.

**\*3** Some time after May 2000, the Bank made a separate, sham $3 million loan to AMFAL. The loan appeared on the books of AMFAL, but the funds were placed in a certificate of deposit that never left the Bank's possession. The loan gave the false impression that AMFAL had $3 million in additional working capital.

In November 2000, Chehab and Chrans told the Individual Plaintiffs and other investors that AMFAL needed additional funds to complete negotiations on a deal with Air France. These representations were false. Based on these misrepresentations, each of the Individual Plaintiff Couples paid $85,750.00 for a promissory note from AMFAL Investment. AMFAL Investment never repaid anything on these three notes. The Plaintiffs have no knowledge of how these funds were used.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
(Cite as: 2006 WL 156828 (C.D.Ill.))

On February 22, 2001, the Individual Plaintiffs were told that AMFAL had signed contracts for charter services that would generate $9 million to $13 million in revenues. This was false. In April 5, 2001, at a meeting of shareholders, the Individual Plaintiffs and other investors were told that AMFAL needed an additional $3 million in capital. In May 2001, there was a recapitalization in which each of the three Individual Plaintiff Couples invested an additional $300,000.00 in cash in AMFAL. They made these investments because of the continuing misrepresentations made by Chehab and Chrans.

In July 2001, AMFAL Investment was unable to make the monthly loan payment to the Bank. The investors in AMFAL Investment put up funds to cover the payment. Each Individual Plaintiff Couple paid $6,380.00 toward covering the payment.

In August 2001, the Bank called the $300,000.00 guarantees for the original AMFAL Investment loan. The Individual Plaintiffs converted the outstanding guarantee obligations into three personal loans, one for each couple. The principal amount of each loan was $248,510.00, and each loan was evidenced by a promissory note to the Bank. The Bank, in turn, released the Individual Plaintiffs from their AMFAL Investment guarantees. At this time, Defendant McGlasson was Executive Vice President of the Bank. He informed the Individual Plaintiffs that Capital Aircraft was in financial difficulty and would not be able to provide aircraft to AMFAL.

In April and May 2001, Chrans and Chehab recruited the Individual Plaintiffs to invest in a new venture to acquire a Boeing 737 aircraft to lease to AMFAL because Capital Aircraft was not going to be able to lease aircraft. On October 9, 2001, Chehab and Chrans formed ROTFL for the purpose of acquiring the Boeing 737 to lease to AMFAL. McGlasson told the Individual Plaintiffs that investing in an airplane was like investing in a house because the plane provided collateral to pay the loan in the event of default. The Individual Plaintiffs relied on McGlasson's representations in entering into this investment.

The ROTFL investment was structured similarly to the original investment in AMFAL Investment. The investors, including the Individual Plaintiffs, provided personal guarantees of $1.05 million each, to secure a $4.05 million loan to ROTFL, to purchase the Boeing 737. Each guarantee was later reduced to $840,000.00. In exchange, the investors, including the Individual Plaintiffs, received interests in ROTFL. The loan proceeds were used to acquire a Boeing 737 aircraft for a purchase price of $4 million. The price grossly exceeded the fair market value of the plane. Chehab and Chrans also negotiated a $400,000.00 "rebate" from the seller. The "rebate" did not go to ROTFL; rather, Chrans and Chehab diverted the funds to their own use.

*4 On December 12, 2001, Chehab sent AMFAL investors an email saying that AMFAL, again, needed additional capital. In January 2002, AMFAL had a second recapitalization in which the Mallavarapus and the Trasks, as married couples, each invested $121,216.00 in cash in AMFAL.

In March 2002, Chehab sent emails to AMFAL Investment investors in which he continued to paint a rosy picture of the viability of AMFAL and to ask for additional loans to finance receivables. In April 2002, the Barons and the Mallavarapus, as married couples, each loaned $75,000.00 to AMFAL.

In September 2002, Chehab and Chrans requested additional capital from investors, including the Individual Plaintiffs. Chrans made misrepresentations to induce the Individual Plaintiffs to participate in the recapitalization. In September 2002, the Individual Plaintiffs invested a total of $655,000.00 in the third recapitalization of AMFAL.

Capital Aircraft went out of business in November 2002. Chehab and Chrans encouraged investors to buy a Boeing 737 from Capital Aircraft to lease to AMFAL. They also advised the Individual Plaintiffs to buy the Fokker F-28-1000 that Capital Aircraft had been leasing to AMFAL. McGlasson also encouraged the Plaintiffs to participate in these transactions. He said that the purchases were good investments that would assist AMFAL in realizing profits.

On January 24, 2003, Chehab and Chrans formed Plaintiff Alpha Foxtrot for the purpose of acquiring the Boeing 737 from Capital Aircraft. The Individual Plaintiffs, and other investors, each provided guarantees of $250,000.00 to secure a loan to Alpha Foxtrot from the Bank. The Individual Plaintiffs received interests in Alpha Foxtrot in exchange for their guarantees. The Bank loaned Alpha Foxtrot $2 million to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
**(Cite as: 2006 WL 156828 (C.D.Ill.))**

Page 4

purchase the Boeing 737. The purchase price was $1.7 million. The Individual Plaintiffs do not know what Chehab and Chrans did with the remaining $300,000.00. The price greatly exceeded the market value of the plane. The Bank never perfected a security interest in the plane. Instead, Chehab ultimately used the plane as collateral for a personal loan, discussed below. The plane was leased to AMFAL.

In 2003, Chehab and Chrans formed an Argentinian corporation called Falcon Air, S.A. (Falcon Air). Falcon Air purchased the Fokker F-28-1000 plane used by AMFAL. Falcon Air borrowed $3.7 million from the Bank to finance the purchase. The Barons and the Mallavarapus extended their personal guarantees of the ROTFL and Alpha Foxtrot loans to guarantee this loan also. The Barons and the Mallavarapus were to receive interests in Falcon Air in exchange for the extension of their guarantees. Chehab and Chrans, however, kept all of the ownership interests in Falcon Air for themselves, excluding the Barons and the Mallavarapus. The proceeds from the loan were used to pay the $2.7 million purchase price for the plane. Chehab and Chrans diverted the remaining $1 million to pay undisclosed obligations of AMFAL and for their personal use. The Bank again took no action to perfect a security interest in the plane. Chehab was also able to use this plane later as collateral for a personal loan.

**\*5** On May 16, 2004, the Bank loaned an additional $410,000.00 to Falcon Air, purportedly to purchase a new jet engine. The Barons and the Mallavarapus provided guarantees for this loan.

Throughout this time, Chehab, Chrans and Bank officer Defendants McGlasson and Kelley regularly asked the Individual Plaintiffs to provide the additional cash to meet the immediate needs of AMFAL, ROTFL, Alpha Foxtrot, and Falcon Air (collectively the Enterprises), including making monthly payments on loans to the Bank. The Bank did not make a demand under the personal guarantees, and so, the Individual Plaintiffs were not obligated to make these payments. Bank representatives, particularly Kelley, misrepresented to the Individual Plaintiffs that they were obligated to make these contributions to keep the Enterprises operating. The Bank did not credit the payments against the dollar limits on the guarantees.

In March and April 2004, Chehab halted all of AM-

FAL's scheduled operations. Chehab advised the Individual Plaintiffs that he was negotiating the sale of AMFAL to a Chilean airline called Lan Chile. Chehab asked the Individual Plaintiffs to send him their AMFAL stock certificates to complete the transaction. Chehab told the Individual Plaintiffs that Lan Chile had agreed to make a short-term loan to AMFAL to be secured by the stock certificates. The Individual Plaintiffs sent Chehab the stock certificates.

In July 2004, Chehab told the Individual Plaintiffs that the deal with Lan Chile had fallen through. He subsequently negotiated a personal loan from a lending unit of Aerolineas Argentina in the amount of approximately $2 million. He used the stock certificates, the Boeing 737 owned by Alpha Foxtrot, and the Fokker F-28-1000 owned by Falcon Air as collateral for the loan. Aerolineas Argentina secured liens on the two aircraft that had priority over the Bank's unperfected security interests. Chehab later canceled all of the Individual Plaintiffs' shares in AMFAL.

Also in July 2004, Chehab and Chrans caused AMFAL, ROTFL and Alpha Foxtrot to execute four documents called Loan Sale Agreements. Under the terms of these Loan Sale Agreements, ROTFL and Alpha Foxtrot "sold" to Chehab all the obligations owed to them by AMFAL. The total purchase price was $40.00. The obligations that Chehab "purchased" for $40.00 exceeded $5 million. As of May 31, 2005, AMFAL owed ROTFL $4,729,320.00, and owed Alpha Foxtrot $1,693,160.00.

In September 2004, the Bank and the other Defendants consolidated the Bank's outstanding loans to the Enterprises. AMFAL defaulted on the payments on the consolidated loans in November and December 2004. Each Individual Plaintiff Couple paid approximately $26,666.00 toward these two payment obligations. AMFAL continued to default on the payments thereafter for the first six months in 2005. Defendant Kelley contacted Dr. Baron and Dr. Trask on behalf of the Bank to persuade them to make payments on the loans. They refused.

**\*6** In January 2005, Chehab represented to Dr. Mallavarapu that there was an opportunity to purchase Skyways, S.A. (Skyways), an Argentinian charter airline from which AMFAL leased an airplane. The deal also involved purchasing a second airplane referred to as the "Ryan" airplane. Dr. Mallavarapu

sent Chehab $735,000.00 to fund the purchase of Skyways and the Ryan airplane. On April 14, 2005, Dr. Mallavarapu loaned an additional $200,000.00 to Chehab to complete the transaction. The Skyways and Ryan transactions were never completed, and Dr. Mallavarapu never received any money back.

In February 2005, Chehab sent an email to the Individual Plaintiffs informing them that AMFAL could not generate enough money to pay all its obligations and proposed an interest-only arrangement with the Bank for six months. In May 2005, the Bank entered into a Modification of Loan Consolidation and Forbearance Agreement (Modification Agreement) with the Enterprises, the Individual Plaintiffs, Chehab, and Chrans. The Modification Agreement provided for interest-only payments through October 5, 2005, and for the parties' best efforts to remove the prior liens on the Alpha Foxtrot and Falcon Air planes. In conjunction with the Modification Agreement, the Individual Plaintiffs were required to execute agreements in which they reaffirmed their prior outstanding guarantees.

On May 30 2005, AMFAL filed the equivalent of Chapter 11 bankruptcy in Argentina. Chehab never advised the Individual Plaintiffs in advance that AMFAL was planning to file bankruptcy, and did not seek their vote or input as shareholders regarding the bankruptcy. The Individual Plaintiffs were not allowed to participate in shareholder meetings regarding the bankruptcy because they did not have their shares in AMFAL.

On June 29, 2005, the Bank loaned Chehab $150,000.00. To secure the loan, Chrans signed guarantees on behalf of ROTFL and Alpha Foxtrot guaranteeing all of Chehab's debts to the Bank. Chrans then resigned as the manager of ROTFL and Alpha Foxtrot. The Bank applied $125,183.12 to pay interest and the remaining $24,816.88 to reduce the principal of the ROTFL, Alpha Foxtrot, and Falcon Air's loans to the Bank.

Plaintiffs discovered the fraud in 2005 when they engaged a third party, EM Capital and EM Management, to take over the management of ROTFL and Alpha Foxtrot. After discovering the fraud, the Plaintiffs brought this action.

*ANALYSIS*

The Amended Complaint has 22 Counts. Count I alleges securities fraud in violation of § 10 of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Counts II, III, IV, and V allege RICO violations based on predicate acts of mail fraud, wire fraud, and bank fraud committed by Defendants. 18 U.S.C. §§ 1341, 1343, 1344, 1962, & 1964. The remaining Counts allege state law claims against one or more of the Defendants, including conversion (Count XVII) and unjust enrichment (Count XIV and XV). The Moving Defendants ask the Court to dismiss the RICO claims, the unjust enrichment claim in Count XV, and the conversion claims.[FN1]

> FN1. The unjust enrichment claim in Count XIV is only against Chehab. He has not filed a motion to dismiss this claim.

*7 For purposes of these Motions, the Court must accept as true all well-pleaded factual allegations contained in the Amended Complaint and draw all inferences in the light most favorable to the non-moving party. Hager v. City of West Peoria, 84 F.3d 865, 868-69 (7th Cir.1996); Covington Court, Ltd. v. Village of Oak Brook, 77 F.3d 177, 178 (7th Cir.1996). The Amended Complaint should not be dismissed unless it appears beyond doubt that the Plaintiffs can prove no set of facts that would entitle them to relief. Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir.1996). As explained below, the Court agrees with the Moving Defendants that the Plaintiffs have failed to state claims for relief under RICO, or under state law theories of unjust enrichment and conversion.

*A. RICO*

In 1995, Congress amended RICO to bar private RICO causes of action based on allegations that would be actionable as fraud in the purchase or sale of securities, unless the defendants have already been convicted of securities fraud. 18 U.S.C. § 1964(c). Congress enacted § 1964(c):

"to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses, such as mail fraud or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

would have been actionable as securities fraud."

*Bald Eagle Area School Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 327 (3rd Cir.1999) (quoting H.R. Conf. Rep. No. 104-369 at 47 (1995)). Congress's goal was, " 'completely eliminating the so-called "treble damage blunderbuss of RICO" in securities fraud cases." ' *Id. at 328* (quoting 141 Cong. Rec. H2771). The Plaintiffs do not allege that any of the Defendants have been convicted of securities fraud. Thus, the RICO Counts fail to state claims if the conduct pled as the predicate acts is actionable as securities fraud. *Id.* at 330.That is exactly what the Plaintiffs are trying to do here.

The Plaintiffs' securities fraud claim requires proof, *interalia,* that the Defendants made misrepresentations or omissions that induced the Plaintiffs to participate in the purchase or sale of securities. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997). The Plaintiffs RICO claims require proof that the Defendants conducted an enterprise through a pattern of racketeering. *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 473 (7th Cir.1997). A pattern of racketeering requires proof that the Defendants engaged in two or more specific predicate criminal acts. *Id.* The Plaintiffs allege that the Defendants engaged in the predicate criminal acts of mail fraud, wire fraud, and bank fraud. *Amended Complaint,* ¶ 231. Each of these predicate criminal acts requires proof that the Defendants participated in a scheme to defraud. *Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1005 (7th Cir.2004) (mail fraud); *U.S. v. Yoon,* 128 F.3d 515, 522 (7th Cir.1997) (bank fraud); *U.S. v. Brandon,* 50 F.3d 464, 467 (7th Cir.1995) (wire fraud). In RICO cases, the allegations of a scheme to defraud must be pled with particularity. *Fed.R.Civ.P.* 9(b); *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 777 (7th Cir.1994).

*8 The Plaintiffs allege the same misrepresentations to establish both the securities fraud claim in Count I and the scheme to defraud necessary to establish the predicate acts, and so the pattern of racketeering, for the RICO claims in Counts II-V. Count I of the Amended Complaint alleges 32 specific misrepresentations that were made by the various Defendants to induce the Individual Plaintiffs to engage in securities transactions. *Amended Complaint,* ¶ 216(a)-(af). The Plaintiffs further allege that the Individual Plaintiffs

would not have made any of the investments, executed any of the guarantees, loaned any of the money, or made any of the payments to the Bank or others, but for these 32 misrepresentations. *Id.* ¶ 218.Counts II-V incorporate by reference 18 of these misrepresentations, and allege that these same misrepresentations were part of the predicate acts of mail fraud, wire fraud, and bank fraud that form the basis of the RICO claims. *Id.,* ¶¶ 229, 246, 253, 261.The RICO claims are thus dependent on conduct that is actionable as securities fraud. Since the conduct is actionable as securities fraud, the conduct cannot be a basis for a RICO claim. 18 U.S.C. § 1964(c); *Bald Eagle School Dist.,* 189 F.3d at 330. The Plaintiffs, therefore, fail to state a RICO claim.

The Plaintiffs argue that some of the Defendants' wrongful conduct might not be actionable as securities fraud, and the RICO Counts should survive a motion to dismiss because of that possibility. The Plaintiffs argue, for example, that the Defendants fraudulently induced the Individual Plaintiffs to make numerous payments to the Bank on the Enterprises' outstanding loans over the course of the scheme. They argue that those payments were not made in connection with a securities transaction and so are not actionable as securities fraud.

The Plaintiffs effectively ask the Court to parse their claim to identify parts that might be separable from the securities fraud. The courts have rejected this approach. *Bald Eagle School Dist.,* 189 F.3d at 329-30; *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1071-72 n. 27 (D.Minn.2003); *Fezzani v. Bear, Stearns & Co., Inc.,* 2005 WL 500377, *4 (S.D.N.Y.2005). Congress sought to eliminate RICO claims in securities fraud cases. The careful parsing of the Amended Complaint would frustrate that congressional goal. *Bald Eagle School Dist.,* 189 F.3d at 329-30.

The Plaintiffs also argue that some of the Defendants engaged in mail fraud, wire fraud and bank fraud to aid and abet the securities fraud, and a private cause of action cannot be brought for aiding and abetting securities fraud. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 176, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Since aiding and abetting is not actionable as securities fraud, Plaintiffs argue that the Court should allow the RICO claims against these Defendants to proceed.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
(Cite as: 2006 WL 156828 (C.D.Ill.))

One district court has accepted this argument. *OSRecovery, Inc. v. One Groupe International, Inc.,* 354 F.Supp.2d 357, 368-70 (S.D.N.Y.2005).

*9 This Court is not persuaded by the decision in *OSRecovery, Inc.* First, aiding and abetting securities fraud is actionable under the Securities and Exchange Act. After the Supreme Court decision in *Central Bank of Denver,* Congress amended the Securities and Exchange Act to authorize the Securities and Exchange Commission to bring actions against defendants who aid and abet securities fraud. 15 U.S.C. § 78t(e). Thus, aiding and abetting securities fraud is actionable under the securities laws, and so cannot be the basis of a RICO claim. The *OSRecovery, Inc.* Court did not address the impact of § 78t(e) on its analysis.[FN2]

> FN2. It is true that the Plaintiffs cannot bring a private cause of action for aiding and abetting securities fraud, but the bar to RICO claims is based on whether the conduct is actionable as securities fraud, not whether a particular plaintiff could bring the action. A number of courts have barred RICO claims because someone other than the plaintiff in the particular case could bring a securities fraud claim based on the same conduct. E.g., *Howard v. America OnLine Inc.,* 208 F.3d 741, 749 (9th Cir.2000); *Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F.Supp.2d 1345, 1356-58 (S.D.Fla.2001).

In addition, any possible wrongful conduct that is not actionable as securities fraud (such as aiding and abetting the securities fraud or fraudulently inducing the Individual Plaintiffs to make payments to the Bank on the Enterprises' outstanding loans) is only actionable under RICO if the wrongful conduct was part of a pattern of racketeering. *Mira,* 107 F.3d at 473. The *OSRecovery, Inc.* Court did not address whether the plaintiffs in that case alleged a pattern of racketeering that was not based on conduct that was actionable as securities fraud. In this case, however, the Plaintiffs allege a pattern of racketeering activity consisting of mail fraud, wire fraud, and bank fraud. Such fraud must be pled with particularity. *Vicom, Inc.,* 20 F.3d at 777;Fed.R.Civ.P. 9(b). The Plaintiffs alleged 18 specific misrepresentations that formed the basis of the mail fraud, wire fraud, and bank fraud that consti-

tuted the predicate acts necessary to allege the pattern of racketeering activity here. *Amended Complaint,* ¶¶ 229, 246, 253, 261. Those misrepresentations were also made to induce the Individual Plaintiffs to purchase securities. *Id.,* ¶¶ 216-18, 222.Thus, the alleged pattern of racketeering essential to any of the Plaintiffs' RICO claims requires proof of conduct that is actionable as securities fraud. The Plaintiffs cannot pursue RICO claims based on this conduct. 18 U.S.C. § 1964(c). The Plaintiffs, therefore, fail to state a RICO claim. The RICO claims are dismissed against the Moving Defendants.

*B. Unjust Enrichment*

Count XV alleges that the Bank was unjustly enriched by payments made by the Individual Plaintiffs on the Bank's loans to the various enterprises, and by the notes and guarantees executed by them. The Plaintiffs seek disgorgement of the payments and recision of the Plaintiffs' outstanding obligations to the Bank.

The Plaintiffs' unjust enrichment claim is based on a theory of quasicontract, or contract implied in law. *Consolidated Response to Defendants' Motions to Dismiss Counts XV and XVII of the First Amended Complaint (d/e 57)* at 7; *see Hanley v. Trendway Corp.,* 1995 WL 103748, *3 (N.D.Ill.1995).* A contract implied in law, or a quasi-contract, can be found when one party provides a benefit to another under circumstances in which it would be inequitable or unjust to allow the benefitted party to retain the benefit without compensating the other party. *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.,* 104 Ill.App.3d 357, 60 Ill.Dec. 100, 432 N.E.2d 999, 1002 (1982). This theory of recovery, however, is only available if the parties have no contract governing their relationship. *Id.* Here, the parties executed numerous contracts to govern their relationship. The Individual Plaintiffs executed personal guarantees, promissory notes, the Modification Agreement, and other agreements to govern their obligations to the Bank. The Enterprises executed notes and other documents to govern their obligations to the Bank. The Individual Plaintiffs made payments on debts governed by these documents. Because the relationship between the parties was governed by these agreements, there is no basis for recovery under an unjust enrichment or quasi-contract theory.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
(Cite as: 2006 WL 156828 (C.D.Ill.))

Page 8

**\*10** The Plaintiffs argue that the Bank coerced the Individual Plaintiffs to make payments that were not governed by any of these agreements. They argue that the Bank regularly coerced them into making payments on the Enterprises' obligations that the Individual Plaintiffs were not contractually obligated to make. The Bank, however, was receiving funds owed pursuant to the notes and other agreements with the Enterprises, and the Individual Plaintiffs had an equity interest in the Enterprises and had guaranteed some, if not all, of those debts. These payments, thus, were directly connected to the overall contractual relationships between these parties. In such situations, quasi-contract or unjust enrichment recovery is not available. *See Industrial Lift Truck Service Corp.,* 60 Ill.Dec. 100, 432 N.E.2d at 1003. In addition, these payments did not unjustly enrich the Bank because the amounts paid to the Bank were owed to it by the Enterprises. Count XV fails to state a claim.

*C. Conversion*

Count XVII alleges conversion of all the funds paid by the Individual Plaintiffs to the Defendants.[FN3] To state a claim for conversion, the Plaintiffs must allege that: (1) the Defendants have taken wrongful control of their personal property, (2) the Plaintiffs have a right to the property, (3) the Plaintiffs' right to possession is immediate and absolute, and (4) the Plaintiffs demand possession of the property. *Roderick Dev. Inv. Co. v. Community Bank of Edgewater,* 282 Ill.App.3d 1052, 218 Ill.Dec. 297, 668 N.E.2d 1129, 1133 (1996). Conversion will not lie for money, however, unless the funds are specifically identifiable. *Id.* at 1134. The funds have been found to be specifically identifiable in Illinois in situations where: (1) a third party transfers the funds to the defendant with the understanding that the defendant will transfer the funds to the plaintiff, but the defendant wrongfully retains the funds; or (2) the plaintiff transfers the funds to the defendant for a limited purpose, but the defendant wrongfully retains the funds. *E.g., Addante v. Pompilio,* 303 Ill.App. 172, 25 N.E.2d 123 (1940); *Grand Pacific Hotel Co. v. Rowland,* 88 Ill.App. 519 (1899). A general debt or sum owed on account, however, is not identifiable and will not support a claim for conversion. *In re Thebus,* 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (1985).

FN3. Count XVII does not assert a claim for

conversion of any other property, such as the AMFAL stock certificates delivered to Chehab. Count XVII also does not assert a claim by ROTFL or Alpha Foxtrot for conversion of any funds owned by either entity.

Conversion also will not lie when the plaintiff voluntarily transfers the funds to the defendant as part of a transaction between the two parties. *Roderick,* 218 Ill.Dec. 297, 668 N.E.2d at 1135. In such situations, a plaintiff has voluntarily and intentionally relinquished ownership of the funds as part of the transaction. Since the plaintiff has given up ownership, and thus, the right to possession of the funds, conversion will not lie. The plaintiff may have a claim in tort or contract for damages, but not a claim for conversion. *Roderick,* 218 Ill.Dec. 297, 668 N.E.2d at 1133; *General Motors Corp. v. Douglass,* 206 Ill.App.3d 881, 151 Ill.Dec. 822, 565 N.E.2d 93, 97 (1990).

**\*11** In this case, the Individual Plaintiffs paid debts owed to the Bank, purchased investments, and loaned money to the Enterprises and one or more of the Defendants. In each case, they intentionally relinquished ownership and control of the funds as part of the transactions. Since the Individual Plaintiffs gave up their right to ownership and possession of the funds, there was no conversion. *General Motors Corp.,* 151 Ill.Dec. 822, 565 N.E.2d at 97. The Individual Plaintiffs may recover from these Defendants if they prevail on one or more of the remaining theories alleged in the Amended Complaint, but they cannot state a claim for conversion.

THEREFORE, Bank of Springfield's Motion to Dismiss Counts II, III and V of First Amended Complaint Pursuant to Rule 12(b)(6) (d/e 43), Bank of Springfield's Motion to Dismiss Count XV-Unjust Enrichment (d/e 45), Bank of Springfield's Motion to Dismiss Count XVII-Conversion (d/e 47), Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 49), Motion to Dismiss Count XVII of the First Amended Complaint (d/e 50), Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 51), and Motion to Dismiss Count XVII of the First Amended Complaint (d/e 53) are ALLOWED. Count XV is dismissed. The claims alleged against Defendants Bank of Springfield, Michael McGlasson, James Kelley, William Chrans, Stephen K. Bentley, and Better Business Systems of Montana, Inc. in Counts II-V, and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 156828 (C.D.Ill.)
 **(Cite as: 2006 WL 156828 (C.D.Ill.))**

XVII are dismissed.

IT IS THEREFORE SO ORDERED.

C.D.Ill.,2006.
Baron v. Chehab
Not Reported in F.Supp.2d, 2006 WL 156828
(C.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
**(Cite as: 2006 WL 2859625 (D.Colo.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Fred Mark and Carol Ann BURNETT, Plaintiffs,
v.
Robert L. AMREIN, an individual, Karen L. Amrein,
an individual, B. Doug George, an individual, and
Daniel P. Powell, an individual, Defendants.
**Civil Case No. 06-cv-00564-REB-CBS.**

Oct. 3, 2006.

Fred Mark Burnett, Antonito, CO, pro se.

Carol Ann Burnett, Antonito, CO, pro se.

Matthew Kirk Hobbs, Eugene L. Farish, P.C., Monte
Vista, CO, B. Douglas George, Doug George, Attor-
ney at Law, Alamosa, CO, Daniel Ray McCune,
Miles Leachman Buckingham, Kennedy Childs &
Fogg, PC, Denver, CO, for Defendants.

**ORDER APPROVING AND ADOPTING REC-
OMMENDATION OF UNITED STATES MAG-
ISTRATE JUDGE**

BLACKBURN, J.

*1 This matter is before me on the **Recommendation
of United States Magistrate Judge** [# 99], filed Sep-
tember 12, 2006. The Magistrate Judge recommends
that

1. "Defendant Daniel Powell's Motion [to] Dismiss
   Pursuant to Fed. R. Civ. Pro. 9(b) and 12(b)(6)"
   (filed August 3, 2006) (doc. # 76) be GRANTED;

2. "Defendant George's Renewed Motion for Sum-
   mary Judgment" (filed August 3, 2006) (doc. # 74)
   be GRANTED IN PART;

3. "Plaintiff Burnetts' Motion this court under Au-
   thority of F.R. Civ. P. R 60(B)(4) for Vacation of
   the Judgments/Order in Colorado State Court Cas-
   es 2001 C5 and 2004CV03 [sic]" (filed July 6,

2006) (doc. # 62) be DENIED;

4. "Defendants Robert L. and Karen L. Amrein's Mo-
   tion for Summary Judgment" (filed June 6, 2006)
   (doc. # 41) be GRANTED IN PART;

5. "Defendant Daniel Powell's Motion for Summary
   Judgment" (filed May 31, 2006) (doc. # 34) be
   GRANTED IN PART;

6. "Defendant Doug B. George's Renewed Motion for
   Summary Judgment ..." (filed May 4, 2006) (doc. #
   19) be GRANTED IN PART;

7. In light of this Recommendation, "Plaintiffs' Bur-
   netts' Motion to Lift Order Staying Discovery and
   Grant Leave to Engage in Discovery ..." (filed Au-
   gust 30, 2006) (doc. # 94) be DENIED; and

8. This civil action be DISMISSED WITH PREJU-
   DICE.

*See* Recommendation at 21.

On September 22, 2006, plaintiffs filed objections [#
106] to the recommendation. On October 2, 2006,
defendant Powell filed a response [# 114] to plain-
tiffs' objections. I overrule plaintiffs' objections and
approve and adopt the recommendation.

As required by 28 U.S.C. § 636(b), I have reviewed
*de novo* all portions of the recommendation to which
objections have been filed, and have considered care-
fully the recommendation, plaintiffs' objections, de-
fendant Powell's response, and the applicable case
law. In addition, because plaintiffs are proceeding
*pro se,* I have construed their pleadings more liber-
ally and held them to a less stringent standard than
formal pleadings drafted by lawyers. *See Haines v.
Kerner,* 104 U.S. 519, 520-21 (1972), *Hall v. Bel-
mon,* 935 F.2d 1106, 1110 (10th Cir.1991). I find
plaintiffs' objections to be without merit. The rec-
ommendation is detailed, circumstantiated, and well-
reasoned. Therefore, I approve, adopt, and incorpo-
rate the reasons stated, arguments advanced, and au-
thorities cited, together with the findings of fact, con-
clusions of law, and recommendations proposed by

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

Page 2

the Magistrate Judge.

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Recommendation of United States Magistrate Judge** [# 99], filed September 12, 2006, **IS APPROVED AND ADOPTED** as the order of this court;

2. That "Defendant Daniel Powell's Motion [to] Dismiss Pursuant to Fed. R. Civ. Pro. 9(b) and 12(b)(6)" [# 76] filed August 3, 2006, **IS GRANTED;**

3. That "Defendant George's Renewed Motion for Summary Judgment" [# 74] filed August 3, 2006, **IS GRANTED IN PART;**

**\*2** 4. That "Plaintiff Burnetts' Motion this court under Authority of F.R. Civ. P. R 60(B)(4) for Vacation of the Judgments/Order in Colorado State Court Cases 2001 C5 and 2004CV03 [sic ]" [# 62] filed July 6, 2006, **IS DENIED;**

5. That "Defendants Robert L. and Karen L. Amrein's Motion for Summary Judgment" [# 41] filed June 6, 2006, **IS GRANTED IN PART;**

6. That "Defendant Daniel Powell's Motion for Summary Judgment" [# 34] filed May 31, 2006, **IS GRANTED IN PART;**

7. That "Defendant Doug B. George's Renewed Motion for Summary Judgment ..." [# 19] filed May 4, 2006, **IS GRANTED IN PART;**

8. That "Plaintiffs' Burnetts' Motion to Lift Order Staying Discovery and Grant Leave to Engage in Discovery ..." [# 94] filed August 30, 2006, **IS DENIED;** and

9. That this action **IS DISMISSED WITH PREJUDICE.**
CRAIG B. SHAFFER, Magistrate Judge.

RECOMMENDATION OF UNITED STATES
MAGISTRATE JUDGE

This civil action comes before the court on:

1. "Defendant Daniel Powell's Motion [to] Dismiss Pursuant to Fed. R. Civ. Pro. 9(b) and 12(b)(6)" (filed August 3, 2006) (doc. # 76);

2. "Defendant George's Renewed Motion for Summary Judgment" (filed August 3, 2006) (doc. # 74);

3. "Plaintiff Burnetts' Motion this court under Authority of F.R .Civ. P. R 60(B)(4) for Vacation of the Judgments/Order in Colorado State Court Cases 2001 C5 and 2004CV03 [sic]" (filed July 6, 2006) (doc. # 62);

4. "Defendants Robert L. and Karen L. Amrein's Motion for Summary Judgment" (filed June 6, 2006) (doc. # 41);

5. "Defendant Daniel Powell's Motion for Summary Judgment" (filed May 31, 2006) (doc. # 34);

6. "Defendant Doug B. George's Renewed Motion for Summary Judgment ..." (filed May 4, 2006) (doc. # 19); and

7. "Plaintiffs' Burnetts' Motion to Lift Order Staying Discovery and Grant Leave to Engage in Discovery ..." (filed August 30, 2006) (doc. # 94).

Pursuant to the Order of Reference dated March 30, 2006 (doc. # 2) and the memoranda dated May 8, 2006 (doc. # 20), June 1, 2006 (doc. # 37), June 7, 2006 (doc. # 44), August 4, 2006 (doc. # 79), and September 6, 2006 (doc. # 96), these motions were referred to the Magistrate Judge. The court has reviewed the motions, the corresponding responses and replies (docs. # 51, # 55, # 61, # 70, # 71, # 72, # 78, # 86, # 91, and # 95), the entire case file, and the applicable law and is sufficiently advised in the premises.[FN1]

> FN1. On August 24, 2006, the District Judge afforded the Burnetts until September 8, 2006 to re-file their reply to the Defendants' Responses (docs. # 70, # 71, and # 72). (See Minute Order (doc. # 92)). The Burnetts filed their "First Amended Consolidated Reply" on September 5, 2006. (See doc. # 95).

I. Statement of the Case

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
**(Cite as: 2006 WL 2859625 (D.Colo.))**

The Amreins and the Burnetts are owners of adjoining land in the Aspen Springs subdivision in Conejos County, Colorado. (*See Burnett v. Amrein* (Colo.App. No. 05CA1212, June 15, 2006) (not published pursuant to C.A.R. 35(f)) (Exhibit A-13 (doc. # 82))). Defendants George and Powell are attorneys who represented the Amreins in litigation in the County and State Courts. On January 12, 2001, the Amreins brought a civil action, Case No.2001 C 05, in the County Court for the County of Conejos seeking a preliminary and permanent injunction against the Burnetts for violation of certain protective covenants which run with the land located within the subdivision. (Exhibit B to doc. # 35 at p. 1)."Specifically, the Amreins alleged that the Burnetts were in violation of two provisions of the Covenants pertaining to the keeping of livestock, and pertaining to the use of reserved easements within the subdivision."(Exhibit B to doc. # 35 at p. 1). The County Court ruled that it had subject matter jurisdiction over the keeping of livestock issue raised in the Complaint. (Exhibit E to doc. # 35 at p. 3). The County Court permanently enjoined the Burnetts "from keeping horses upon property located within the subdivision."(Exhibit E to doc. # 35 at p. 3). That Order was not appealed by the Burnetts. (Exhibit E to doc. # 35 at p. 3).

*3 The County Court further ruled that it did not have subject matter jurisdiction over the easement encroachment issue. (Exhibit E to doc. # 35 at p. 3). On May 24, 2002, the Conejos County District Court overruled the County Court, holding that the County Court had subject matter jurisdiction over the easement encroachment issue. (Exhibit E to doc. # 35 at p. 4). The District Court's ruling was not appealed by the Burnetts. (Exhibit E to doc. # 35 at p. 4).

On November 5, 2003, at the conclusion of a trial in Case No.2001 C 05, the County Court ruled that it had subject matter jurisdiction to enforce the covenants under C.R.S. § 13-6-105(1)(f), ordered the Burnetts to remove all fences, gates and other obstructions from the easement area, and permanently enjoined the Burnetts from erecting any obstruction that may encroach upon the easement. (Exhibit E to doc. # 35 at pp. 4, 11). On or about January 15, 2004, the County Court awarded attorney fees and costs against the Burnetts in the amount of $21,500.28 "given that [the Burnetts'] defense in this action was substantially frivolous, substantially groundless and substantially vexatious; and inasmuch as [the Bur-

netts']violations of the relevant Aspen Springs subdivision Protective Covenants in this respect were willful, knowing, not in good faith, and continued with full knowledge of the violations before this litigation began and throughout this litigation." (Exhibit F to doc. # 35 at p. 1)."The Burnetts filed an appeal in the Conejos County District Court, Case No.2004 CV 03."(Exhibit B to doc. # 35 at p. 3).

"On August 12, 2004, the Burnetts filed a Complaint in the Conejos County District Court, Case No.2004 CV 27, seeking an Order vacating the Judgment of the County Court entered on November 18, 2003...." (Exhibit B to doc. # 35 at p. 4). On November 22, 2004, the District Court stayed the proceedings in Case No.2004 CV 27, pending a ruling in Case No.2004 CV 03. (Exhibit B to doc. # 35 at p. 4).

On March 3, 2005, the District Court affirmed the County Court in Case No.2004 CV 03 in all respects, with the exception of a portion of the attorney fees the County Court awarded to the Amreins. (Exhibit G to doc. # 35 at p. 1). On remand, on September 13, 2005, the County Court entered judgment for attorney fees and costs against the Burnetts in the amount of $29,039.26 plus interest. (Exhibit J to doc. # 35).

The District Court granted summary judgment against the Burnetts in Case No.2004 CV 27 on April 29, 2005. (Exhibit K to doc. # 35). On June 10, 2005, the District Court denied the Burnetts' Motion for Reconsideration. (Exhibit B to doc. # 35 at p. 5). The Burnetts appealed the judgment in Case No.2004 CV 27 by filing a Notice of Appeal in 05CA1212. (*See* Exhibit A-13 (doc. # 82)). The Colorado Court of Appeals affirmed the District Court on June 15, 2006. (*See* Exhibit A-13 (doc. # 82)). As of the date of this Recommendation, the time period for filing a petition for certiorari has not expired.

*4 The Burnetts appealed the judgment in Case No.2004 CV 03 by filing a Notice of Appeal in 05CA0674. (Exhibit B to doc. # 35 at p. 4). On May 18, 2005, the Colorado Court of Appeals dismissed the appeal for lack of jurisdiction. (Exhibit H to doc. # 35). The Burnetts filed a petition for a stay in the Colorado Supreme Court (Case No.2005 SC 0191) that was denied on July 6, 2005. (Exhibit I to doc. # 35).

The Burnetts appealed the County Court judgment

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

Page 4

for attorney fees and costs in the amount of $29,039.26 (Exhibit J to doc. # 35) by filing Case No.2005 CV 49 in the District Court for Conejos County. (See Exhibit D to doc. # 35 at ¶ 5). The Amreins filed a motion to dismiss that appeal based upon the Burnetts' failure to file an appeal bond. The District Court directed the Burnetts to post bond pursuant to C.R.C.P. 411(a) in the sum of $29,039.26 within 30 days of March 3, 2006. (See Exhibit D to doc. # 35 at ¶ 10).Case No.2005 CV 49 in the District Court for Conejos County is still ongoing.

The Burnetts commenced this civil action on March 28, 2006 by filing a *pro se* Complaint alleging claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18 U.S.C. §§ 1964(a) and (c). The Burnetts filed an Amended Complaint on April 4, 2006 (doc. # 3). With leave of court, the Burnetts filed a Second Amended Complaint ("SAC") on July 20, 2006 (doc. # 67). The Burnetts allege that Defendants violated §§ 1964(a) and (c) by their attempts to collect the judgment for approximately $30,000.00 dollars of attorney fees and costs. (SAC at p. 1). Defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and for summary judgment pursuant to Fed.R.Civ.P. 56.

II. Standard of Review

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."When reviewing a Rule 12(b)(6) motion to dismiss, the court accepts the well-pleaded allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Ramirez v. Dep't of Corrections,* 222 F.3d 1238, 1240 (10th Cir.2000) (citation omitted). A complaint should not be dismissed under Rule 12(b)(6)"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ramirez,* 222 F.3d at 1240 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

Under Fed.R.Civ.P. 56(c),

summary judgment is proper only if the evidence, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. A material" fact is one that might affect the outcome

of the suit under the governing law, and a genuine issue is one where the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Stearns v. McGuire,* 354 F.Supp.2d 1188, 1189 (D.Colo.2004) (internal quotation marks and citations omitted), *aff'd,* 154 Fed. Appx. 70 (10th Cir.2005).[FN2]

> FN2. In more than one filing, the Burnetts have asked the court to take judicial notice of facts. (See docs. # 87, # 58). Pursuant to Fed.R.Evid. 201, "[j]udicial notice is when a judge recognizes the truth of certain facts, which from their nature are not properly the subject of testimony, or which are universally regarded as established by common knowledge. The recognition of certain facts by the judge is proper without proof because such facts are not subject to reasonable dispute." *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 895 (10th Cir.19940 (footnote omitted)."Judicial notice is appropriate where a matter is 'verifiable with certainty.' " *York v. American Tel & Tel. Co.,* 95 F.3d 948, 958 (10th Cir.1996).
>
> The facts to which the Burnetts refer in their Notices are not appropriate for judicial notice because they are subject to dispute. Further, judicial notice of the factual matters recited by the Burnetts is unnecessary because the court has and will consider all of the evidence presented by the parties as it relates to this civil action. The Burnetts' request that the court take judicial notice of the referenced facts is inappropriate and unnecessary.

III. RICO

*5 The RICO statute, 18 U.S.C. §§ 1961-1968, provides for civil and criminal remedies for racketeering activities. "RICO allows private parties to bring civil suits for treble damages." *Deck v. Engineered Laminates,* 349 F.3d 1253, 1256-57 (10th Cir.2003) (citing 18 U.S.C. § 1964(c)). "Racketeering activity" encompasses a number of crimes identified in the statute, including mail fraud. 18 U.S.C. § 1961(1)."These underlying acts are referred to as predicate acts, because they form the basis for liability under RICO ."

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                        Page 5
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

*Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir.2006) (internal quotation marks and citation omitted). Section 1962 defines the criminal violations necessary for the recovery of civil damages under § 1964(c). A person need not "be formally convicted of any predicate act before liability under 18 U.S.C. § 1962(b) may attach." *Tal*, 453 F.3d at 1262 (internal quotation marks and citation omitted)."To state a RICO claim, a plaintiff must allege that the defendant violated the substantive RICO statute, 18 U.S.C. § 1962, by setting forth four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Deck,* 349 F.3d at 1256-57 (internal quotation marks and citations omitted).

A. Failure to Allege a RICO Violation

The Burnetts appear to allege violation of § 1962(b). (*See* SAC at ¶ 1).

> It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

1. RICO Enterprise

"The first rule of pleading a RICO claim is that the plaintiff must identify the enterprise." *Jennings v. Emry,* 910 F.2d 1434, 1439-40 (7th Cir.1990).*See also American Buying Ins. Services, Inc. v. S. Kornreich & Sons, Inc.,* 944 F.Supp. 240, 246 (S.D.N.Y.1996) (RICO plaintiff must adequately allege an enterprise in order to state a claim under either Section 1962(b) or (c)). An "enterprise" is defined under RICO to include "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."18 U.S.C. § 1961(4). An enterprise "is an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to [hierarchal] or consensual decision-making." *Jennings,* 910 F.2d at 1440 (citations omitted).*See also United States Fire Insurance Co. v. United Limousine Service, Inc.,* 303 F.Supp.2d 432, 446 (S.D.N.Y.2004) ("An enterprise is defined as an entity, ... a group of persons associated together for the common purpose of engaging in

a course of conduct") (internal quotation marks and citations omitted).

"To allege an enterprise within the meaning of RICO, there must be a group of persons associated together for a common purpose of engaging in a course of conduct ... [It is] proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Seidl v. Greentree Mortgage Co.,* 30 F.Supp.2d 1292, 1305 (D.Colo.1998) (internal quotation marks and citation omitted)."Any RICO enterprise must consist of more than a group of people who get together to commit a pattern of racketeering activity." *Starfish Investment Corp. v. Hansen,* 370 F.Supp.2d 759, 769 (N.D.Ill.2005) (citation omitted)."A RICO complaint must allege that the defendants were conducting the enterprise's affairs, rather than their own affairs." *Starfish,* 370 F.Supp.2d at 771.

*6 The SAC does not contain allegations, even in conclusory form, that there was a common purpose among the Defendants or any sort of decision-making mechanism for conducting an enterprise's affairs on a continuing basis. At best, the SAC alleges that George and Powell attempted to collect a judgment that the Burnetts allege is invalid. These allegations do not support the existence of an enterprise with shared or common purposes, continuity of structure and personnel, and a structure distinct from that inherent in the alleged pattern of racketeering activity. *See United States v. Turkette,* 452 U.S. 576, 583 (1981) (enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages"); *United States v. Irizarry,* 341 F.3d 273, 286 (3d Cir.2003) (requiring that the enterprise be an ongoing organization with a framework for making or carrying out decisions, that the various associates function as a continuing unit, and that the enterprise is separate and apart from the pattern of racketeering activity) (citation omitted), *cert. denied,* 540 U.S. 1140 (2004); *United States v. Parise,* 159 F.3d 790, 795 (3d Cir.1998) (enterprise must maintain a shared organizational pattern and system of authority) (citation omitted). Even "conspiring to commit a fraud is not enough to trigger [RICO] if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck v. CommonPoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir.2000)."Further, an attorney does not participate in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

Page 6

the operation or management of an enterprise by offering legal advice or otherwise represent[ing] a client. *Seidl,* 30 F.Supp.2d at 1305 (citation omitted). The activity alleged in the SAC may be interpreted as nothing more than a legitimate and singular endeavor to collect a judgment. In sum, the SAC does not allege an enterprise under RICO.

2. Pattern of Racketeering under § 1962

"[T]he complaint must demonstrate sufficient relationship and continuity among the predicate acts to qualify as a pattern of racketeering activity within the meaning of the RICO statute." *Starfish,* 370 F.Supp.2d at 771 (citation omitted)."[A] complaint asserting a pattern of racketeering activity must allege facts from which such a continuous and related course of conduct-one indicating the threat of continuing criminal activity-reasonably may be inferred." *Jennings,* 910 F.2d at 1439,*See also St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir.2000) ("to state a RICO claim there must be: (1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise*") (emphasis in original) (internal quotation marks and citation omitted). "In order to demonstrate a pattern of racketeering under 18 U.S.C. § 1962, a plaintiff must establish that the conduct in question amounts to, or constitutes a threat of, continuing racketeering activity." *Protter v. Nathan's Famous Systems, Inc.,* 925 F.Supp. 947, 953 (E.D.N.Y.1996)."A pattern of racketeering activity must include commission of at least two predicate acts." *Deck,* 349 F.3d at 1256-57 (citation omitted).

*7 Several related "predicate acts" do not establish a pattern when they are part of an alleged "single effort" to effectuate one wrong, such as the obtaining of a contract or an act of insurance fraud. *See Scottsdale Insurance Co. v. Dorman,* 153 F.Supp.2d 852, 857 (E.D.La.2001) (granting motion to dismiss RICO claim where all alleged predicate acts were part of or directed toward a single scheme of insurance fraud against one insurer over a period of 6 months). The Burnetts allege that each of the predicate acts was perpetrated solely to allow the Defendants to collect a judgment that the Burnetts contend is invalid. Attempts to collect one judgment do not "constitute a distinct threat of long-term racketeering activity." *Tal,* 453 F.3d at 1268 (internal quotation

marks and citation omitted). Further, the SAC is devoid of factual allegations as to any conduct engaged in by the Amreins that would qualify as predicate acts within the meaning of 18 U.S.C. § 1961. Because the SAC does not allege a "pattern" of racketeering activity, it is properly dismissed.

3. Fraud under RICO

All of the predicate acts pled in the SAC are based upon fraud. (*See* SAC at ¶¶ 14-38)."Rule 9(b) is applicable to RICO predicate acts based on fraud." *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989).*See also In Re Sattler's,* 73 B.R. 780, 786 (S.D.N.Y.1987) ( "the pleading of predicate acts for a RICO claim must meet the particularity requirements of Rule 9(b), Fed.R.Civ.P., where the acts are based in fraud") (citations omitted).

"[W]e believe that the threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts. We believe this is particularly important in cases where the predicate fraud allegations provide the only link to federal jurisdiction. Thus, we hold that Rule 9(b) requires particularity in pleading RICO mail and wire fraud."

*Cayman Exploration,* 873 F.2d at 1362.

Fed.R.Civ.P. 9(b) requires that

[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

To meet the Rule 9(b) standard, a plaintiff must identify the circumstances constituting the fraud. *Broadview Financial, Inc. v. Entech Management Services Corp.,* 859 F.Supp. 444, 449 (D.Colo.1994) (citation omitted). Specifically, a plaintiff must (1) identify the particular individuals with whom he dealt; (2) designate the occasion on which the fraudulent statements were made, and by whom; and (3) describe what misstatements and half-truths were expressed and how. *Id. See also Brooks v. Bank of Boulder,* 891 F.Supp. 1469, 1476 ("In pleading a claim under RICO, ...

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
**(Cite as: 2006 WL 2859625 (D.Colo.))**

Page 7

Plaintiffs must set forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof") (internal quotation marks and citation omitted); _Kaiser v. Bowlen,_ 181 F.Supp.2d 1200, 1203 (D.Colo.2002) ("The complaint must contain allegations of the specific representations alleged to be fraudulent, where and when the statements were made, the particular defendant making the misrepresentations, and what was false about them") (citation omitted).

**\*8** The Burnetts have not adequately pled the elements of fraud. The SAC lacks specific allegations regarding the time, place, and content of the alleged fraud. The Burnetts have not alleged what documents were sent, to whom the documents were sent, the contents of the documents, or how the documents were fraudulent. There are no specific allegations of fraud against the Amreins. The Burnetts' allegations are stated in the most vague and conclusory manner. This is insufficient to meet the requirements that a RICO claim based on fraud be stated with particularly as to each defendant. Because the SAC does not allege fraud with the particularity required in pleading RICO claims, it is properly dismissed.

4. Mail Fraud

The Burnetts allege that Defendants engaged in mail fraud. (_See_ SAC at ¶¶ 8, 9, 11)."The elements of federal mail fraud as defined in 18 U.S.C. § 1341 are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme." _United States v. Welch,_ 327 F.3d 1081, 1104 (10th Cir.2003) (citation omitted)._See also BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.,_ 194 F.3d 1089, 1102 (10th Cir.1999) (same) (internal quotation marks and citation omitted).

The particularity requirement of Rule 9(b) applies to civil RICO claims for which mail fraud is the predicate illegal act. _Tal,_ 453 F.3d at 1263 (citations omitted). In order to satisfy the particularity requirements of Rule 9(b) where, as here, mail fraud is alleged as a predicate act of a RICO claim, "the plaintiff must specify the time, place, and content of the alleged false representation and describe with particularity any allegedly fraudulent transaction, and how the

particular mailing or transactions furthered the fraudulent scheme." _Weizmann v. Kirkland and Ellis,_ 732 F.Supp. 1540, 1546 (D.Colo.1990)."In addition, a plaintiff asserting fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme and allege facts that give rise to a strong inference of fraudulent intent." _Kashelkar v. Rubin & Rothman,_ 97 F.Supp.2d 383, 393 (S.D.N.Y.2000) (citation omitted).

Mail fraud is not committed simply by sending false statements through the mail. Instead, the mails must have been used to further a scheme to defraud or obtain money or property through false pretenses. _Atlas Pile Driving Co. v. DiCon Financial Co.,_ 886 F .2d 986, 991 (8th Cir.1989). The absence of specific intent to defraud is a complete defense to mail fraud. _United State v. Ashman,_ 979 F.2d 469, 480 (7th Cir.1993) (citation omitted. _See also United States v. Dunn,_ 961 F.2d 648, 650 (7th Cir.1992) ("Good faith, or the absence of an intent to defraud, constitutes a complete defense to a charge of mail fraud") (citation omitted). General allegations such as that transfers of funds were accomplished through the use of the mail or that the mails were used in connection and in furtherance of the enterprise are insufficient to meet the particularity requirements of Rule 9(b). _In Re Sattler's,_ 73 B.R. at 786 (citation omitted). The SAC does not satisfy the requirements for alleging mail fraud under RICO. The Burnetts merely allege that unidentified mailings were false. The allegations do not specify what each Defendant is alleged to have communicated, how those communications were false, and how, if at all, the Burnetts relied on them. _See Kashelkar,_ 97 F.Supp.2d at 393 (allegations giving no particulars about what were the alleged statements, who made them, when and where they were made, what role they played in the scheme, or any facts which give rise to an inference of fraudulent intent" failed to satisfy pleading requirements of a RICO claim) (citation omitted).

**\*9** The Burnetts do not specifically allege predicate acts of mail fraud. (_See_ SAC at ¶¶ 1438 (Defendants George and Powell "conduct[ed] fraud" and "intent to defraud")). There is no allegation that the Amreins used the mail to defraud Plaintiffs. The SAC does not allege with particularity how otherwise routine mailings furthered a fraudulent scheme. _See BancOklahoma,_ 194 F .3d at 1102 (activities that would have been performed in normal course of business failed to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

establish that title companies directed activities of or participated in operations of alleged RICO enterprise).

Among the predicate acts of fraud and mail fraud alleged by the Burnetts is the preparation by George and Powell of documents "alleging that Burnetts were liable to Amreins [sic]." (SAC at ¶ 14). The allegations in the SAC do not support a claim that George's and Powell's actions were other than completely lawful, legitimate conduct of attorneys representing their clients in pending litigation. *See D'Orange v. Feely,* 877 F.Supp. 152,156 (S.D.N.Y.1995) (dismissing RICO claims against attorneys who had allegedly sent fraudulent accountings through the mail and holding that the attorney's actions "cannot be considered predicate acts because they constitute legitimate conduct of attorneys acting on behalf of a client in the course of pending litigation"); *Morin v. Trupin,* 711 F.Supp. 97, 105 (S.D.N.Y.1989) (holding that letter sent by attorney-defendants to plaintiffs demanding payment on notes which defendants allegedly knew to be unenforceable could not constitute RICO predicate act of mail fraud and that "Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an issue in pending litigation") (internal quotation marks and citation omitted); *Paul S. Mullin & Associates v. Bassett,* 632 F.Supp. 532, 540 (D.Del.1986) (finding "absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud") (citation omitted).

The court will not imply or read mail fraud into the SAC where it is not specifically alleged. *Giuliano v. Fulton,* 399 F.3d 381, 388 (1st Cir.2005) (quoting *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 444 (1st Cir.1990) (we have "no duty to conjure up unpled allegations in order to bolster the plaintiff's chances of surviving a .12(b)(6) motion to dismiss") (internal quotation marks omitted)). The SAC does not adequately allege mail fraud and accordingly does not state a claim for violation of RICO, the only basis for this civil action.

5. Reliance Requirement under RICO

Reliance is an element of a civil RICO claim. *See City of New York v. Cyco.Net, Inc.,* 383 F.Supp.2d

526, 559 (S.D.N.Y.2005) (in order to establish the required causal connection in the context of an alleged RICO violation based on an act of mail fraud, plaintiffs must demonstrate that they relied on the alleged misrepresentations) (citations omitted); *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539 (5th Cir.2001) (in civil RICO claims in which fraud is alleged as a predicate act, reliance on the fraud must be shown) (citations omitted); *VanDenBroeck,* 210 F.3d at 701 (under RICO, an element of both mail fraud and wire fraud is reliance on the fraudulent representation).

*10 The SAC includes a single conclusory allegation that the Burnetts relied on the alleged misrepresentations by Defendants. (*See* SAC at ¶ 9). Throughout the extensive underlying and ongoing litigation in state court, the Burnetts have challenged the collection of the judgment against them, belying any allegation of their reliance on Defendants' alleged misrepresentations. For this reason also, the SAC is properly dismissed.

6. Section 1962(b)

The first element of a Section 1962(b) claim "requires sufficient allegations of an interest in or control of an enterprise ." *Tal,* 453 F.3d at 1268 (internal quotation marks omitted)." 'Interest in or control of' requires more than a general interest in the results of its actions, or the ability to influence the enterprise through deceit." *Id.* (citation omitted)."Rather, it requires some ownership of the enterprise or an ability to exercise dominion over it." *Id.*"To survive a motion to dismiss, the complaint must specify the connection between defendants' racketeering activity and their interest in the ... enterprise." *Protter,* 925 F.Supp. at 955 (internal quotation marks and citations omitted).

The SAC lacks any allegations regarding acquisition or maintenance of an interest in an enterprise. The Burnetts have not pled any specific facts that Defendants acquired or maintained an enterprise through illegitimate acquisitions. The SAC does not allege a nexus between control of a named enterprise and alleged racketeering activity. The SAC does not allege any "facts would establish either that the individual defendants had acquired or maintained control of [an enterprise] through a pattern of racketeering." *Protter,* 925 F.Supp. at 955.For this reason, the Burnetts' RICO claims pursuant to § 1962(b) are properly

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)

**(Cite as: 2006 WL 2859625 (D.Colo.))**

dismissed.

IV. Conclusion

The SAC does not state any claim upon which relief may be granted. The SAC is the Burnetts' third attempt to comply with the rules of this court and the Federal Rules of Civil Procedure. Defendants raised numerous legal challenges to the Amended Complaint. Even after Defendants filed motions to dismiss and for summary judgment addressed to the Amended Complaint, the court afforded the Burnetts an opportunity to further amend their claims. At the hearing held on July 6, 2006, the court notified the Burnetts of the legal deficiencies of their claims. After ample warning of the deficiencies of their claims, the Burnetts filed a SAC that suffers from the same deficiencies.

Under the circumstances of this case, it is appropriate for the court to recommend dismissal of the SAC on the merits and with prejudice. Even *pro se* parties are not permitted an infinite number of attempts to comply with the rules of the court. The Burnetts do not appear willing or able to prepare a proper complaint. Defendants have offered legitimate reasons why the SAC should be dismissed. When the state court "proceedings are final," the federal court will likely lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine.[FN3] For these reasons, the court recommends that the SAC be dismissed with prejudice.[FN4]

FN3. Under the *Rooker-Feldman* doctrine, "a federal district court does not have subject matter jurisdiction to hear appeals from final judgments of state courts." *Guttman v. Khalsa,* 401 F.3d 1170, 1173 (10th Cir.), *judgment vacated on other grounds,* 126 S .Ct. 321 (2005). The United States Supreme Court recently stated that the *Rooker-Feldman* doctrine precludes "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284 (2005).

The Burnetts "plainly" have "repaired to

federal court to undo" the Colorado judgment against them. *Exxon Mobil,* 544 U.S. at 293.*See, e.g.,*"Plaintiff Burnetts' Motion this Court under Authority of F.R.CIV.P.R 60(B)(4) for Vacation of the Judgments/Order in Colorado State Court Cases 2001 C5 and 2004CV03" (doc. # 62) (Burnetts ask federal court "to vacate Colorado state court judgments/orders, November 18th 2003, January 20th 2004, March 7th 2005 and July 13th, 2005 in matters 2001 C5 and 2004CV03").

However, "[t]he *Rooker-Feldman* doctrine only applies to cases brought after the state proceedings have ended."*Guttman,* 446 F.3d at 1031 (internal quotation marks and citation omitted). The Burnetts have appealed the County Court judgment for attorney fees and costs in the amount of $29,039.26 (Exhibit J to doc. # 35) by filing Case No.2005 CV 49 in the District Court for Conejos County. (*See* Exhibit D to doc. # 35 at ¶ 5).Case No.2005 CV 49 is not yet concluded in the state courts.

FN4. In light of this Recommendation, the court does not reach the alternative arguments presented in the Defendants' Motions.

V. Burnetts' Motion to Vacate

**\*11** The Burnetts ask this court, apparently pursuant to Fed.R.Civ,P. 60(b)(4), to vacate "void" judgments entered by the state courts. (*See* Burnett's Motion (filed July 6, 2006) (doc. # 62), Burnetts' Notice (filed July 19 2006) (doc. # 66)). The Burnetts argue that the state courts did not have jurisdiction to enter the judgments against them. (*See id.*).

Fed.R.Civ.P. 60(b) provides in part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void.

Rule 60(b)(4) provides for relief from a judgment on the ground that "the judgment is void." Fed.R.Civ.P. 60(b)(4)."A judgment is void ... if the court which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

rendered it lacked jurisdiction of the subject matter, or of the parties, or acted in a manner inconsistent with due process of law." *United States v. Buck,* 281 F.3d 1336, 1344 (10th Cir.2002) (quotation omitted).

The Burnetts seek relief in the federal district court for a judgment that was rendered in state court. Rule 60(b) does not authorize a federal district court to relieve the Burnetts of a judgment entered in state court. The Burnetts have raised in the state courts the same arguments raised in their Motion to Vacate. A motion under Rule 60(b) cannot be used as a substitute for appeal. *Morris v. Adams-Millis Corp.,* 758 F.2d 1352, 1357 (10th Cir.1985). The Motion to Vacate is not properly brought in this court.

Further, the *Rooker-Feldman* doctrine provides that federal district courts lack jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp.,* 544 U.S. at 284."The Rooker-Feldman doctrine is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Bolden v. City of Topeka, Kan.,* 441 F.3d 1129, 1142-43 (10th Cir.2006) (internal quotation marks and citation omitted). "*Rooker-Feldman* does not bar federal-court claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." *Bolden,* 441 F.3d at 1145."Appellate review-the type of judicial action barred by Rooker-Feldman-consists of a review of the proceedings already conducted by the lower tribunal to determine whether it reached its result in accordance with law." *Bolden,* 441 F.3d at 1143."A suit in federal district court to litigate the issue already decided by the [Colorado courts] in essence would be an attempt to obtain direct review" of the decisions in the Colorado courts. *Bolden,* 441 F.3d at 1144 (internal quotation marks and citation omitted). The Burnetts' motion to vacate "void" judgments entered by the state courts is essentially an appeal of state court judgments. The relief sought by the Burnetts runs afoul of the *Rooker-Feldman* doctrine.

**\*12** Accordingly, IT IS RECOMMENDED that:

1. "Defendant Daniel Powell's Motion [to] Dismiss Pursuant to Fed. R. Civ. Pro. 9(b) and 12(b)(6)" (filed August 3, 2006) (doc. # 76) be GRANTED;

2. "Defendant George's Renewed Motion for Summary Judgment" (filed August 3, 2006) (doc. # 74) be GRANTED IN PART;

3. "Plaintiff Burnetts' Motion this court under Authority of F.R. Civ. P. R 60(B)(4) for Vacation of the Judgments/Order in Colorado State Court Cases 2001 C5 and 2004CV03 [sic]" (filed July 6, 2006) (doc. # 62) be DENIED;

4. "Defendants Robert L. and Karen L. Amrein's Motion for Summary Judgment" (filed June 6, 2006) (doc. # 41) be GRANTED IN PART;

5. "Defendant Daniel Powell's Motion for Summary Judgment" (filed May 31, 2006) (doc. # 34) be GRANTED IN PART;

6. "Defendant Doug B. George's Renewed Motion for Summary Judgment ..." (filed May 4, 2006) (doc. # 19) be GRANTED IN PART;

7. In light of this Recommendation, "Plaintiffs' Burnetts' Motion to Lift Order Staying Discovery and Grant Leave to Engage in Discovery ..." (filed August 30, 2006) (doc. # 94) be DENIED; and

8. This civil action be DISMISSED WITH PREJUDICE.

**Advisement to the Parties**

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *In re Griego,* 64 F.3d 580, 583 (10th Cir.1995).

The district judge shall make a *de novo* determination of those specific portions of the proposed findings or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)
(Cite as: 2006 WL 2859625 (D.Colo.))

recommendations to which specific objection is made. 28 U.S.C. § 636(b)(1). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. *See In re Griego,* 64 F.3d at 583; *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma,* 73 F.3d 1057, 1060 (10th Cir.1996). The district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1).

"[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *One Parcel of Real Property,* 73 F.3d at 1060.Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers,* 195 F.3d 573, 579-80 (10th Cir.1999) (district court's decision to review a magistrate's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Property,* 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.,* 52 F.3d 901, 904 (10th Cir.1995) (by failing to object to certain portions of the magistrate's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States,* 980 F.2d 1342, 1352 (10th Cir.1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate's ruling).*But see, Morales-Fernandez v. INS,* 418 F.3d 1116, 1122 (10th Cir.2005) (firm waiver rule does not apply when the interests of justice require review).

D.Colo.,2006.
Burnett v. Amrein
Not Reported in F.Supp.2d, 2006 WL 2859625 (D.Colo.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                Page 1
Slip Copy, 2008 WL 4223271 (D.Colo.)
(Cite as: 2008 WL 4223271 (D.Colo.))

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Vicki R. DILLARD-CROWE, Plaintiff,
v.
CITIBANK, N.A., as Trustee, et al., Defendants.
Civil Action No. 07-cv-02172-WDM-CBS.

Sept. 10, 2008.

Vicki R. Dillard-Crowe, Aurora, CO, pro se.

Susan Jean Hendrick, Aronowitz & Ford, LLP, Denver, CO, Robert D. Clark, Castle Rock, CO, for Defendants.

## ORDER ON MOTIONS TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

MILLER, J.

*1 This matter is before me on the Motion to Dismiss for Lack of Jurisdiction (doc. no. 12) filed by Defendant Diane Bailey ("Public Trustee"), the Motion for Summary Judgment (doc. no. 15) filed by Plaintiff Vicki R. Dillard-Crowe, and the Motion to Dismiss (doc. no. 25) filed by Defendants CitiBank, N.A. ("CitiBank"), and Avelo Mortgage ("Avelo"). Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motions to dismiss filed by Defendants will be granted and Plaintiff's motion for summary judgment will be denied as moot.

This case concerns two completed foreclosures on properties located in Douglas County, Colorado, formerly owned by Plaintiff. Her claims against Avelo arise from foreclosure proceedings on real property known by street and number as 12066 North 3rd Street, Parker, Colorado ("3rd Street Property"). On April 25, 2007, Avelo obtained a Public Trustee Certificate of Purchase for the 3rd Street Property from the Douglas County Public Trustee following the foreclosure sale. Avelo then initiated a forcible entry and detainer action against a tenant occupying the property. Plaintiff's claims against CitiBank arise

from foreclosure proceedings on real property known by street and number 20 Red Deer Road, Franktown, Colorado ("Red Deer Property"). CitiBank obtained a Public Trustee deed to the Red Deer Property on July 27, 2007, also following a completed foreclosure. Defendant Diane Bailey is the Public Trustee for Douglas County. After the foreclosures were completed and title vested in Avelo and CitiBank, Plaintiff filed challenges in the County Court for Douglas County, Colorado, seeking to vacate the foreclosure sales. She then filed her complaint in this Court on October 15, 2007, alleging defects in the foreclosure proceedings and seeking damages.[FN1]

> FN1. Plaintiff's Amended Complaint and Jury Demand (doc. no. 29) is the operative pleading at this time. In it, Plaintiff asserts the following claims against the Defendants: (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq .; (2) misrepresentation and fraud; (3) denial of due process for failure to give notice of the foreclosure hearing/sale; (4) failure to comply with state foreclosure statutes; (5) unlawful transfer of real property; (6) lack of contractual relationship with the holders of the promissory notes; (7) breach of contract and interference with contractual relations.

This case is substantially similar to other lawsuits filed by the Plaintiff in this Court concerning other real property Plaintiff lost to foreclosure, specifically Consolidated Civil Action No. 07-cv-01987-WDM-CBS (Consolidated with Civil Action No. 07-cv-02293-WDM-CBS). I recently dismissed those cases after accepting the recommendation of United States Magistrate Judge Craig B. Shaffer (see doc. no. 45 in Civil Action No. 07-cv-01987). For substantially the same reasons as set forth in Magistrate Judge Shaffer's recommendation, this case will also be dismissed.

I take judicial notice of the pleadings and other filings filed in the state court actions, which I consider to be incorporated in Plaintiff's complaint. GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir.1997) ("if a plaintiff does

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 4223271 (D.Colo.)

**(Cite as: 2008 WL 4223271 (D.Colo.))**

Page 2

not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiffs claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss"). These establish that Plaintiff obtained title to the 3rd Street Property and Red Deer Property by executing promissory notes secured by deeds of trust. She thereafter defaulted on the mortgages. Avelo and Citi-Bank, as the holders of the promissory notes, initiated foreclosure proceedings. Plaintiff did not challenge those proceedings until after the redemption period had expired and the foreclosure sales vested title in Avelo and CitiBank. The Douglas County state court declined to vacate the foreclosure sales. Although Plaintiff appealed the Avelo foreclosure to the Colorado Court of Appeals, her appeal was dismissed. There is no indication that she sought to appeal the CitiBank foreclosure. Plaintiff's claims against the Public Trustee relate only to the Public Trustee's actions in execution of her official duties in the two foreclosure proceedings.

**\*2** I conclude that Plaintiff's complaint must be dismissed because this Court does not have subject matter jurisdiction. First, as noted by the Public Trustee, there is no diversity jurisdiction here under 28 U.S.C. § 1332 because the parties are not completely diverse. It is apparent from the pleadings that both Plaintiff and the Public Trustee are citizens of Colorado; accordingly, diversity jurisdiction is lacking. _Salt Lake Tribune Publishing Co., LLC v. AT & T Corp._, 320 F.3d 1081, 1095-96 (10th Cir.2003) ("It has long been the rule that to satisfy the diversity of citizenship requirements of 28 U.S.C. § 1332(a)(1) the plaintiffs and defendants must be completely diverse: No plaintiff can be a citizen of the same state as any defendant.").

In addition, there is no federal question jurisdiction pursuant to 28 U.S.C. § 1331, as there is no issue concerning the Constitution, laws, or treaties of the United States. Although Plaintiff purports to assert a claim for violations of the Fair Debt Collection Practices Act, this claim fails as a matter of law because none of the defendants is a debt collector. 15 U.S.C. § 1692a (6) (defining "debt collector" under FDCPA). For the reasons set forth in Magistrate Shaffer's recommendation (doc. no. 45 in Civil Action No. 07-cv-01987), I conclude that CitiBank and Avelo are creditors collecting on their own debt and

so fall outside of the scope of the FDCPA. In addition, for the reasons set forth in the Public Trustee's motion to dismiss and reply brief, I conclude that the Public Trustee is not a debt collector or otherwise subject to the FDCPA.

Plaintiff also alleges a claim of denial of due process for failure to give notice of the foreclosure hearing/sale. However, the state court determined that adequate notice was sent; accordingly, I conclude that this issue is barred by the principles of collateral estoppel (or issue preclusion)."The doctrine of issue preclusion provides that a court's final decision on an issue actually litigated and decided in a previous suit is conclusive of that issue in a subsequent suit between the same parties or their privies, and may not be relitigated." _In re Water Rights of Elk Dance Colorado, LLC_, 139 P.3d 660, 667 (Colo.2006). Under Colorado law, issue preclusion bars relitigation of an issue when: (1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) The party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) There was a final judgment on the merits in the prior proceeding; and (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding. _Id._ (citation omitted). All of these elements apply here. Plaintiff sought to vacate both foreclosure sales on the grounds that she did not receive notice; the court in both cases determined that adequate notice was sent to Plaintiff at the several addresses contained in the records. See Exh. 15, 37, and 39 to CitiBank and Avelo's Motion to Dismiss (doc. nos. 25-16, 25-38, and 25-40). The judgments are final, as Plaintiff's appeals have been dismissed or are foreclosed. The parties in this and the state court proceedings are identical and Plaintiff had a full opportunity to litigate the notice issue. Because Plaintiff is estopped from claiming she did not receive notice of the foreclosure hearing, her due process claim fails as a matter of law.[FN2]

> FN2. Plaintiff asserts throughout her pleadings and briefs that the notice was deficient because it did not strictly comply with Rule 120(b) of the Colorado Rules of Civil Procedure regarding the number of days in advance of the hearing the notice needed to set forth as a response date. This technical defect is not sufficient to state a federal due

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4223271 (D.Colo.)
(Cite as: 2008 WL 4223271 (D.Colo.))

process claim, which is determined by federal standards regarding basic procedural fairness. _Ward v. Anderson,_ 494 F.3d 929, 935 (10th Cir.2007) ("[A] failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause."). Plaintiff does not allege and has never argued that this alleged error in the notice affected her ability to understand what was at stake, when and where the hearing would occur, or prevented her from filing a response and/or otherwise contesting the sale.

*3 Defendants Avelo and CitiBank also assert that jurisdiction is lacking here because Plaintiff's claims at their heart seek to invalidate the final state court judgments of foreclosure, which is prohibited under the _Rooker-Feldman_ doctrine. "The _Rooker-Feldman_ doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.' " _Lance v. Dennis,_ 546 U.S. 459 (2006) (quoting _Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,_ 544 U.S. 280, 284 (2005)). However, it is not clear whether the state court judgments were final before Plaintiff commenced her litigation here, since she filed numerous post-judgment motions and an appeal in the state proceedings after initiating her lawsuit in this Court. Accordingly, I do not rely on the _Rooker-Feldman_ doctrine in dismissing this case.

Because I do not have subject matter jurisdiction, this case should be dismissed and Plaintiff's motion for summary judgment should be denied as moot.

Accordingly, it is ordered:

1. The Motion to Dismiss for Lack of Jurisdiction (doc. no. 12) filed by Defendant Diane Bailey and the Motion to Dismiss (doc. no. 25) filed by Defendants CitiBank, N.A. and Avelo Mortgage are granted.

2. The Motion for Summary Judgment (doc. no. 15) filed by Plaintiff Vicki R. Dillard-Crowe is denied as moot.

3. This case is dismissed without prejudice.

D.Colo.,2008.
Dillard-Crowe v. CitiBank, N.A.
Slip Copy, 2008 WL 4223271 (D.Colo.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514
(Cite as: 2008 WL 3166533 (S.D.Fla.))

Page 1

**H**

United States District Court,
S.D. Florida.
EAGLETECH COMMUNICATIONS INC., et al.,
Plaintiffs,
v.
CITIGROUP, INC., et al., Defendants.
No. 07-60668-CIV.

June 27, 2008.

David Reich Chase, David R. Chase PA, Fort Lauderdale, FL, David Lewis Templer, Templer & Hirsch, Aventura, FL, Joe E. Luce, Stephen R. Smith, Christian Smith & Jewell, Houston, TX, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, for Plaintiffs.

Tiffani Gay Lee, Tracy Ann Nichols, Holland & Knight, Stephen Bernard Gillman, Shutts & Bowen, Marcos Daniel Jimenez, Kenny Nachwalter Seymour Arnold Critchlow & Spector, Nicolas Swerdloff, Hughes Hubbard & Reed, Miami, FL, Matthew Henry Triggs, Ronald Joseph Tomassi, Jr., Proskauer Rose, Boca Raton, FL, Terrence Russell, Ruden McClosky Smith Schuster & Russell, Jeffrey Allan Hirsch, Jerold Ira Budney, Greenberg Traurig, Fort Lauderdale, FL, Adam S. Hakki, Herbert S. Washer, Kirsten Nelson, Shearman & Sterling, Brian L. Friedman, Harry Frischer, Stephen L. Ratner, Proskauer Rose LLP, Anthony L. Paccione, Matthew D. Parrott, Katten Muchin Rosenman LLP, Michael P. Geiser, Richard H. Klapper, Richard C. Pepperman, II, Tracy R. High, Sullivan & Cromwell, Leslie Sobel, Hughes Hubbard & Reed, New York, NY, Charles Leroy Pickett, Jr., Richard Lee Martens, Casey Ciklin Lubitz Martens & O'Connell, Edward Cole Fitzgerald, III, Fitzgerald Hawkins Mayans & Cook, West Palm Beach, FL, David G. Cabrales, Jeffrey A. Logan, Roger B. Cowie, Locke Lord Bissell & Liddell LLP, Dallas, TX, Frederick Cay Heidgerd, Deerfield Beach, FL, William P. Thornton, Jr., Stevens & Lee PC, Reading, PA, Jamie Blythe Goldberg, Steven M. Davis, Becker & Poliakoff, PA, Coral Gables, FL, for Defendants.

*ORDER GRANTING IN PART DEFENDANTS' MO-*

*TIONS TO DISMISS; DISMISSING WITH PREJUDICE THE FEDERAL RICO CLAIMS AGAINST MOVING DEFENDANTS AND THOSE SIMILARLY SITUATED; DISMISSING WITHOUT PREJUDICE, AND REMANDING TO STATE COURT, THE REMAINING STATE LAW CLAIMS*

ALAN S. GOLD, District Judge.

**\*1** THIS CAUSE comes before the Court on: (1) the Moving Financial Institutions' Motion to Dismiss [DE 134] [FN1]; (2) Vincent Anthony Zeccola's ("Zeccola") Motion to Dismiss [DE 135]; and, (3) Tower Equities Re, Inc.'s ("Tower Equities") Motion to Dismiss [DE 136].[FN2] The parties filed responses, replies, sur-replies, and sur-sur replies, and the Court held oral argument on June 6, 2008. In accordance with the briefing procedures established in this case, these motions ("Phase I briefs") only address "common issues" of Federal RICO and preemption. (*See* Plaintiffs' Report to the Court Regarding Proposed Briefing Schedule for Motion to Dismiss, DE 122; Order Setting Briefing Schedule, DE 127). The parties have agreed that during Phase I, the Defendants would submit one joint motion on the common issues. (*Id.*).

> FN1. "Moving Financial Institutions" collectively refers to the following Defendants: (1) Citigroup, Inc. ("Citigroup"); (2) JP Morgan Chase & Co. ("JPMC"); (3) The Bank of New York Company ("BNY"); (4) Prudential Equity Group, LLC f/k/a Prudential Securities Incorporated ("Prudential"); (5) Bear, Stearns Securities Corp., Inc. ("Bear Stearns"); (6) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); (7) Herzog, Heine, Geduld, LLC ("Herzog"); (8) Tucker Anthony Incorporated, n/k/a RBC Capital Markets Corporation ("Tucker Anthony"); (9) Knight Equity Markets, L.P. ("Knight"); (10) Man Financial Inc., n/k/a MF Global Inc., ("MFG"); (11) Leesport Bank, as successor in interest to Madison Bank ("Madison Bank"); (12) Oscar Gruss & Son, Inc. ("Oscar Gruss"); and, (13) Goldman Sachs Execution Clearing, L.P. ("Goldman Sachs").

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN2. Defendants Zeccola and Tower Equities incorporate to their motions the arguments set forth in the Moving Financial Institutions' Motion to Dismiss. In addition, Defendant John Black ("Black") filed a Motion to Dismiss based on lack of personal jurisdiction, because the Complaint was untimely, and "for such other and further relief as to the Court appears just and proper."(*See* DE 120). On January 4, 2008, I issued an Order Clarifying Deadlines [DE 121], in which I stated that a response to Black's motion would not be due until the case reached the Phase II briefing stage. Accordingly, Plaintiffs did not respond to Black's motion. While I have not considered Black's argument as to personal jurisdiction, as explained further below, the Complaint is dismissed as to Black based on the Private Securities Litigation Reform Act ("PSLRA").

Having reviewed the motions and related pleadings, the relevant case law and statutes, and having considered the parties' arguments, I have determined that the Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), codified at 18 U.S.C. § 1964(c), bars the federal RICO claims asserted by Plaintiffs, and I decline to exercise supplemental jurisdiction over the remaining state law claims. I therefore dismiss with prejudice the federal RICO claims (Counts I-IV) because they are legally barred, except as to Defendant Labella, and dismiss without prejudice and remand to state court the remaining state law claims (Counts V-XV).[FN3]

FN3. This a large multiparty case and Plaintiffs have been unable to serve the following Defendants: (1) Vincent Langella; (2) L. Vincent Roth III; (3) Richard J. Schecher; (4) Dorian Mathews; and, (5) GM Financial. I have granted Plaintiffs a second enlargement of time within which to serve these defendants [DE 148]. As a result, Plaintiffs have up to and including July 29, 2008 to effectuate service. As will be further explained in this Order, however, because these defendants are similarly situated to the moving defendants, the Federal RICO claims are dismissed as to these parties as well.

## I. *Background*

The relevant facts,[FN4] as alleged in Plaintiffs' First Amended Complaint [DE 84], taken as true in deciding a motion to dismiss, are as follows:

FN4. The facts of this case spread over 61 pages encompassing 181 paragraphs. This section merely summarizes the nature of the case and the allegations relevant to the motions to dismiss.

## A. *Nature of the Case*

This case is brought because, according to Plaintiffs, members of organized crime, brokerage firms, securities clearing firms, banking institutions, and their various individual members, officers and employees, participated in massive racketeering schemes that manipulated Eagletech stock to create enormous illegal profits for the conspirators while, at the same time, destroying Eagletech.[FN5](Am.Compl., ¶ 1). Numerous federal criminal and civil cases stemming from an undercover FBI investigation, "Operation Uptick," into Mob-controlled securities operations revealed that Eagletech was one of dozens of companies victimized by the alleged far-reaching, inter-related racketeering conspiracies between several Wall Street institutions and the members and associates of all five New York Mob families. (*Id.* at ¶ 2). According to Plaintiffs, the Mob used the U.S. Securities markets to produce illicit profits for the purpose of "obtaining easily ill fattens monies by any means necessary to support the Mob's members and associates lavish life styles and, most importantly, support the continued operations of organized crime."(*Id.*). Operation Uptick resulted in criminal charges against 120 individuals named in 21 separate charging documents. (*Id.* at ¶ 7). The defendants in the criminal charges included members and associates of all five New York Mob families, and allegations that they controlled or infiltrated several brokerage firms. (*Id.*). The allegations in the criminal charges included "fraudulent Internet touting of stocks, fraudulent private placements, pump and dump schemes, prearranged trades, bribes, 'no net sales' policies, and brokers bring subjected to 'beating, intimidation, and threats'."(*Id.* at ¶ 7) (quoting testimony of Barry R. Goldsmith before the Finance and Hazardous Materials Subcommittee of the House Commerce Committee on Organized Crime in the Securities Market,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514
(Cite as: 2008 WL 3166533 (S.D.Fla.))

September 13, 2000). The criminal cases brought against these individuals involved the "blatant manipulation of several stocks; manipulation facilitated by a racketeering conspiracy that ... included ... firms controlled by organized crime that were used to manipulated the sale of Eagletech stock."(*Id.* at ¶ 8).

> FN5. In 2001, Eagletech commenced litigation in Florida state court against parties that were allegedly primarily responsible for the manipulation of Eagletech stock in a case styled *Eagletech Communications, Inc. v. Bryn Mawr Investment Group, et al.,* 17th Judicial Circuit in and for Broward County, Florida, Case No. 03-012404-02.The instant action alleges that various individuals named as defendants in the prior action but not named as defendants in this action (described by Plaintiffs as "Non-Party Defendants"), including members of organized crime, purportedly manipulated the price of Eagletech stock, and that the Moving Financial Institutions and others named as Defendants in this action allegedly aided and abetted in such manipulation.

*2 Defendants in this action include members of La Cosa Nostra,[FN6] as well as individuals, brokers, dealers, clearing firms, prime brokers, market makers and bankers who allegedly conspired with those criminals to unlawfully and knowingly manipulated the price of Eagletech stock in exchange for excessive fees, bribes, kickbacks, commissions, gifts, loans, money, and things of value. (*Id.* at ¶ 3). Plaintiffs argue that Defendants' actions constitute a pattern of predicate crimes prohibited by federal and state law, including the transfer or transmittal in interstate commerce of money or property they knew to have been stolen or converted, money laundering, and the illegal counterfeiting of shares of Eagletech. (*Id.*). Plaintiffs seek to "recover the actual and punitive damages to which they are entitled for the devastating manipulation of Eagletech stock that destroyed the company ..."(*Id.* at ¶ 4).

> FN6. The only named Defendant in this action that is allegedly a member of La Cosa Nostra is Defendant Black who, according to Plaintiffs, is an "associate of the Luchese Crime Family and Chief Operating Officer at Grady & Hatch Company, Inc., a New York broker-dealer ..." (Compl., ¶ 36). The remaining members of La Cosa Nostra which were involved in the alleged manipulation of Eagletech stock are non-parties to this suit.

The allegations in this action stem, in part, as a result of Plaintiffs being able to obtain "internal records of some of the alleged conspirators and a key database from the U.S. Securities and Exchange Commission ("SEC")."(*Id.* at ¶ 10). The documents were obtained by the SEC in 2000 when it subpoenaed broker-dealers and clearing firms for information regarding the trading in Eagletech stock. (*Id.*). The database contains the name and addresses of the purchasers and sellers of Eagletech stock and details the reported activity in Eagletech by broker-dealers and their prime brokers/clearing firms, including the Defendants in this action. (*Id.*). When Plaintiffs attempted to match the information from the SEC database to the data reported in the Equity Trade Journal from the National Association of Securities Dealers Automated Quotations system ("NASDAQ"), which gives trade-by-trade information as reported to the public marketplace, Eagletech discovered that the information significantly differed between the two databases. (*Id.* at ¶¶ 12-13). Through the accumulation and analysis of several documents, Plaintiffs can allegedly demonstrate the extend and impact of the racketeering conspiracies that "caused, aided, and abetted the destructive manipulation of the stock of so many companies-including Eagletech ...".(*Id.* at ¶ 15).

Eagletech first became a victim of organized crime when it became a publicly traded security company and sought to obtain funding through typical small public company funding agreements known as PIPEs-Private Investment in Public Equity. (*Id.* at ¶ 73). The lenders with whom Eagletech entered into the PIPEs utilized sham companies controlled by members of organized crime to manipulate Eagletech stock, and "Eagletech soon became one of several companies caught up in illegal manipulation of their publicly-traded stocks by a group of avowed criminals and their cohorts at presumably respectable financial institutions."(*Id.* at ¶ 74).

Plaintiffs allege two Racketeering Enterprises in this action: the BMIG/VFS Enterprise, and the Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514
(Cite as: 2008 WL 3166533 (S.D.Fla.))

**B.** *The BMIG/VFS Racketeering Enterprise*[FN7]

> FN7. The BMIG/VFS Enterprise is comprised of Bryn Mawr Investment Group; Valley Forge Securities, Inc.; Robert Montani; James Cavaliere,; Alexander Ricci; Vincent Langella; Michael T. Garbo; Tonino Labella; John Black; Vincent Anthony Zeccola; and, L. Vincent Roth. Some of these participants have not been named as defendants in this suit. In addition, Defendants Zeccola, Black, Knight, BNY, Madison Bank, Citigroup, Tower Equities, Herzog, MFG, and Goldman Sachs, all of which have moved for dismissal, allegedly participated in the enterprise. (*See* Am. Compl., ¶¶ 157, 158).

*3 The BMIG/VFS Enterprise obtained 10 million shares of common stock in exchange for $1.2 million. (*Id.* at ¶ 77). These shares were transferred into a Bahamian shell company accounts at various brokerage firms, and constituted approximately 92% of the outstanding non-restricted Eagletech shares. (*Id.*). The enterprise participants advised Eagletech's founder, Rod Young, to conduct an offering of the securities pursuant to Rule 54 of Regulation D of the Securities Act 1933 to avoid the need to register the officer with the SEC. (*Id.* at ¶ 78). The BMIG/VFS Enterprise participants had, in actuality, already solicited private investors to purportedly purchase the shares in private offerings, and had raised almost $1.6 million from those investors.(*Id.*). The racketeers further told those private investors that each had purchased a specific number of shares, and caused letters and brokerage statements to be sent allegedly confirming the purchase of Eagletech shares at prices ranging from $1.00 to $2.50 per share. (*Id.* at ¶ 79). No shares or Eagletech stock were actually issued or owned by the selected investors.(*Id.* at ¶ 80).

Instead, the BMIG/VFS Enterprise pocketed the money from the private placement investors. (*Id.*). In addition, the racketeers re-sold the same stock to purchasers in the public market at prices higher than those reportedly paid by the private investors. (*Id.* at ¶ 81). Plaintiffs allege that conspirators were able to accomplish this scheme by offering excessive, undisclosed commissions and bribes to brokers in exchange for promoting and selling their Eagletech

stock. (*Id.*). The BMIG/VFS Enterprise also orchestrated a Ponzi scheme type return for investors by lying to private investors and telling them that they had sold their Eagletech stock at about $4.00; letters with the false information were sent to these investors. (*Id.* at ¶ 82). In reality, the BMIG/VFS Enterprise had sold the stock at amounts well above those reported, and used the exceed proceeds to pay kickbacks to brokers for their involvement. (*Id.* at ¶ 83).

When Eagletech needed a second round of financing, it was introduced to non-party John Dorocki, a Vice President and Senior Planner in the Salomon Smith Barney ("SSB") Executive Financial Services department, and to a group of Chicago investors headed by non-party Randall Goulding. (*Id.* at ¶ 87). This group dealt directly with organized crime members regarding the financing knowing that they were connected to organized crime. (*Id.* at ¶ 88). The group planned to takeover Eagletech. (*Id.* at ¶ 89). In order to maximize their profits, the group acted in concert to manipulate the value of Eagletech stock. (*Id.* at ¶¶ 90-91). The group coordinated, among other things, short selling of Eagletech stock in a manner to avoid detection. (*Id.* at ¶ 93). John Serubo, a non-party defendant involved in the alleged manipulation, has previously testified that stock manipulation occurs in several ways, including when one conspires with others to hold the price of stock up or down; or, when one pays off market makers; uses influence on market makers to long or short the stock; uses a market marker to give orders to other market makers to make one side look stronger than the other; etc. (*Id.* at ¶ 94). While their stock manipulation scheme was taking place, the racketeers were lying to Eagletech.(*Id.* at ¶ 96). The plan to take over Eagletech, however, hit a major roadblock because the group did not actually hold any shares of Eagletech stock. (*Id.* at ¶ 97).

*4 Among other acts of manipulation, some conspirators sold the stock "short" without owning the shares they were selling or without having the ability to borrow those shares in the market; this is known as "naked shorting" of stock. (*Id.*). In an attempt to obtain more shares, Goulding appointed himself as special counsel to Eagletech without authority to do so, and began to send "conversion notices" and other unauthorized correspondence to Eagletech's attorneys to have shares of the company's stock issued to the group. (*Id.* at ¶ 98). When Eagletech discovered Goulding's attempt to convert without first receiving

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the appropriate authorization, it instructed its transfer agent to cancel any such certificates that were issued pursuant to Goulding's instructions. (*Id.*). The unsuccessful attempt to take over Eagletech nonetheless destroyed its share value and put the company into a predicted "death spiral" through the use of "illegal trading techniques; techniques that were available to the conspirators only because of the actions of the ... Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise."(*Id.* at ¶ 100).

C. *The Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise*[FN8]

> FN8. This enterprise consists of the following defendants: Bear Stearns; J. Alexander Securities; J.E. Liss & Co.; MFG; Merril Lynch; Pierce, Fenner & Smith, Inc.; NF Clearing, Inc. d/b/a Fiserv Securities, Inc. ("Fiserv"); Oscar Gruss; Prudential; and, Tucker Anthony, several of which are part of the Moving Financial Institutions.

Plaintiffs allege that the BMIG/VFS Enterprise and the SSB/Goulding conspirators were able to avoid regulatory requirements in their manipulation of stocks because some of the largest financial corporation engaged in a racketeering conspiracy that allowed the "illegal sale and manipulation of stocks-including Eagletech-for their own financial gain."(*Id.* at ¶ 102). Market manipulation, such as naked short sales, can corrupt the market in order to generate a "riskless profit", and exponentially increase the supply of shares of a given stock offered for sale allowing stock manipulators to engineer the price of the stock all the way down to nothing (i.e. a "death spiral").(*Id.* at ¶ 109). According to Plaintiffs, the entity defendants, by controlling the records that would show stock manipulation and not acting on that information, "effectively assisted and facilitated the manipulation of Eagletech stock, including but not limited to the creation of counterfeit or phantom Eagletech securities, pegging prices and matching and washing trades."(*Id.* at ¶ 110). According to Plaintiffs, a legitimate short sale involves a seller who first either borrows the stock to be sold or has a documented arrangement to borrow it so that the stock can be delivered to the buyer by the required sale settlement date, which is usually three days. (*Id.* at ¶ 107). In a naked short sale, the seller does not actually own and has not made a provision to borrow

the stock. (*Id.* at ¶ 108).

Plaintiffs allege that these defendants had a duty within their self-regulating industry to protect investors and issuers of stock from fraud and to protect the integrity of the self-regulated market place but, by failing to comply with industry standards and regulations, these defendants aided, abetted and facilitated the manipulation of Eagletech stock. (*Id.*). Plaintiffs further allege that these failures to deliver by the settlement date were not inadvertent; rather, these defendants' failure to perform the functions required by federal law and regulation were part of an overall strategy to profit from such stock manipulation. (*Id.* at ¶ 111). Plaintiffs allege that these defendants knew or with little effort should have known that their customers that were manipulating the stock were organized crime; and that this enterprise continued to solicit business of organized crime even after the announcement of Operation Uptick. (*Id.* at ¶ 14).

**\*5** In addition, Plaintiffs allege that these defendants had the duty to detect suspicious transactions and to inquire into possible money laundering but that, in this instance, they failed to do so even after Operation Uptick and knowing that they were dealing with organized crime. (*Id.* at ¶ 114). Examples of suspicious activity these defendants failed to investigate include: (1) from August 1999 through December 2000, there are 4,093 trades without a contra party-meaning that the defendants were trading with no one-for 6,571,815 shares; and, (2) 4,117,400 shares remain to be accounted in "long" sells traded with at least 81 different firms. (*Id.* at ¶ 115). Plaintiffs state that the SEC had this data, which supports the Plaintiffs' Amended Complaint, "but chose not to prosecute the facilitators of illegal transactions and the money launderers that allowed organized crime to conceal their profits from their illegally obtained proceeds."(*Id.*). In essence, Plaintiffs allege that these defendants facilitated the manipulation, trading and clearing of Eagletech stock. (*Id.* at ¶ 116).

Allegations involving the Moving Financial Institutions include the following:

1. After the announcement of Operation Uptick, the Bank of N.Y., among others, continued to conduct business as usual with the mob "[b]ecause of the cozy relationship between the BMIG/VFS racketeers and their clearing firm accomplices, who were

paid handsomely to manipulate stock."(*Id.* at ¶ 118).

2. MFG accounted for several cross trades "designed to indicate a false appearance of interest and liquidity in the marketplace for the Eagletech securities and was in a position to see these washed or matched trades occurring ...".(*Id.* at ¶ 123).

3. Knight purchased shares and distributed them to various broker-dealers selling to the investing public; the sales were cleared trades through Merrill Lynch. (*Id.* at ¶¶ 128-129). The transactions resulted in Knight receiving many thousands of dollars from trades that were engineered at an artificial price posted to the marketplace. (*Id.* at ¶ 129). The prices were prearranged, thus causing illegal distortions in the market's ability to determine the true and accurate price of the stock. (*Id.* at ¶ 130)."Knight's market making actions belie a regular, orderly, and transparent market."(*Id.* at ¶ 131).

5. Merrily Lynch was responsible for Knight's blue sheet reporting to the SEC and was therefore in a position to know that stock was going through Knight and its subsidiaries at prices substantially different than those reported in the marketplace or sold short into the marketplace. (*Id.* at ¶ 132). Merrill Lynch had a responsibility to monitor Knight, its largest trading customer, for improper trading and report suspicious activity to regulators. (*Id.* at ¶ 136).

6. Knight distribute over 1.2 million shares of Eagletech into the public markets that were cleared through Merrill Lynch; 629,900 of which were distributed into the public market after the announcement of Operation Uptick.(*Id.* at ¶ 134).

*6 7. Prudential acted as a market maker for the sort sales, but none of the short sales through Prudential were marked as short sales. (*Id.* at ¶ 138). Prudential also maintained its failure-to-deliver positions for more than four months, reaching a hight of 578,000 shares. (*Id.*).

8. Other clearinghouses had a handful of briefer and smaller delivery failures: Bear Stearns had 29 trading days at an average of 6,027 shares per day; Oscar Gruss had 21 trading days at an average of 10,302 shares per day; and, Tucker Anthony sold

240,900 shares while only purchasing 74,600 shares.(*Id.* at ¶ 140).

The Amended Complaint finally alleges that various defendants, including Citigroup and Madison Bank, were responsible parents of and/or acted to launder the ill-gotten gains from the above mentioned criminal conspiracies. (*Id.* at ¶ 141). Additionally, the Bank of Nova Scotia of New York and its subsidiary group were used to move profits from the enterprises' illicit stock manipulation scheme and held accounts for the money obtained from the operation. (*Id.* at ¶ 148).

### D. *Allegations Related to the Federal Claims*

#### 1. *The BMIG/VFS Enterprise*

Plaintiffs allege that members of the BMIG/VFS Enterprise, including Non-Party Defendants, participated in illegal activities by engineering trades of Eagletech stock at manipulated prices and/or laundering and transporting the illegal profits and monies generated by the racketeering activities. (*Id.* at ¶ 156). According to Plaintiffs, the participants had knowledge of and a stake in the illegal activities, and independently profited from those activities in the form of illegal commissions, gifts, bribes, or kickbacks. Further, Defendants Knight; Lewco Securities Corporation; Schroder & Co., Inc.; Grady & Hatch; MFG, Herzog; Fiserv; Tower Equities; GM Financial; Goldman Sachs; and, Schecher and Mathews participated in the enterprise by facilitating trades of Eagletech stock at manipulated prices and/or laundering and transporting the illegal profits, with knowledge and a stake in the illegal activities. (*Id.* at ¶ 157). Similarly, BNY and its subsidiary Scotia Bank; Madison Bank; and, Citigroup knowingly or recklessly laundered funds and transferred money and property in interstate and foreign commerce that was the product of illegal activities. (*Id.* at ¶ 158).

Plaintiffs allege that the BMIG/VFS Enterprise carried out the following predicate crimes: (1) transportation in interstate or foreign stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in property derived from unlawful activity (i.e. stock manipulation).(*Id.* at ¶¶ 160-165). These predicate crimes "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate, de-

stroy, and/or (as in the case of Eagletech) take over the ownership of emerging companies through unlawful means."(*Id*. at ¶ 168). According to Plaintiffs, "the threat of future occurrence is established by the ongoing and continuing nature of the purpose of the Predicate Crimes (i.e., to exploit emerging companies through PIPE financing and illegal naked shorting/failures to deliver securities, matching and washing trades, pegging prices and other forms of stock manipulation) ..."(*Id.* at ¶ 169).

2. *The Clearing Firms, Prime Brokers, and Financial Institutions Racketeering Enterprise*

*7 Plaintiffs allege that this enterprise carried out the following predicate crimes: (1) transportation in interstate or foreign stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in property derived from unlawful activity (i.e. stock manipulation).(*Id.* at ¶¶ 173-182). Specifically, Plaintiffs allege that participants committed these crimes when they "intentionally executed transactions that they accounted for that facilitated the stock manipulation of Eagletech including but not limited to not requiring the proper delivery of short sold stock, thus allowing these 'fail to deliver' positions to remain 'open' for long periods of time, for their own benefit as well as part and parcel of an understanding between themselves to conspire in not requiring proper delivery and closing of trades, washing and matching, and pegging prices."(*Id.* at ¶¶ 174,177, 181).

Further, these defendants "executed or cleared trades involving the manipulation of Eagletech shares [sic] i.e. trades for which there were no shares actually delivered and as to which they required no shares to be delivered, washed and matched trades or pegged prices trades ..."(*Id.* at ¶ 173). These predicate crimes "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate the price of stock by means including, but not limited to, short selling stock without mandating or enforcing the delivery of such stock as required by federal law and regulation, washing and matching trades and pegging prices."(*Id.* at ¶ 184). Further, the enterprise participants were aware that the manipulation of stock strategies employed are illegal and have been used to destroy, and/or take ownership of emerging companies through unlawful means.(*Id.*). According to Plaintiffs, continuity is established by the numerous dif-

ferent companies involved and the empirical evidence demonstrating that their actions are not random or independent, but are rather part "of an understanding between the clearing firms and prime brokers to cooperate in stock manipulation ...".(*Id.* at ¶ 185). Finally, the threat of future occurrence is shown by the ongoing nature of the purpose of the understanding to cooperate, as well as the numerous different companies who have continual presence on the New York Stock Exchange and NASDAQ Reg. SHO Threshold Lists that detail the continuing nature of the failure to delivery stocks. (*Id.* at ¶ 187).

E. *The Amended Complaint*

Based on these allegations, Plaintiffs filed an Amended Complaint [FN9] setting forth fifteen (15) counts against the various defendants. Plaintiffs have invoked the Court's federal question jurisdiction, pursuant to 28 U.S.C. § 1331, in brining four counts for alleged violations of the U.S. Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Plaintiffs have also invoked the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, for the remaining state law claims, which include claims for violation of Florida's Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.103, civil conspiracy, negligence *per se,* negligence, conversion and trespass to chattels.

> FN9. The initial Complaint was filed in the Seventeenth Judicial Circuit, in and for Broward County, Florida. Defendants removed the case to this Court pursuant to 28 U.S.C. § 1441 based on federal question jurisdiction [DE 1].

*8 Counts I and II are plead against the BMIG/VFS Racketeering Enterprise Defendants, including some of the moving defendants, and allege a violation of RICO, 18 U.S.C. § 1962(c), and a Conspiracy in violation of 18 U.S.C. § 1962(d). Counts III and IV are plead against the Clearing Firms, Prime Brokers and Financial Institutions, including several of the moving defendants, and allege a violation of RICO, 18 U.S.C. § 1962(c), and a Conspiracy in violation of 18 U.S.C. § 1962(d).[FN10]

> FN10. As noted above, the Moving Financial Institutions, Black, Zeccola, and Tower Equities include alleged participants in each

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of the two alleged enterprises. During oral argument, I inquired whether the pending motions to dismiss apply to all Defendants, including those defendants who did not file Phase I briefs and those who have not yet being served, or whether the decision would apply only to those defendants who have personally moved for dismissal. The moving defendants responded that dismissal of the counts should apply across the board since alleged members of both enterprises have moved for dismissal, and finding that the PSLRA bars the RICO claim as a matter of law is a ruling that affects all defendants that are similarly situated. Although given an opportunity to argue otherwise, Plaintiffs did not oppose the Defendants' position. I further note that the record in this case indicates that the parties agreed to file a joint Phase I brief discussing common issues as to the Federal RICO claims and Federal Preemption. For these reasons, and noting that Plaintiffs have had ample opportunity to respond to the argument that the PSLRA bars the four RICO claims in their entirety, I conclude that dismissal of these counts applies to all defendants similarly situated, including those that have not personally moved for dismissal or who have not been properly served. Based on the allegations of the Amended Complaint, the only defendant that is not similarly situated to the moving defendants is Tonino Labella, as he is the only named defendant that has allegedly been indicted and plead guilty to federal charges brought against him based on his role in the manipulation of Eagletech stock. (Am.Compl., ¶ 37).

## II. *Standard of Review*

In determining whether to grant a motion to dismiss, the court must accept all the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *Hoffend v. Villa,* 261 F.3d 1148, 1150 (11th Cir.2001).

Although a plaintiff need not state in detail the facts upon which he bases his claim, Fed.R.Civ.P. 8(a)(2)"still requires a 'showing,' rather than a blan-

ket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ---- n. 3, 127 S.Ct. 1955, 1965 n. 3, 167 L.Ed.2d 929 (2007). In other words, a plaintiff's pleading obligation requires "more than labels and conclusions." *Id.* at 1964-65;*see also Pafumi v. Davidson,* No. 05-61679-CIV, 2007 WL 1729969, at *2 (S.D.Fla. June 14, 2007). The previous standard that there be "no set of facts" before a motion to dismiss is granted has thus been abrogated in favor of the requirement that a pleading must be "plausible on its face." *Bell Atl.,* 127 S.Ct. at 1968, 1974 (discussing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also, Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir.2007) ("While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable, the factual allegations must be enough to raise a right to relief above the speculative level.") (citing *Bell Atl.,* 127 S.Ct. at 1965) (internal quotations omitted)). In order to survive a motion to dismiss, the Plaintiff must have "nudged [its] claims across the line from conceivable to plausible." *Bell Atl.,* 127 S.Ct. at 1974.

## III. *Analysis*

Defendants allege that the federal claims must be dismissed for two reasons. First, the RICO claims are expressly precluded by the PSLRA, which amended the federal RICO statute to eliminate securities fraud as a predicate act in federal RICO actions. According to Defendants, courts have interpreted the amendment broadly and have consistently rejected efforts to evade the amendment by pleading predicate acts that, although not labeled securities fraud, are nonetheless actionable as such. In this case, the Moving Financial Institutions argue that Plaintiffs' case against them turns on a theory that they somehow facilitated manipulative securities trading.[FN1] Second, Defendants argue that the RICO claims are precluded by long-standing principles of federal preemption, as more recently enunciated in *Credit Suisse Sec. (USA) v. Billing,* 127 S.Ct. 2382, 2395-96 (2007). Because I conclude that the PSLRA precludes Plaintiffs' federal RICO claims as to all Defendants, I dismiss with prejudice counts I-IV of the Amended Complaint, and do not reach the question of whether *Billing* preempts those claims.[FN2] In Section III.C of this Order, I discuss my decision to decline to exercise supplemental jurisdiction over the remaining state law

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claims, and therefore dismiss the remaining state law claims (Counts V-XV) without prejudice. Having so decided, I do not entertain the Defendants' argument that the state law claims are preempted by federal law because Plaintiffs' proposed application of state law would conflict with the federal securities laws. Instead, I remand the remaining claims for the state court judge to consider them.

> FN11. Likewise, the entire case against the BMIG/VFS Enterprise defendants turns on a theory of stock manipulation and facilitation of stock manipulation for personal gain.

> FN12. Although the PSLRA bar does not preclude the RICO claims against Labella, I do not consider the *Billing* preemption argument because I find it inapplicable. In their Motion to Dismiss, the Moving Financial Institutions argue that Plaintiffs' claims that the Moving Financial Institutions facilitated the manipulation of Eagletech stock by allowing short sales and "fails to deliver" are inconsistent with the SEC's regulatory scheme and are thus precluded under the reasoning of *Billing*. The allegations against Labella, however, include more than his alleged role in these short sales. Thus, even if I agreed with the Moving Financial Institutions' argument, the claims against Labella will survive, at least in part. Labella will have an opportunity to raise a *Billing* argument as it applies to the allegations made against him in Phase II briefs, if appropriate, to which Plaintiffs will have an opportunity to respond.

A. *The Federal RICO Act*

*9 The RICO Act, 18 U.S.C. § 1961, *et seq.*, provides civil and criminal liability for persons engaged in a "pattern of racketeering activity." See18 U.S.C. §§ 1962(a-d). To state a civil claim under the act, a person injured by its violation must allege the following four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Langford v. Rite Aid of Ala., Inc.,* 231 F.3d 1308, 1311 (11th Cir.2000). Plaintiffs in civil RICO actions must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10 year period. *Id.* at 1311-1312 (citing 18

U.S.C. § 1961(5)). "Racketeering activity" includes any act which is indictable under a lengthy list of criminal offenses, including the federal statutes prohibiting mail and wire fraud. *Id.* As stated above, Plaintiffs in this case allege the following predicate acts: (1) transportation of stolen money or property in violation of 18 U.S.C. § 2314; (2) money laundering in violation of 18 U.S.C. § 1956; and, (3) monetary transactions involving criminally derived property in violation of 18 U.S.C. § 1957.

B. *Private Securities Litigation Reform Act*

In 1995, Congress amended the federal RICO statute by enacting the PSLRA, § 107, Pub.L. No. 104-67, 109 Stat. 737 (1995), which narrows the type of conduct that can qualify as a predicate act under RICO. See18 U.S.C. § 1964(c). Specifically, relevant parts of the RICO statute now provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962," unless the person who committed such conduct has been criminally convicted. *Id.* The Conference Committee Report accompanying the PSLRA states that the amendment was intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "pleading other specified offenses ... as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."H.R. Conf. Rep. No. 104-396 at 47 (1995); *see also Fla. Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F.Supp.2d 1345, 1356 (S.D.Fla.2001) (same).

To prevent circumvention of congressional intent, courts have interpreted the PSLRA amendment broadly. *See, e.g., Bald Eagle Area School Dist. v. Keystone Fin., Inc.* 189 F.3d 321, 330 (3d Cir.1999) (stating that allowing a plaintiff to avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses where the conduct giving rise to those predicate offenses amounts to securities fraud would undermine the congressional intent behind the RICO Amendment.); *Swartz v. KPMG, LLC,* 401 F.Supp.2d 1146, 1151 (W.D.Wash.2004) ("The rule that a plaintiff cannot assert a RICO claim based on predicate acts that sound in securities fraud is applicable even if, as is the case here, the claim is plead as a matter of mail fraud or wire fraud.") (citing *Howard v. Am. Online*

*Inc.,* 208 F.3d 741, 749-50 (9th Cir .2000), cert. denied, 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000)). In determining whether the PSLRA bars a civil RICO claim, courts view the complaint in its entirety and reject the invitation to parse the plaintiff's allegations. *See, e.g., Bald Eagle,* 189 F.3d at 329 (holding that the PSLRA bars an action where some, but not all, of the predicate acts are actionable as securities fraud, because allowing a "surgical presentation of the cause of action ... undermine[s] the congressional intent behind the RICO Amendment."); *Baron v. Chehab,* No. 05-3240, 2006 WL 156828, *8 (C.D.Ill. Jan.20, 2006) (refusing to parse out plaintiff's claim to identify parts that might be separable from the securities fraud because Congress sought to eliminate RICO claims in securities fraud cases, and the careful parsing of the Amended Complaint would frustrate that Congressional goal); *Gatz v. Ponsoldt,* 297 F.Supp.2d 719, 731 (D.Del.2003) ("A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading."). Thus, where the allegations in a complaint, taken as a whole, amount to conduct that can be actionable as fraud *in connection with* the purchase or sale of securities, federal courts have uniformly applied the PSLRA's bar. *See id.*

*10 Defendants argue that, regardless of the labels Plaintiffs assign to their predicate acts, the PSLRA bars the civil RICO claims because they are based upon allegations of fraud in connection with the purchase or sale of securities. *Cf. Champion,* 2008 WL 900967, at *13 (dismissing the RICO claims alleging wire and mail fraud and money laundering because the predicate acts were based on, and intrinsically connected to, conduct that would have been actionable as securities fraud). Plaintiffs respond that the predicate acts sound in theft, not fraud, and are therefore not within the exception to the RICO statute, which only excepts conduct actionable as securities fraud. Moreover, Plaintiffs contend that the conduct alleged against the Moving Financial Institutions is not "actionable" as fraud in connection with the sale or purchase of securities, because Section 10(b) of the 1934 Act does not allow an injured party to bring a claim for aiding and abetting securities fraud. Plaintiffs further argue that the clear language of § 1964(c) supports its position that because no "person" can sue these defendants, the Plaintiffs are entitled to invoke their remedy under RICO. In essence, their arguments are twofold: (1) the alleged conduct does not amount to securities fraud because it sounds in theft;

and, (2) because at least some of these Defendants cannot be held liable as primary violators of the securities laws, the PSLRA bar does not apply and Plaintiffs' RICO civil claims should not be dismissed; or, in other words, because no "person" can sue these Defendants for aiding and abetting a securities fraud, the conduct is not "actionable" for purposes of the PSLRA bar.

*1. Whether the Conduct Alleged by Plaintiffs Amounts to Securities Fraud*

The alleged predicate acts involve the manipulation of Eagletech stock. Even a cursory reading of the allegations reveals that the entire Amended Complaint stems from alleged manipulation of Eagletech stock, "including but not limited to not requiring the proper delivery of short sold stock, thus allowing these 'fail to deliver' positions to remain 'open' for long periods of time, for their own benefit as well as part and parcel of an understanding between themselves to conspire in not requiring proper delivery and closing of trades, washing and matching, and pegging prices."(Am.Compl., ¶¶ 174,177, 181). The very opening paragraphs of the Amended Complaint reveal that the lawsuit was brought to recover damages for the alleged "devastating manipulation of Eagletech stock that destroyed the company."(*Id.* at ¶ 4). In fact, the very first paragraph explains that this case was brought because members of organized crime, brokerage firms, securities clearing firms, banking institutions, and their various individual members, officers and employees, participated in massive racketeering schemes that manipulated Eagletech stock to create enormous illegal profits for the conspirators while, at the same time, destroying Eagletech. (Am.Compl., ¶ 1). Thus, the essence of the misconduct alleged in the Amended Complaint can be summarized as follows: the BMIG/VFS Enterprise manipulated Eagletech stock, and the Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise aided and abetted such manipulation, for personal gain.

*11 While Plaintiffs try to disguise the predicate acts as sounding in theft, not fraud, the Amended Complaint is replete with allegations of stock manipulation. (*Id.* at ¶¶ 1, 3, 4, 8, 9, 15, 20, 29, 30, 32-44, 74, 76-84, 90-92, 94, 97, 101, 102, 108, 110, 111, 114, 116-119, 156, 157, 168, 169, 173, 177, 181, 184-185). Plaintiffs, to no avail, attempt to circumvent the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PSLRA bar by labeling the predicate acts as (1) transportation in interstate or foreign stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in property derived from unlawful activity. *See Burton v. KenCrest Servs.*, 127 F.Supp.2d 673, 676-677 (E.D.Pa.2001) (rejecting the plaintiff's attempt to recast the alleged acts as "theft," because there was "no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities," and "Plaintiff cannot magically revive his claim by picking discreet [sic.] details of his allegations" to claim they are not actionable as securities fraud). But Plaintiffs themselves admit that these predicate acts, as alleged against the BMIG/VFS Enterprise, "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate, destroy, and/or (as in the case of Eagletech) take over the ownership of emerging companies through unlawful means."(Am. Compl. at ¶ 168). Similarly, according to Plaintiffs, these predicate acts, as alleged against the Clearing Firms, Prime Brokers and Financial Institutions Enterprise, "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate the price of stock by means including, but not limited to, short selling stock without mandating or enforcing the delivery of such stock as required by federal law and regulation, washing and matching trades and pegging prices."(*Id.* at ¶ 184). Plaintiffs further allege that the very purpose of both enterprises was to manipulate Eagletech's stock for the benefit of the enterprise participants. (*Id.* at ¶¶ 101, 102, 156, 157).

Moreover, Plaintiffs allege that "the threat of future occurrence is established by the ongoing and continuing nature of the purpose of the Predicate Crimes (i.e., *to exploit emerging companies through PIPE financing and illegal naked shorting/failures to deliver securities, matching and washing trades, pegging prices and other forms of stock manipulation* ) ...".(*Id.* at ¶ 169) (emphasis added). Plaintiffs also allege that the cause of their RICO injury was caused by the manipulation of Eagletech securities. (RICO Statement, ¶¶ 25-27).

The law is clear that stock manipulation is a form of securities fraud governed by federal securities laws. *See generally Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 79, 126 S.Ct. 1503, 164 L.Ed.2d 179 (U.S.2006); *Santa Fe Indus., Inc. v.*

*Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (U.S.1977) ("Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.") (internal quotations and citations omitted). Consequently, the alleged misconduct of the BMIG/VFS Enterprise, i.e. the manipulation of Eagletech stock, is a form of securities fraud. Similarly, the alleged misconduct of the Clearing Firms, Prime Brokers and Financial Institutions Enterprise, i.e. the facilitation of stock manipulation, is also a form as securities fraud pursuant to 15 U.S.C. § 78t, which was enacted by Congress to authorize the SEC to bring actions against defendants who aid and abet securities fraud. 15 U.S.C. § 78t (titled "Liability of controlling persons and persons who aid and abet violations") [FN13].

> FN13. Plaintiffs reliance on *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) for their argument that Section 10(b) does not include a claim for aiding and abetting is misguided, since the decision was superseded by the enactment of 15 U.S.C. § 78t. Thus, Plaintiffs' argument that the conduct challenged is not a form of securities fraud unless Defendants can be held liable as primary violators is meritless.

*12 In addition, as Plaintiffs admit, the facts that underlie the SEC's complaint filed against many of the same individuals named as Defendants in this case are the same facts that underlie Plaintiffs' RICO claims. (*Id.* at ¶¶ 8, 9, 10, 84). According to Plaintiffs, this action stems from their ability to obtain "internal records of some of the alleged conspirators and a key database from the [SEC]."(*Id.* at ¶ 10). When facts underlying an SEC action are the same as the facts underlying a federal RICO action, the PSLRA bar applies. *See Bald Eagle,* 189 F.3d at 32-329. I therefore conclude that the entire case is about an alleged scheme to manipulate securities, and that Plaintiffs' RICO allegations are based on fraud in connection with the purchase and sale of securities.

*2. Whether the Conduct Alleged is "Actionable" for Purposes of the PSLRA*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs second argument is that the PSLRA bar does not apply because these Plaintiffs do not have standing to bring a securities fraud claim against these Defendants, since aiding and abetting is not actionable by a private plaintiff under Section 10(b) of the Securities Act of 1934 ("Section 10(b)"). In *Florida Evergreen Foliage,* I rejected the argument that the PSLRA only operates as a bar to civil RICO claims if the claims could be actionable by the same plaintiff. *Fla. Evergreen Foliage,* 165 F.Supp.2d at 1357-1358. In the absence of Eleventh Circuit precedent, I relied on *Howard v. America Online Inc.,* 208 F.3d 741 (9th Cir.2000), in which the Ninth Circuit Court of Appeals held that the PSLRA acted to bar their claim despite the fact that the named plaintiffs did not have standing to bring a securities fraud claim against AOL because the alleged conduct "could be brought by a plaintiff with proper standing." *Howard,* 208 F.3d at 749; *Fla. Evergreen Foliage,* 165 F.Supp.2d at 1357 ("Plaintiffs have done nothing to distinguish *Howard v. America Online Inc.,* 208 F.3d 741 (9th Cir.2000), and the Court finds that case persuasive."). My independent research has not revealed any Eleventh Circuit or any other Circuit Court of Appeals decisions on the standing issue since that time. However, other district courts that have considered Plaintiffs' argument have also rejected it. *See, e.g., Baron,* 2006 WL 156828, at *9, n. 2 ("[T]he bar to RICO claims is based on whether the conduct is actionable as securities fraud, not whether a particular plaintiff could bring the action."); *Cook v. Campbell,* 482 F.Supp.2d 1341, 1350 (M.D.Ala,2007) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws."); *Gatz,* 297 F.Supp.2d at 731("PSLRA's exclusion of securities fraud as a RICO predicate act applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b-5."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 620 (S.D.Tex.2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws."); *In re Ikon Office Solutions Inc, Sec. Litig.,* 86 F.Supp.2d 481, 486 (E.D.Pa.2000) (decided prior to *Howard* ). I continue to find the rulings in these district court cases persuasive.

*13 During oral argument, Plaintiffs' counsel conceded that courts have rejected his standing argu-

ment. However, he urged the Court to rely on the text of the statute and to deviate from prior rulings. The text of § 1964(c), with the language added by the PSLRA highlighted, is as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, **except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.**

18 U.S.C. § 1964(c). Plaintiffs interpretation is that the statute prohibits "persons" who have a claim for securities fraud under Section 10(b) and Rule 10-b5 from brining a RICO claim based on conduct that would have been actionable as fraud in the purchase or sale of securities. Reading the language "no person" found in the rule's exception in conjunction with "any person injured" found in the general rule means that the injured person is precluded from bringing a RICO claims only if he could also bring a securities fraud claim against the alleged violators. Since the Government, in this case the SEC, is not a "person," and since private individuals are not authorized to bring civil causes of actions for aiding and abetting a securities fraud, no person can sue these Defendants on the facts as alleged. For this reason, Plaintiffs argue that they are entitled to invoke their remedy under RICO. Plaintiffs further note that the Government's civil remedies under RICO are located in a different subsection, and that the SEC's usual fraud remedies are located in a separate statute altogether. Thus, the fact that the SEC could prosecute the alleged conduct as securities fraud under Title 15, does not place that action within Section 107 of the PSLRA amendment, which created an exception to the civil remedies of RICO in Title 18.

The problem with Plaintiffs' argument is that this is not an issue of first impression. I find no reason to deviate from prior precedent on this matter. *See Fla.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Evergreen Foliage,* 165 F.Supp.2d at 1357 (rejecting argument that the act only operates to bar civil RICO claims if the claims could be actionable by the same plaintiff). Moreover, confronted with the very narrow issue of whether the PSLRA bars RICO claims predicated on facts that give the SEC authority to bring aiding and abetting claims under the federal securities laws, both the Central District of Illinois and the Southern District of Texas concluded that it did. *See Baron,* 2006 WL 156828, *9 (holding because the SEC is authorized to bring aiding and abetting securities fraud actions, aiding and abetting securities fraud cannot form the basis of a RICO claim); *In re Enron Corp. Sec. Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 650 (S.D.Tex.2003) (holding that the RICO claims were barred by the PSLRA because aiding and abetting securities fraud can be pursued by the SEC). These decisions are consistent with the plain language of the statue, which does not condition its bar on whether the plaintiff has a securities fraud claim. Instead, the statute merely provides that any "person"-i.e. the Plaintiffs-cannot rely on "any conduct that would be actionable as a fraud in the purchase or sale of securities"-i.e. stock manipulation and facilitating such manipulation. I decline Plaintiffs' invitation to read into the statute the condition that the injured person, rather than the SEC, needs standing to bring the claim of securities fraud for the bar to apply. *Cf. In re Enron Corp. Secs. Derivative & ERISA Litig.,* 284 F.Supp.2d at 260 ("The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under the securities laws.").

*14 In the Amended Complaint, Plaintiffs admit that the SEC could have prosecuted the Defendants under the securities laws, but chose not to. (*See* Am. Compl., ¶ 115) ("The SEC has the documents and data that supports this Eagletech complaint but chose not to prosecute the facilitators of the illegal transactions and the money launders that allowed organized crime to conceal their profits from their illegally obtained profits."). Therefore, by their own allegations, the predicate acts are actionable as securities fraud and may be prosecuted by the SEC. For this reason, the PSLRA acts as a bar to Plaintiffs' RICO claims. Having so concluded, Counts I-IV of the Amended Complaint are dismissed with prejudice as to all Defendants, with the exception of Defendant Labella.[FN14]

FN14. Because Plaintiffs can plead no set of facts to avoid the PSLRA bar as to these defendants, any further amendment to the complaint would be futile. Therefore, these claims are dismissed with prejudice and without leave to amend. *See Daewoo Motor Am. v. GMC,* 459 F.3d 1249, 1260-1261 (11th Cir.2006) (finding that the bankruptcy court did not abuse its discretion where it dismissed a complaint with prejudice because any further amendment would be futile).

### 3. *Defendant Labella*

Plaintiffs allege that Labella and non-party Serubo were "unwritten partners" in the stock business and invested in Eagletech through two companies Labella controlled. (Am.Compl., ¶ 75). Thereafter, Labella used at least 100 accounts at five or more brokerage houses to manipulate the price of Eagletech stock.(*Id.* at ¶ 76). In connection with Eagletech financing, Eagletech issued 10 million shares of common stock to Labella, Serubo and their nominees in exchange for $1.2 million. (*Id.* at ¶ 77). These individuals, in turn, transferred the shares into a Bahamian shell company. (*Id.*). Labella and Serubo then advised Young to conduct an offering of Eagletech securities pursuant to Rule 504 of Regulation D of the securities Act of 1933 to avoid the SEC register requirements. (*Id.* at ¶ 78). Labella and the BMIG/VFS crew had already raised $1.6 million from private investors interested in purchasing the Eagletech stock. (*Id.*). Labella and the BMIG/VFS racketeers caused letters and brokerage statements to be sent to the investors that allegedly confirmed the purchase of Eagletech stock, but the shares were never actually purchased by these investors. (*Id.* at ¶¶ 79-80). Instead, the stock was always held by Labella, Serubo and their nominees. (*Id.* at ¶ 80). Labella also participated in the alleged Ponzi scheme type return the enterprise engaged in. (*Id.* at ¶ 82). The Plaintiffs also allege that Labella directed Defendant Montani to fill orders by selling Eagletech stock held at BMIG/VFS accounts that Labella controlled, and issued and used Axxess International ATM/credit cards to pay individual brokers bribes and kickbacks. (*Id.* at ¶ 85). In sum, the Amended Complaint alleges that Labella was primarily responsible for orchestrating and carrying out the manipulation of Eagletech stock.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514
(Cite as: 2008 WL 3166533 (S.D.Fla.))

Page 14

At first glance, the RICO claims against Labella are precluded by the PSLRA as they include conduct actionable as securities fraud. However, Defendant Labella is not similarly situated to the moving defendants, as he is the only individual who has allegedly been criminally convicted for his role in the manipulation of Eagletech stock. (Am.Compl., ¶ 37) ("Labella was one of the primary architects of the scheme to manipulate the sale of Eagletech stock and has pled guilty to federal charges brought against him based on that activity."). The PSLRA explicitly states that the exception to the RICO rule does not apply to persons who have been criminally convicted of fraud in the purchase or sale of securities. See18 U.S.C. § 1964(c) ("The exception ... does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."). The Amended Complaint does not state the date of Labella's conviction, and I instructed defendants to raise their statute of limitations arguments, if applicable, on motions for summary judgment and not on the Phase I briefs. (See Order Setting Briefing Schedule, DE 127). Because the PSLRA bar does not apply to Labella, who is alleged to have been a participant of the BMIG/VFS Enterprise, Counts I and II remain viable as to him at this time.

C. Supplemental Jurisdiction

*15 Defendants ask the Court to dismiss the federal RICO claims, but to nonetheless exercise supplemental jurisdiction over Plaintiffs' state law claims and dismiss them on the merits as preempted by federal law. Defendants concede that federal courts typically decline to exercise supplemental jurisdiction over state laws where, as here, the accompanying federal claims are dismissed prior to trial. However, Defendants argue that supplemental jurisdiction should nonetheless be exercised because the state law claims are closely tied to the questions of federal policy, and because the doctrine of federal preemption may be implicated. Defendants also argue that refiling of the claims in state court would waste judicial resources, as the state court must once again consider the same issues that this court has considered in connection with Billing.On the other hand, Plaintiffs argue that if the federal claims are dismissed, I should decline to exercise supplemental jurisdiction because strong state law policies are at issue in this case.

Federal courts have supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."28 U.S.C. § 1367(a). Because there is no diversity between the parties, Plaintiffs in this case must establish federal question jurisdiction over at least one count of the Amended Complaint. Cf. Smith, 238 Fed. Appx. at 455 (stating that because there was no diversity between the parties, the sole question was whether any claim arose under federal law as to allow the court to exercise supplemental jurisdiction). Only then may I inquire into whether supplemental jurisdiction can be exercised over the state law claims.

Pursuant to 28 U.S.C. § 1331, district courts have original jurisdiction of "civil actions arising under the Constitution, laws or treaties of the United States."A claim arises under the laws of the United States "only when the plaintiff's well-pleaded complaint raises issue of federal law." Brown v. Connecticut Gen. Life Ins. Co., 934 F.2d 1193, 1195 (11th Cir.1991). A possible defense involving a federal question does not generally create federal question jurisdiction. See Ervast v. Flexible Products Co. ., 346 F.3d 1007, 1012 (11th Cir.2003). Thus, it follows that a defendant may not remove a case to federal court based on a defense involving federal law. A narrow exception to this rule is complete preemption, which exists when Congress has so completely preempted an area of the law that state law claims are considered converted into federal claims. Id. (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); Palmer v. Local 8285 USW, 234 Fed. Appx. 884, 887 (11th Cir.2007) ("The doctrine of complete preemption, however, exists as an exception to the well-pleaded complaint rule"); Alyse v. Sprosty, 06-21075, 2007 U.S. Dist. LEXIS 23043, ----7-8 (S.D.Fla. March 29, 2007) (same).

*16 Even if a court is satisfied that supplemental jurisdiction has been established, the court may decline to exercise it if: "(1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                                Page 15
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514
(Cite as: 2008 WL 3166533 (S.D.Fla.))

district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or; (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). The Supreme Court has stated that "[w]hen federal laws claims have dropped out of the lawsuit in its early stages and only state law claims reaming, the federal court *should* decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (emphasis added); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 428 (11th Cir.1984) ("If the federal claim is dismissed prior to trial, [Supreme Court's precedent] strongly encourages or even requires dismissal of the state law claims"); *Champion v. Homa,* Case No. 03-275, 2008 WL 900967 (M.D.Ala. March 31, 2008) (declining to exercise supplemental jurisdiction over state law claims, including state law claims of securities fraud, after holding that the federal RICO claims were barred by the PSLRA); *Schneider v. KPMG LLP,* Case No. 04-55-Orl-31, 2004 U.S. Dist. LEXIS 27317, * 11 (M.D. Fla. April 12, 2004) (declining discretion to exercise supplemental jurisdiction over state law claims, including claims of fraud, breach of contract and deceptive and unfair trade practices, after concluding that the PSLRA barred the plaintiffs' federal RICO claims). A Court shall "find substantial predominance when it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage." *Parker v. Scrap Metal Processors, Inc.,* 468 F.3d 733, 744 (11th Cir.2006).

There is no question in this case that the federal RICO claims, Counts I-IV, arise under the laws of the United States so that federal question jurisdiction has been established, and that I may exercise supplemental jurisdiction over the state law claims, Counts V-XV, because they are part of the same case or controversy. However, I have dismissed with prejudice all of the claims over which I had original jurisdiction as to all but one defendant, have entered partial final judgment as to the federal claims, and the "complete preemption" exception to the well-pleaded complaint rule does not apply.[FN15] *See, e.g., Humana Inc. v. Forsyth,* 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (Federal RICO does not proscribe state laws governing insurance permit); *Hill v. Marston,* 13 F.3d 1548, 1550 (11th Cir.1994) (Georgia securities law not completely preempted by the federal securities laws, including the Securities Exchange Acts of 1933

and 1934); *Patterman v. Travelers, Inc.,* 11 F.Supp.2d 1382, 1388 (S.D.Ga.1997) (Georgia RICO statute not preempted by federal RICO statute).

> FN15. During oral argument, Defendants' counsel conceded that this case did not involve a situation of complete preemption. (June 6, 2008 Hr'g Tr.).

*17 Resolution of the argued basis for dismissal of the state law claims requires consideration of matters this Court has not addressed, and interpretation of several state laws. "[C]onsiderations of practicality and comity counsel that a state judge is best equipped to resolve [state] claims." *See Jacoboni v. KPMG,* 314 F.Supp.2d 172, 1180-1181 (M.D.Fla.2004). I agree with Plaintiffs that strong state law policy is implicated in this case since a ruling that some of Florida's securities laws are preempted have a significant impact on the state's consumer protection laws. Further, the state law issues substantially predominate over what remains of Counts I and II as to Defendant Labella and for which the Court has original jurisdiction. Therefore, in my discretion, pursuant to 28 U.S.C. § 1367(c)(3), I decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, and I thus dismiss them without prejudice, and remand them to the state court.

### D. *Partial Final Judgment*

Despite the survival of Counts I and II as to Defendant Labella at this stage of the proceedings, pursuant to Federal Rule of Civil Procedure 54, I find that there is no just reason for delay and direct entry of final judgment as to Counts I-IV as plead against all other defendants. Fed.R.Civ.P. 54(b) ("When action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.").

The Eleventh Circuit has established a two-step analysis district courts must follow in determining whether a partial final judgment. may properly be certified under Rule 54(b). *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.,* 483 F.3d 773, 777 (11th Cir.2007). The first step is to determine that the final judgment is in fact both "final" and a "judgment". *Id.* A decision is "final" if it is "an ultimate disposition

of an individual claim [or individual party] entered in the course of a multiple claims action."*Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)*). A decision is a "judgment" when it is a "a decision upon a cognizable claim for relief."*Id.* The second step is to "determine that there is no 'just reason for delay' in certifying it as final and immediately appealable."*Id .* The second step is required because not all final judgments on individual claims and/or on individual parties should be immediately appealable. *Id.* at 777-78.Whether there is no just reason for delay is a decision within the district court's discretion. *Id.* at 778, n. 5 (citing *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956) ("[T]he District Court may, by the exercise of its discretion in the interest of sound judicial administration, release for appeal final decisions upon one or more, but less than all, claims in multiple claims actions."). In issuing a final partial judgment, the district court mus be mindful of "judicial administrative interests-including the historic federal policy against piecemeal appeals-and the equities involved."*Id.* at 778 (quoting *Sears, Roebuck & Co.,* 351 U.S. at 438 (internal quotations omitted)).

**\*18** In this case, my decision that the PSLRA bars the federal RICO claims as to all but one defendant is a final judgment, as it is an ultimate decision that dismisses with prejudice Counts I-IV of the Amended Complaint as to all similarly situated defendants. I further note that Counts I-IV are the only federal claims in this action, and I have remanded the remaining state law claims to state court. The Eleventh Circuit has not had the opportunity to consider the important issue raised by the parties as to the PSLRA exception to the RICO statute, and I find no just reason for delaying its review. Additionally, the remaining state law claims have not been considered by me, and the Eleventh Circuit's decision on the Federal RICO claims will not affect their adjudication in state court.

IV. *Conclusion*

For the reasons discussed in this order, having reviewed the Amended Complaint, the motions to dismiss and related pleadings, the applicable case law and statutes, and having considered the parties' arguments, it is hereby ORDERED AND ADJUDGED:

1. The Moving Financial Institutions' Motion to Dismiss [DE 134] is GRANTED in part.

2. Zeccola's Motion to Dismiss [DE 135] is GRANTED in part.

3. Tower Equities' Motion to Dismiss [DE 136] is GRANTED in part.

4. Counts I-IV, the federal RICO claims, are DISMISSED with prejudice because they are legally barred, except as to Defendant Labella.

5. On or before July 7, 2008, Plaintiffs shall file a Status Report informing the Court of whether they intend to proceed with their Federal RICO claims as to Defendant Labella. If Plaintiffs proceed with these claims, Mr. Labella may file a motion to dismiss within 45 days from the filing of the Status Report. If such motion is filed, Plaintiffs must file their response within 60 days of its filing. Labella's reply will be due 30 days thereafter.

6. The remaining state law claims, Counts V-XV, are DISMISSED without prejudice as to all Defendants.

7. The Clerk of Court shall remand the state law claims to the Clerk of the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida.

8. All other pending motions are DENIED as moot and all hearings are CANCELLED.

9. A partial final judgment in accordance with this Order will be issued separately.

DONE AND ORDERED in Chambers, at Miami, Florida, this 25th day of June, 2008.

S.D.Fla.,2008.
Eagletech Communications Inc. v. Citigroup, Inc.
Slip Copy, 2008 WL 3166533 (S.D.Fla.), RICO Bus.Disp.Guide 11,514

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762
**(Cite as: 2004 WL 2278545 (N.D.Ill.))**

H

United States District Court,
N.D. Illinois, Eastern Division.
HOLLINGER INTERNATIONAL, INC. Plaintiff,
v.
HOLLINGER INC., et al. Defendants.
No. 04 C 0698.

Oct. 8, 2004.

Ian Simmons, Henry C. Thumann, O'Melveny &
Myers, Washington, DC, Abby F. Rudzin, Jonathan
Rosenberg, Andrew J. Geist, O'Melveny & Myers,
New York, NY, Mark V. Chester, Steven Lawson,
Joan M. Meyers, Johnson & Colmar, Chicago, IL,
Robert M. Schwartz, O'Melveny & Myers, LLP, Los
Angeles, CA, for Plaintiff.

Nathan P. Eimer, Andrew George Klevorn, Linda P.
Kurtos, Adam B. Deutsch, Vanessa G. Jacobsen, Ei-
mer, Stahl, Klevorn & Solberg, LLP, Chicago, IL,
Brian L. Crowe, Allan Tracy Slagel, Cary E. Don-
ham, Douglas Michael Ramsey, Shefsky & Froelich,
Ltd., Chicago, IL, Paula Enid Litt, Veronica Gomez,
William Butler Berndt, Schopf & Weiss, Chicago, IL,
Laurent S. Wiesel, John L. Warden, Robin D. Fessel,
David H. Braff, James V. Masella, III, Sullivan and
Cromwell, Lisa Swedenborg Getson, Friedman Kap-
lan Seiler & Adelman LLP, Greg A. Danilow, Ri-
chard A. Rothman, Weil, Gotshal & Manges, New
York, NY, Anthony Albanese, Weil, Cotshal &
Manges LLP, New York, NY, Joseph J. Duffy, Stet-
ler & Duffy, Ltd., Chicago, IL, Stephen C. Voris,
Burke, Warren, MacKay & Serritella, P.C., Chicago,
IL, Ira Lee Sorkin, Donald A. Corbett, Carter, Led-
yard & Milburn, New York, NY, James R. Figliulo,
Peter A. Silverman, Gregory L. Stelzer, Figliulo &
Silverman, Chicago, IL, Gregory P. Joseph, Douglas
J. Pepe, Gregory P. Joseph Law Offices LLC, New
York, NY, Jonathan M. Cyrluk, Stetler & Duffy,
Ltd., Michael J. Gaertner, Lord, Bissell & Brook
LLP, Chicago, IL, Daniel I. Bourer, P. Gavin East-
gate, Reed, Smith, Shaw & McClay, Pittsburgh, PA,
for Defendant.

*MEMORANDUM AND ORDER*

MANNING, J.

*1 Plaintiff Hollinger International, Inc. ("Interna-
tional" or "the Company") brought the instant action
alleging that Hollinger Inc. ("Inc.") and individual
and corporate defendants (collectively, "Defendants")
used their positions as officers, directors, and control-
ling shareholders of International to "loot" over $380
million from the Company. In its First Amended
Complaint ("the Complaint"), International alleges
violations of the Racketeer Influenced and Corrupt
Organization Act, 18 U.S.C. §§ 1962 and 1964 ("RI-
CO"), and state law claims for breach of fiduciary
duty, unjust enrichment, and civil conspiracy. The
present matter comes before this Court on Defen-
dants' Motion to Dismiss on the grounds that 18
U.S.C. § 1964(c) bars the RICO claims.[FN1] For the
reasons set forth below, this Court GRANTS this
motion.

> FN1. The Motion to Dismiss is brought by
> all individual and corporate Defendants, ex-
> cept for Defendant Daniel W. Colson, who
> is currently contesting jurisdiction in a sepa-
> rate motion to dismiss.

BACKGROUND [FN2]

> FN2. The facts in the Background section
> are derived from the Complaint. Additional-
> ly, because this motion is brought under 18
> U.S.C. § 1964(c), this Court will examine
> the facts and claims in the following sepa-
> rate but factually similar actions brought in
> this district: (1) securities class actions ("the
> Securities Class Actions") against Interna-
> tional; and (2) an enforcement action
> brought by the Securities and Exchange
> Commission ("SEC") ("the SEC Action")
> against International and many of the De-
> fendants in this case. *See Florida Evergreen
> Foliage v. E.I. Dupont De Nemours and Co.,
> 165 F.Supp.2d 1345, 1350, 1356-58
> (S.D.Fla.2001)* (in dismissing RICO claims
> under section 1964(c), the court compared
> the RICO claims to allegations in a separate
> securities class action suit); *Tyrone Area
> Sch. Dist. v. Mid-State Bank & Trust Co.,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                 Page 2
Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762
(Cite as: 2004 WL 2278545 (N.D.Ill.))

1999 WL 703729, at *4 (W.D.Pa. Feb.9, 1999) (in dismissing RICO claims under subsection (c), the court examined the RICO allegations in relation to the claims in an enforcement action brought by the SEC).

International brought this action to recover $380.6 million, which it contends Defendants, who include the controlling shareholders of International and companies controlled by individual Defendants, looted through a series of fraudulent transactions. By alleging RICO violations, International seeks to recover treble damages-$1.25 billion-plus attorneys' fees and costs.

*The Parties*

International is a Delaware corporation which owns and operates numerous domestic and foreign newspapers. Although a publicly traded company, International is controlled by Inc. which owns 30.3% of its equity and 72.8% of its voting rights. Inc., in turn, is owned by Defendant Ravleston Corporation which is controlled by Defendant Conrad Black, International's former CEO and chairman, and Defendant David Radler, International's former deputy chairman and president.

*RICO Predicate Acts*[FN3]

> FN3. To determine whether the section 1964(c) bars International's RICO claims, this Court need only examine whether the RICO predicate acts could be "actionable" as securities fraud. *See Gatz v. Ponsoldt*, 297 F.Supp.2d 719, 730 (D.Del.2003). Therefore, in an attempt to simplify the complex facts set forth in International's 175 page and 514 paragraph Complaint, this Court will only discuss the predicate acts as they relate to subsection (c). Additionally, although different Defendants are alleged to have committed the various predicate acts, for the purposes of this opinion, this Court will describe the alleged predicate acts as committed by Defendants generally.

In support of its RICO claims (Counts I and II), International sets forth "predicate acts" which allege that Defendants caused International "to transfer to them [1] sham non-compete payments, [2] sell them

valuable newspaper assets at below market prices, and [3] pay them other unwarranted, excessive, and unauthorized payments."

*Non-Compete Payments*

International alleges that Defendants fraudulently caused the Company to transfer to them over $90 million in non-compete payments, which rightfully should have gone to International. Defendants failed to disclose these payments to International's board, its non-controlling shareholders, or in its SEC filings. Where Defendants did obtain board approval or publicly disclose the transfers, they made material misstatements and omissions. While unnecessary to detail all of these alleged improper transfers because they all basically follow the same modus operandi, the Court will describe some of the more blatant allegations.

For example, International alleges that Defendants forced the Company to sell certain of its publishing assets to Intertec Publishing Corporation ("Intertec") for approximately $75 million. As part of the sale, Intertec agreed to pay $2 million to International for entering into a non-compete agreement. Although Inc. was not mentioned in the agreement, Defendants had International transfer the $2 million payment to Inc. "Defendants never obtained [International's] independent directors' approval to make this $2 million payment ..., nor did they disclose this payment to [International's] public majority non-controlling shareholders."(First Am. Compl. at ¶¶ 80, 287-88.)

*2 Additionally, when International sold certain of its newspapers to Community Newspaper Holdings, Inc. ("CNHI") for $472 million, $50 million of the purchase price was in consideration for a non-compete agreement. Although Inc. is a holding company and does not actually publish newspapers (and thus not a threat to compete), Defendants had Inc. included as a signatory in the non-compete agreement. Then without obtaining approval of International's independent directors or disclosing this transaction to the Company's "public non-controlling shareholders," Defendants caused $12 million of the $50 million non-compete payment to be wired to Inc. (*Id.* at ¶¶ 82, 289-90.)

After fraudulently obtaining $14 million from the above non-complete payments, Defendants trans-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 3
Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762
(Cite as: 2004 WL 2278545 (N.D.Ill.))

ferred the money back to International as repayment for a prior loan. Defendants, however, did not disclose the fact that they repaid the loan with International's own money. Likewise, Defendants had International issue a material misstatement in its 2000 10-K annual report by reporting that a redemption of stock, not the fraudulent non-compete payments, extinguished the loan. (*Id.* at ¶¶ 83, 291)

Defendants also brought about the sale of other publications owned by International to Defendant Horizon Publications, Inc. ("Horizon") for $43.7 million, which included a $5 million payment for a non-compete agreement. Although Inc. was not a threat to compete, it signed the non-compete agreement, after which Defendants caused International to transfer $1.2 million of the $5 million payment to Inc. When this transaction was presented to the board by Defendants, they did not disclose the $1.2 million payment to Inc. Likewise, this payment was never disclosed to the "majority non-controlling shareholders." (*Id.* at ¶¶ 84-85, 294.)

In 2001, International sold all of its Canadian newspapers-over 200-to Can West Global Communications Corp. ("CanWest") for $2.33 billion. Included in this purchase price was a payment for $52.9 million for an agreement not to compete. Although Defendants were not signatories to the CanWest non-compete agreement, they induced International to transfer to them the entire $52.9 million, plus interest. To get approval from International's board for this payment, Defendants made numerous material misrepresentations and omissions. In an attempt to hide this misappropriation, Defendants forced International to make materially false misstatements and omissions in its SEC filings and in public statements. For example, when Defendant Black was confronted with this transaction at International's annual shareholders' meeting, he made several false public statements to hide the fraudulent and unfair nature of the CanWest payments. In addition to the non-compete payments, International alleges that the CanWest transaction was "[un]fair to [International's] public non-controlling shareholders."(*Id.* at ¶¶ 98-120, 306-08.)

### Horizon Transactions

*3 In orchestrating the above $43.7 million sale to Horizon, Defendants failed to disclose, as required by law, their significant ownership interest in Horizon. This omission was particularly important given that International's assets were sold to Horizon at well "below fair market value," resulting in a loss for International and a windfall for Defendants. (*Id.* at ¶¶ 84-85, 184-193, 197-209, 292-94.)

Defendants also effectuated the sale of millions of dollars in other assets to Horizon at well "below fair market value." Like the other Horizon transaction, Defendants failed to disclose its ownership interest in Horizon to International's board, its shareholders, or in International's SEC public filings. Additionally, Defendants caused International to make materially false statements in its SEC filings by asserting that these exchanges were "market value transactions," when in fact International sold its assets at well below market value. (*Id.* at ¶¶ 184-96, 210-274, 298-301, 304-05.)

### Bradford Transactions

Similar to the Horizon transactions, Defendants formed Bradford Publishing Co. ("Bradford") to purchase newspaper assets from International at prices "substantially below market value." Defendants also failed to disclose their ownership interest in Bradford to International's board, its shareholders, or in its SEC filings. Additionally, Defendants had International make materially false statements in its SEC filings by stating that these sales were "market value transactions." (*Id.* at ¶¶ 194-96, 235-49, 302-03.)

### Digital Management Incentive Plan

Defendants also fraudulently converted over $5 million from International in what were termed "incentive payments" for managing investments of an International subsidiary-Digital. To get approval for these payments, Defendants made "knowingly false representations" by stating that the incentive plan was in-line with comparable plans at other companies. In fact, the incentive plan was "unusual and excessive because it paid bonuses based on liquidity ... without regard to the investment's portfolio's overall performance."Additionally, Defendants' used their positions to have International make investments in entities which Defendants had undisclosed interests. (*Id.* at ¶¶ 169-83, 315-17.)

### Sham Broker Fees

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

International further alleges that Defendants incorporated Moffat Management Inc. ("Moffat") to provide management and consulting services to International. Defendants then caused International pay Moffat $900,000 for "broker" services. Moffat, however, never actual performed any "broker" services. Moreover, Defendants failed to disclose this payment to International's board or shareholders and had this payment recorded on International's books as a legitimate "broker fee." (*Id.* at ¶¶ 160-65, 295-297.)

In all, International alleges that Defendants abused their positions of control and trust to misappropriate $380.6 million in assets from International.

*SEC Enforcement Action*

*4 Prior to the filing of this action, the SEC brought an enforcement action against International alleging violations of federal securities laws-*SEC v. Hollinger International, Inc.* Case No. 04 C 336 (N.D. Ill. Judge Manning).[FN4] The SEC alleged that from 1999 until at least 2001, International improperly transferred at least $32 million to corporate insiders and related entities, including Defendants Inc., Black, and Radler. These improper transfers were facilitated by many of the fraudulent non-compete payments alleged by International in the instant action. The SEC further alleged that in an attempt to hide these transactions, International made false statements and failed to disclose material information in violation of the Securities Exchange Act of 1934 and SEC rules. International settled the SEC Action in a consent judgment, wherein International agreed to allow an independent committee to investigate the "unauthorized transfer[ ] of [the Company's] assets" via "non-competition payments." [FN5]

> FN4. In addition to the action against International, on August 27, 2004, the SEC gave Defendant Inc. notice that it intended to file an action against it for violation of securities laws based in part on the transfer of International's assets to Inc. through sham non-compete agreements.

> FN5. After entry of the consent judgment, Inc. sought to intervene and vacate the judgment. This Court granted Inc.'s motion to intervene but denied the motion to vacate.

Inc. then appealed this decision but voluntarily dismissed the appeal pursuant to Federal Rule of Appellate Procedure 42(b).

*Shareholder Securities Class Actions*

In addition to the present action and the SEC Action, purchasers of International's stock between August 1999 and March 2003, brought at least three securities class actions against International and many of the Defendants in this action-Case Nos. 04 C 0834, 1276, and 2505 (N.D. Ill. consolidated before Judge Coar). The Securities Class Actions allege that International and Defendants violated federal securities laws by making material misrepresentations and omissions regarding the same conduct alleged in this case-*e.g.,* the non-compete payments, sale of assets to related entities at below market value, and inflated and improper management fees. According to the class plaintiffs, these misrepresentations and omissions "deceive[d] the investing public, including [the class plaintiffs] ... and cause[d] them to purchase [International's] securities at artificially inflated prices."(Compl. in *Washington Area Carpenters Pension and Retirement Fund,* 04 C 2505, ¶¶ 228-246, Ex. 1 to Aff. in Supp. of Defs.' Mot. to Dismiss the First Am. Compl.)

STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. *See, e.g., McMath v. City of Gary,* 976 F.2d 1026, 1031 (7th Cir.1992); *Gillman v. Burlington N. R.R. Co.,* 878 F.2d 1020, 1022 (7th Cir.1989).[FN6] Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kunik v. Racine County, Wis.,* 946 F.2d 1574, 1579 (7th Cir.1991) (*citing Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

> FN6. When ruling on a 12(b)(6) motion, courts are generally limited to the facts set forth in the complaint. Here, however, because this motion is also brought under 12(b)(1), the Court may look beyond the

complaint to any document submitted with the motion or in response to the motion. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir.1995). Likewise, as explained below, when determining whether section 1964(c) applies, courts often look to complaints in related shareholder securities class actions and SEC actions which allege the same conduct asserted in the RICO action. Accordingly, this Court will consider limited facts outside of the Complaint.

The court will accept all well-pled factual allegations in the complaint as true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. *Craigs, Inc. v. General Electric Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993). The court, however, is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir.1992).

## ANALYSIS

**\*5** Defendants contend that this Court should dismiss International's RICO claims (Counts I and II) on the grounds that 18 U.S.C. § 1964(c), as amended by Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737 (1995), bars RICO claims "that would have been actionable as fraud in the purchase of securities" ("the RICO Bar"). In response, International contends that subsection (c) does not apply because none of the allegations in the Complaint directly relate to the purchase or sale of securities. Before addressing the merits of these contentions, this Court will first examine the language of subsection (c), the legislative history of the PSLRA, judicial interpretations of the RICO Bar, and whether securities law encompasses fraudulent schemes which do not directly involve the sale or purchase of securities.

Section 1964(c) states in relevant part that:

Any person injured in his business or property by reason of any violation of section 1962 in this chapter may sue therefor ... and shall recover threefold the damages ..., *except that no person may rely upon any*

*conduct that would have been actionable as fraud in the purchase of securities to establish a violation of section 1962.*

(Emphasis added.) The legislative history of subsection (c) reveals that Congress intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent plaintiffs from attempting "to plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO *if such offenses are based on conduct that would have been actionable as securities fraud."* H.R. Conf. Rep. No. 104-369, at 47 (1995) (emphasis added). In testifying before the House Commerce Committee, the SEC chairman, stated that the rationale for the RICO Bar was that:

securities laws generally provide adequate remedies for those injured by securities fraud[; therefore,] it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO.

141 Cong. Rec. H2771, reprinted in 1996 U.S.C.C.A.N. 679, 746 (1995).

Based on the above language, courts broadly construe section 1964(c) to preclude wire and mail fraud from forming predicate acts under RICO "if such conduct would also be actionable as securities fraud." *In re Enron Corp. Sec. Lit.*, 284 F.Supp.2d 511, 619 (S.D.Tex.2003).[FN7] Courts should not permit "surgical presentation" of the facts to "undermine the congressional intent behind the RICO amendment." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329-30 (3d Cir.1999).*See also Gatz v. Ponsoldt*, 297 F.Supp.2d 719, 730 (D.Del.2003) ("a plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading"); *Burton v.. Ken-Crest Servs., Inc.*, 127 F.Supp.2d 673, 677 (E.D.Pa.2001) (plaintiffs "cannot magically revive his [RICO] claim by picking out discrete details of his allegations and then claiming they are not actionable as securities fraud").

> FN7. Because neither the Seventh Circuit nor any courts in this district have interpreted the scope of section 1964(c), this Court will look to cases from other circuits.

**\*6** "The proper test is whether the conduct pled as predicate offenses is actionable as securities fraud."

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762
(Cite as: 2004 WL 2278545 (N.D.Ill.))

*Gatz, 297 F.Supp.2d at 730.* In applying this test, courts carefully examine the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that operated as a fraud on sellers or purchasers of securities. *See Bald Eagle, 189 F.3d at 330; Gatz, 297 F.Supp.2d at 730; In re Enron Corp. Sec. Lit., 284 F.Supp.2d at 622; Florida Evergreen Foliage, 165 F.Supp.2d at 1350, 1356-58 (M.D.Fla.2001); Tyrone Area Sch. Dist. v. Mid-State Bank & Trust Co., 1999 WL 703729, at *4 (W.D.Pa. Feb.9, 1999).*

In *Gatz, 297 F.Supp.2d at 721-23,* the plaintiff shareholders brought RICO and state law claims against the controlling shareholders and affiliated corporate entities, alleging that the defendants looted the corporation through a series of fraudulent transactions which benefitted the controlling shareholders. The defendants contended that the RICO claims were barred under 18 U.S.C. § 1964(c) because the predicate acts were "actionable" under federal securities law. *Id.* at 730. In response, the plaintiffs asserted that the RICO Bar did not apply because they did not "allege that they were purchasers or sellers of securities."*Id.* at 731.

In dismissing the RICO claims, the court examined the entire fraudulent scheme as a whole to determine if it fell within section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *Id.* at 730-31. The court found that "the alleged scheme involved a series of fraudulent transactions designed to loot [the company] for the purposes of maximizing [the controlling shareholders'] compensation." *Id.* The predicate RICO acts, which alleged the use of wires and mails, facilitated the looting of the company. *Id.* Broadly applying the RICO bar to prevent the use of "artful pleading" to avoid the bar, the court held that "the conduct alleged as predicate acts by the plaintiffs would be actionable as securities fraud and, consequently, may not serve as predicate acts for purpose of a RICO civil action."*Id.* at 731.

Similarly, in *In re Enron Corp. Securities Litigation, 284 F.Supp.2d at 622,* the shareholder plaintiffs alleged RICO and state law claims, asserting that the defendants, who were officers of the company, enacted a fraudulent scheme to "loot" the company. Granting the defendants' motion to dismiss the RICO claims under section 1964(c), the court held that while the predicate acts were technically not actionable as securities fraud, the court could not look at these acts in a vacuum. *Id.* Instead, the court was required to consider the fraudulent scheme as a whole. *Id.* Applying this broad test, the court found that "the predicate acts [ ] are part of an overreaching scheme and conspiracy to defraud current and prospective shareholders ... with all alleged acts and omissions intended to achieve the same goal, personal enrichment of [the defendants] at the expense of the corporation [and] its shareholders."*Id.* Accordingly, section 1964(c) barred the RICO claims because the predicate acts were part of a scheme "that operated as a fraud on sellers or purchasers of securities."*Id.*

*\*7* Although both sets of plaintiffs in *Gatz* and *Enron* had standing to bring securities fraud claims, the RICO bar operates irrespective of whether the RICO plaintiff has standing to bring a securities claim-*i.e.,* was a purchaser or seller of the company's stock-as long as another plaintiff could bring a securities action based on the alleged conduct. For example, in *Gatz, 297 F.Supp.2d at 731,* in rejecting the plaintiffs contention that the RICO Bar did not apply because they did not "allege that they were purchasers or sellers of securities," the court held that "[w]hether plaintiffs were purchasers or sellers of securities would only be relevant to the inquiry of their standing to bring a securities fraud claim, whereas [section 1964(c) ]... applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b-5." *See alsoIn re Enron Corp. Sec. Lit., 284 F.Supp.2d at 619* (the RICO Bar applies "regardless of whether a particular plaintiff has standing to bring a cause of action under the securities laws").

In determining whether the RICO conduct is actionable, courts also consider whether there are any pending shareholder securities class actions or SEC actions which allege the same conduct asserted in the RICO action. Where the SEC or the class plaintiffs base their securities fraud claims on the conduct as alleged in the RICO action, courts generally find that the RICO claims are "actionable" as securities fraud. *See, e.g., Bald Eagle, 189 F.3d at 328* (noting that the SEC's complaint alleged the same scheme which "is at the heart of this RICO action"); *Florida Evergreen Foliage, 165 F.Supp.2d at 1356-57* (in dismissing RICO claims under section 1964(c), the court compared the RICO action with a shareholder action to determine if the predicate acts were actionable as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

securities fraud); *In re Ikon Office Solutions, Inc.,* 86 F.Supp.2d 481, 486 (E.D.Pa.2000) (same); *Tyrone Area Sch. Dist.,* 1999 WL 703729, at \*4 ("that the conduct involved in the [ ] scheme is actionable under securities laws is evidenced by the SEC's commencement of a suit for violations of federal securities laws" based on the conduct alleged in the RICO claims).

Here, after carefully reviewing the predicate acts alleged in the Complaint in relation to Defendants' scheme to loot the Company and comparing the allegations here to the allegations in the Securities Class Actions and the SEC Action, this Court finds that the alleged predicate offenses are "actionable" as securities fraud under 10(b) and 20(a) of the Securities and Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) and thus are barred by section 1964(c).[FN8]

> FN8. In reaching this conclusion, the Court does not make any determination as to the merits of any securities fraud claims against Defendants or International. The Court simply finds that the RICO claims here are "actionable," which is defined as "[f]urnishing the legal ground for a lawsuit or other legal action."*Black's Law Dictionary* (7th ed.1999).

Before applying the above principles to the present allegations, however, this Court will briefly set forth the applicable securities laws which could be applicable to the allegations in International's Complaint. To state a valid securities fraud claim under section 10(b) or Rule 10b-5, a plaintiff must allege that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996).[FN9] To properly plead a claim under section 20(a), a plaintiff must allege that the defendant: (1) exercised general control over the entity principally liable; and (2) possessed the power or ability to control the specific transaction upon which the primary violation was predicated, even if such power was not exercised. *Donohue v. Consolidated Operating & Prod. Corp.,* 982 F.2d 1130, 1138-39 (7th Cir.1992).[FN10]

> FN9. Section 10(b) prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person:

> > (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

> > 17 C.F.R. § 240.10b-5.

> FN10. Section 20(a) states in pertinent part that: "[e]very person who, directly or indirectly, controls any person liable under this chapter or rule or regulation ... shall be liable jointly and severally."15 U.S.C. § 78t(a).

\*8 Here, International contends that the conduct alleged in its Complaint does not constitute "actionable" securities fraud because none of the allegations were in "connection with the purchase or sale of securities."This interpretation, however, is too narrow and has been rejected. Courts "broadly construe" the "in connection with the purchase or sale" requirement, 3 *Fletcher Cyclopedia of Private Corp.,* § 900.85 (May 2004) (citing cases), to include omissions and misrepresentations reasonably calculated to influence the investing public to purchase or sell securities. *See Goldberg v. Meridor,* 567 F.2d 209, 218-19 (2d Cir.1977); *Britt v. Cyril Bath Co.,* 417 F.2d 433, 435 (6th Cir.1969).*See also Jacoboni v. KPMG LLP,* 314 F.Supp.2d 1172, 1186 (M.D.Fla.2004) (when analyzing the RICO predicate acts in relation to the entire fraudulent scheme, courts give credence to the principle that the securities law should be broadly construed to "encompass a wide range of

activity"). This broad interpretation supports the underlying purpose of Congress in enacting section 10(b)-"to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a[n] [inadequate] price." 4 *Broomberg & Lowenfels on Securities Fraud,* § 6:570 (2004).*See also Superintendent of Ins. of New York v. Bankers Life and Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (Congress intended section 10(b) to protect "the entire community of interests in the corporation").

Based on this broad interpretation, "[u]nder Rule 10b-5, when a party undertakes to disclose anything, it has the duty to speak the full truth." *Issen v. GSC Enter., Inc.,* 538 F.Supp. 745, 751 (N.D.Ill.1982). Therefore, corporations are required to disclose material events in their annual reports, including transactions between the corporation and companies in which the corporation's controlling shareholders have an interest. *See id.See also Boggess v. O.T. Hogan,* 328 F.Supp. 1048, 1052 (N.D.Ill.1971) (holding that failure to disclose insider transactions stated a cause of action under section 10(b)).

Courts also hold that a securities law violation occurs when "the corporation is influenced by its controlling shareholders to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is non-disclosure or misleading disclosures as to the material facts of the transaction."*See Goldberg,* 567 F.2d at 217. *See also Wright v. Heizer,* 560 F.2d 236, 246-49 (7th Cir.1977) (section 10(b) permits a cause of action where a breach of fiduciary duty to a non-controlling shareholder involving conflict of interest occurs in conjunction with a deception, non-disclosure, or misrepresentation in the purchase of securities).

With these principles in mind, the Court now turns to the predicate acts International alleges in support of its RICO claims. These acts include Defendants' use of the mails and wires to facilitate their scheme to loot International. Defendants allegedly devised several schemes to use their ownership and control of International to fraudulently convert $380.6 million in assets from the Company. As detailed above, these schemes included fraudulent non-compete payments, sale of assets to entities controlled by Defendants at well below market value, and inflated and unearned management fees. While the predicate acts alone are not per se violations of securities law, they were an integral part of Defendants' scheme to loot International. Indeed, as explained below, without the use of the mails and wires, Defendants would not have been able to successfully loot over $380 million from International.

*9 For example, when International sold some of its publishing assets to CNHI for $472 million, $50 million of the purchase price was for non-compete agreements. Even though Inc does not actually publish newspapers (and thus not a threat to compete), Defendants allegedly had Inc. included as a signatory in the non-compete agreement. Then without obtaining approval of International's independent directors or disclosing this transaction to the Company's "public non-controlling shareholders," Defendants allegedly caused $12 million of the $50 million non-compete payment to be wired to Inc. (Compl. at ¶¶ 82, 289-90.)

Likewise, in the Moffat scheme, Defendants allegedly induced International to pay Moffat $900,000 for "broker" services. Moffat, a company controlled be Defendants, however, never actually performed any "broker" services. To complete this "sham transaction," Defendants used the mails and telephones, *e.g.,* sending the $900,000 sham payment by Federal Express across state lines. Once finalized, Defendants allegedly disguised this transaction by failing to disclose this payment to International's board or shareholders and causing it to be recorded on International's books as a "broker fee." (*Id.* at ¶¶ 160-65, 295-297.)

Similarly, Defendants allegedly formed several shell companies, *e.g.,* Horizon and Bradford, and then caused International to sell assets to these shells at "substantially below market value." To facilitate these fraudulent sales, Defendants are alleged to have used "wires in interstate and foreign commerce."In an attempt to disguise these transactions, Defendants allegedly failed to disclose their ownership interest to International's board, its shareholders, or in its SEC filings and forced International to make materially false statements in its SEC filings by stating that these transactions were "market value transactions." (*Id.* at ¶¶ 194-96, 235-49, 302-03.)

In addition to the actions alleged in the Complaint,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762
(Cite as: 2004 WL 2278545 (N.D.Ill.))

the Securities Class Actions, brought by purchasers of International's stock, allege that International and several of Defendants in this case violated sections 10(b) and 20(a) and Rule 10b-5 by making material misrepresentations and omissions regarding the same conduct alleged in this action-*e.g.,* the non-compete payments, sale of assets to related entities at below market value, and inflated and improper management fees. The class plaintiffs allege that these misrepresentations and omissions "deceive[d] the investing public, including [the class plaintiffs] ... and cause[d] them to purchase [International's] securities at artificially inflated prices."(Compl. in *Washington Area Carpenters Pension and Retirement Fund,* 04 C 2505, ¶¶ 228-246, Ex. 1 to Aff. in Supp. of Defs.' Mot. to Dismiss the First Am. Compl.)

Likewise, the SEC Action alleged that from 1999 until at least 2001, International improperly transferred at least $32 million to corporate insiders and related entities, including Defendants Inc., Black, and Radler. These improper transactions include many of the fraudulent non-compete payments alleged by International in the instant action. The SEC further alleged that in an attempt to facilitate and hide these transactions, International falsified its corporate books and records and failed to disclose material information in its SEC filings, in violation of the Securities Exchange Act of 1934 and SEC rules. (SEC Compl., Ex. 4 to Aff. in Supp. of Defs.' Mot. to Dismiss the First Am. Compl.) In addition, on August 27, 2004, the SEC gave Defendant Inc. notice that it intended to file an action against it for securities fraud based in part on the transfer of International's assets to Inc. through sham non-compete agreements.

**\*10** Based on the above allegations (in the Complaint, the Securities Class Actions, and the SEC Action), this Court concludes that International's predicate acts would be a part of an overreaching scheme to defraud International (and thus also its majority non-controlling shareholders) by misappropriating and usurping the Company's assets for their personal enrichment at the expense of International and the other shareholders. To facilitate and disguise this scheme, Defendants used the mails and wires (the predicate acts) and caused International to make material misstatements and omissions in its financial records and public filings with the SEC. Accordingly, the predicate acts would be part of a scheme which is actionable under securities law, and therefore, the

RICO claims are barred by 18 U.S.C. § 1964(c). The Court therefore GRANTS the motion to dismiss Counts I and II (the RICO claims).[FN11]

> FN11. In holding that section 1964(c) precludes International's RICO claims, this Court is not making any determination as to validity of the fraudulent actions underlying these claims. This decision simply holds that the claims are "actionable" as securities fraud.

Having dismissed the RICO claims, International's sole basis for federal subject matter jurisdiction, the Court must now address whether to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over International's remaining state law claims. Section 1367(a) authorizes federal courts to exercise supplemental jurisdiction over state law claims, but this, however, does not mean that federal courts must exercise jurisdiction in all cases. *See City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). Instead, supplemental jurisdiction is "a doctrine of discretion, not [a litigant's] right...."*Id.*Pursuant to section 1367(c), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-"

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).

District courts should "deal with cases involving [supplemental] claims in the manner that best serves the principles of economy, convenience, fairness and comity which underlie the [supplemental] jurisdiction doctrine." *Int'l College of Surgeons,* 522 U.S., at 172. *See also Wright v. Associated Ins. Co. Inc.,* 29 F.3d

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1244, 1251 (7th Cir.1994). As a "general rule ... when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."*Id.* Only in the "unusual cases in which the balance of factors to be considered under the [supplemental] jurisdiction doctrine-judicial economy, convenience, fairness and comity" should the district court hear "the state-law claims on the merits" after dismissal of the original claim granting the court jurisdiction. *Wright,* 29 F.3d at 1251.

*11 In the context of cases involving the RICO Bar, after dismissing the RICO claims, courts generally refuse to exercise supplemental jurisdiction over the remaining state law claims. *See Bald Eagle,* 189 F.3d at 327 (affirming district court's decision not to exercise supplemental jurisdiction over remaining state law claims); *Tyrone Area Sch. Dist.,* 1999 WL 703729, at *4 (declining to exercise supplemental jurisdiction over remaining state law claims after dismissing RICO claims).

Here, because all of International's federal claims have been dismissed and International has failed to cite any special circumstances for this Court to retain jurisdiction, this Court sees no reason for exercising jurisdiction over the remaining state law claims and therefore dismisses Counts III-XXIX without prejudice.

## CONCLUSION

For the reasons discussed, this Court GRANTS Defendants' Motion to Dismiss the First Amended Complaint [74-1] and dismisses Counts I and II with prejudice and Counts III-XXIX without prejudice. Given this ruling, the Court also dismisses as moot, the following pending motions in this case: (1) the Horizon Defendants' Supplemental Motion to Dismiss [78-1]; (2) Defendant Barbra Black's Motion to Dismiss Counts XIII and XXVIII for Lack of Subject Matter Jurisdiction [77-1]; (3) Defendant Conrad Black's Supplemental Motion to Dismiss Counts I and II [76-1]; and (4) Defendant Daniel Colson's Motion to Dismiss [106-1].

It is so ordered.

N.D.Ill.,2004.
Hollinger Intern., Inc. v. Hollinger Inc.

Not Reported in F.Supp.2d, 2004 WL 2278545 (N.D.Ill.), Fed. Sec. L. Rep. P 93,012, RICO Bus.Disp.Guide 10,762

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.W.2d                                                                              Page 1
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
(Cite as: 2005 WL 1403769 (Wis.Cir.))

C Only the Westlaw citation is currently available.

Circuit Court of Wisconsin, Milwaukee County..
Mary STRANG, individually and on behalf of all
others similarly situated Plaintiff
v.
VISA U.S.A. INC., et. al. Defendants
No. 03 CV 011323.

Feb. 8, 2005.

John S. Skilton and Gabrielle E. Bina of Heller Ehr-
man White & McAuliffe LLP, Madison, WI; Stephen
V. Bomse and David M. Goldstein of Heller Ehrman
White & McAuliffe LLP, San Francisco, CA; Robert
C. Mason of Arnold & Porter LLP, New York, NY,
for Defendant Visa U.S.A. Inc.

Jeffrey Morris of Quarles & Brady LLP, Milwaukee,
WI; Kenneth A. Gallo and Patricia C. Crowley of
Paul, Weiss, Rifkind, Wharton & Garrison LLP,
Washington, DC; Gary R. Carney and Randi D.
Adelstein of Paul, Weiss, Rifkind, Wharton & Garri-
son LLP, New York, NY, for Defendant MasterCard
International Incorporated.

John M. Swietlik, Jr. and Jane M. Cuthbert of Kas-
dorf, Lewis & Swietlik, S.C., Milwaukee, WI, for
Plaintiffs.

DECISION AND ORDER

FOLEY, J.

FACTS AND PROCEDURAL POSTURE

*1 This matter is before me on the Visa U.S.A. and
MasterCard International's (Defendants') motion to
dismiss. They maintain that Ms. Strang lacks stand-
ing to bring this lawsuit, as her claimed injuries are
derivative and too remote.[FN1]In addressing a motion
to dismiss, all properly plead facts are taken as true.
Wis. Stat. sec. 802.06(2)(a)(6) and Tietsworth v. Har-
ley-Davidson, Inc., 2004 WI 32, par. 11, 677 N.W.2d
233, 238 (2004). After careful consideration, I have
decided that I must join the chorus [FN2] and grant the
motion to dismiss. As a general consumer or debit

card consumer, Ms. Strang's claimed injuries are de-
rivative and too remote; they are also highly specula-
tive, potentially duplicative and would clearly in-
volve daunting and overwhelming evidentiary con-
cerns.

> FN1. Standing requires that a party have "a
> sufficient stake in an otherwise justiciable
> controversy to obtain judicial resolution of
> that controversy."Sierra Club v. Morton,
> 472 U.S. 727, 731 (1972). The Sierra Club
> standard has been recognized by the Wis-
> consin Supreme Court and requires a two-
> step analysis: whether the plaintiff has suf-
> fered a threatened or actual injury and
> whether the interest asserted is recognized
> by law. Norquist v. Zeuske, 211 Wis.2d 241,
> 247, 564 N.W.2d 748 (1997). As noted be-
> low, there is little question that Ms. Strang
> alleges she suffered injury in regard to an in-
> terest recognized by law in Wis. Stats. ch.
> 133. The critical issue is whether judicially
> imposed limitations nevertheless deprive her
> of standing to maintain this lawsuit.

> FN2. With the latest submission of authori-
> ties by the Defendants, Kanne v. Visa,
> U.S.A., Inc., et. al, Neb. Dist. Ct., Douglas
> County, Doc. 1033, No. 469, arriving today,
> I am advised that fourteen state trial courts
> have granted motions to dismiss in parallel
> state court proceedings concluding that con-
> sumers like Ms. Strang lack standing to
> maintain state antitrust claims based upon
> virtually identical factual allegations under
> statutes similar to Wis. Stats. ch. 133..

Ms. Strang's complaint, seeking relief under Wiscon-
sin's antitrust statutes, Wis. Stats. ch.. 133, is a "fol-
low on" action [FN3] to In re Visa Check/Master Money
Antitrust Litigation, No. CV-96-5238 (E.D.N.Y.). In
that litigation, it was determined that the defendants
illegally tied their credit and debit card services, i.e.
merchants were forced to accept Visa and Master-
Card debit cards if they wished accept defendants'
credit cards. This practice was commonly referred to
as an "honor all cards" rule. This tying, according to
the complaint, resulted in merchants paying excessive

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
(Cite as: 2005 WL 1403769 (Wis.Cir.))

Page 2

debit card service (discount) fees. In the settlement of that merchant-initiated federal litigation, the defendants agreed to pay $3 billion in damages and to cease the tying requirement. A series of "follow on" actions have been filed in a number of states affording state antitrust protection to those harmed directly or indirectly by actions that violate relevant state statutes.

> FN3. The Honorable Ben Tenille, of the Superior Court, Hanover County, North Carolina, who wrote a scholarly decision in regard to this same issue in the parallel proceedings in that state, *Morris v. Visa, et. al.,* No. 03 CVS 2514, characterized this and similar state antitrust claims as "generally parasitic" in that they almost invariably piggyback on some triggering federal antitrust claim. Given our relatively recent experience with parasites in the water in our community, I'll constrain myself to the "follow on" characterization.

Ms. Strang proposes to bring suit individually and on behalf of a proposed class of all persons who made purchases in Wisconsin from any retailer utilizing Visa and MasterCard credit card and debit card services during the proposed class period, December, 1999 to December, 2003. Ms. Strang, a Wisconsin consumer, alleges the tying practices of the defendants' violated Wis. Stat. ch. 133 as a contract or conspiracy in restraint of trade. Pursuant to Wis. Stats. sec. 133.18(1)"any person injured, directly or indirectly," by prohibited practices is entitled to recover treble damages, the costs of suit and reasonable attorney fees. Ms. Strang claims she was indirectly injured by the defendants' practices because the merchants using their debit card services passed through the excessive fees merchants were forced to pay.[FN4]She reasons that she, and all other Wisconsin consumers who made purchases from merchants paying Visa and Master Card debit card service fees, incurred indirect injury in each purchase made when those excessive fees were passed through to the consumer in the form of increased prices of all items sold by the merchant. Anticipating potential standing concerns related to the manageability of the size of this proposed class and the potential volume of claims, leave is sought to plead an alternative class comprised only of debit card users. *Plaintiff's Brief in Opposition,* p. 34.

> FN4. The complaint alleges that the fees were as much as 1500% higher than those incurred by merchants for competitive debit card services. See, par. 45.

**\*2** In my view, only a brief summary of the intricacies of the business relationships and transactions underlying this lawsuit is necessary. Visa and MasterCard are alleged to be an association of thousands of member banks operating a national bank card network. Individual banks that are members of the association issue Visa or MasterCard branded payment cards to consumers and enter into agreements with merchants allowing them to accept these cards. Credit cards allow consumers to buy on credit, using the bank's funds and repaying the debt later. Debit cards are utilized to make payments directly from funds the consumer has on deposit with the bank. The merchant pays a fee to the bank providing debit card services for each transaction involving a Visa or MasterCard branded card.[FN5]According to the complaint, the defendants are able to extract excessive debit card fees due to their dominant position in the credit card market and the imposition of the "honor all cards" policy. More succinctly stated, they assert that merchants cannot survive without Visa and MasterCard credit card services and therefore accede to the excessive fees for their debit card services.

> FN5. Fees paid by merchants (discount fees) are actually split between the bank providing debit card services to the merchant and the bank that issues the Visa or MasterCard debit card to the consumer.

### PRECEDENTIAL CONTEXT

The positions taken by the parties in this litigation cannot be properly understood without a basic understanding of the United States Supreme Court's decisions relating to standing of "indirect purchasers" in antitrust litigation. This is true, in primary part, because Wis. Stat. ch. 133 and similar statutes in other states are acknowledged to be a direct response to denial of standing to indirect purchasers in federal antitrust litigation as a result of those decisions.

In *Hanover Shoe Co. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968), the Supreme Court rejected the "pass on" theory of an antitrust violator,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rejecting the proffered defense that the direct purchaser of the affected product was not actually injured in that they had "passed on" the excessive costs to a succeeding (indirect) purchaser in the chain of distribution. Nine years later, the Court held that an indirect purchaser did not have standing to maintain a federal antitrust claim. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In response, Wisconsin and a significant number of other states (twenty two) enacted "*Illinois Brick* repealer" legislation, granting standing to indirect purchasers.[FN6] The U.S. Supreme Court subsequently rejected a challenge to the validity of state "*Illinois Brick* repealer" (indirect purchaser standing) statutes. *California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

> FN6. See, *Bunker's Glass Comp. v. Pilkington, PLC*, 75 P.3d 99, 105, fn. 4 (Ariz., 2003).

## STANDING IN WISCONSIN ANTITRUST CASES

As noted, Wisconsin enacted an "*Illinois Brick* repealer" statute in response to the dramatic standing limitations of that decision. Wis. Stat. sec 133.18(1)(b) provides in pertinent part: "Any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefore...." The breadth of the language is emphasized in the legislative expression of intent in Wis. Stat. 133.01: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition."

**\*3** Defendants correctly and emphatically assert however that the breadth of this statutory standard would grant standing to even the most remote of purchasers in the chain of distribution of an affected commodity. A literal application of the language would grant standing to the purchaser of a used bicycle asserting that the purchase price of the twice-sold bicycle was inflated due to a price fixing conspiracy of a rubber manufacturer whose product was used to manufacture the tires of the bike. In direct response to those concerns, courts have refused to grant standing to those remotely and derivatively injured based on policy considerations. The most notable case in this regard is *Associated General Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 529, 534 (1983) (hereinafter *AGC* ) in which the Court noted that a literal reading of the federal anti-

trust statute "was broad enough to encompass every harm that can be attributed directly or indirectly to ... an antitrust violation," but noting that "federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, fn. 14 (1972)). *AGC* went on to enumerate various factors to be considered in determining whether a claimed antitrust injury was too remote to accord standing to bring the claim. Given then that the literal language of the Wisconsin statute specifically rejects the federal ban on standing for indirect purchasers [FN7] and would clearly grant standing to Ms. Strang to bring her claim, the critical issue becomes what, if any, policy limitations attend the Wisconsin statute. The parties agree that this is an issue of first impression in Wisconsin.[FN8]

> FN7. As indicated at fn. 9, *infra*, I agree that Ms. Strang and other debit card (or general) consumers are not "indirect purchasers" of defendants' debit card services. However, she does allege indirect injury from restraint of trade conduct. This is all that Wis. Stats. secs. 133.03 and 133.18, by their literal terms, require. The critical issue then is not whether she is or is not an indirect purchaser; it is whether she lacks standing based upon an analysis of the *AGC* factors set forth below.

> FN8. The process of "judicial line drawing" based upon concerns that an injury is too remotely related to a wrongdoing is, of course, not unprecedented. Tort liability in Wisconsin is cut off, based upon six judicially crafted public policy considerations, if "the cause in fact of injury is legally insufficient to allow recovery." *Fandrey v. American Family*, 04 Wi. 62, par. 15, 272 Wis.2d 46, 680 N.W.2d 345. The *AGC* court noted the similarity of this "proximate cause" analysis in tort law to the standing analysis in antitrust law. *AGC,supra* at 532-535.

Defendants argue that I should embrace the policy considerations set forth in *AGC.* I read that case to set forth the following factors to be considered in determining whether an antitrust claimant has standing to

maintain an antitrust claim.

1. Is there a causal connection between the antitrust violation and the harm to the plaintiff?

2. Did the defendant intend to cause the particular harm?

3. The nature of the claimant's injuries, most specifically the directness or indirectness of those injuries. Included in this consideration is whether there is another class of affected individuals who are more directly injured.

4. Is the injury claimed highly speculative in nature? At bottom, does the claimed injury rest on an abstract conception or speculative measure of harm.

5. The risk of duplicative recovery as well as the danger and judicial manageability of complex apportionment of damages.

While I share the concern of the plaintiff that these factors could be read to simply reinstate the rule of *Illinois Brick* as law in Wisconsin, i.e. no indirect purchaser standing, I suspect that if faced with this issue, our appellate courts would look to these factors for guidance in assessing an indirect or remote purchaser's standing. Numerous state courts have analyzed these factors and concluded that injuries identical to those claimed by Ms. Strang are too remote and speculative and granted motions to dismiss for lack of standing. See, fn. 2. After a careful analysis of those factors, and while noting that the first two factors support a conclusion that Ms. Strang should be accorded standing, I have concluded that the remaining factors clearly dictate the conclusion the motion should be granted.

### CAUSAL CONNECTION

\*4 Ms. Strang does allege causally related injury. She maintains that the tying of debit card services to credit card services violated Wis. Stat. sec. 133.03. As a result, according to her allegations, merchants paid excessive fees for defendants' debit card services and those costs were passed on to her in the form of inflated prices for goods that she purchased. This is sufficient to establish an "inference of causation" [FN9] to support her antitrust claim pursuant to Wis. Stat.

secs. 133.03 and 133.18.

> FN9. *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648 (1969),

### INTENT TO CAUSE HARM

Clearly the strongest inference from the facts alleged in the complaint is that the defendants most directly intended to harm the merchants. However, it would be disingenuous to argue or conclude that no inference of intent to harm consumers is supported by those same facts. It has long been recognized in antitrust litigation that the ultimate purchaser/consumer is saddled with some or all of the antitrust related costs of products. *Hanover Shoe,supra* at 492.[FN10]Quite clearly, the facts as plead support a reasonable inference that the defendants intended, or foresaw, their conduct in restraint of trade would injure the consumer as well as the merchant.

> FN10. This fact was also noted in the legislative history of amendments to the Sherman Antitrust Act. "[T]he economic burden of most antitrust violations is borne by the consumer in the form of higher prices for goods and services."Hart-Scott-Rondino Antitrust Improvements Act of 1976, S.Rep. No. 94-808.

### NATURE OF INJURY

This factor looks initially to the directness or indirectness of the injury. There is no question that the plaintiff alleges injuries that are indirect. The excessive fees were paid initially by the merchants and, according to the plaintiff's allegations, then passed through to the consumer/purchaser in the form of higher purchase prices for all goods. As in *AGC,*"such injuries were the indirect result" of injuries suffered by the merchants. *AGC,supra* at 541.

The *AGC* court also directed attention to whether a claimant was a consumer or competitor in the restrained market. The restrained market in the context of the plaintiff's claims is the debit card service market. Ms. Strang and consumer/purchasers are hardly competitors in the debit card services market. They are also not consumers of debit card services. Merchants are consumers of those services.[FN11]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
(Cite as: 2005 WL 1403769 (Wis.Cir.))

FN11. As I noted at oral arguments on this motion, unquestionably merchants consume these services because consumers demand the convenience of cashless transactions. However, this does not transform ultimate purchasers into consumers of debit card services in the legal or economic sense.

An additional consideration in regard to this factor is whether a more directly affected class exists who would be likely to address the violation.*Id.* at 542.Succinctly stated, merchants are the class of individuals who are more directly injured by the antitrust activities and in a better position to prosecute a claim based upon that activity; in fact, they have done so. While the plaintiff alleges that the damages assessed fall far short of the damages actually incurred, a "significant antitrust violation [has not been] undetected or unremedied."*Id.* at 543.Given that their claimed injuries were direct, they entailed none of the "conceptual difficulties" that encumber indirectly injured parties claims. Most specifically, as noted below, they encounter none of the daunting evidentiary problems of proving any marginal effect of the excessive debit card fees vis a vis the multitude of other pricing factors that impact the ultimate purchase price of any and all products that a Visa or MasterCard merchant sells.

## SPECULATIVE DAMAGES, RISK OF DUPLICATIVE RECOVERY AND COMPLEX APPORTIONMENT OF DAMAGES

**\*5** Dovetailing with the directness of injury consideration, antitrust courts have looked to the speculative nature of claimed injuries in assessing antitrust standing. As discussed above, direct purchasers are immediately impacted by the antitrust violation. Proof of damages is often complicated, but given their immediate proximity in the chain of distribution, there is far less likelihood that a multitude of other pricing factors will at the very best cloud, if not obliterate, the connection between the prohibited conduct and the claimed injury. Simply stated, with indirect purchasers, their most significant "conceptual difficulty" is that the causal connection, if in fact one exists, often times will be obliterated in the intervening steps in the chain of distribution. They are faced with the daunting task of proving the effect of the prohibited conduct on the price at any and all

levels above them and then at their removed position in the chain of distribution, and disproving, or at least quantifying, the effects of a multitude of other pricing considerations which clearly did or could have intervened at any relevant level.[FN12]In the context of the proposed class, they bear this burden with respect to every product purchase made at a Visa or MasterCard merchants store during the proposed class period. As Judge Tenille stated in *Morris,* one cannot "conceive of an economically feasible way to administer a trial which would require inquiry into how every retailer set the price for every consumer good sold in this state. Nor is it conceivable that any judgment would be in any amount which could be economically allocated and paid to every consumer in North Carolina."Paragraph 90.

FN12. I am not unmindful that the consumer is closer to the wrongdoer in this chain of distribution than, for instance, the purchaser of the fictional bicycle in the scenario cited earlier in this decision. However, the difficulty of proof attends nevertheless as the intervening party considers a multitude of factors in pricing decisions. In addition, depending upon the elasticity of the product, the prohibited conduct could have a major, minor or no effect on the ultimate purchase price of a good. Landes and Posner, *An Economic Analysis of the Rule of Illinois Brick,* 46 U. Chi. L.Rev., 602, 619-620;*Morris, supra, par. 89.*Suffice it to say that the damage claim in this case is fairly characterized as "highly speculative." *AGC,supra* at 544.

The risk of duplicative recovery could not be more acute. Merchants have sued and recovered. Assuming the plaintiff can overcome the daunting task of proving a causal connection and quantifying the overarching injury caused by the prohibited conduct, there remains the difficult process of determining a nonduplicative measure of damages between the ultimate consumers and the merchants. As the Supreme Court noted in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475, fn. 11,"the task of disentangling overlapping damage claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system," in that doing so "would be to discourage vigorous enforcement of antitrust laws by private suit."This is, of course, the antithesis of the legislative purpose of Wis. Stats. sec. 133.18.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
**(Cite as: 2005 WL 1403769 (Wis.Cir.))**

Page 6

### CONCLUSION

Ms. Strang alleges a recognizable claim under Wis. Stats. ch. 133 and resultant injuries. She also alleges facts to support an inference that the defendants intended, or foresaw, ultimate purchasers would be injured as a result of the tying arrangement and pass through of excessive debit card fees paid by merchants. However, her claimed injuries, as a general Wisconsin consumer or as a debit card purchaser, are derivative, remote, and highly speculative. The direct purchaser victims of the prohibited conduct have sued and recovered, redressing the prohibited conduct. Overwhelming concerns exist as to the speculative nature of the injuries and the manageability of the litigation in which she would endeavor to overcome those conceptual and evidentiary concerns. In my view, the analysis of the *AGC* factors overwhelmingly supports the conclusion that Ms. Strang lacks standing to maintain this action. For that reason, the motion to dismiss is granted.

Wis.Cir.,2005.
Strang v. Visa U.S.A., Inc.
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                                    Page 1
Slip Copy, 2008 WL 3850462 (E.D.La.), RICO Bus.Disp.Guide 11,542
**(Cite as: 2008 WL 3850462 (E.D.La.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Michael TREADWAY, Linda Gentry and Judith Allen Sullivan
v.
Terry LISOTTA, Property Insurance Association of Louisiana, Louisiana Citizens Property Insurance Corporation, Chad Brown, Jeff Albright, Caryl Mathes, Mike Ely, Joelle Lapreze, Hal Stiel, Christian Faser, and P & C Insurance Consulting, LLC.
**Civil Action No. 08-1375.**

Aug. 15, 2008.

Madro Bandaries, Madro Bandaries, PLC, Bernard L. Charbonnet, Jr., Law Office of Bernard L. Charbonnet, Jr., Gregory Pius Dileo, Gregory P. Dileo, Attorney at Law, Jeffrey P. Berniard, Berniard & Wilson Law Firm, LLC, Jennifer B. Eagan, Law Offices of Greg Di Leo, New Orleans, LA, for Plaintiffs.

Alvin John Herbert, III, Elliot Ross Buckley, Jr., Jennifer Rebekah Warden, Middleberg, Riddle & Gianna, Kyle D. Schonekas, Patrick S. McGoey, Thomas M. McEachin, Schonekas, Winsberg, Evans & McGoey, LLC, John William Waters, Jr., Bienvenu, Foster, Ryan & O'Bannon, Harry Rosenberg, Phelps Dunbar, LLP, New Orleans, LA, Jennifer A. Fiore, Sonia Mallett, Middleberg, Riddle & Gianna, Richard M. Upton, Richard M. Upton, Attorney at Law, Baton Rouge, LA, Dennis J. Phayer, Christopher Kent Tankersley, Sue Buser, Burglass & Tankersley, L.L.C., Michael Hudson Ellis, Michael H. Ellis, Attorney at Law, Metairie, LA, Adolph B. Curet, III, James B. Supple, Biggs, Supple, Cremaldi & Curet, LLP, Franklin, LA, for Defendants.

*ORDER AND REASONS*

MARTIN L.C. FELDMAN, District Judge.

**\*1** The plaintiffs in this lawsuit are three Louisiana property owners who seek damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, in relation to insurance as-

sessments they paid to fund the operations of Louisiana Citizens Property Insurance Corporation (Citizens). The plaintiffs filed this RICO complaint against Citizens, Property Insurance Association of Louisiana (PIAL), Terry Lisotta (the former CEO of Citizens and PIAL), and seven other individuals associated with Citizens and PIAL, claiming that the defendants devised a scheme to cause Citizens to pay for false, excessive, or improper business expenses between 2004 and 2007, which were ultimately passed on to Louisiana property owners through higher insurance rates and surcharges. Now before the Court is the defendants' motion to dismiss.[FN1] For the reasons that follow, the motion to dismiss is GRANTED.

> FN1. Citizens' filed a motion to dismiss joined by Chad Brown, Jeffrey Albright, David Stiel, Christian Faser, and P & C Insurance Consulting, LLC. Chad Brown, Mike Ely, and PIAL also adopted Citizens' motion and filed their own submissions.

*Background*

Citizens was created by the Louisiana legislature in 2003 to oversee the state's Coastal and FAIR (Fair Access to Insurance Requirements) Insurance Plans. See La. R.S. 22:1430.2.[FN2] This state-run entity provides insurance to "high risk" applicants who may have difficulty obtaining coverage in the private market. By law, Citizens is governed by a 15-member board of directors that includes representatives from the Department of Insurance and Department of the Treasury, members of the House and Senate Committees on Insurance, people appointed by the governor, and members of various insurance associations. See La. R.S. 22:1430.3.

> FN2. The Coastal Plan offers coverage in Zone 5, south of the Intercoastal Waterway, the most hurricane-vulnerable area. The Fair Plan offers coverage in the rest of the state.

Citizens' funding comes from four sources. The first, is premiums paid by FAIR and Costal Plan policyholders. As insurance of last resort, these plans do not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

offer premiums competitive with the private market. The enabling legislation requires Citizens' rates to be actuarially sound and at least 10 percent higher than average rates charged by other insurers in the relevant market. *See* La. R.S. 22:1430.12.

The second source of funding is "regular assessments" that may be levied against all private insurers doing business in Louisiana, to cover any shortfall between revenues and exposure. *See* La. R .S. 22:1430.6, 16. Insurers are permitted, but are not required, to recoup these assessments by surcharging their policyholders. When Citizens makes a regular assessment, it imposes a commensurate "market equalization charge" on Citizens' own policyholders to maintain the 10 percent (or more) rate differential.

Next, if the revenue from premiums and regular assessments is not enough to cover its liabilities, Citizens' governing board can, subject to statutory requirements, resort to the third source of funding: levying "emergency assessments" for as many years as necessary to pay off a deficit.[FN3] Emergency assessments are charged directly to Louisiana policyholders. *See* La. R.S. 22:1430.6, 16.[FN4]

> FN3. The Department of Insurance must agree there is a need for the assessment and verify the amount and calculation. La. R.S. 22:1430.16.E and H.

> FN4. The aggregate amount of emergency assessments levied in any calendar year cannot be higher than 10 percent of either the amount needed to cover the original deficit, or of the aggregate statewide direct property premiums written for the previous year.

Finally, the board of directors is also permitted to borrow money from third-party lenders to cover its liabilities and, if necessary, secure these loans by assigning Citizens' right to receive proceeds from future assessments. All bonds, loans, or other financing mechanisms must be approved by the Louisiana State Bond Commission. La. R.S. 22:1430.16.I.

**\*2** Two of the plaintiffs, Michael Treadway and Linda Gentry, are insured by Citizens. They allege in their RICO complaint that they were forced to incur "market equalization charges" and pay higherthannecessary insurance premiums, between 2004 and

2007. The third plaintiff, Judith Sullivan, is insured by a non-Citizens insurer, USAA, and claims that she was forced to pay a "recoupment" to USAA as a result of a "regular assessment" that USAA paid to Citizens. In addition, all plaintiffs contend that they have, or will in the future, be forced to pay "emergency assessments" to Citizens as a result of the nearly $1 billion debt Citizens incurred to cover its insurance exposure after the 2005 hurricane season.

According to the plaintiffs, the defendants are partly to blame for these add-on assessments. Between 2004 and 2007, the plaintiffs claim, the defendants systematically wasted Citizens' dollars on self-indulgent expenses that had nothing to do with its operations, and caused the company to spend money on unnecessary professional services. These financial misdeeds, the plaintiffs contend, left Citizens with depleted resources in its time of need, resulting in the assessments that anchor this lawsuit.

Plaintiffs' allegations of the defendants' misconduct generally fall into two categories. First, they claim that Terry Lisotta, and other defendants associated with Citizens, caused the company to reimburse the Property Insurance Association of Louisiana (PIAL), a legislatively-created association made up of all Louisiana property insurers, for expenses allegedly incurred on Citizens' behalf.[FN5] According to the plaintiffs, PIAL charged Citizens $20,771,831 for administrative services from January 1, 2004 to May 23, 2007.[FN6] Although the plaintiffs apparently claim that every cent of this $20 million was paid "to the detriment of Citizens and those it insured," the complaint is scant in factual support of this theory. The plaintiffs allege that, (1) as of September 26, 2007, Citizens paid PIAL $1,248,351 for equipment, even though "PIAL has not transferred ownership of these assets to Citizens"; (2) the P & C Insurance Consulting firm "was paid $192,336 for fees and expenses by PIAL from April 2004 to December 2006, with PIAL invoicing $102,062 of this amount to Citizens," even though PIAL was "unable to demonstrate what the $102,062 was for"; (3) "PIAL allocated to Citizens ... $5,901 of retainer fees paid to the Louisiana Auto Insurance Plan [LAIP], which is inexplicable as Citizens had no conceivable relationship with LAIP"; and (4) PIAL invoiced Citizens for the cost of group hunting and fishing trips taken by P & C Consultants, board members of PIAL and Citizens, and other individuals from state insurance agencies, in the amounts

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of $1,020 and $3,522. In addition, the plaintiffs assert that between August 2005 and June 2007, Citizens paid between $3.5 and $3.7 million in insurance claims-related legal expenses to lawyers who were retained without written contracts, who used "inconsistent billing practices," and who were chosen by Lisotta "based on the geographic location of the claims and on **social, professional, or commercial relationships** the firms had with him and/or Citizens' general counsel" (emphasis in the complaint).[FN7] The plaintiffs further submit that, even to the extent some defendants were not directly involved in this misconduct, each defendant was, at minimum, "in the position of being able to stop the actions of Lisotta ... but took no steps to do so."

> FN5. In establishing Citizens, the legislature did not provide for a staff, facilities, or other necessary services, and instead authorized the board of directors to hire personnel and enter into third-party service contracts as needed. In turn, Citizens hired PIAL on a cost-reimbursement basis as a "third party administrator" to provide staff, facilities, and other services. See La. R.S. 22:1430.6.

> FN6. PIAL collected $1,532,972 on December 31, 2004; $7,631,554 on December 31, 2005; and $11,607,305 on December 31, 2006.

> FN7. The plaintiffs also allege that, "[b]onuses totally $180,299 were paid by PIAL to senior management and other employees"; there is, however, no allegation that PIAL ever charged these bonuses to Citizens.

*3 With respect to the second category of misconduct, the plaintiffs claim that between approximately August 2005 and June 2007, Lisotta submitted fraudulent expense reports to both Citizens and PIAL and was reimbursed for thousands of dollars of business expenses that were unrelated to his duties as CEO. The plaintiffs charge that Lisotta: (1) charged $1,219.75 "to his LAIP credit card" in February 2004 for his wife's airfare to Bermuda, where Lisotta was conducting company business, and there is "no record of Mr. Lisotta reimbursing LAIP"; [FN8] (2) charged $1,716.56 on his LAIP credit card for hotel rooms during Mardi Gras in February 2005, and

submitted a separate expense report seeking cash reimbursement of $914.77 for a hotel room during the same time period; [FN9] (3) spent money on "expensive cigar purchases, other airline tickets for Mr. Lisotta's daughters, LSU football season tickets, an LSU parking pass, $1,723 for the purchase of 'golf merchandise,' purchase of golf games."[FN10] In total, the plaintiffs submit that "of Mr. Lisotta's expenditures examined, $25,702.00 appears to be expenses that Mr. Lisotta either did not incur, were personal in nature, or did not have a legitimate public purpose."

> FN8. The plaintiffs do not explain the connection between Lisotta's charging expenses to his "LAIP credit card" and the allegations at issue in this lawsuit. These allegations appear to be somewhat at odds with the plaintiffs' assertion elsewhere in the pleadings that Citizens "had no conceivable relationship with LAIP."If the latter is correct, the Court is at a loss to understand how Lisotta's charging rooms to LAIP (however wrongful) is relevant to the plaintiffs' theory that he defrauded Citizens.

> FN9. The complaint is silent as to whom the second expense report was submitted.

> FN10. Once again, the pleadings fail to specify whether these invoices were actually paid and, if so, whether they were paid by Citizens, PIAL, or, for that matter, charged to Lisotta's LAIP credit card.

Plaintiffs urge that this wrongdoing constitutes "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity,"see *Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 496 (1985), in violation of § 1962(c) of the RICO statute. Specifically, they contend that the defendants' acts amounted to mail fraud, wire fraud, and money laundering-each offense being a "predicate act" to satisfy the "racketeering activity" requirement of a civil RICO claim. The defendants now move to dismiss, because the plaintiffs lack standing and, further, have not sufficiently alleged the statutory elements of a RICO violation: namely, the existence of an "enterprise" or a "pattern of racketeering activity."

I.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

When evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1572 (5th Cir.1988).* The Court cannot dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff cannot prove a plausible set of facts in support of his claim which would entitle him to relief. *Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).*"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly, 127 S.Ct. at 1965* (internal citations omitted).

## II.

RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."Section 1962 contains RICO's criminal prohibitions. Pertinent here is § 1962(c), which makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."The term "racketeering activity" is defined to include a host of so-called predicate acts, including "any act which is indictable under ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ... section 1956 (relating to the laundering of monetary instruments),"*see*§ 1961(1)(B), which are the three predicate acts alleged in the plaintiffs' complaint.

*4 "The upshot," the Supreme Court recently wrote, "is that RICO provides a private right of action for treble damages to any person injured in his business or property *by reason of* the conduct of a qualifying enterprise's affairs through a pattern of acts" that are indictable as, among other things, mail fraud, wire fraud, or money laundering. *Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131, 2137-38 (2008)* (emphasis added). To establish that their harm was "by reason of" the RICO violation, plaintiffs must

show that the defendants' RICO violation proximately caused their injury. *Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992); Sedima, 473 U.S. 479, 496, (1985).* "Proximate causation" poses a set of questions to ask, rather than a formula that may be applied algorithmically. *Phoenix Bond & Indemnity Co. v. Bridge, 477 F.3d 928, 930 (7th. Cir.2007), citing Holmes, 503 U.S. at 268-70.* Courts have observed that such questions include, "[i]s someone else a distinctly better enforcer? Does the presence of intermediate parties make it too hard to calculate damages-or create a risk that recovery by this plaintiff will come at the expense of someone with a better claim? If so, then suit by the remotely injured person should not be allowed."*See id., aff'd, Bridge, 128 S.Ct. 2131.* Proximate causation requires a showing of "some direct relation between the injury asserted and the injurious conduct alleged." *Sedima, 473 U.S. at 496.* In *Holmes,* the Supreme Court applied the proximate cause requirement to preclude a RICO suit by a plaintiff whose injury was entirely contingent on the injury of direct victims. *Id.* at 271-74.[FN11]In *Anza v. Ideal Steel Supply Corp, 547 U.S. 451, 126 S.Ct. 1991 (2006),* the Supreme Court considered the district court's grant of a Rule 12 motion to dismiss in a case in which the RICO plaintiffs were business rivals of a group of retailers that allegedly cheated on their taxes. The theory of causation was that, by not paying sales taxes, defendants reduced their costs of doing business, and could cut their retail price commensurately; as a result, the defendants had an unfair advantage and took business (and profits) away from the plaintiffs. In holding that the plaintiffs lacked standing, the Court clarified that the *Holmes* proximate cause requirement not only bars RICO suits by derivative victims (those whose injuries are "purely contingent on the harm suffered by" direct victims), but generally precludes recovery by those whose injuries are only tenuously related to the RICO violation at issue. *126 S.Ct. at 1996.* Under *Anza,* courts must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff. *See id.* at 1996-98.If the violation is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking. The Court emphasized the reasons for the requirement that the plaintiff's harm directly result from the alleged RICO violation. *Id. (citing Holmes, 503 U.S. at 269-270).*

> FN11. The three policy rationales for the proximate cause requirement discussed by

the *Holmes* Court were: (i) "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors;" (ii) "quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries;" and (iii) "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."

*5 First, the Court noted "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action ."*Id.* The Court felt it significant that the attenuated causal chain between the defendant's tax fraud and the plaintiff's loss of sales was apparent. It noted the difficulty of determining whether the defendant's lower prices were in fact based on the defendant's fraudulent failure to pay sales tax, or whether other causes were present that determined the defendant's pricing. *Id.* The Court also pointed out that the plaintiffs' lost sales could have resulted from a host of factors other than a competitor's fraud. *Id.*

Second, and on a related note, the Court discussed "the speculative nature of the proceedings that would follow if [plaintiff] were permitted to maintain its claim."*Id.* at 1998.A court would have to determine the portion of plaintiff's damages resulting from the RICO violation, by evaluating the relative causal role of the defendant's fraud in lowering the defendant's prices, and the relative causal role of those lowered prices in diminishing plaintiff's sales-in effect, requiring a complex apportionment of fault among various causes. *Id.* The proximate causation requirement "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation."*Id.*

Finally, the Court felt it important to consider whether "the immediate victims of an alleged RICO violation can be expected to vindicate the laws by

pursuing their own claims."*Id.* Because a more immediate victim (the State of New York) could be expected to pursue its own remedies for the fraud practiced upon it by the defendant, the Court found "no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."

Under *Anza,* then, this Court's task is to determine whether the plaintiffs meet the high court's proximate cause expectations by examining "whether the alleged violation led directly to the [their] injuries."*Id.*[FN12] The RICO violation, according to the complaint, is the defendants' scheme to cause Citizens or PIAL to pay for services or expenses that were unnecessary, unjustified, or, in some cases, proscribed by state law,[FN13] which included violations of federal mail fraud, wire fraud, and money laundering statutes. The alleged injury is the plaintiffs' "increased insurance costs, failure to have their Citizens' insurance claims paid timely, conversion of funds and 'special benefits' received by defendants, but paid for out of Citizens' funds, and being cast as the surety for 989 million dollars in bonds which [plaintiffs] will have to pay for until 2027, [all] due to the wrongful acts of the defendants."

> FN12. At the motion to dismiss stage, the Court presumes that the "general allegations" in the complaint "embrace those specific facts ... necessary to support the claim." *Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 256 (1994).*Anza* itself, however, dealt with the adequacy of the proximate cause allegations, and the Court did not allow the RICO plaintiffs to continue with their case in an attempt to prove an entirely remote causal link. 126 S.Ct. at 1994.

> FN13. The complaint includes an allegation that Caryl Mathes, former chief operating officer of Citizens and "willing participant in the scheme," received $47,850 in severance pay, and that "[b]onuses, totally $180,299 were paid by PIAL to senior management and other employees," all in violation of the Louisiana Constitution. The Court notes that the pleadings provide no information about whether these payments were charged to Citizens. The plaintiffs also complain that defendants' breached fiduciary

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

duties under state law.

Applying the proximate cause analysis in *Anza,* the Court concludes that the plaintiffs have fallen into the remote-causal connection trap, and failed to allege their injury was proximately caused by defendants' RICO violations. To begin, the Court points out that the complaint provides very little factual information about the timing of the assessments and makes almost no attempt whatsoever to actually link these assessments to funding deficits that may have been caused by the defendants' misconduct. The drama of plaintiffs' charges is simply not enough. Their implicit theory of proximate cause is that, if the corporate dollars wasted by the defendants had instead been used to fund the FAIR and Costal Plans, Citizens would have been able to levy smaller assessments against the plaintiffs. But the allegations provide little information about when these charges occurred, how much they were, whether they were based on financial deficits that came into existence before or after the RICO violations.[FN14]

> FN14. By implication, the plaintiffs suggest that a regular assessment was levied against all non-Citizens insurers sometime prior to July 1, 2006, because on that date "Citizens levied a 15 percent 'market equalization charge' on its own policy holders." Under 1430:16(f), a market equalization charge is permitted only after a "regular assessment." Plaintiffs aver that the market equalization charge ended on June 30, 2007, and raised some "$30,375,000 for Citizens, yet Citizens still had to borrow $978,205,000 through bonds to cover its deficits"; Citizens secured the loan by "pledg[ing] the proceeds of future emergency assessments to repay bondholders." This suggests that the loan was taken after June 30, 2007. Earlier in the complaint, the plaintiffs represent that the sale of nearly $1 billion in bonds was "arranged for" in April 2006.

*6 As to the first *Anza* consideration, the asserted causal chain is patently attenuated. It would be nearly impossible to determine what effect, if any, the defendants' misconduct had on Citizens' decision to impose an assessment, or the amount, compared to a number of other possible factors. The most signifi-

cant catalyst for the assessment was, quite obviously, funding deficits brought about by insurance claims following Hurricanes Katrina and Rita. It strains reason to imagine that financial losses caused by the alleged acts of mail fraud, wire fraud, and money laundering-however blameworthy and disreputable-materially influenced Citizens' decision to take out a nearly $1 billion loan.[FN15] Likewise, it would be complex in the extreme to calculate whether the defendants' deeds affected FAIR or Coastal Plan premiums. These rates are primarily a consequence of the rates being charged by the industry at large (plus 10 percent).

> FN15. The Court also considers relevant the fact that Citizens' has no authority to unilaterally impose or set the amount of an emergency assessment. Rather, the board's power is subject to statutory oversight. La. R.S. 22:1430.16.E and H.

Second, the proceedings required to evaluate the plaintiffs' injury would be unacceptably speculative, as *Anza* instructs. As the complaint acknowledges, there exists very little, if any, documentation regarding some of Citizens' payments to PIAL, law firms, and others. But to determine whether the plaintiffs were injured, and by how much, the Court would first be required to determine, for example, how much of the alleged $3.5-$3.7 million in legal fees, the $20 million paid to PIAL between 2004 and 2007, the consultant's fees, and many of the other expenses were, in fact, fraudulent. This equates with limitless speculation and uncertainty.[FN16] The Court would also be faced with the possibility of having to consider what factors went into USAA's (or other non-Citizens insurers) decision to "recoup" regular assessments from their policyholders. And, finally, the Court would need to ultimately decide what portion of the costs incurred by plaintiffs could reasonably be attributed to the RICO violations, as opposed to other factors. This would be an "intricate, uncertain" inquiry of the type that the *Anza* Court assertively warned against. *Id.*

> FN16. Lack of clarity of the complaint also presents an obstacle to evaluating the plaintiffs' injury. In many cases, the complaint provides no information about whether the fraudulent costs were charged to Citizens or PIAL.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Given the substantial shortcomings of the complaint in meeting *Anza's* proximate cause requirements, the Court does not need to determine whether more immediate victims of the defendants' alleged RICO violations are likely to sue.[FN17] The Court does note, however, that a lawsuit brought by Citizens or PIAL against the alleged wrongdoers would present a much less difficult case for proximate causation. Although the plaintiffs' allegations are insufficient as a matter of law to continue with this lawsuit, it bears emphasizing that the defendants have not escaped condemnation. Michael Treadway, Linda Gentry, and Judith Sullivan are simply not the proper plaintiffs, and RICO is not the proper civil instrument, to redress these alleged acts of illegality.

> FN17. The likelihood of more direct victims bringing suit was not essential to a finding of no proximate cause in *Anza. See* 126 S.Ct. at 1998 (noting that "[t]he requirement of a direct causal connection is *especially* warranted where the immediate victim of an alleged RICO violation can be expected to vindicate the laws by pressing their own claims") (emphasis added).

Because the plaintiffs cannot show that their claimed injuries were proximately caused by the defendants' conduct, the plaintiffs lack statutory standing to pursue their federal RICO claims. The defendants' motion to dismiss is, therefore, GRANTED.[FN18]

> FN18. Because the Court agrees the plaintiffs lack standing, the defendants' other grounds for dismissal need not be considered.

E.D.La.,2008.
Treadway v. Lisotta
Slip Copy, 2008 WL 3850462 (E.D.La.), RICO Bus.Disp.Guide 11,542

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

C Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Ann C. WALSTROM, Plaintiff,
v.
CITY OF ALTOONA, Defendant.
Civil Action No. 3:2006-81.

Dec. 29, 2008.

West KeySummary
Limitation of Actions 241 ⚖➞58(1)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or De-
fense
            241k58 Liabilities Created by Statute
                241k58(1) k. In General. Most Cited
Cases

Limitation of Actions 241 ⚖➞118(1)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Re-
lation Back
            241k117 Proceedings Constituting Com-
mencement of Action
                241k118 In General
                    241k118(1) k. In General. Most
Cited Cases
Claims brought under the Rehabilitation Act by a
terminated police officer were time-barred. The offi-
cer's Rehabilitation Act claims rested on two separate
theories, one of which was viable before December 1,
1990, and one of which did not become viable until
October 29, 1992. This created difficulty in charac-
terizing the claims as arising under either the pre-
1992 Rehabilitation Act or under the post-1992 Re-
habilitation Act. Nevertheless, it was clear that the
officer's claims were time-barred regardless of
whether they were subject to the two-year statute of
limitations or the four-year statute of limitations. Lit-
tle less than seven years elapsed between the date of
the officer's discharge and the commencement of the

instant action. Moreover, neither the two or four year
statute of limitations was tolled by the filing of a
praecipe. Rehabilitation Act of 1973, § 504(a), 29
U.S.C.A. § 794(a); 42 Pa.C.S.A. § 5524; 28 U.S.C.A.
§ 1658(a).

Joseph H. Chivers, Pittsburgh, PA, for Plaintiff.

Brian P. Gabriel, Robert E. Durrant, Campbell, Dur-
rant, Beatty, Palombo & Miller, P.C., Pittsburgh, PA,
for Defendant.

*MEMORANDUM OPINION and ORDER OF
COURT*

GIBSON, District Judge.

I. SYNOPSIS

*1 This matter comes before the Court on a Motion
for Summary Judgment (Document No. 28) filed by
the Defendant pursuant to Federal Rule of Civil Pro-
cedure 56. For the reasons that follow, this motion
will be granted in its entirety.

II. BACKGROUND

The City of Altoona ("Altoona"), the Defendant in
this case, is a municipality created and maintained
under the laws of Pennsylvania. Document No. 41, p.
2, ¶ 4. Plaintiff Ann C. Walstrom ("Walstrom") be-
came a secretary for the Altoona Police Department
("APD") in 1982. *Id.,* p. 3, ¶ 5. In 1992, by resolution
of the Altoona City Council, Walstrom was hired as a
police officer for Altoona.*Id.,* ¶ 6. In that capacity,
she was a member of both the Patrol Division and the
Collective Bargaining Unit. *Id.,* ¶ 7.

In November 1997, during a work-related training
class, Walstrom sustained a torn ligament in her right
elbow. *Id.,* ¶ 8. While being treated for her injury,
Walstrom received worker's compensation benefits.
*Id.,* pp. 3-4, ¶ 9. She did not return to work until Jan-
uary 5, 1999. *Id.,* p. 4, ¶ 10.Prior to her return, Wal-
strom was informed by Captain Janice Freehling
("Freehling") that she would have to participate in a
two-week re-acclimation program.*Id.,* ¶ 11.Walstrom

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 2

apparently believed that, after the re-acclimation program, she would be scheduled to work on the first shift, which was a daylight shift. *Id.,* ¶ 12.

Lieutenant John Carnicella ("Carnicella") was responsible for scheduling officers to work shifts for the Patrol Division. *Id.,* pp. 4-5, ¶ 13.Carnicella did not have oral communications with Walstrom prior to her return, since he had been told that Freehling was responsible for all correspondence with Walstrom. *Id.,* p. 5, ¶ 14.Nevertheless, in a memorandum dated December 17, 1998, Carnicella informed Walstrom that she would be assigned to a field training program upon her return to work. Document No. 40-2, p. 74. Because she was just returning from an extended leave, Walstrom was placed with a field training officer. Document No. 41, p. 5, ¶ 16. This arrangement was designed to help Walstrom become reacquainted with her duties. *Id.,* pp. 5-6, ¶ 17.

Around that same time, Carnicella realized that he needed someone to fill an evening shift at the Fairview Hills housing project. *Id.,* p. 6, ¶ 18.Carnicella typically filled such evening shifts at Fairview Hills with officers who had just completed their training programs, assigning them for periods of approximately three months. *Id.,* ¶ 19.Although he realized that an assignment to work at Fairview Hills was less than ideal for many officers, Carnicella did not consider such an assignment to be demeaning. *Id.,* pp. 6-7, ¶¶ 20-21.Carnicella believed that assigning Walstrom to patrol at Fairview Hills was a good idea, since she had worked there for three months on a prior occasion and was not yet acclimated to a particular shift. *Id.,* p. 7, ¶¶ 22-24.Carnicella anticipated that Walstrom's assignment would last for approximately three months. *Id.,* ¶ 24.

*2 Walstrom and her husband had apparently told Freehling that Walstrom needed to work a daylight shift in order to fulfill the needs of their children. *Id.,* pp. 8-9, ¶¶ 27-28.Upon her return to work on January 5, 1999, Walstrom rode with a field training officer for approximately six hours.*Id.,* p. 9, ¶ 30.At some point during the shift, Walstrom received a letter from Carnicella indicating that, as of January 19, 1999, she would be transferred to the evening shift at Fairview Hills.[FN1]*Id.,* ¶ 31.Walstrom was surprised to learn of this assignment, since she had been under the impression that she would be working a day shift after the completion of her training. *Id.,* pp. 9-10, ¶

32.After learning of her impending assignment, Walstrom became emotionally distraught. *Id.,* p. 10, ¶ 33.She left work in tears. *Id.,* p. 11, ¶ 37.Although the assignment was clearly not embraced by Walstrom, it did not constitute a demotion. *Id.,* p. 10, ¶ 34.Her job description, pay and rank all remained the same. *Id.,* ¶ 35.Despite her frustration, Walstrom did not attempt to contact Freehling about the assignment. *Id.,* pp. 10-11, ¶ 36.

> FN1. The record contains a memorandum dated December 23, 1998, from Carnicella to Walstrom. Document No. 40-2, p. 75. Walstrom's assignment to Fairview Hills is described in that memorandum. *Id.* Walstrom apparently did not receive the memorandum until her return to work on January 5, 1999.

Walstrom subsequently sought medical treatment from both her family physician and a psychiatrist. *Id.,* p. 11, ¶ 38.She indicated that she was unable to return to her job as a police officer. *Id.,* ¶ 39.Her husband, James Walstrom ("James"), began to deal with Altoona on her behalf. *Id.,* p. 12, ¶ 41.As a supervisory narcotics agent for the Pennsylvania Office of Attorney General, James typically interacted with the Deputy Chief of the APD on a daily basis. *Id.,* ¶ 42.The day after Walstrom left work, James informed Carnicella and Freehling by telephone that Walstrom was unable to work and under a doctor's care. *Id.,* ¶ 43.In late January 1999, James told Chief John F. Treese ("Treese") that Walstrom was upset about both the Fairview Hills assignment and being passed over for promotion. *Id.,* pp. 12-13, ¶ 44.

In a memorandum dated March 22, 1999, Treese informed Walstrom that her last day of sick leave would be exhausted as of March 27, 1999, and that the following two days were her "relief days." Document No. 40-3, p. 69. Walstrom was instructed to contact Treese or Freehling about her intentions as of March 30, 1999. *Id.* After receiving the memorandum, James contacted Freehling and explained that Walstrom was unable to return to her duties as a police officer. Document No. 41, p. 13, ¶ 46. Although James and Freehling spoke about worker's compensation benefits, no claim was filed on Walstrom's behalf. *Id.,* ¶ 47.Freehling told James that Walstrom would begin to use her paid leave time.*Id.,* pp. 13-14, ¶ 48.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 3

On April 26, 1999, Freehling sent Walstrom a memorandum stating that her last day of paid leave would be April 30, 1999. Document No. 40-3, p. 70. Walstrom was advised that she should contact either Freehling or Michael Eggert ("Eggert"), the Personnel Director, about her intentions for the future. *Id.* Altoona apparently received no response from Walstrom. In a letter dated May 12, 1999, Eggert informed Walstrom that her employment with the APD would be terminated as of May 21, 1999, unless she could provide an adequate written justification for the continuation of her employment. Document No. 40-5, p. 14. The letter indicated that Walstrom's position could not remain open indefinitely. *Id.* Walstrom's attorney responded on May 20, 1999, by forwarding to Eggert a previous letter from Dr. James P. Mahan ("Dr.Mahan") to Dr. Brett Scharf ("Dr.Scharf") dated February 2, 1999. *Id.,* pp. 15-17.The letter from Walstrom's attorney specifically stated that the letter from Dr. Mahan was being offered "in support of a request for disability retirement," and that Walstrom was "unable to return to duty." *Id.,* p. 5. The attached letter from Dr. Mahan to Dr. Scharf indicated that Walstrom was suffering from "an adjustment disorder with depressed mood and anxiety," and that her problems with the APD were "probably the cause of her depressed mood."*Id.,* p. 16.Walstrom was apparently being treated with Zoloft, which is an antidepressant. *Id.*

*3 James Weakland ("Weakland"), Altoona's City Manager, gave Eggert authorization to send Walstrom a termination letter. Document No. 41, p. 17, ¶ 59. In a letter dated May 24, 1999, Eggert informed Walstrom that her employment with the APD had been terminated as of May 21, 1999. Document No. 40-5, p. 18. Eggert's letter stated that the previous letter from Walstrom's attorney, along with the attached letter from Dr. Mahan to Dr. Scharf, was being forwarded to the Police Retirement Board so that Walstrom's request for a "disability retirement" could be acted upon. *Id.* The letter expressed regret that Walstrom's "medical status" had made it "impossible" for her to continue working as a police officer. *Id.*

At the time of Walstrom's termination, the collective bargaining agreement ("CBA") which governed the terms of her employment with the APD provided for a four-step grievance process. Document No. 41, p.

19, ¶ 65. No grievance was filed by Walstrom concerning the termination of her employment. *Id.,* ¶ 66.The matter was never appealed to the Civil Service Commission. *Id.,* pp. 19-20, ¶ 67.Walstrom never applied for disability benefits under Titles II and XVI of the Social Security Act [42 U.S.C. §§ 401-433 and 1381-1383(f) ].*Id.,* p. 20, ¶ 69.Since her discharge, Walstrom has not sought employment. *Id.,* p. 27, ¶ 97.She continues to receive treatment from a psychologist for mental ailments which she believes to have been caused by her termination. *Id.,* pp. 26-27, ¶ 94.She has a prescription for Celexa and sometimes takes a "sleeping pill." *Id.,* p. 27, ¶ 96.Walstrom is unsure as to whether she will seek future employment as a police officer.*Id.,* ¶ 95.

On January 4, 2001, Walstrom filed a praecipe for a writ of summons against Altoona and Treese in the Pennsylvania Court of Common Pleas of Blair County. Document No. 40-8. On February 2, 2001, Walstrom filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") pursuant to 43 PA. STAT. § 959, alleging that she had been illegally discharged on the basis of her gender and disability. Document No. 31-11, pp. 3-25. She also alleged that, in 1997, Treese had denied her a promotion to a corporal or detective position with the APD's Criminal Investigation Division because of her gender. *Id.,* p. 25.Walstrom further indicated that she had first learned of Treese's reason for not promoting her in August 2000 when a retired APD official told her that Treese believed that women had no place in law enforcement and were undeserving of promotions.[FN2]*Id.,* pp. 12, 25.On May 17, 2001, Walstrom filed an amended complaint with the PHRC. *Id.,* pp. 26-29.Among other things, Walstrom alleged that several male officers had been off duty for several years because of work-related injuries, and that they had not been terminated.*Id.,* p. 28.The amended complaint was dual-filed as a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. §§ 2000e-5(b) and 12117(a).*Id.,* p. 29.

> FN2. In her brief, Walstrom indicates that the retired APD official referenced in her complaint to the PHRC was Carnicella, and that the information concerning the alleged reason for Treese's failure to promote Walstrom (*i.e.,* her sex) was relayed to James by Carnicella on August 25, 2000. Document

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 4

No. 40, p. 13.

*4 In a letter dated June 1, 2005, the PHRC dis-
missed Walstrom's complaint on the ground that
probable cause did not exist to credit her allegations
of unlawful discrimination. Document No. 31-12, p.
2. Although Walstrom objected to the dismissal of
her complaint, she has apparently never received a
formal dismissal of that objection from either the
PHRC or the EEOC. Document No. 41, p. 21, ¶ 74.
On April 7, 2006, Walstrom commenced this action
against Altoona, alleging violations of the Due Proc-
ess Clause of the Fourteenth Amendment to the
United States Constitution, the Rehabilitation Act [29
U.S.C. § 701 et seq.], and the Pennsylvania Human
Relations Act ("PHRA") [43 PA. STAT. § 951 et
seq.]. Document No. 1. Her Fourteenth Amendment
claim was brought pursuant to 42 U.S.C. § 1983. Id.
Altoona filed a Motion for Summary Judgment on
February 4, 2008. Document No. 28. That motion is
the subject of this Memorandum Opinion.

III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when it is
demonstrated that there is no genuine issue as to
any material fact and the moving party is entitled to
judgment as a matter of law. Celotex Corp. v. Ca-
trett, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-
57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P.
56(c). An issue of material fact is genuine "if the
evidence is such that a reasonable jury could return
a verdict for the nonmoving party." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct.
2505, 2510, 91 L.Ed.2d 202, 211-212 (1986). In
deciding a motion for summary judgment, all rea-
sonable inferences must be drawn in favor of the
non-movant. Oritani [Sav. and Loan Ass'n v. Fidel-
ity and Deposit Co., 989 F.2d 635, 638 (3d
Cir.1993) ].
Troy Chemical Corp. v. Teamsters Union Local No.
408, 37 F.3d 123, 125-126 (3d Cir.1994).

As to materiality, the substantive law will identify
which facts are material. Only disputes over facts
that might affect the outcome of the suit under the
governing law will properly preclude the entry of
summary judgment. Factual disputes that are ir-
relevant or unnecessary will not be counted. See
generally 10A C. Wright, A. Miller, & M. Kane,
Federal Practice and Procedure § 2725, pp. 93-95

(1983). This materiality inquiry is independent of
and separate from the question of the incorporation
of the evidentiary standard into the summary
judgment determination. That is, while the materi-
ality determination rests on the substantive law, it
is the substantive law's identification of which facts
are critical and which facts are irrelevant that gov-
erns. Any proof or evidentiary requirements im-
posed by the substantive law are not germane to
this inquiry, since materiality is only a criterion for
categorizing factual disputes in their relation to the
legal elements of the claim and not a criterion for
evaluating the evidentiary underpinnings of those
disputes.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,
106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

IV. JURISDICTION AND VENUE

*5 The Court has jurisdiction over Walstrom's federal
claims pursuant to 28 U.S.C. § 1331 and supplemen-
tal jurisdiction over her state claims pursuant to 28
U.S.C. § 1367(a). Venue is proper under 28 U.S.C. §
1391(b).

V. DISCUSSION

Although Walstrom initially asserted a claim against
Altoona under § 1983 for an alleged violation of the
Due Process Clause of the Fourteenth Amendment,
she now stipulates to the dismissal of that claim.
Document No. 40, p. 15. Consequently, the Court
will grant Altoona's Motion for Summary Judgment
as to that claim without further inquiry. The only
remaining claims before the Court arise under the
Rehabilitation Act and the PHRA. Walstrom's claims
for disability-based discrimination arise under both
the Rehabilitation Act and the PHRA, while her
claims for sex-based discrimination arise solely under
the PHRA. Document No. 1, ¶¶ 37-46, 56-59. Be-
cause of the procedural history of this case, however,
the Court need not address the merits of Walstrom's
claims. It is clear that all of her claims are barred by
the applicable statutes of limitations.

A. The Rehabilitation Act Claims

Walstrom's federal claims arise under § 504 of the
Rehabilitation Act, the present version of which is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 5

codified at 29 U.S.C. § 794(a). The applicable statutory provision provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"29 U.S.C. § 794(a).[FN1] Altoona does not dispute that its operations constitute a "program or activity" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(b). The plain language of the Rehabilitation Act makes the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964 ("Title VI") [29 U.S.C. § 2000d et seq.] available to those whose rights under § 794(a) are violated. 29 U.S.C. § 794(a)(2). Title VI provides for the termination of a covered entity's federal funding if that entity engages in prohibited forms of discrimination based on race, color, or national origin. 42 U.S.C. § 2000d-l. Although Title VI contains no express private right of action, the United States Supreme Court has construed it to contain an implied private right of action. Barnes v. Gorman, 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Because Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, individuals have a private right of action under § 794(a). Three Rivers Center for Independent Living, Inc. v. Housing Authority of Pittsburgh, 382 F.3d 412, 425-426 (3d Cir.2004).

> FN3. The standards used for determining whether an employer has violated § 794(a) are the same as the standards used for determining whether an employer has violated Title I of the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12111 et seq.].29 U.S.C. § 794(d). On September 25, 2008, President George W. Bush signed the ADA Amendments Act of 2008 into law. Pub.L, No. 110-325; 122 Stat. 3553 (2008). This legislation, which takes effect on January 1, 2009, amended the ADA'S definition of the term "qualified individual with a disability" in order to extend the ADA's protections to a broader class of individuals. Id., § 4. This new standard will apply to cases brought under the Rehabilitation Act. Id., § 7. By enacting this legislation, Congress has clearly expressed its intent to repudiate the Supreme Court's decisions in Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).Id., ¶ 2. Nevertheless, there is nothing in the statutory language which suggests that this new legislation should be applied retroactively. Since the alleged discrimination at issue in this case occurred between 1997 and 1999, the general presumption that legislation is to be applied only prospectively would most likely defeat any argument to the effect that the newly enacted statute should be applied in this case. Ward v. Allied Van Lines, Inc., 231 F.3d 135, 141-142 (4th Cir.2000). The Court need not resolve that issue, however, since the merits of Walstrom's claims will not be considered.

The Rehabilitation Act, which was originally enacted in 1973, does not contain its own statute of limitations. Consequently, the Court must "borrow" the most analogous statute of limitations available under Pennsylvania law. North Star Steel Company v. Thomas, 515 U.S. 29, 33-34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995). In Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority, 539 F.3d 199, 208 (3d Cir.2008), the United States Court of Appeals for the Third Circuit held that the applicable statute of limitations in Pennsylvania for claims arising under § 794(a) is the two-year statute of limitations for personal injury actions, which is codified at 42 PA. CONS.STAT. § 5524.[FN4]Therefore, to the extent that discrimination of the kind alleged by Walstrom was actionable under the Rehabilitation Act prior to December 1, 1990, the Court will apply Pennsylvania's two-year statute of limitations.

> FN4. Subsection 2 establishes a two-year statute of limitations for actions "to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another."42 PA. CONS.STAT. § 5524(2). Subsection 7 likewise establishes a two-year statute of limitations for other actions or proceedings "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct"42 PA.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

CONS.STAT. § 5524(7).

*6 In order to mitigate the confusion caused by the borrowing of state statutes of limitations, Congress enacted a four-year default statute of limitations for federal causes of action arising under statutes enacted after December 1, 1990.[FN5]Pub.L. No. 101-650, § 313, 104 Stat. 5089, 5114-5115 (1990). This default statute of limitations is codified at 28 U.S.C. § 1658(a). In Jones v. R.R. Donnelley & Sons Company, 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Supreme Court held that a cause of action is governed by § 1658(a)'s four-year statute of limitations if it was made possible by an amendment enacted subsequent to December 1, 1990, even if the original statute had been enacted prior to that date. Speaking through Justice Stevens, the Supreme Court explained:

> FN5. The statutory language provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues." 28U.S.C. § 1658(a). The phrase "[e]xcept as otherwise provided by law" limits the default statute of limitations not only to those causes of action arising under federal statutes enacted after December 1, 1990, but also to those for which no express statutes of limitations are specifically created. Consequently, the default statute of limitations does not apply where Congress specifically codifies a specific statute of limitations for a particular cause of action.

Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code. An amendment to an existing statute is no less an "Act of Congress" than a new, stand-alone statute. What matters is the substantive effect of an enactment-the creation of new rights of action and corresponding liabilities-not the format in which it appears in the Code.

Jones, 541 U.S. at 38. The Supreme Court's decision in Jones abrogated the contrary decision of the United States Court of Appeals for the Third Circuit in Zubi v. AT & T Corp., 219 F.3d 220 (3d Cir.2000). Couch v. Jabe, 479 F.Supp.2d 569, 576-577 (W.D.Va.2006) (recognizing that the Supreme Court, in Jones, had expressly rejected the holding in Zubi ).

The Rehabilitation Act was originally enacted in 1973. Pub.L.No. 93-112; 87 Stat. 355 (1973). Thus, the general prohibition against disability-based discrimination on the part of recipients of federal financial assistance was in effect long before December 1, 1990. This proscription made it unlawful for a covered recipient to discharge an individual because of his or her disability. Tuck v. HCA Health Services of Tennessee, Inc., 842 F.Supp. 988, 989-994 (M.D.Tenn.1992). Covered employers were required to make "reasonable accommodations" for the limitations of disabled employees. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1383 (3d Cir.1991). Nevertheless, the Rehabilitation Act did not require a covered employer to transfer a disabled employee to a vacant position where necessary to accommodate his or her disability. School Board of Nassau County v. Arline, 480 U.S. 273, 289, n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) ("Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.") (emphasis added). Under the pre-1992 Rehabilitation Act, covered employers were merely precluded from denying disabled employees alternative positions for which they would have qualified under their employers' existing policies. Fedro v. Reno, 21 F.3d 1391, 1395-1397 (7th Cir.1994); Guillot v. Garrett, 970 F.2d 1320, 1326-1327 (4th Cir.1992).

*7 On July 26, 1990, President George H.W. Bush signed the Americans with Disabilities Act ("ADA") into law. Pub.L. No. 101-336; 104 Stat. 327 (1990). Title I of the ADA, which proscribes disability-based discrimination in the employment context, became effective on July 26, 1992. Pub.L.No. 101-336, § 108; 104 Stat. 327, 337 (1990) ("This title shall become effective 24 months after the date of enactment."). The substantive provision of Title I, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of em-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
**(Cite as: 2008 WL 5411091 (W.D.Pa.))**

Page 7

ployees, employee compensation, job training, and other terms, conditions, and privileges of employment."42 U.S.C. § 12112(a). Title I also provides rules of construction describing the meaning of the word "discriminate." The relevant statutory language provides:

**(b) Construction.**As used in subsection (a), the term "discriminate" includes-

* * *

(5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5)(A)-(B). These rules of construction make it clear that a covered employer's failure to make "reasonable accommodations" for the benefit of a disabled employee constitutes unlawful "discrimination" under the ADA.

The term "reasonable accommodation" is defined in 42 U.S.C. § 12111(9), which provides:

(9) Reasonable accommodation. The term "reasonable accommodation" may include-

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabili-

ties.

42 U.S.C. § 12111(9). Because § 12111(9)(B) includes "reassignment to a vacant position" within the definition of "reasonable accommodation," and because a covered employer's failure to make a "reasonable accommodation" for a disabled employee constitutes "discrimination" under Title I, an employer's failure to transfer a disabled employee to a vacant position (where necessary to accommodate his or her disability) constitutes a violation of Title I.

**\*8** Shortly after Title I went into effect, Congress amended the Rehabilitation Act in order to incorporate the ADA's substantive standards for determining whether a covered employer has engaged in illegal "discrimination." Pub.L. No. 102-569, § 506; 106 Stat. 4344, 4428 (1992). This conforming amendment, which is codified at 29 U.S.C. § 794(d), was signed into law by President George H.W. Bush on October 29, 1992. 28 Weekly Comp. Pres. Doc. 2198 (Oct. 29, 1992). Since that date, the standards for determining whether a covered employer has violated § 794(a) have been coextensive with the standards for determining whether a covered employer has violated Title I.[FN6]29 U.S.C. § 794(d). Consequently, employers covered under § 794(a) are now required to transfer disabled employees to vacant positions where necessary to accommodate their disabilities, provided that such transfers do not impose "undue hardships" on the operations of such employers. 42 U.S.C. § 12112(b)(5)(A).

> FN6. Title I of the ADA is Commerce Clause legislation which limits the actions of "employers." Title I defines the term "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person...."42 U.S.C. § 12111(5)(A).Section 794(a) of the Rehabilitation Act is Spending Clause legislation which limits the actions of certain recipients of federal financial assistance. 29 U.S.C. § 794(a)-(b). The substantive provisions contained in Title I and § 794(a) are not redundant, since some entities are covered by only one of the two statutes.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 8

In _Shiring v. Runyon_, 90 F.3d 827, 831-832 (3d Cir.1996), the United States Court of Appeals for the Third Circuit explicitly recognized § 794(d) as the statutory provision requiring an employer covered under § 794(a) to transfer a disabled employee to a vacant position where necessary to accommodate his or her disability. Section 794(d), of course, was not enacted until October 29, 1992. Prior to that date, an employer's failure to transfer a disabled employee was not actionable under the Rehabilitation Act. _Bratten v. SSI Services, Inc._, 185 F.3d 625, 633 (6th Cir.1999) ("Prior to 1992, the Rehabilitation Act did not include reassignment to a vacant position as a reasonable accommodation."); _Gile v. United Airlines_, 95 F.3d 492, 496-497 (7th Cir.1996) ("Until recently, the Rehabilitation Act and its regulations did not include reassignment to a vacant position within the list of potential reasonable accommodations."). Since "failure to transfer" claims under the Rehabilitation Act can be brought solely because of a statutory amendment enacted after December 1, 1990, they are subject to the four-year statute of limitations prescribed by § 1658(a) rather than the two-year statute of limitations prescribed by § 5524.[FN7] _Jones_, 541 U.S. at 382. This conclusion is consistent with the Court's analysis in _Chedwick v. UPMC_, Civil Action No. 07-806, 2007 WL 4390327, at *7-13, 2007 U.S. Dist. LEXIS 91181, *21-42 (W.D.Pa. December 12, 2007), which addressed this same issue.

> FN7. The Court acknowledges that, even before 1992, "failure to transfer" claims were viable under the Rehabilitation Act in circumstances where employers had denied disabled employees "alternative employment opportunities reasonably available under the employee[s'] existing policies." _School Board of Nassau County v. Arline_, 480 U.S. 273, 289, n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Nonetheless, the Court does not understand Walstrom's "failure to transfer" argument to be premised on the theory that, because she was disabled, Walstrom was denied a transfer that a nondisabled employee would have received. Instead, the Court understands Walstrom to argue that Altoona "discriminated" against her by not providing her with the "reasonable accommodation" of a "transfer to a vacant position." "Failure to transfer" claims of the kind asserted by Walstrom did not become actionable under the Rehabilitation

Act until the enactment of § 794(d) in 1992.

In her Complaint, Walstrom asserts that Altoona would not have endured an "undue hardship" had it accommodated her "either in her prior position or in another available position."Document No. 1, ¶ 42. Thus, it appears that her Rehabilitation Act claims rest on two separate theories, one of which was viable before December 1, 1990, and one of which did not become viable until October 29, 1992. The difficulty in characterizing Walstrom's claims as arising under either the pre-1992 Rehabilitation Act or under the post-1992 Rehabilitation Act illustrates how complex the analysis required under _Jones_ can be. Nevertheless, it is clear that Walstrom's claims are time-barred regardless of whether they are subject to the two-year statute of limitations prescribed by § 5524 or the four-year statute of limitations prescribed by § 1658(a). The Court will explain why that is the case, beginning with § 5524 and ending with § 1658(a).

*9 It is undisputed that Walstrom learned of her discharge on May 24, 1999. Document No. 40-5, p. 18. This action was not commenced until April 7, 2006. DocumentNo. 1. Consequently, a little less than seven years elapsed between the date of Walstrom's discharge and the commencement of this action. Given the long lapse of time between the challenged action and the filing of Walstrom's Complaint, the dispute as to which statute of limitations applies in this case would, at first glance, appear to be purely academic. Nonetheless, Walstrom contends that she tolled the applicable statute of limitations on January 4, 2001, when she filed a praecipe for a writ of summons in the Pennsylvania Court of Common Pleas of Blair County. Document No. 40, pp. 12-13. The praecipe, of course, named both Altoona and Treese as defendants. Document No. 40-8, p. 1. The question for consideration is whether the statute of limitations applicable to this action was tolled by the filing of the praecipe. The Supreme Court has recognized that the "borrowing" of a State's statute of limitations necessarily entails the incorporation of that State's tolling rules. _Hardin v. Straub_, 490 U.S. 536, 538-544, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989). Therefore, the question of which statute of limitations applies in this case matters not because of the duration of the applicable limitations period, but rather because of the tolling rules that must be applied in this situation. Since the Court understands Walstrom's Rehabilita-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion Act claims to rest on two different theories (one of which would render her claims subject to Pennsylvania's tolling rules and the other of which would render her claims subject to federal tolling rules), the Court will evaluate the issue of tolling from both perspectives.

The first issue for consideration is whether the filing of the praecipe tolled the two-year statute of limitations prescribed by § 5524, to the extent that Walstrom's claims are based on conduct by Altoona that would have been actionable under the Rehabilitation Act prior to October 29, 1992. This issue is very similar to that faced by the Court in *Baranowski v. Waters*, Civil Action No. 05-1379, 2008 WL 728366, at *7-12, 2008 U.S. Dist. LEXIS 21301, at *10-40 (W.D.Pa. March 18, 2008).[FN8] In accordance with that decision, the Court holds that the filing of the praecipe did not toll § 5524's two-year statute of limitations, and that Walstrom's Rehabilitation Act claims are time-barred to the extent that they are based on conduct that would have been actionable prior to the enactment of § 794(d) in 1992. The Court will briefly explain the basis for this holding.

> FN8. The portion of the opinion in *Baranowski* addressing the application of the statute of limitations was subsequently vacated by the Court, which ultimately determined that the defendants in that case had waived their statute of limitations defense with respect to the issue of tolling. *Baranowski v. Waters*, Civil Action No. 05-1379, 2008 WL 4000406, at *6-16, 2008 U.S. Dist. LEXIS 64802, at *16-51 (W.D.Pa. August 25, 2008). Aside from the issue of waiver, however, this vacatur did not impugn the Court's earlier rationale concerning the application of the statute of limitations. *Id.*

In order to determine whether the filing of the praecipe tolled Pennsylvania's two-year statute of limitations, the Court must look to Pennsylvania law. *Callwood v. Questel*, 883 F.2d 272, 274-275 (3d Cir.1987). Under Pennsylvania Rule of Civil Procedure 1007, the filing of a praecipe constitutes the commencement of a civil action. *Pa. R. Civ. P. 1007.* Hence, when Walstrom filed her praecipe in the Court of Common Pleas, she commenced an action against Altoona and Treese. It is undisputed that the

praecipe was filed within the two-year limitations period. If *that* action had been pursued by Walstrom and subsequently removed to this Court by Altoona pursuant to 28 U.S.C. § 1441, there would be no statute of limitations problem. *Heater v. Kidspeace*, Civil Action No. 05-4545, 2005 WL 2456008, at *2, 2005 U.S. Dist. LEXIS 22512, at *5 (E.D.Pa. October 5, 2005). The question presented in this case, however, is whether the filing of a distinct action in a Pennsylvania court tolled the statute of limitations applicable to this action.

**\*10** The Court's analysis must begin with the statutory language governing this situation. Like many jurisdictions, Pennsylvania has codified rules governing the effect that the commencement of one action has on the statute of limitations applicable to a related action that is commenced at a later time. Pennsylvania's "savings statute," which is codified at 42 PA. CONS.STAT. § 5535(a), provides:

**§ 5535. Effect of other actions and proceedings**

**(a) Termination of prior matter.-**

(1) If a civil action or proceeding is timely commenced and is terminated, a party, or his successor in interest, may, notwithstanding any other provision of this subchapter, commence a new action or proceeding upon the same cause of action within one year after the termination and any other party may interpose any defense or claim which might have been interposed in the original action or proceeding.

(2) Paragraph (1) does not apply to:

(i) An action to recover damages for injury to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

(ii) An action or proceeding terminated by a voluntary nonsuit, a discontinuance, a dismissal for neglect to prosecute the action or proceeding, or a final judgment upon the merits.

42 PA. CONS.STAT. § 5535(a). As the United States Court of Appeals for the Third Circuit recently observed in *Jewelcor, Inc. v. Karfunkel*, 517 F.3d 672,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

675 (3d Cir.2008), the Pennsylvania courts have consistently held that § 5535(a)(l)'s savings provision applies only where a civil action is first commenced in a Pennsylvania court (and subsequently terminated), and that the commencement of an action in a federal court does not toll the running of the limitations period applicable to an action subsequently filed in a Pennsylvania court. *Ravitch v. Price Waterhouse, 793 A.2d 939, 942 (Pa.Super.Ct.2002); Maxwell Downs v. City of Philadelphia, 162 Pa.Cmwlth. 300, 638 A.2d 473, 476 (Pa.Commw.Ct.1994)*. The decisions rendered by both federal courts and Pennsylvania courts also indicate that the commencement of an action in a Pennsylvania court does not toll the statute of limitations applicable to a subsequent action commenced in a federal court. *Ravitch,* 793 A.2d 942.In *Stinson v. Kaiser Gypsum Company, Inc., 972 F.2d 59 (3d Cir.1992),* the United States Court of Appeals for the Third Circuit explained:

> While a timely filed complaint or praecipe for writ of summons satisfies the statute of limitations under Pennsylvania law as far as *that action* is concerned, the Pennsylvania rule as to new actions is the same as the generally accepted rule. If a timely filed action is dismissed after the limitations period measured from the accrual of the claim, has run, *a new action* on the same claim is time barred unless a limitations savings statute provides otherwise.

*Stinson,* 972 F.2d at 62 (emphasis added). It is clear from the language used by the Court of Appeals in *Stinson* that Pennsylvania's statute of limitations principles (and related tolling principles) operate with respect to a specific *action.*Pennsylvania law recognizes a distinction between the action commenced by Walstrom in the Court of Common Pleas and the action commenced by Walstrom in this Court. The general rule is that "[t]he running of a Pennsylvania statute of limitations against a federal cause of action is not tolled under Pennsylvania concepts of tolling by the commencement of a similar suit in state court." *Ammlung v. City of Chester,* 494 F.2d 811, 816 (3d Cir.1974).

*11 Whether that general rule bars Walstrom's Rehabilitation Act claims in this case depends on whether such claims are "saved" by § 5535(a)(1). For the same reasons identified by the Court in *Baranowski,*§ 5535(a)(1) does not "save" Walstrom's Rehabilitation Act claims. First of all, the plain language of § 5535(a)(1) indicates that a prior civil action must be

both "timely commenced" and "terminated" in order for the savings provision to be operative. 42 PA. CONS.STAT. § 5535(a)(1). There is no indication from the parties that the action commenced in the Court of Common Pleas has been terminated. As far as the Court can tell, it is still pending as of today. Consequently, Walstrom "has failed to satisfy a statutory prerequisite for the otherwise untimely commencement of a new action (*i.e.,* the termination of the previous action)." *Baranowski,* 2008 WL 728366, at *10, 2008 U.S. Dist. LEXIS 21301, at *32.

The exceptions to the savings statute, which can be found in § 5535(a)(2), further confirm that § 5535(a)(1) does not "save" Walstrom's Rehabilitation Act claims.[FN9]Even if the Court is incorrect in its assumption that Walstrom's prior suit was never "terminated" within the meaning of § 5535(a)(1), § 5535(a)(2) (h) excludes from the savings provision an "action or proceeding" dismissed "for neglect to prosecute the action or proceeding...."42 PA. CONS.STAT. § 5535(a)(2)(ii). In her brief, Walstrom implicitly concedes that she never filed a complaint in the Court of Common Pleas. Document No. 40, pp. 12-13. She evidently abandoned her first action in order to pursue this one. The language of § 5535(a)(2)(ii), however, evinces a legislative intent to preclude a plaintiff from pursuing an untimely-filed action after having failed to pursue a timely-filed action. Since Walstrom has apparently failed to prosecute her action in the Court of Common Pleas, she cannot reap the benefits of the savings statute. *Baranowski,* 2008 WL 728366, at *11, 2008 U.S. Dist. LEXIS21301, at *36-37.

> FN9. Subsection (b) provides that "[w]here the commencement of a civil action or proceeding has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action or proceeding must be commenced."42 PA. CONS.STAT. § 5535(b). Since there was no stay which interfered with Walstrom's ability to bring this action, Subsection (b) is inapplicable to this case. The same is true of Subsection (c), which provides for tolling during the period of time between a demand for arbitration and a subsequent determination by a court that no obligation to arbitrate exists. 42 PA. CONS.STAT. § 5535(c). Walstrom does not

contend that there was an impediment to her filing of this action in a timely manner. Accordingly, only Subsection (a) is relevant to this case. *Baranowski v. Waters,* 2008 WL 728366, at *10, 2008 U.S. Dist. LEXIS 21301, at *31-32, n. 7.

An additional exception to the savings statute can be found in § 5535(a)(2)(i), which provides that § 5535(a)(1) does not apply to "[a]n action to recover damages for injury to the person...."42 PA. CONS.STAT. § 5535(a)(2)(i). This statutory language unambiguously excludes "personal injury actions" from the operation of the savings statute. *Stinson,* 972 F.2d at 63. In *Disabled in Action of Pennsylvania,* the Court of Appeals held that the statute of limitations applicable to claims arising under § 794(a) is "the statute of limitations for *personal injury actions* in the state in which the trial court sits." *Disabled in Action of Pennsylvania,* 539 F.3d at 208 (emphasis added). To the extent that Walstrom's claims arise under the pre-1992 Rehabilitation Act, they are governed by a two-year statute of limitations precisely because that is Pennsylvania's limitations period fox *personal injury actions. Id.* Because actions arising under § 794(a) have been categorically characterized as "personal injury actions" for statute of limitations purposes, Walstrom's claims must be treated in the same manner as personal injury claims arising under Pennsylvania law. Since the plain language of § 5535(a)(2)(i) would preclude Walstrom from pursuing personal injury claims under these circumstances, the Court holds that she is likewise precluded from pursuing claims under the pre-1992 Rehabilitation Act. *Baranowski,* 2008 WL 728366, at * 10-11, 2008 U.S. Dist. LEXIS 21301, at *32-36. The filing of the praecipe in the Court of Common Pleas tolled the statute of limitations as to *that action,* but it did not toll the statute of limitations as to this action. *Morris v. Hoffa,* Civil Action No. 01-3420, 2002 WL 524037, at *3, 2002 U.S. Dist. LEXIS 5975, at *9-10 (E.D.Pa. April 8, 2002). Given that the limitations period had already run before the commencement of this action, Walstrom's claims under the pre-1992 Rehabilitation Act are time-barred.

**\*12** As noted earlier, the enactment of § 794(d) enlarged the category of conduct prohibited by the Rehabilitation Act. *Shiring,* 90 F.3d at 831 ("Before 1992, disabled individuals had to prove that they were qualified only for the job that they were em-

ployed to do."). Walstrom appears to base her Rehabilitation Act claims, at least in part, on Altoona's alleged failure to transfer her to "another available position." Document No. 1, ¶ 42. Through her attorney, Walstrom informed Eggert that she was "unable to return to duty." Document No. 40-5, p. 15. Altoona proceeded to discharge Walstrom. *Id.,* p. 18.To the extent that Walstrom contends that Altoona engaged in prohibited "discrimination" by opting to discharge her rather than offering her the "reasonable. accommodation" of a "transfer to a vacant position," she bases her claims on conduct that was not actionable under the Rehabilitation Act prior to October 29, 1992. Claims premised on this category of conduct are subject to the four-year statute of limitations prescribed by § 1658(a) rather than the two-year statute of limitations prescribed by § 5524. *Jones,* 541 U.S. at 381-383; *Chedwick,* 2007 WL 4390327, at *8-13, 2007 U.S. Dist. LEXIS 91181, at *24-42. It is undisputed that almost seven years elapsed between the date of Walstrom's discharge and the date on which she commenced this action. Hence, the four-year duration of the federal limitations period is of no help to Walstrom. The critical question is whether the filing of the praecipe in the Court of Common Pleas tolled the statute of limitations applicable to this action under the relevant federal tolling rules.

In *Willard v. Wood,* 164 U.S. 502, 17 S.Ct. 176, 41 L.Ed. 531 (1896), the Supreme Court observed:

The general rule in respect of limitations must also be borne in mind, that if a plaintiff mistakes his remedy, in the absence of any statutory provision saving his rights, or where from any cause a plaintiff becomes nonsuit or the action abates or is dismissed, and, during the pendency of the action, the limitations runs, the remedy is barred.

*Willard,* 164 U.S. at 523. Accordingly, the general federal rule concerning the issue of tolling is that the commencement of one action does not toll the statute of limitations applicable to another. "In other words, a suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed." *Elmore v. Henderson,* 227 F.3d 1009, 1011 (7th Cir.2000).

The question for consideration is whether some provision of federal law exempts Walstrom's claims from the "general rule." In her brief, Walstrom offers

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

no basis for such an exemption.[FN10]Document No. 40, pp. 12-13. The Court notes that 28 U.S.C. § 1367(d) tolls the running of a state statute of limitations while a state claim is pending before a federal court pursuant to the supplemental jurisdiction statute, and for an additional thirty days after the dismissal of such a claim. 28 U.S.C. § 1367(d). This tolling provision was enacted as a part of § 310 of the Judicial Improvements Act of 1990. Pub.L. No. 101-650, § 310; 104 Stat. 5089, 5114 (1990). Section 313 of that same Act of Congress added § 1658(a)'s four-year statute of limitations to the United States Code. Pub.L. No. 101-650, § 313; 104 Stat. 5089, 5114-5115 (1990). Even though Congress expressly provided for the tolling of the statutes of limitations applicable to state claims while such claims are pending before a federal court, it did not provide for the tolling of the federal statute of limitations while federal claims are pending before a state court. Because the enactment of § 1367(d) demonstrates Congress' awareness of its ability to enact a tolling provision, the omission of a similar tolling provision within the text of § 1658(a) illustrates that Congress did not intend for the four-year statute of limitations to be tolled while a federal claim is pending before a state court.[FN11] United States v. Bly, 510 F.3d 453, 461, n. 11 (4th Cir.2007). Consequently, the filing of the praecipe in the Court of Common Pleas did not toll the running of § 1658(a)'s four-year statute of limitations.[FN12]

> FN10. On May 2, 2008, Altoona filed a reply brief in which the issue of tolling was discussed in detail. Document No. 45. On May 23, 2008, the Court granted Walstrom leave to file a responsive brief, but she never availed herself of that opportunity. Document No. 48.

> FN11. The commencement of the action in the Court of Common Pleas raises no bar to the commencement of a separate action in this Court. Although § 1367(d) was enacted primarily to eliminate the need for a plaintiff to file separate actions, a plaintiff nevertheless retains the option to file concurrent actions in federal and state courts. Jinks v. Richland County, 538 U.S. 456, 463-464, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). If Walstrom had commenced this action in a timely manner, the merits of her claims

would have been before the Court for resolution. Since there has been no decision rendered by a Pennsylvania court with respect to the action commenced in the Court of Common Pleas, the doctrines of res judicata and collateral estoppel, which are applicable to this Court by virtue of 28 U.S.C. § 1738, would not preclude this Court's adjudication of the merits of Walstrom's claims. Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Unfortunately for Walstrom, she did not commence this action until the applicable statutes of limitations had already run.

> FN12. Although not directly relevant to the issue of tolling, Walstrom's filings before the PHRC indicate that her action in the Court of Common Pleas was not based on allegations of unlawful discrimination. In those filings, Walstrom stated that her action in the Court of Common Pleas was based on alleged violations of the Due Process Clause. Document No. 31-11, pp. 10, 22.

*13 For the foregoing reasons, the Court holds that Walstrom's claims under the Rehabilitation Act are barred by the statutes of limitations prescribed by §§ 5524 and 1658(a).[FN13] Altoona's Motion for Summary Judgment will be granted with respect to all claims asserted by Walstrom under the Rehabilitation Act.

> FN13. Since Walstrom stipulates to the dismissal of her § 1983 claim, the Court need not address the statute of limitations issues surrounding that claim. Document No. 40, p. 15. Nevertheless, the same reasoning would warrant a determination that her § 1983 claim is time-barred. Baranowski v. Waters, Civil Action No. 05-1379, 2008 WL 728366, at *7-12, 2008 U.S. Dist. LEXIS 21301, at *21-40 (W.D.Pa. March 18, 2008).

**B. The Pennsylvania Human Relations Act Claims**

The PHRA makes it unlawful "[f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability ... to bar or to discharge from employment such individual...."43 PA. STAT. § 955(a). It is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

undisputed that Altoona is an "employer" within the meaning of 43 PA. STAT. § 954(b). The PHRA contains a requirement that an individual exhaust his or her administrative remedies with the PHRC before commencing an action against his or her employer. 43 PA. STAT. §§ 959, 962. This remedial scheme is invoked by the filing of a complaint with the PHRC. 43 PA. STAT . § 959(a). The statutory language contained in 43 PA. STAT. § 959(h) makes it clear that any complaint filed pursuant to the PHRA "must be so filed within one hundred eighty days after the alleged act of discrimination...."43 PA. STAT. § 959(h).

Walstrom first learned of her discharge on May 24, 1999. Document No. 40-5, p. 18. She did not file her complaint with the PHRC until February 2, 2001. Document No. 31-11, p. 10. Consequently, her claims are presumptively time-barred. Walstrom attempts to save her PHRA claims by arguing that she did not learn of the unlawful reasons for her discharge (i.e., her sex and her disability) until August 25, 2000, when Carnicella allegedly told James that Walstrom had been discharged because of her sex and her disability. Document No. 40, p. 13. In her filings with the PHRC, Walstrom made reference to this conversation. Document No. 31-11, p. 12. Walstrom contends that the 180-day limitations period began to run not when she learned that she had been discharged, but rather when she learned *why* she had been discharged. Document No. 40, p. 13.

Although the PHRA is a statute of independent force, the Pennsylvania courts generally construe its provisions in the same manner as analogous federal anti-discrimination provisions. *Stultz v. Reese Brothers, Inc.*, 835 A.2d 754, 759 (Pa.Super.Ct.2003). Therefore, the Court can look to decisions interpreting federal anti-discrimination statutes for guidance as to how the PHRA should be construed. The United States Court of Appeals for the Third Circuit has recognized that the accrual date of a cause of action "is not the date on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff *discovers* that he or she has been injured." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir.1994) (emphasis in original). This "discovery rule" operates to toll the running of the limitations period until the plaintiff has notice (actual or constructive) that he or she has been wronged by another. *Id.* at 1386 ("Thus, the 'polestar' of the discov-

ery rule is not the plaintiff's actual knowledge of injury, but rather whether the knowledge was known, or through the exercise of reasonable diligence, knowable to the plaintiff."). Nevertheless, the Court of Appeals has been careful to emphasize that the application of the discovery rule depends on a plaintiff's knowledge of *actual* injury, not on his or her knowledge of legal injury. *Podobnik v. United States Postal Service*, 409 F.3d 584, 590 (3d Cir.2005). The discovery rule delays the start of the limitations period, but only until the plaintiff has discovered (1) that he or she has been injured, and (2) that his or her injury has been caused by another party's conduct. *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124 (3d Cir.1997). It does not delay the start of the limitations period until the plaintiff discovers that the precise legal nature of his or her injury implicates a particular statutory prohibition. *Podobnik*, 409 F.3d at 590-591.

*14 Walstrom was aware of her actual injury (*i.e.,* her discharge) on May 24, 1999. It is of no moment that she may not have recognized the legal significance of that injury (*i.e.,* the allegedly illicit reasons for Altoona's decision to terminate her) until August 25, 2000. This same principle applies to Walstrom's claim that Altoona engaged in sex-based discrimination when it failed to offer her a promotion in 1997. It is clear from the record that Walstrom "was upset" as early as January 1999 that she had not received the promotion. Document No. 41, pp. 12-13, ¶ 44. It is of no significance that she may not have realized until August 25, 2000, that her sex had potentially been a motivating or determinative factor in Altoona's decision not to promote her. The applicability of the discovery rule turns on one's awareness of his or her injury, not on his or her awareness of the legal significance of that injury. *Podobnik*, 409 F.3d at 590-591. Accordingly, Walstrom cannot rely on the discovery rule to save her PHRA claims.

The time limitations for filing complaints under the PHRA are "subject to waiver, estoppel and equitable tolling."43 PA. STAT. § 962(e). Nevertheless, restrictions on equitable tolling must be "scrupulously observed." *Shaver v. Corry Hiebert Corp.*, 936 F.Supp. 313, 316 (W.D.Pa.1996). Although the permissible applications of equitable tolling are not reducible to an exclusive list, equitable tolling is typically permitted only (1) where the defendant affirmatively misleads the plaintiff with respect to a particu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 5411091 (W.D.Pa.)
(Cite as: 2008 WL 5411091 (W.D.Pa.))

Page 14

lar cause of action; (2) where extraordinary circumstances prevent the plaintiff from asserting his or her rights in a timely manner; or (3) where the plaintiff has timely asserted his or her rights in the wrong forum. *Uber v. Slippery Rock University,* 887 A.2d 362, 366 (Pa.Commw.Ct.2005). In this case, Walstrom does not contend that she was actively misled by Altoona, or that extraordinary circumstances somehow prevented her from filing a timely complaint with the PHRC. Additionally, she did not file a praecipe for a writ of summons in the Court of Common Pleas until January 4, 2001, which was roughly a year after the 180-day limitations period had already run. Document No. 40-8, p. 1. Even if she had filed her praecipe within the 180-day limitations period, Walstrom clearly stated in her subsequent filings with the PHRC that the action commenced in the Court of Common Pleas was based on the Due Process Clause, and that it was not related to the charges of discrimination supporting her administrative complaint under the PHRA. Document No. 31-11, pp. 10, 22. Thus, it cannot be said that Walstrom mistakenly asserted her rights under the PHRA in the wrong forum. Courts tend to disfavor equitable tolling in circumstances where the untimeliness of a complaint appears to be due solely to the plaintiff's lack of due diligence. *Altopiedi v. Memorex Telex Corp.,* 834 F.Supp. 800, 806 (E.D.Pa.1993). There is no basis for applying the doctrine of equitable tolling in this case.

*15 The PHRA provides that an individual's private right of action in the courts is not foreclosed if he or she properly invokes the procedures set forth therein. 43 PA. STAT. § 962(c)(1). Had Walstrom exhausted her administrative remedies with the PHRC in a timely manner, she would have been able to proceed against Altoona under the PHRA. Since she failed to file a timely complaint with the PHRC, she cannot maintain her action against Altoona for alleged violations of the PHRA. *Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917, 921 (Pa.1989). Accordingly, the Court will grant Altoona's Motion for Summary Judgment with respect to Walstrom's claims under the PHRA.

### VI. CONCLUSION

The Court has determined that all of Walstrom's claims are barred by the applicable statutes of limitations. Consequently, the Court has no occasion to consider the merits of these claims. Altoona's Motion

for Summary Judgment will be granted. An appropriate order follows.

**AND NOW,** this 29th day of December, 2008, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendant pursuant to Federal Rule of Civil Procedure 56 (Document No. 28), IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment is **GRANTED.**

W.D.Pa.,2008.
Walstrom v. City of Altoona
Slip Copy, 2008 WL 5411091 (W.D.Pa.)

END OF DOCUMENT