**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO**

Civil Case No. 09-cv-162-REB-KLM

| | |
|---|---|
| E.T. MEIJER and MARCEL WINDT, In their Capacity as Trustees in Bankruptcy for KPNQwest N.V., et al., | ) ) ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| QWEST COMMUNICATIONS INTERNATIONAL, INC., JOHN A. McMASTER, JOSEPH P. NACCHIO, ROBERT S. WOODRUFF, | ) ) ) ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS FILED ON MAY 1, 2009**

CROWELL & MORING LLP
Richard McMillan Jr.
Clifton S. Elgarten
Daniel W. Wolff
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

RICHARD W. DAILY LLC
Richard W. Daily
621 17th Street, Suite 1535
Denver, Colorado 80293-1501

Attorneys for Plaintiffs
Trustees of KPNQwest

*Electronically Filed*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT ................................................................................................... 1

    A.    Factual Background ................................................................. 2

    B.    New Jersey Proceedings .......................................................... 4

    C.    Other Proceedings In The Netherlands....................................... 6

ARGUMENT.................................................................................................... 7

I.    COLORADO IS A CONVENIENT AND PROPER FORUM. ................................. 9

    A.    Tenth Circuit Law Favors Retaining This Case In Colorado. ..................... 9

        1.    Private Interest Factors Favor Of Colorado.................................... 13

        2.    The Public Interest Factors Favor Colorado................................... 16

            a.    The Colorado Jury Venire And The Interest Of Having Local Disputes Decided Locally........................................... 16

            b.    Consideration For Foreign  Bankruptcy Trustees ............... 17

            c.    Treaty of Friendship ............................................ 17

    B.    The Court Is Not Bound By The Previous "Forum Non"  Ruling.............. 18

        1.    Dismissal Based On *Forum Non Conveniens* In One District Court Does Not Preclude Consideration Of The Case In Another District Court.................................................... 18

        2.    Tenth Circuit Law On *Forum Non Conveniens* Is Not Identical To That Of The Third Circuit. ......................................... 22

        3.    Neither The District Of New Jersey Nor The Third Circuit Decided Whether this Action Is Proper In Colorado. ..................... 24

II.    THE TRUSTEES HAVE PROPERLY PRESENTED A RICO CLAIM. ................ 26

    A.    The Conduct On Which The Trustees Rely Is Not Actionable As Fraud In The Sale Of Securities............................................ 26

    B.    The Trustees' RICO Claim Is Timely....................................... 35

1.  The Trustees Were Not Required To Seek A Conditional Order Of Dismissal From The New Jersey Court. ......................... 35

2.  The Statute Of Limitations Was Tolled By Filing In The Wrong Forum. .............................................................. 36

C.  The Trustees Have Standing And Seek Appropriate Damages. .............. 40

1.  The Trustees Seek Recovery For Damages Directly Caused By Defendants' Fraudulent Conduct. ............................................ 40

2.  The Deepening Insolvency Measure Of Damages Is Perfectly Normal And Cannot Be Dismissed. ................................ 44

CONCLUSION ............................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*555 Corporate Ventures, Ltd. v. Ash Grove Cement Co.*,
  No. 04 Civ. 2169, 2005 U.S. Dist. LEXIS 8814 (D. Kan. Aug. 2, 2005) ..................... 21

*Allard v. Arthur Andersen & Co. (USA)*,
  924 F. Supp. 488 (S.D.N.Y. 1996) ........................................................... 45

*Alpine Atl. Asset Mgmt AG v. Comstock*,
  552 F.Supp. 2d 1268 (D. Kan. 2008) ........................................................ 13

*Am. Dredging Co. v. Miller*,
  510 U.S. 443 (1994) ........................................................................ 10

*Am. Pipe & Const. Co. v. Utah*,
  414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) ......................................... 37

*Amore v. Accor*, 484 F. Supp. 2d 124 (D.D.C. 2007) .................................... 21

*ANR Ltd. v. Chattin*,
  89 B.R. 898 (D. Utah 1988) ................................................................ 42

Anza v. Ideal Steel Supply Corp.,
  547 U.S. 451 (2006) ................................................................... 43, 44

*Bald Eagle Area School Dist. v. Keystone Fin., Inc.*,
  189 F.3d 321 (3d Cir. 1999)................................................. 26, 29, 32, 33

*Baron v. Chehab*,
  No. 05-3240, 2006 WL 156828 (C.D. Ill. Jan. 20, 2006).......................................... 33

*Barrantes Cabalceta v. Standard Fruit Co.*,
  667 F. Supp. 833 (S.D. Fla. 1987) ........................................................ 21

*Billings v. Chicago, Rock Island and Pacific Railroad Co.*,
  581 F.2d 707 (8th Cir. 1978)............................................................... 39

*Bowen v. City of New York*,
  476 U.S. 467 (1986) ........................................................................ 38

*Brown v. Hartshorne Pub. Sch. Dist. No. 1*,
  926 F.2d 959 (10th Cir. 1991)............................................................. 40

*Burnett v. N.Y. Cent. R.R. Co.*,
  380 U.S. 424 (1965) .................................................................. 37, 38, 39

*Burton v. Ken-Crest Servs., Inc.*,
    127 F. Supp. 2d 673 (E.D.Pa. 2001) ..................................................... 33

*Butler v. Pollard*,
    800 F.2d 223 (10th Cir. 1986).............................................................. 18

*Carlile v. S. Routt Sch. Dist.*,
    652 F.2d 981 (10th Cir. 1981).............................................................. 38

*China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*,
    91 F. Supp. 2d 1106 (N.D. Ohio 2000) ............................................ 19, 21

*County of Hudson v. Janiszewski*,
    No. CV 06-319, 2007 WL 2688882 (D.N.J. Sept. 13, 2007) ...................... 15

*Crown, Cork & Seal Co., Inc. v. Parker*,
    462 U.S. 345 (1983) ........................................................................ 40

*Delgado Oil Co. v. Torres*,
    785 F.2d 857 (10th Cir. 1986).............................................................. 42

*Dolin v. Contemporary Fin. Solutions, Inc.*,
    No. 08-CV-00675, 2009 WL 890689 (D. Colo. Mar. 31, 2009) .................. 42

*Drabkin v. L & L Constr. Assocs., Inc. (In re Latin Inv. Corp.),*
    168 B.R. 1 (Bankr. D.C. 1993)............................................................. 45

*Dummar v. Lummis*,
    543 F.3d 614 (10th Cir. 2008).............................................................. 39

*Eagletech Communications Inc. v. Citigroup, Inc.*,
    No. 07-60668, 2008 WL 3166553 (S.D. Fla. June 27, 2008)...................... 33

*Ebrahimi v. E.F. Hutton & Co.*,
    852 F.2d 516 (10th Cir. 1988).............................................................. 38

*Elec. Workers v. Robbins & Myers, Inc.*,
    429 U.S. 229 (1976) ........................................................................ 38

*Esfeld v. Costa Crociere, S.P.A.*,
    289 F.3d 1300 (11th Cir. 2002)............................................................ 24

*Exxon Corp v. Choo*,
    817 F.2d 307 (5th Cir. 1987), *rev'd on other grounds*, 486 U.S. 140 (1988).. 19, 20, 25

*Flood v. Makowski*,
    2004 WL 1908221 (M.D. Pa. Aug. 24, 2004)......................................... 33

*Gonzalez-Aller Balseyro v. GTE Lenkurt, Inc.*,
    702 F.2d 857 (10th Cir. 1983)................................................................ 37

*Gouiran Holdings, Inc. v. DeSantis*,
    165 B.R. 104 (E.D.N.Y. 1994) .............................................................. 45

*Grand v. Nacchio*,
    No. C-2002-5348 (Pima Co., Arizona, Superior Ct., filed Oct. 31, 2002)............. 15, 16

*Gschwind v. Cessna Aircraft Co.*,
    161 F.3d 602 (10th Cir. 1998).................................................... 9, 10, 13, 23

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ............................................................................ 10

*Hamilton v. Water Whole Int'l*,
    302 Fed. Appx. 789 (10th Cir. 2008) .................................................... 42

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
    No. 04-C-0698, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ...................... 33

Holmes v. Sec. Investor Prot. Corp.,
    503 U.S. 258 (1992) ..................................................................... 43, 44

*Howard v. Am. Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000).............................................................. 27

*Ibar Ltd. v. Am. Bureau of Shipping*,
    No. 97 Civ. 8592, 1998 WL 274469 (S.D.N.Y. May 26, 1998)................ 20

*In re Air Crash Off Long Island, N.Y.*,
    65 F. Supp. 2d 207 (S.D.N.Y. 1999) ................................................... 36

*In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.*,
    228 F. Supp. 2d 348 (S.D.N.Y. 2002) ................................................. 14

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
    546 F. Supp. 2d 1191 (D. Kan. 2008),
    *motion for reconsideration denied*, 2009 WL 229796 (Jan. 30, 2009) ...................... 14

*In re Enron Corp. Sec. Derivatives & ERISA Litig.*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003);................................................. 33

*In re Ikon Office Solutions, Inc. Securities Litigation*,
    86 F. Supp. 2d 481 (E.D.Pa. 2000) ............................................... 32, 33

*In re Silver*,
    303 B.R. 849 (B.A.P. 10th Cir. 2004)...................................................................... 42

*In re Vartec Telecom, Inc.*,
    335 B.R. 631 (Bankr. N.D. Tex. 2005)...................................................................... 45

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)........................................................................................ 18

*Irwin v. Dept. of Vets. Affairs*,
    498 U.S. 89 (1990) ............................................................................................. 37, 38

*James v. City of Dallas*,
    254 F.3d 551 (5th Cir. 2001)..................................................................................... 42

*John R. Sand & Gravel Co. v. United States*,
    128 S.Ct. 750 (2008) ................................................................................................ 37

*Johnston v. Multidata Sys. Int'l Corp.*,
    No. G-06-313, 2007 WL 1296204 (S.D. Tex. Apr. 30, 2007) ..................................... 19

*Kalb, Voorhis & Co. v. American Financial Corp.*,
    8 F.3d 130 (2d Cir. 1993)......................................................................................... 42

*Kelly v. Interpublic Group of Cos.*,
    No. 07 Civ 1317, 2007 WL 2265570 (S.D.N.Y. Aug. 2, 2007) ........................... 20, 21

*Kuiper v. Busch Entertainment Corp.*,
    45 F.3d 284 (8th Cir. 1995)...................................................................................... 40

*Liberty Sav. Bank v. Webb Crane Servs., Inc.*,
    No Civ. 03-2218, 2005 WL 1846983 (D. Colo. Aug. 3, 2005) ................................... 42

*Matter of S.I. Acquisitions, Inc.*,
    817 F.2d 1142 (5th Cir. 1987)................................................................................... 42

*Mercier v. Sheraton Int'l, Inc.*,
    935 F.2d 419 (1st Cir. 1991)..................................................................................... 24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ............................................................................................. 30, 31

*Million v. Frank*,
    47 F.3d 385 (10th Cir. 1995)..................................................................................... 37

*Mizokami Bros. of Arizona, Inc. v. Mobay Chem. Corp.*,
    660 F.2d 712 (8th Cir. 1981)................................................................. 19, 20, 21, 25

*Needham v. Phillips Petroleum Co. of Norway*,
   719 F.2d 1481 (10th Cir. 1983) ........................................................................... 9, 10

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   416 F.3d 146 (2d Cir. 2005) ...................................................................................... 23

*Pastewka v. Texaco, Inc.*,
   565 F.2d 851 (3d Cir. 1977) ................................................................................ 19, 21

*Peterson v. City of Wichita*,
   706 F. Supp. 766 (D. Kan. 1989) ............................................................................. 37

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981) .................................................................................................... 9

*Reed v. Norfolk & W. Ry. Co.*,
   635 F. Supp. 1166 (N.D. Ill. 1986) .................................................................... 36, 39

*Reid-Walen v. Hansen*,
   933 F.2d 1390 (8th Cir. 1991) .................................................................................. 24

*Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd.*,
   2 F.3d 990 (10th Cir. 1993) ................................................................................. 9, 10

*Rotella v. Wood*,
   528 U.S. 549 (2000) .................................................................................................. 39

*Schacht v. Brown*,
   711 F.2d 1343 (7th Cir. 1983) .................................................................................. 45

*SEC v. Zandford*,
   535 U.S. 813 (2002) ...................................................................................... 32, 33, 34

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985). ................................................................................................. 43

*Smith v. Am. President Lines, Ltd.*,
   571 F.2d 102 (2d Cir. 1978) ..................................................................................... 38

*Superintendent of Ins. v. Bankers Life and Cas. Co.*,
   404 U.S. 6 (1971) .............................................................................................. 32, 34

*Tabas v. Greenleaf Ventures, Inc. (In re Flagship Healthcare, Inc.)*,
   269 B.R. 721 (Bankr. S.D. Fla. 2001) ...................................................................... 45

*TH Agric. & Nutrition, L.L.C. v. ACE European Group Ltd.*,
   416 F. Supp. 2d 1054 (D. Kan. 2006) ...................................................................... 14

*Torreblanca de Aguilar v. Boeing Co.*,
    806 F. Supp. 139 (E.D. Tex. 1992) .......................................................... 21

*Turgeau v. Admin. Review Bd.*,
    446 F.3d 1052 (10th Cir. 2006) ......................................................... 37, 38

*United States v. Cambio Exacto, S.A.*,
    166 F.3d 522 (2d Cir. 1999) .................................................................. 42

*Villar v. Crowley Maritime Corp.*,
    990 F.2d 1489 (5th Cir. 1993), *abrogated on other grounds by*
    *Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211 (5th Cir. 1998) ..................................... 19

*Windt v. Qwest Comm. Int'l, Inc.*,
    529 F.3d 183 (3d Cir. 2008) ............................................................passim

*Windt v. Qwest Comm. Int'l, Inc.*,
    544 F. Supp. 2d 409 421 (D.N.J. 2008) ...........................................passim

*Yavuz v. 61 MM, Ltd.*,
    465 F.3d 418 (10th Cir. 2006 ................................................... 8, 10, 23, 25

## Statutes

11 U.S.C. § 1501 ................................................................................ 16, 17

11 U.S.C. §1509 ..................................................................................... 17

11 U.S.C. §1515 ..................................................................................... 17

15 U.S.C. §§ 78aaa-78lll ........................................................................ 43

15 U.S.C. § 78j(b) .............................................................................passim

18 U.S.C. § 1964(c) ................................................................. 26, 29, 30, 31

18 U.S.C. § 1965(a) ................................................................................ 23

28 U.S.C. § 1391(b) ................................................................................ 23

## Legislative History

H.R. Conf. Rep. No. 104-369 (1995) ..................................................... 27, 30

**Treaties**

Treaty of Friendship, Commerce and Navigation
  between the Kingdom of the Netherlands and the United States of America,
  art. V, March 27, 1956, 8 U.S.T. 2043 .................................................................. 5, 17

**Other Authorities**

"Nacchio Reports to Prison," Denver Business Journal,
  2009 WLNR 6953309 (April 14, 2009)........................................................................ 16

17 *Moore's Federal Practice* § 111.94 (Matthew Bender 3d ed. 2009) ......................... 20

18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
  *Federal Practice and Procedure* § 4436 (2d ed. 2002)............................................. 19

Council Regulation (EC) 44/2001, art. 2(1) (2000) ........................................................ 23

## STATEMENT

This case arises from the efforts of Qwest Communications International, Inc, a Colorado-based telecommunications company, and three former Qwest executives, Chief Executive Officer Joseph Nacchio, Vice President of International Business Jack McMaster, and Chief Financial Officer Robert Woodruff, to defraud KPNQwest N.V., a telecommunications company launched in 1999 and operated until its bankruptcy in May 2002.  Plaintiffs are the court-appointed trustees ("Trustees") for KPNQwest's bankruptcy estate.  They allege, *inter alia*, that Defendants' fraud caused KPNQwest to make decisions that ultimately resulted in KPNQwest's bankruptcy.

There is no mystery about why the Trustees filed in Colorado.  Qwest, the prime mover in this case, is based here, and most or all of the actions directed at KPNQwest happened, or had their origin, in Qwest's offices in Denver.  All Defendants are located in the United States and there is nothing unusual about suing Defendants where they reside and from where they performed many of their unlawful acts.

The Trustees previously filed the same Complaint in the District of New Jersey, where two individual Defendants reside.  The case was dismissed from that district based on *forum non conveniens*, with the dismissing court focusing on the lack of any real connection to *New Jersey* beyond the residence of the two Defendants.  In affirming that dismissal, the Third Circuit also focused on *New Jersey*, and explicitly stated that it was *not* addressing whether the Trustees could make a better showing of convenience in Colorado where the scheme had its origins and Qwest is headquartered.  This re-filing comes as no surprise to Defendants; they argued emphatically in the New Jersey case that the *forum non conveniens* analysis focuses on

the specific federal district in which the suit is filed.  The New Jersey District Court and Third Circuit adopted that approach.

### A.     Factual Background

KPNQwest was conceived as a joint venture between Qwest and a Dutch company, Koninklijke KPN N.V. ("KPN"), to proceed in the mold of Qwest itself, which had transformed itself into one the United States' largest telephone companies. Complaint ¶¶ 4, 8, 38-40.  The "Qwest model" involved constructing a fiber-optic network financed largely by the "sale" of portions of the network to competitors or other wholesale buyers before construction was completed.  *Id.* ¶¶ 4, 34, 36.  So-called "IRU" ("indefeasible rights of use") sales generated revenue that reduced the need to turn to capital markets to finance network construction.  *Id.* ¶¶ 4, 36-37.  The ultimate goal was to sell telecommunications services (*e.g.*, broadband, etc.) once the network came online.  *Id.* ¶ 5.  But by the end of the 1990s, a glut of fiber-optic cable resulted in reduced demand for its fiber and retail products.  *Id.* ¶¶ 6, 48-49.  To conceal the absence of real revenue and cash flow, Qwest employed a variety of techniques, notably deceptive accounting for IRU sales of "lit fiber."  *Id.* ¶¶ 7, 51, 57-58, 60, 62-76.

At KPNQwest, Qwest, which had an interest in KPNQwest, installed CEO Jack McMaster and others into management and director positions.  *Id.* ¶¶ 8, 10, 41-43, 85, 91.  Using techniques similar to those that Qwest used in the United States – including causing KPNQwest to engage in fictive IRU sales and swaps – Defendants deceived KPNQwest, specifically certain Supervisory Board members and other decision-makers, about the company's financial condition in order to manipulate its business to suit Qwest's objectives.  *Id.* ¶¶ 3, 77, 80, 82-85, 88, 103-128, 156-70, 210.  KPNQwest was led to believe, erroneously, that the business was thriving when it was not.  *Id.* ¶¶ 3,

232, 240-267.  Qwest and the individual Defendants perpetrated this deception on

KPNQwest over the span of several years, beginning after KPNQwest's initial public

offering in November 1999 and culminating in its May 2002 bankruptcy.  Defendants'

*reasons* for perpetrating the fraud were primarily three-fold, all for the benefit of Qwest:

(a) If the failure of Qwest's business model was exposed at KPNQwest, it would have

created questions about the viability of that model at Qwest, *id.* ¶¶ 77-84; (b) The

deception propped up the apparent value of Qwest's holdings in KPNQwest at a crucial

time, *id.* ¶ 301(b); and (c) Qwest used KPNQwest both directly and indirectly as a

counterparty in IRU transactions and needed to maintain that relationship, *id.* ¶¶ 171-

188.  KPNQwest eventually came to a crashing halt, but not before, *inter alia*, the

Supervisory Board, as a result of Defendants' deceptions, had far overextended itself as

a result of its mistaken impression about the viability of the business.

The individual Defendants all reside in the U.S., one in Colorado.  *Id.* ¶¶ 20, 21,

22.  Qwest's principal place of business is Denver.  *Id.* ¶ 19.  During the period covered

by the Complaint, each individual Defendant was a Qwest employee while also serving

on KPNQwest's Supervisory or Management Board.  Nacchio and Woodruff, Qwest's

CEO and CFO, respectively, were Supervisory Board members.  *Id.* ¶ 10.  McMaster

was KPNQwest's CEO and sole Management Board member.  *Id.*

Qwest, Nacchio and Woodruff, as well as McMaster at times, participated in

KPNQwest's management from the U.S.  *Id.* ¶¶ 80, 89, 90.  Qwest's direction of

KPNQwest from the U.S. was frequent and unremitting.  *Id.* ¶¶ 80, 85, 89-90, 142, 143,

151.  KPNQwest board meetings were regularly conducted in the U.S. or with U.S.

board members (including Defendants) participating from the United States via

conference call. *Id.* ¶¶ 94, 105. Defendants instructed KPNQwest from the United States on transactions and strategic decisions, *id.* ¶¶ 93, 99(d), 99(g), as well as reports to the Supervisory Board designed to conceal KPNQwest's financial circumstances. *Id.* ¶¶ 80, 82-83, 85, 88, 94, 104, 156-70, 190, 193. Nacchio in particular directed McMaster on a regular, at times daily, basis and limited information to be revealed to "non-Qwest" members of the KPNQwest Supervisory Board. *Id.* ¶¶ 88, 89, 94, 99(c), 104, 164, 166, 190. Qwest employees in Denver negotiated IRUs and swaps for KPNQwest. *Id.* ¶¶ 99(h), 112-115, 173, 142-43, 151.

In addition to Defendants, the key Qwest executives involved in the deception reside in the United States, as do primary KPNQwest-affiliated witnesses. Declaration of Daniel W. Wolff ("Wolff Decl.") ¶ 4. Many former Supervisory Board members also reside in the U.S. *Id.* ¶ 5. All will be witnesses.

### B.    New Jersey Proceedings

In June 2004, the Trustees filed a complaint – essentially this Complaint – in the District of New Jersey. Defendants unsuccessfully moved to compel arbitration – the motion was denied by the Magistrate Judge in a June 2005 decision that was affirmed by the District Judge in September 2006. While their appeal of the order denying their arbitration motion was pending, Defendants moved to dismiss in February 2006, raising, *inter alia*, *forum non conveniens* and asserting that the case should not proceed in New Jersey. The district court granted that motion in October 2006.

In granting Defendants' motion, the New Jersey court's analysis was guided by the *forum non conveniens* law of the Third Circuit and focused on a comparison of the *New Jersey* forum (*not* the United States as a whole) with the Netherlands. Using the Third Circuit's analytical framework, the court began by determining the "degree of

4

deference" to be given the foreign plaintiff's choice of forum and granted a "low degree of deference" to the foreign bankruptcy trustees' forum choice. *See Windt v. Qwest Comm. Int'l, Inc.*, 544 F. Supp. 2d 409 421 (D.N.J. 2008). The court emphasized that the Trustees lacked "personal" connections to the U.S. and New Jersey. *See id.* at 419. It concluded that "the community of New Jersey" had little interest in the case. *Id.* at 420. And, raising the issue *sua sponte*, the court said that the absence of a treaty guaranteeing equal treatment to Dutch nationals in U.S. courts meant that the Trustees were not entitled to the same deference in choosing a forum as a U.S. plaintiff. *See id.* at 419 n.14. The district court failed to realize that there is a treaty, it was in the record, and, under it, Dutch nationals are given parity with U.S. citizens. *See* Treaty of Friendship, Commerce and Navigation between the Kingdom of the Netherlands and the United States of America, art. V, March 27, 1956, 8 U.S.T. 2043

The Trustees appealed to the Third Circuit, noting various mistakes by the district court and arguing, *inter alia*, that the district court improperly compared *New Jersey* with the Netherlands rather than the *United States* with the Netherlands. In response, Defendants urged the Third Circuit to focus on New Jersey, contending that there was not "any support for Appellants' repeated assertion that the *forum non conveniens* analysis focuses on the U.S. as a whole," and that "the proper analysis focuses on ties to the forum district." *See* Wolff Decl. ¶ 8.

The Third Circuit accepted that contention. The Third Circuit did find that the district court erred in applying Third Circuit law in certain respects, *i.e.*, by (i) stating that equal balance in the relative convenience on certain points favors dismissal, rather than maintaining the case in plaintiff's chosen forum; and (ii) excusing Defendants from

having to show that suit in New Jersey would be oppressive or vexatious.  *Windt v. Qwest Comm. Int'l, Inc.*, 529 F.3d 183 194, 195 (3d Cir. 2008).  It nonetheless affirmed, finding "no indication that evidence is concentrated in New Jersey," and no "indication that a substantial amount of conduct giving rise to the instant dispute occurred in New Jersey."  *Id.* at 191.  It distinguished an earlier decision in which a foreign plaintiff's lawsuit was permitted to proceed, noting that that case was filed in the *corporate defendant*'s home state, whereas New Jersey "is not the home forum of the corporate defendant [Qwest]."  *Id.*  The Third Circuit held that the Trustees' claim was not "local" to *New Jersey*, and "without a dispute local to the community of New Jersey, there is little public interest in subjecting that community to the burdens of jury service."  *Id.* at 193.

That the Third Circuit focused its *forum non conveniens* analysis on New Jersey is highlighted by its caveat that its decision was *not* to be construed as affecting the right of the Trustees to file suit in another federal district court.  It said:

> It would be problematic if granting a motion to dismiss for *forum non conveniens*, based on local considerations, precluded a plaintiff from filing the suit in another, convenient district.  Thus, the conclusion we reach in this case does not necessarily mean that this action may not be maintainable in another federal district.

*Id.* at 191-92.  A rehearing petition was denied in July 2008, and a petition for writ of certiorari denied by the Supreme Court in January 2009.

### C.    Other Proceedings In The Netherlands

A major focus of Defendant's motion is the "[s]even KPNQwest-related proceedings ... currently pending in the Netherlands," but Defendants mischaracterize both the number and relevance of these proceedings.  The first cited proceeding – the investigation by the Enterprise Chamber of the Amsterdam Court of Appeals – is not a civil litigation proceeding.  Filed in August 2005 and based in large part on the

allegations in this case (as set forth in the New Jersey complaint), it arises from a petition by shareholders and involves the investigation of the conduct of certain entities and individuals, including Defendants, in the narrow timeframe *between January and May of 2002*. It is of very limited scope and does not address damages. Declaration of Dirk Knottenbelt ("Knottenbelt Decl.") ¶ 3. The preliminary witness examinations in the Hague, cited by Defendants as separate actions, are not separate actions, at least not in U.S. terms. They were sought solely to perpetuate testimony. *Id.* ¶ 4.

The so-called "Cargill litigation" is also limited. It is a simple claim for fraud, stemming from a single loan made to KPNQwest in the final months before KPNQwest declared bankruptcy. Supplemental Declaration of Jonathan Sherman ("Sherman Decl.") ¶ 3 & Exh. 2 (Curtin letter) at attachment pp. 13-16 (background of complaint). Moreover, the third-party discovery requests which Defendants depict as the fourth and fifth "proceedings" (Defs. Br. at 8) relate directly to the Cargill litigation, Knottenbelt Decl. ¶ 6, and are nothing more than what in the United States would constitute subpoenas or motions to compel discovery.

The third proceeding is simply an arbitration with certain D&O insurance carriers. The question presented there is whether the policies are void in light of misrepresentations made by Defendants in this case. *Id.* ¶ 7.

## ARGUMENT

Colorado is a convenient forum for this dispute and the Trustees' decision to pursue this case in *Defendants*' home forum should be sustained. Qwest, the alleged primary wrongdoer, is a corporate resident of Colorado. Its world headquarters is in the middle of downtown Denver. Qwest also served as the prime mover, as well as the conduit, through which the individual Defendants committed fraud. One of the individual

7

Defendants (Woodruff) is also a resident of Colorado, and the other two (New Jersey residents) are no strangers to the forum – Nacchio is the former Qwest CEO; McMaster is former Vice President of International Business.  Neither has argued that the Court lacks personal jurisdiction over him.

Indeed, Defendants do not contend that Colorado is not convenient.  Thus, the basic prerequisite for a *forum non conveniens* claim does not exist here.  There is nothing *vexatious* or *harassing*, *see Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 426 (10th Cir. 2006, or even burdensome, about proceeding here.  Instead, Defendants try to bootstrap their *forum non conveniens* argument to various preclusion principles.  They contend that this Court should not consider the forum question because the New Jersey District Court already dismissed in favor of the Netherlands.  Alternatively, they contend that this Court is bound by "subsidiary findings" of the New Jersey District Court that require dismissal even if this Court were otherwise inclined to take a fresh look at the forum question.  But both arguments fail for the same reason: the New Jersey court's analysis compared the convenience of *New Jersey* to that of the Netherlands. Defendants know this to be true because they specifically argued, and the district court (and court of appeals) accepted, the premise that the forum comparison was between *New Jersey* and the Netherlands.  The court neither considered nor decided how Colorado (or even the United States generally) compares in terms of convenience to the Netherlands.  This affects both the "big" preclusion argument (that the Court should dismiss based on the prior court's dismissal) and the "little" preclusion argument (that the Court is bound by certain subsidiary findings):  because the New Jersey court never

examined the questions of relative convenience from the vantage point of Colorado, the relevant issues *for this Court's consideration* have not been decided.

## I.    COLORADO IS A CONVENIENT AND PROPER FORUM.

It is Defendants' heavy burden to show that dismissal on grounds of *forum non conveniens* is appropriate.  *See Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd.*, 2 F.3d 990, 993 (10th Cir. 1993).  But noticeably absent from Defendants' motion is *any* indication that it would be inconvenient to litigate in Colorado.  And it would not be: Qwest is the prime mover and principal here; it resides in Denver.  Woodruff is a Colorado resident, and Nacchio and McMaster, U.S. citizens, worked out of Qwest's Denver offices for many years.  Indeed, Defendants are being sued at home and thus must make "a stronger case than others for dismissal based on *forum non conveniens.*" *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 609 (10th Cir. 1998).  Given that a central purpose of *forum non conveniens* is to "ensure that the trial is convenient," Defendants' failure to show inconvenience illuminates why they cannot overcome the "strong presumption in favor of hearing the case in the plaintiff's chosen forum." *Id.* at 605 (*quoting Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 236, 255 (1981)).

### A.    Tenth Circuit Law Favors Retaining This Case In Colorado.

Under the Tenth Circuit's controlling precedent, the Court's inquiry begins with the threshold questions: (1) is there an adequate alternative forum; (2) does foreign law apply.  *See id*; *see also Rivendell*, 2 F.3d at 994.  If the threshold questions are answered affirmatively – as conceded here[1] – the presumption remains that plaintiff

---

[1] U.S. law – RICO and federal statutory fraud law – applies to one of the two claims.  That militates against dismissal under Tenth Circuit jurisprudence.  *See Needham v. Phillips Petroleum Co. of Norway*,

(continued…)

chooses the forum.  That choice may not be disturbed unless "trial in the chosen forum would establish oppressiveness and vexation to a defendant *out of all proportion to the plaintiff's convenience*, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems...." *Yavuz*, 465 F.3d at 426 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994)) (emphasis added).  Defendants must show that suit in plaintiff's chosen forum is oppressive and vexatious.  *See Rivendell*, 2 F.3d at 993.

The determination whether the case is oppressive or vexatious to defendants is made by weighing private and public interest factors.  Private interest factors include (1) relative ease of access to sources of proof; (2) availability of compulsory process to compel attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; and (4) other issues that may keep trial from being easy, expeditious and inexpensive.  *See Gschwind*, 161 F.3d at 605-06 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Public interest factors include (1) congested dockets arising from cases not being prosecuted at their place of origin; (2) the burden of jury duty on members of a community with no connection to the case; (3) the local interest in having localized controversies decided at home; and (4) the utility of having diversity cases tried in a forum familiar with governing law.  *See id.* (citing *Gulf Oil*, 330 U.S. at 508-09).

---

(continued)

719 F.2d 1481, 1483 (10th Cir. 1983).  That Dutch law is also in play does not change the outcome.  The *forum non conveniens* analysis does not rest on choice of law, and "application of foreign law does not preclude litigation in this country."  *Rivendell*, 2 F.3d at 994.

Beyond the simple fact that suing defendants in their home jurisdiction is universally regarded as entirely conventional, it is useful to outline why this lawsuit is convenient in the United States and Colorado in particular:

- Qwest – the beneficiary of the unlawful conduct and central actor with respect to these claims – maintains its principal place of business at 1801 California Street in downtown Denver, and Colorado is where the benefits of Defendants' unlawful conduct were received.  Compl. ¶¶ 19, 26.

- Woodruff is a Colorado resident.  *Id.* ¶ 21.

- Nacchio, though a New Jersey resident, is the former Qwest CEO, worked for years out of Qwest's Denver office, and does not assert that the Court lacks jurisdiction over his person.  *Id.* ¶ 20.

- McMaster, a New Jersey resident, worked for years as an executive at Qwest out of its Denver office, and he does not assert that the Court lacks jurisdiction over his person.  *Id.* ¶ 22.

- Colorado is the specific location from which a substantial part of the unlawful conduct described in the Complaint was directed by Qwest and the other Defendants.  *Id.* ¶¶ 25, 26, 80.

- Colorado is where many of the fictive IRU transactions and swaps were arranged for KPNQwest by Qwest officials.  *Id.* ¶¶ 112-115, 130, 142-143.

- Colorado is where important meetings of the KPNQwest Supervisory Board were held and conferences were initiated.  *Id.* ¶¶ 25, 26, 105.

- Colorado is the location from which, or to which, e-mails, telephone calls, and other inter-company communiqués directing or regarding the management of KPNQwest were written or sent.  *Id.* ¶¶ 25, 26, 99(c), 105, 112, 114-115, 243.

- Colorado is where the substantial majority of relevant documents are located or stored.  *Id.* ¶ 26; Wolff Decl. ¶ 7(a), (c).

- A substantial number of witnesses resided and worked in Colorado when, through affiliation with Qwest, they witnessed or participated in the fraud, and many continue to reside here.  *Id.* ¶¶ 25, 26, 112, 114, 173; Wolff Decl. ¶¶ 4, 5.

- The decisions to install McMaster as the sole member of the Management Board of KPNQwest, Nacchio as Chairman of the Supervisory Board,

Woodruff as a member of the Supervisory Board, and other Qwest personnel in key positions, were all made from the United States, specifically Denver. *Id.* ¶¶ 25, 85, 99, 100.

The basic focus of the case is on a fraudulent scheme "directed primarily from Qwest's headquarters in Denver," *id.* ¶ 80, and the individual Defendants do not suggest that, for the actions at issue, they were not following Qwest's lead and instruction. Indeed, at least three Supervisory Board meetings were actually held in Denver (March 2000, January 2001, and December 2001) and at least seven significant board meetings involving Nacchio, Woodruff, or other Qwest personnel participating from Colorado, were held via conference call, from July 2000 to February 2002, in which material facts were either misrepresented or omitted by the named Defendants or other agents of Qwest. *Id.* ¶¶ 94, 105.

But beyond specific meetings and conference calls, fraudulent IRU transactions involving KPNQwest were orchestrated at Qwest's Denver office on a regular basis, *id.* ¶¶ 112, 114, 142-43, 173, and certain Qwest officers "sent emails and had regularly scheduled telephone conferences each quarter from Qwest's offices in Denver in which they explained to KPNQwest representatives, including Defendant McMaster, Rhett Williams and others, the IRU deals that Qwest was arranging and those in which Qwest expected KPNQwest to participate." *Id.* ¶ 115. Nacchio, "providing direction from Colorado," regularly – and at times daily – coordinated with McMaster. *Id.* ¶ 99(c).

Regarding documents, Qwest made it clear in the New Jersey litigation that millions of pages of relevant documents are maintained in Colorado or within the custody of Qwest or its agents. Wolff Decl. ¶ 7(a), (c). Indeed, even before this

litigation began, Qwest had already assembled a database of 100 million pages of potentially relevant information.  *Id.* ¶ 7(c).

In short, Colorado is the logical and most convenient forum to litigate the case, and Defendants do not show otherwise.

### 1.    Private Interest Factors Favor Of Colorado.

The private interest factors identified in *Gschwind* demonstrate that Colorado (and the United States) is a convenient forum; certainly not less convenient than the Netherlands.  Access to sources of proof weighs in favor of Colorado: all Defendants reside in the United States, two in Colorado (including the corporate Defendant), and the other two are subject to jurisdiction in Colorado.  Other central witnesses to the Trustees' case, including former Qwest executives and KPNQwest executives or board members, are in the United States, several in Colorado.  *See* Wolff Decl. ¶¶ 4, 5.[2] Given the issues, Qwest has not suggested that Dutch witnesses would predominate. U.S. citizens ran KPNQwest into the ground and did so from the United States.

Although many of the relevant documents will no doubt be available in electronic format – thus moderating the significance of document location[3] – Qwest has already

---

[2] Key witnesses that the Trustees seek are in the U.S., including Colorado.  They include former Qwest executives Afshin Mohebbi and Greg Casey, each instrumental in specific plans and IRU transactions, Wolff Decl. ¶ 4(a), (f); former KPNQwest Supervisory Board member Drake Tempest, and former Qwest CFO Robin Szeliga, *id* ¶ 4(h), 5(d); Susan Chase, former VP of International Wholesale Markets, Bill Eveleth, former Qwest Senior VP of Finance, and Frank Noyes, former Qwest Senior VP of Financial Reporting, *id.* ¶ 4(b), (c), (g); former KPNQwest CFO Jeff von Deylen, former KPNQwest Senior VP of Finance Brendan Keating, former KPNQwest CMO Rhett Williams, and former KPNQwest Corporate Controller Erin Wray, *id.* ¶ 4(d), (i), (j), (k); former KPNQwest board members Scott Berman, Marc Weisberg, Eelco Blok, and J.G. Dreschel, *id.* ¶ 5(a), (e), (f), (g); former "independent" KPNQwest Supervisory Board members Richard Liebhaber and Pierre Everaert, *id.* ¶ 5(b), (c); and Mark Iwan, once one of KPNQwest's principal outside auditors, *id.* ¶ 6.

[3] *See, e.g.*, *Alpine Atl. Asset Mgmt AG v. Comstock*, 552 F.Supp. 2d 1268, 1280-81 (D. Kan. 2008) (location of e-documents "not particularly significant because [they] can easily be produced anywhere");

(continued…)

admitted that it has millions of pages of potentially relevant documents in the United States, Colorado specifically. Wolff Decl. ¶ 7(a), (c). Qwest's documents are here, KPNQwest's there. This favors suit here.[4]

Regarding the authority of this Court to compel attendance of witnesses, there is no reason to think a Dutch court would have any greater right of compulsory process over non-party witnesses. Indeed, the New Jersey court did not see this factor tipping in favor of either forum, *see Windt*, 544 F. Supp. 2d at 427-28, and, given the presumption in favor of plaintiff's forum choice, this weighs against dismissal. *See Windt*, 529 F.3d at 194. *See also In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 546 F. Supp. 2d 1191, 1196 (D. Kan. 2008, *motion for reconsideration denied*, 2009 WL 229796 (Jan. 30, 2009) (neutral factors did not favor dismissal); *TH Agric. & Nutrition, L.L.C. v. ACE European Group Ltd.*, 416 F. Supp. 2d 1054, 1080 (D. Kan. 2006) (dismissal unwarranted when factors "weigh in favor of both parties").

The cost of obtaining the attendance of willing non-party witnesses also is more or less a toss-up. As noted above*,* the key witnesses reside in the United States, many in Colorado. Thus, about the most that can be made about Defendants' claim that many witnesses reside in Europe (not even in the Netherlands in particular), *see* Defs. Br. at 18 & Sherman Decl. ¶ 3, is that the competing positions cancel each other out.

---

(continued)

*In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 361 (S.D.N.Y. 2002) (advances in technology undercut forum non conveniens arguments in international case).

[4] That some hard-copy documents remain in the Netherlands, *see* Defs. Br. at 18-19, does not significantly affect the balancing. The New Jersey District Court correctly found the "ease of access" to documents issue to be in equipoise. *See* 544 F. Supp. 2d at 426 .

Finally, there are no other practical problems that would make trial of this case in this Court any less easy, less expeditious, or more expensive than a trial of the same or similar claims in the Netherlands.  Defendants point to so-called "related" Dutch proceedings, but in fact those proceedings bear very little in common with this lawsuit.[5] The investigation by the Enterprise Chamber addresses *only* events between January and May of 2002.  Supp. Das Decl. ¶ 5.  This is a much narrower timeframe than that in which Defendants carried out their fraudulent scheme against KPNQwest (following its initial offering in November 1999 to May 2002), and it does not address damages. Knottenbelt Decl. ¶ 3.  The Cargill fraud claim is narrower still in its focus.  Sherman Decl. ¶ 3 & Exh. 2 (Curtin letter) at attachment pp. 13-16.  Finally, no weight is due the D&O insurance arbitration on Defendants' claims for coverage on this and other matters.  The question there is whether the insurers can terminate the policies for misrepresentation.  Knottenbelt Decl. ¶ 7.  Allowing that separate insurance proceeding to dictate the forum for the Trustees' RICO case would be letting the tail wag the dog.

In any event, Defendants do nothing to show how these narrow proceedings could in any way be coordinated with this case to enhance convenience.  In contrast, currently pending in the United States, as noted by Defendants, is an ongoing action by a KPNQwest investor against Qwest, Nacchio, and McMaster, originally alleging violations of federal and state laws.  *See Grand v. Nacchio*, No. C-2002-5348 (Pima

---

[5] Defendants also refer to "contemplated contribution claims" that they say would be impossible to bring in here. Defs. Br. at 19.  Of course, there are no contribution claims for RICO.  *E.g., County of Hudson v. Janiszewski*, No. CV 06-319, 2007 WL 2688882, at *6 & n.4 (D.N.J. Sept. 13, 2007) (stating rule and collecting cases).  And there is no reason to subject other parties not involved in the RICO claims to a RICO action.  As to the possibility that they may have contribution claims in connection with the mismanagement count, under Dutch law, Defendants do not suggest that they are in any danger of losing their ability, or their right, to assert such claims if it is done separately from this action.

Co., Arizona, Superior Ct., filed Oct. 31, 2002), referenced at Defs. Br. at 28, Sherman

Decl. ¶ 6(c).  As Qwest knows, the Trustees, through an agreement with the plaintiffs,

obtained close to two-million pages of Qwest documents, which has most assuredly

expedited the U.S. proceedings already.  *See* Wolff Decl. ¶ 7(b).  In addition, Mr.

Nacchio is now in prison, and ease of access to him will undoubtedly be easier in

connection with a U.S. case than a Dutch case.  *See* "Nacchio Reports to Prison,"

Denver Business Journal, 2009 WLNR 6953309 (April 14, 2009).

Finally, the pendency of the overall KPNQwest liquidation in Dutch courts does

not weigh in the balance.  Bankruptcy trustees often pursue claims outside their home

forum, including foreign trustees for the benefit of foreign estates.  In aid of international

bankruptcy practice, U.S. statutes and policy encourage foreign trustees to pursue

assets, including claims, in the United States.  *See* 11 U.S.C. § 1501, *et seq.*

### 2. The Public Interest Factors Favor Colorado.

On every score, the Colorado public's interest in this lawsuit is at least as great, if

not greater, than that of the Netherlands.

### a. The Colorado Jury Venire And The Interest Of Having Local Disputes Decided Locally

There is no reason to think the Colorado forum is not appropriate for a lawsuit

that, at its core, is based on the alleged wrongdoing by one of the major corporate

enterprises in the region, carried out from its headquarters.  The United States in

general, and any given State in which the conduct occurs more particularly, has an

obvious interest in regulating fraudulent conduct within its borders.  A Colorado jury is

appropriately asked to consider such matters.

**b.    Consideration For Foreign  Bankruptcy Trustees**

In Chapter 15 of the Bankruptcy Code, Congress codified the established U.S.

policy of *encouraging* U.S. courts to provide assistance to foreign bankruptcy trustees.

*See* 11 U.S.C. § 1501, *et seq*  That chapter specifically provides that foreign bankruptcy

trustees may petition the bankruptcy court for recognition (*id.* §1515) and otherwise

encourages federal courts to be of assistance in a variety of ways in gathering assets.

*See*, *e.g.*, *id.* §1509).  Given the policy of facilitating international bankruptcy

proceedings, the courts should be hospitable to efforts by foreign trustees to pursue

claims in the United States, and ought not be more hostile to such a claim than to a

claim by a U.S. trustee from out of state.  Moreover, the Trustees' ability to pursue

judgment to collection will be facilitated if their judgment is that of a U.S. court.

**c.    Treaty of Friendship**

There is a longstanding treaty between the Netherlands and the United States

guaranteeing Dutch citizens "national treatment" in U.S. courts:

> Nationals and companies of either Party shall be accorded
> national treatment with respect to access to the courts of
> justice and to administrative tribunals and agencies within
> the territories of the other Party, in all degrees of jurisdiction,
> both in pursuit and in defense of their rights.

*See* Treaty of Friendship, Commerce and Navigation between the Kingdom of the

Netherlands and the United States of America, art. V, March 27, 1956, 8 U.S.T. 2043.

While the treaty does not nullify the doctrine of *forum non conveniens*, the requirement

that Dutch citizens and entities receive national treatment means that the Trustees'

forum choice should not be afforded any less deference than that of a U.S. national.[6]
*See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 69 n.2 (2d Cir. 2001) (*en banc*).

*        *        *

Given the private and public interest factors favoring suit in Colorado, there is no

basis upon which Defendants can properly suggest that suit in their own home forum is

oppressive or vexatious out of all proportion to the Trustees' own convenience.

### B.    The Court Is Not Bound By The Previous "Forum Non" Ruling.

Defendants think that this Court's jurisdiction, or at least its ability to

independently judge the *forum non conveniens* question, is precluded by the New

Jersey court's prior dismissal.  Defs. Br. at 10-15.  Defendants are flatly wrong on the

law and the principles.

> **1.    Dismissal Based On *Forum Non Conveniens* In One
> District Court Does Not Preclude Consideration Of
> The Case In Another District Court.**

Defendants open by saying the Trustees may not "relitigate" the New Jersey

court's decision, but the Trustees are not doing so.  Preclusion applies when "an issue

involved in a prior decision is the same issue involved in a subsequent action; the issue

is actually decided in the first action . . . [and] it was necessary to decide the issue in

disposing of the first action." *Butler v. Pollard*, 800 F.2d 223, 224-25 (10th Cir. 1986)

(citation omitted).  Hence, in connection with *forum non conveniens* generally, and

---

[6] Defendants' assertion that this Court should ignore the Treaty, *see* Defs. Br. at 17 n.7, is hard to fathom.
In New Jersey, the Trustees did not affirmatively raise the treaty (though it was in the court record on a
related motion) in the initial briefing because no one suggested the kind of treaty-based hierarchy for
deference applied by the district court.  The district court raised the issue *sua sponte* – including its own
review of treaty law – after expressing skepticism about foreigners using U.S. courts.  *See* 544 F. Supp.
2d at 419 n.14.  In any event, Defendants offer no authority for the proposition that this Court is barred
from considering a legal issue supporting jurisdiction in this case because of an implausible procedural
objection that not even the Third Circuit passed on when Defendants raised it on the Trustees' appeal.

particularly here where the Third Circuit was explicit that it was not addressing whether suit in Colorado would be appropriate, the following rule applies:

"Dismissal on *forum non conveniens* does not establish claim preclusion," nor does it ordinarily "work issue preclusion as to other courts because the convenience issues are intrinsically different." *Exxon Corp v. Choo*, 817 F.2d 307, 312 (5th Cir. 1987), *rev'd on other grounds*, 486 U.S. 140 (1988) (quoting 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4436 (2d ed. 2002).  Therefore, a plaintiff may relitigate *forum non conveniens* in the second district if he "demonstrates that the *forum non conveniens* analysis would be materially different." *China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1110 (N.D. Ohio 2000); *see also Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1498 (5th Cir. 1993), *abrogated on other grounds by Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211 (5th Cir. 1998) (plaintiff must show "objective facts that materially alter the considerations underlying the previous resolution") (citation omitted); *Choo*, 817 F.2d at 314 (plaintiff "must do more than ask for a rebalancing of the *forum non conveniens* considerations"). A plaintiff may try another district if it shows different "objective criteria" or different "material facts underlying the application of those criteria." *Pastewka v. Texaco, Inc.*, 565 F.2d 851, 854 (3d Cir. 1977).[7]

Thus, if (as here) the first court focused its decision on the relative convenience of the first district, plaintiff is not precluded from opposing a *forum non conveniens* motion in the second.  *See Mizokami Bros. of Arizona, Inc. v. Mobay Chem. Corp.*, 660

---

[7] A showing of different objective criteria may include a showing that the governing *forum non conveniens* standard is different.  *See, e.g., Johnston v. Multidata Sys. Int'l Corp.*, No. G-06-313, 2007 WL 1296204, at *8 (S.D. Tex. Apr. 30, 2007).

F.2d 712, 716 (8th Cir. 1981).  "Federal courts have permitted relitigation of the...issue in a different federal forum when the plaintiff has demonstrated different contacts between the new forum and the underlying dispute." *Choo*, 817 F.2d at 311; *see also* 17 *Moore's Federal Practice* § 111.94 (Matthew Bender 3d ed. 2009) ("If differences between two forums make one more convenient, that court should not necessarily be required to dismiss merely because the other, less convenient forum did so.").  The Third Circuit here, in affirming dismissal from New Jersey, recognized as much.  *Windt*, 529 F.3d at 191-92.

In *Mizokami* for example, plaintiff first filed suit in the District of Arizona, which dismissed in favor of Mexico, and the Ninth Circuit affirmed.  660 F.2d at 715.  Plaintiff then refiled in the Western District of Missouri, which dismissed under principles of *res judicata.  Id* On appeal, plaintiff argued that the only issue decided by the first suit was that "the District of Arizona was not a convenient forum ... not that Mexico was the only convenient forum." *Id.* at 716  The Eighth Circuit agreed: "The contacts of the parties and transactions with Missouri, the availability of witnesses and evidence in Missouri, and factors affecting the burden on the Missouri District Court were not explored in the Arizona litigation."  *Id.* Therefore, the District of Arizona dismissal was conclusive "*only as to the availability of an Arizona forum*" and "[f]urther litigation on other procedural questions ... [was] not precluded." *Id.* at 716-17 (emphasis added).  *Accord Ibar Ltd. v. Am. Bureau of Shipping*, No. 97 Civ. 8592, 1998 WL 274469, at *4 (S.D.N.Y. May 26, 1998)  (different contacts between second district and underlying dispute "significantly alter the *forum non conveniens*  analysis that has, up to this point, only been applied with respect to the first forum"); *Kelly v. Interpublic Group of Cos.*, No. 07 Civ. 1317,

2007 WL 2265570, at *2 (S.D.N.Y. Aug. 2, 2007) ("[D]efendants having its principal place of business in [the second district] where the action is pending is a fact relevant to the *forum non conveniens* analysis that was not present in the [first district].").

Defendants cite *Pastewka* for the proposition that plaintiffs can be bound by an earlier *forum non conveniens* dismissal if they try to relitigate the same factual and legal issues in the second district. 565 F.2d at 854. But *Pastewka* is inapposite, for the same reasons noted by the Eighth Circuit in *Mizokami,* which pointed out that the *Pastewka* plaintiffs "conceded that both the objective legal criteria and the material facts underlying the application of those criteria were identical." *Mizokami*, 660 F.2d at 716.[8]

Here, the District of New Jersey (and the Third Circuit) did not decide that the action *must* be tried in the Netherlands. They held only that the *forum non conveniens* analysis favored dismissal from New Jersey, not that there is no convenient U.S. forum.[9] *Windt*, 544 F. Supp. 2d at 429. *See Mizokami*, 660 F.2d at 716 (Although first court dismissed on *forum non conveniens*, it did not hold "that the claim must be tried in [the foreign forum]. It merely refused to exercise jurisdiction and dismissed the case.").

In fact, Defendants argued all though the prior action that the *forum non conveniens* analysis is district-based – not focused on whether the case should be

---

[8] Other cases cited by Defendants are similar. *See Torreblanca de Aguilar v. Boeing Co.*, 806 F. Supp. 139, 142 (E.D. Tex. 1992) ("Plaintiffs have not shown that this jurisdiction is any more convenient than the other fora from which their claims have already been dismissed."); *Barrantes Cabalceta v. Standard Fruit Co.*, 667 F. Supp. 833, 838 (S.D. Fla. 1987).

[9] Given the nature of the New Jersey determinations, Defendants' case law is readily distinguishable. *Compare 555 Corporate Ventures, Ltd. v. Ash Grove Cement Co.*, No. 04 Civ. 2169, 2005 U.S. Dist. LEXIS 8814, at *10-11 (D. Kan. Aug. 2, 2005) ("The case at hand differs [from *Mizokami*], in that the [first district] specifically held that this lawsuit should be pursued in [the foreign forum]."); *Amore v. Accor*, 484 F. Supp. 2d 124, 130 (D.D.C. 2007) (first district's *forum non conveniens* dismissal "is a determination that the merits of the case should be adjudicated in a court abroad, rather than in the United States"); *China Tire*, 91 F. Supp. at 1110-11 (first court's decision considered national interests).

maintained in the United States or some other district – arguing in the Third Circuit that "the proper analysis focuses on ties to the forum district," not the nation as a whole. Wolff Decl. ¶ 8, Exh. A.  The Third Circuit itself focused on New Jersey and explained that this was a case where "considerations of local [New Jersey] inconvenience may be so strong as to dwarf considerations of national convenience."  529 F.3d at 191.  The Third Circuit well understood the point, noting that its dismissal for "local considerations" would not preclude the Trustees' from pursuing the matter in another district :

> It would be problematic if granting a motion to dismiss for *forum non conveniens*, based on local considerations, precluded a plaintiff from filing suit in another, convenient district. *Thus, the conclusion we reach in this case does not necessarily mean that this action may not be maintainable in another federal district.*

*Id*. at 191-92 (emphasis added).

Given the Third Circuit's explicit reservation on this point, and its decision to address the issue from the perspective of New Jersey, it is quite clear that Defendant's motion for *forum non conveniens*, filed in this Court, was *not* resolved by the New Jersey decision.  Moreover, the same conclusion can be drawn by examining the legal standard applied and the matters determined in the prior case.

### 2. Tenth Circuit Law On *Forum Non Conveniens* Is Not Identical To That Of The Third Circuit.

Contrary to what Defendants say, Tenth Circuit and the Third Circuit law in this area is not "identical."  Defs. Br. at 10.  In the Third Circuit, the critical threshold question is "how much" deference to grant the plaintiff's choice of forum.  *See Windt*, 529 F.3d at 190.  As the New Jersey District Court's decision demonstrates, a foreign plaintiff is usually give a only a "low degree of deference," *see Windt*, 544 F. Supp. 2d at 421, which, for all practical purposes, can determine – at the outset – the result of the

balancing of the public and private interests.  *See id.* at 417 (opining that "courts are suspicious" of a foreign plaintiff's motives to sue in the United States).

Not so in the Tenth Circuit.  Although convenience is not assumed when a plaintiff is foreign, such that the presumptive deference can be less than the deference granted a U.S. plaintiff, deference is still the rule.  *See Yavuz*, 465 F.3d at 426.

Moreover, the slightly reduced deference to a foreign plaintiff is, in this Circuit, more than counterbalanced by the established rule that where the defendants are themselves forum residents, they must make "a stronger case than others for dismissal based on *forum non conveniens.*"  *Gschwind*, 161 F.3d at 609.  On this, the Tenth Circuit follows an approach such as that taken by the Second Circuit in *Norex Petroleum Ltd. v. Access Indus., Inc.*, where the court recognized that suit in defendant's home forum was inherently convenient.  416 F.3d 146, 155 (2d Cir. 2005) (foreign plaintiff's "decision to litigate in New York, where all defendants were amenable to suit (and where some reside or are incorporated) is properly viewed as a strong indicator that convenience, and not tactical harassment of an adversary, informed its decision to sue outside its home forum").[10]  The upshot of this different emphasis is that this Circuit does not begin its forum analysis with a presumption of *suspicion* toward the Trustees' choice of forum.  The difference in starting point affects much of the subsequent analysis.

---

[10] It is perfectly ordinary to sue a defendant in defendant's home forum.  The general venue statute so provides, 28 U.S.C. § 1391(b), as does RICO itself, 18 U.S.C. § 1965(a).  European law also adopts this approach.  *See* Council Regulation (EC) 44/2001, art. 2(1) (2000), available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:32001R0044:EN:HTML.

There are obviously other differences as well.  For example, the principal point of contest in the Third Circuit and on certiorari was the Third Circuit's decision to focus on New Jersey.  Notwithstanding that the New Jersey District Court, as a federal district court, could properly compare the relative interests of the *United States* and the Netherlands in the matter, the Third Circuit chose a more parochial view.  Other  circuits reject that approach.  *See Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1313 (11th Cir. 2002) (holding that entire United States is relevant forum); *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 429 (1st Cir. 1991) (same); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991) (same).  Here the contacts with Colorado are strong, but the combined contacts of Colorado and New Jersey, where two individual defendants reside, are even stronger, by definition.  Thus, the basic approach of the Third Circuit may well differ from the approach applicable here.

### 3. Neither The District Of New Jersey Nor The Third Circuit Decided Whether this Action Is Proper In Colorado.

The New Jersey focus pervaded the decision in the prior action and appeal.  For example, Judge Brown paid only lip service to the United States, and said nothing about Colorado when weighing the public and private interests.  And, more importantly, the Third Circuit focused on New Jersey's contacts with this suit:

- "[T]here are no allegations that actions or events occurring in New Jersey gave rise to the fraud and mismanagement at issue in this case. Moreover, without a dispute local to the community of New Jersey, there is little public interest in subjecting that community to the burdens of jury service." *Windt*, 529 F.3d at 193.

- "In light of New Jersey's lack of associations with this case . . . ." *Id.*

- "[A] general national interest does not outweigh the limited connection between New Jersey and this dispute." *Id.* at 193-94.

- "Although the Trustees presented affidavits to the District Court identifying witnesses residing in the United States, almost all of the witnesses reside outside of New Jersey." *Id.* at 194.

- "[T]he District Court considered the burdens of compelling unwilling witnesses to attend trial to be equal in New Jersey and the Netherlands . . . ." *Id.*

- "[T]he District Court did not abuse its discretion when it determined that litigating this dispute in New Jersey would be oppressive . . . [so as to] outweigh[] the convenience to the Trustees in litigating this dispute in New Jersey." *Id.* at 197.

Citing the general notion that preclusion attaches to issues fully and fairly litigated and necessarily decided in the prior action, Defendants argue that even if the overarching forum question is properly considered anew, the Trustees are precluded from relitigating "subsidiary issues." Defs. Br. at 14-15. Defendants again are wrong. *First*, Judge Brown's findings in this comparative exercise were forum-specific and influenced by the Third Circuit's unique paradigm for analysis and his own focus on New Jersey. *Second*, Judge Brown's findings went through significant revision in the Third Circuit, where the forum-specific focus on New Jersey was even more obvious. Colorado issues were not before the court and certainly not "necessarily" decided by that court. *See Mizokami*, 660 F.2d at 716 (rejecting issue preclusion in *forum non conveniens* setting); *Choo*, 817 F.3d at 311-12.

In particular, Defendants ask this Court to adopt the prior court's "finding" of "oppressiveness and vexation" as a basis for dismissal. But it is quite clear that such a "finding" is not a "finding" at all; rather, it was simply the product of the New Jersey District Court's court's *forum non convenins* analysis, after application of the Third Circuit's unique "low deference" standard and its balancing of public and private interests. *See Yavuz*, 465 F.3d at 426. As such, that "finding" cannot simply be adopted by this Court because it has not been analyzed with respect to Colorado.

## II.    THE TRUSTEES HAVE PROPERLY PRESENTED A RICO CLAIM.

### A.    The Conduct On Which The Trustees Rely Is Not Actionable As Fraud In The Sale Of Securities.

For the RICO claim, the Complaint describes a series of frauds perpetrated on KPNQwest, leading KPNQwest to make a number of disastrous decisions.  Defendants assert that their fraud on KPNQwest cannot give rise to a RICO claim because of 18 U.S.C. § 1964(c) , as amended by the Private Securities Litigation Reform Act ("PSLRA"), and Third Circuit case law interpreting that provision.  Defs. Br. at 21 (citing *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999)).  Specifically, § 1964(c) states that in pleading a RICO claim, a person may *not*:

> rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].

18 U.S.C. § 1964(c).  But Defendants' argument goes nowhere because the Trustees do *not rely* upon conduct actionable as fraud in the purchase or sale of securities.  The fraudulent conduct that forms the basis of the Trustees' claims was not *in*, and was not even *coincident with (*see discussion below), a purchase or sale of securities, or any securities transaction at all.  Rather, it was a fraud on KPNQwest, deceiving KPNQwest, allowing Defendants to remain in control and causing KPNQwest to take actions to its detriment.  The fraud did not involve the purchase or sale of securities.

Defendants are correct that § 1964(c), by its terms, bars more than reliance on Securities Act fraud as predicate acts under RICO – as had been affirmatively permitted before the amendment.  Thus, Congress did not focus on whether the claim *was pled* as a Securities Act claim.  Instead, it barred claims based on conduct *actionable* as fraud "in the purchase or sale of securities."  Fraud "in the purchase or sale of securities"

seemingly contemplates at least that the plaintiff is relying on fraud that is actually part of ("in"), not merely related to, a securities transaction.

Some courts have held that the plaintiff itself need not even have standing to pursue the claim of fraud in the sale of securities, holding that if (i) the fraud is in the purchase or sale of securities, (ii) it is being relied on by the plaintiff, and (iii) it is actionable by someone, the bar applies. *See Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000). That conclusion is not compelled by the statutory language, however, which, read logically, refers only to claims that would be actionable by plaintiff.[11] And, indeed, the limited legislative history suggests that Congress was willing to displace RICO claims by parties injured by stock fraud only because it believed that the Securities Act provided sufficient relief to such parties. *See* H.R. Conf. Rep. No. 104-369 ("Conf. Report"), at 47 (1995). Where the plaintiff does not have a securities claim at all because it was not involved in a securities transaction – or was not a purchaser of securities – that rationale does not fit. Indeed, it is difficult to see how a plaintiff can be relying on conduct involving fraud *in* the sale or purchase of securities if there is no purchase or sale at issue.

In any event, Defendants do not demonstrate that the conduct on which the Trustees *rely* is *actionable* as fraud in the purchase or sale of securities *by anyone* (though they concede the obvious fact that it would not be actionable as a securities fraud by the Trustees because the fraud on them did not involve securities at all). In fact, Defendants do not even try to apply the statutory language with a showing that the

---

[11] Such a reading might in a given case, displace a significant claim recovery by a directly injured party, not involved in a securities transaction, based on the possibility that someone else might have some type of (minor) stock fraud claim.

conduct the Trustees rely upon is actionable as fraud in the sale of securities.  They simply note that the Trustees (i) cite Qwest's fraud on its own shareholders and (ii) describe the fraud on KPNQwest helped conceal Qwest's problems from its own shareholders.  Defs. Br. at 22-29.  But those references do not mean that the Trustees' claim relies on conduct actionable as fraud in the sale of *Qwest* securities.

(a)     The Trustees cited Qwest's own deceptive accounting to highlight that similar techniques were used to fool the KPNQwest Supervisory Board.  When Qwest uses deceptive practices to defraud shareholders, that is fraud in the purchase or sale of securities.  But the conduct that the Trustees rely upon for their claim, the defrauding of KPNQwest, did not involve any purchase or sale of securities and was not "actionable" as such.  That these two frauds may have common deceits cannot transform the plainly non-securities fraud on KPNQwest into securities fraud because Qwest similarly deceived its own shareholders.

(b)     As to the Trustees' allegation that among the reasons Defendants defrauded KPNQwest was because it might reveal the failure of Qwest's own business model and because Qwest wanted to maintain the value of KPNQwest on its own books, Defendants again fail to show that the conduct *that the Trustees rely on*, fraud on KPNQwest, would have been actionable as "fraud in the sale of securities," by the Trustees or by anyone.  Again, Qwest's fraudulent misstatements to its own shareholders might well be actionable as fraud in the sale of its securities.  But the conduct on which the Trustees rely is the fraud on, and manipulation of, KPNQwest. There is a relationship, of course.  But fraud by Qwest involving its own securities and its shareholders does not make Qwest's fraud on KPNQwest, not involving securities,

fraud "in the sale of securities" (or, for that matter, "in connection with the sale of securities," *see discussion below* at 32-34).[12]

Rather than demonstrate that the Trustees are themselves "relying on conduct that would be actionable as fraud in the purchase or sale of securities" in any linguistically plausible sense, Defendants cite the Third Circuit's decision in *Bald Eagle*. In *Bald Eagle*, the Third Circuit skirted the actual language of § 1964(c) – fraud "*in* the purchase or sale of securities" – and instead relied on the more elastic language of § 10(b)  of the Securities and Exchange Act, 15 U.S.C. § 78j(b), which gives the *SEC* authority over fraud "in connection with" the sale of securities.  189 F.3d at 330.

There are many situations where there is no practical difference between fraud "in connection with" a sale of securities and fraud "in" a sale of securities.  But the substitution of "in connection with," drawn from § 10(b), on the one hand, for the "in" language of § 1964(c), often gives defendants more wiggle room.  Here, for example, Defendants invoke the § 10(b) language to create the impression that *any* relationship between the claim at issue and some securities transaction is barred by § 1964(c). And, as is clear from cases cited by Defendants, reading "in connection with" into § 1964(c)  seems to broaden the scope of § 1964(c) to make it co-extensive with the potential range of SEC enforcement under § 10(b).  Indeed, the Third Circuit's decision to substitute "in connection with" for "in" is why most of the cases cited by Defendants

---

[12] Defendants say that the Trustees have alleged that Qwest bought additional stock in KPNQwest to solidify Qwest's control over the Board.  But the Trustees have not alleged anything fraudulent or improper about that purchase.  It did happen, as noted in the Complaint.  But it involved no fraud in its own right and none is alleged.  Similarly, the notation of Qwest's executives' insider trading relates to the fraud taking place at Qwest, not to the fraud on KPNQwest on which the Trustees rely.

are from courts in the Third Circuit or courts relying on that precedent. The Tenth and other Circuits have not endorsed that language substitution.

*Bald Eagle*'s resort to legislative history to draw in the looser language does not support its approach. That history is brief and suggests no extraordinary breadth for the section. The Conference Report (cited by *Bald Eagle*) states that "[b]ecause the securities laws generally provide adequate remedies for those injured by securities fraud," RICO treble damages are not necessary. Conf. Report at 47 (testimony of SEC Chairman Levitt). It does *not* suggest that RICO actions by plaintiffs *not* involved in the sale or purchase of securities, or relying on conduct that is not itself fraud in the sale of securities, are barred under RICO because *defendants* may also have engaged in related securities transactions – defendants' suggestion. There really is no reason to believe that Congress meant to exclude more than actionable fraud "in" the purchase or sale of securities. *See generally Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 79-80 (2006) (discussing the evolving interpretation of § 10(b) and the scope of private actions under § 10(b)).

Suffice it to say that to the extent the Third Circuit declines to apply the statutory language "in," and substitutes "in connection with," its approach is inappropriate. As made clear in cases like *Dabit*, 547 U.S. at 79-85, there can sometimes be a significant distinction between fraud "in" the sale of securities, and fraud "in connection with" a sale of securities (though neither phrase would reach the conduct that the Trustees rely on here).[13] In drafting § 1964(c), Congress used the facially narrower formulation.

---

[13] Indeed, *Dabit* explains that originally, even the term "*in connection with* a sale or purchase of securities" was interpreted to require the fraud be part of the sale, in the

(continued…)

Because Congress used "in," there is little support for Defendants' argument here that § 1964(c) reaches conduct related to securities through indirect means, based on connections demonstrated through extrinsic proof of facts not actually relied upon by the Trustees for their own claims.  Defs. Br. at 22-23.

To the contrary, with its choice of language, there is every reason to believe that Congress was rejecting an infinitely elastic "in connection with" approach of the type sponsored by Defendants.  As Defendant's arguments illustrate, almost any action that a company takes is reflected in shareholder reports.  This allows defendants to argue, as they do here, that virtually any fraud committed *by* a public company, *within* the company, or *upon* the company, has some relationship or "connection with" its securities – notwithstanding that the underlying fraud did not involve securities.  That argument would effectively grant corporations that engage in fraud on other entities (as Qwest did here), *in a manner that has nothing to do with securities*, a RICO immunity based on the argument that the company also, separately, deceived shareholders too.

Moreover, Defendants' proposed approach to "in connection with" creates a novel procedural posture for judging a complaint under § 1964(c).  It is generally easy to see on the face of the pleadings whether a complaint relies on actionable fraud "*in*" the purchase or sale of securities.  That can be determined by the allegations.  But there is

---

(continued)

sense of inducing the purchase or sale. 547 U.S. at 79.  However, based on the "in connection with" phrase, § 10(b)'s scope was eventually expanded to include frauds that *coincide* with security sales – thus allowing broker frauds involving manipulation of securities sales accounts for example – where the fraud was in the handling of the account – to be covered.  *See id.* at 84-85 (noting evolution).

no way to tell on the pleadings whether plaintiff is relying on conduct that may, based on extrinsic facts (or pleadings in some other case, as Defendants suggest here), be connected to some other actionable fraud in connection with a sale or purchase of securities one or two steps removed.  It is unlikely that Congress wanted to determine whether a claim was well pleaded under RICO by looking to extrinsic facts and determinations about whether other parties in other cases pled viable securities frauds.

More important, even the Third Circuit recognized that the phrase that Defendants prefer, "in connection with," has never been interpreted "so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," *SEC v. Zandford*, 535 U.S. 813, 819 (2002), including corporate mismanagement, *see Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12 (1971), which is what Defendants suggest here.  Such matters do not even involve frauds coinciding with securities sales, but rather, matters one or more steps removed from any sale or purchase of securities.  Thus, *Bald Eagle* specifically rejected extending the PSLRA bar to fraudulent conduct that is only "*intrinsically connected to, and dependent upon* conduct actionable as securities fraud."  *Bald Eagle*, 189 F.3d at 330 (emphasis added).  The conduct at issue must itself be actionable as fraud "in connection with" a securities sale.  No doubt, there is a "very fine line between an act taken 'in connection with' the sale or purchase of securities and actions that are 'intrinsically connected to and dependent upon' conduct actionable as securities fraud." *In re Ikon Office Solutions, Inc. Securities Litigation*, 86 F. Supp. 2d 481, 487 (E.D.Pa. 2000).  But it is an important line all the same: "In connection with" does not mean all matters related to a securities transaction.  *See*, *e.g.*, *Flood v. Makowski*, 2004 WL

1908221, *17 (M.D. Pa. Aug. 24, 2004) ("A fraud related to the purchase or sale of a security is not always actionable as securities fraud.").  Defendants must show that the Trustees' conduct is actionable as fraud in securities purchase or sales.

Therefore, even if one were to assume that the question was whether the conduct relied on was fraud "in connection with" the purchase or sale of securities, rather than "in" the purchase or sale, Defendants would *still* be stretching the precedents beyond the breaking point.  At bottom, virtually all of the cases cited by Defendant were securities cases at heart, being pled, often in the alternative, as RICO claims, but always about injury from purchasing securities, not just securities transactions incident to, or steps removed from, the conduct at issue.[14]  They were, in a real sense, about the sale of securities and coincident with the purchase and sale.  This is equally true of the § 10(b) cases, involving SEC actions, under the "in connection with" rubric.  *See Zandford*, 535 U.S. at 822 (where securities sales coincide with scheme to defraud, conduct is actionable).[15]

---

[14] *See In re Ikon Office Solutions*, *supra*; *Eagletech Communications Inc. v. Citigroup, Inc.*, No. 07-60668, 2008 WL 3166553, at *12-13 (S.D. Fla. June 27, 2008); *Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673, 677 & n.4 (E.D.Pa. 2001); *In re Enron Corp. Sec. Derivatives & ERISA Litig.*, 284 F. Supp. 2d 511, 652 (S.D. Tex. 2003); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04-C-0698, 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004); *Baron v. Chehab*, No. 05-3240, 2006 WL 156828, at *8 (C.D. Ill. Jan. 20, 2006).

For example, in *Bald Eagle* itself, plaintiffs bought securities from defendant as part of a Ponzi scheme – a classic securities fraud in which the defendant sells fraudulent securities to finance and conceal earlier frauds.  Plaintiffs were seeking to recover the money they lost in those securities purchases.  They "concede[d] that some of the conduct alleged as predicate offenses of mail, wire, and bank fraud does constitute securities fraud," and asserted that they *also* alleged fraudulent conduct apart from the securities purchases.  *Bald Eagle*, 189 F.3d at 329.  The Third Circuit characterized this argument as an "attempt to avoid the unavoidable"; because given the nature of a Ponzi scheme "conduct undertaken to keep the securities fraud Ponzi scheme alive" is actionable as securities fraud.  *Id* at 329-30.

[15] Qwest relies on *Zandford*, in which the Supreme Court held that the requirements of § 10(b) of the Securities Exchange Act can be satisfied if "the scheme to defraud and the sale of securities coincide." But both that case and *Bankers Life* (which it cites) involved injury to *investors* of precisely the sort that securities laws capture.  In *Zandford*, a broker sold his customers' securities and used the proceeds for

(continued…)

None of the cited cases goes so far as to suggest, as Plaintiffs do here, that "in connection with" – let alone "in" – reaches a non-securities fraud that a company commits against another company because of the way the perpetrator reflects the transaction on its own books. The conduct on which the Trustees rely was neither "in" nor "in connection with" the sale of securities, regardless of whether related conduct ultimately affected Qwest's shareholders – shareholders of a different company, in a different country.

For example, if Company A defrauded Company B (and Company C and Company D) by submitting fictitious invoices for work not done, and generated revenue on that basis, that income might show up on Company A's books as revenue – later disappointing shareholders, defrauding them, when they realize it was not legitimate revenue at all. But the decision to compound the frauds on B, C, and D, by making false statements that fool shareholders in A does not transform the frauds on B, C, and D into securities fraud. B, C and D were deceived by fraudulent invoices. A's fraud on its shareholders is not the same, or coincident with, the fraud on the duped companies.

As discussed above, Defendants rely primarily upon the Trustees' references to Qwest in their Complaint, and the securities suits that were filed against Qwest for its misleading accounting practices of various sorts. Defs. Br. at 28-29. In passing, *id.* at 28, Defendants also note a few complaints filed by purchasers of KPNQwest securities. But again, the mere fact that some shareholders made efforts to build on the Trustees

---

(continued)

his own benefit. The Court held that "like the company directors in *Bankers Life*, the [plaintiffs] were *injured as investors* through respondents' deceptions, which deprived them of any *compensation for the sale of their valuable securities*." 535 U.S. at 822 (emphasis added).

allegations does not demonstrate that the Trustees' own claims would have been actionable as fraud "in connection with," or "in," the sale of securities.  That can be seen from the nature of the claims as pled by the Trustees and the conduct the Trustees rely on.  Even if separate securities complaints reference those allegations, that suggests only that that the Trustees' action is "intrinsically connected to" securities fraud, not that the Trustees rely on conduct actionable as fraud in the sale or purchase of securities.

## B.    The Trustees' RICO Claim Is Timely.

Defendants contend that because the Trustees did not obtain an order in New Jersey conditioning dismissal on a waiver of the statute of limitations, the four-year statutory period has run and the RICO claim is time-barred.  Defendants are wrong in positing a requirement that a waiver be sought, and their statute of limitations argument ignores well-established principles of equitable tolling which recognize that the earlier action, dismissed on *forum non conveniens* grounds, tolls the limitations period.

### 1.    The Trustees Were Not Required To Seek A Conditional Order Of Dismissal From The New Jersey Court.

Claiming "common practice," Defendants argue that absent an order from the New Jersey District Court conditioning its dismissal on Defendants' agreement to waive any statute of limitations defense, the limitations period did not stop running with the filing (and dismissal) of the New Jersey action.  There is no such practice, let alone requirement, and the argument is disingenuous.  Defendants' cases stand only for the obvious proposition that with respect to the *alternative forum to which the defendant proposes that the litigation be transferred* – the forum that moving defendants must show to be an adequate "available" forum – dismissals are often conditioned on the moving defendant's concession that it will be amenable to suit in the proposed

alternative forum, *e.g.*, *In re Air Crash Off Long Island, N.Y.*, 65 F. Supp. 2d 207, 212 (S.D.N.Y. 1999), including that it will not raise the statute of limitations as a defense. *See Reed v. Norfolk & W. Ry. Co.*, 635 F. Supp. 1166, 1168 (N.D. Ill. 1986).

The suggestion that the Trustees were somehow required to seek a conditional order from the New Jersey District Court requiring or declaring a waiver to allow Trustees to file their Complaint in the District of Colorado (or any other U.S. forum) is fanciful. For one thing, Defendants know full well that they would not have agreed to any such waiver. Consistent with the case authority cited by Defendants, the court could have mandated that Defendants agree to such a waiver in connection with the pursuit of the claims in *the Netherlands* because Defendants were required to demonstrate that the Netherlands is an available forum. And such waivers are important in the international context because there is no assurance that foreign law or foreign courts would recognize tolling principles.

In connection with a refiling in U.S. federal court, however, there is simply no reason why *the dismissing court* should get involved in such issues, let alone that there should be some requirement that it do so. To the contrary, it is the court in which the action is filed and the limitations defense is raised that determines whether the statute should be deemed equitably tolled. Here, established principles of equitable tolling clearly preclude Defendants' statute of limitations theory.

### 2. The Statute Of Limitations Was Tolled By Filing In The Wrong Forum.

The claims in this case have been continuously pending against Defendants since June 2004. In light of principles of equitable tolling, the fact that the New Jersey

action was dismissed on grounds of *forum non conveniens* offers no plausible basis to suggest that the Trustees' RICO claims are now barred by the statute of limitations.

Given Defendants' argument on limitations periods and tolling, it is useful (as the Supreme Court made clear) to recall the bedrock principle on which limitations periods rest:  the desire of the law not to prejudice a defendant by belatedly calling him to defend against charges that have become stale.  *See John R. Sand & Gravel Co. v. United States*, 128 S.Ct. 750, 753 (2008) (noting desire to "protect defendants against stale or unduly delayed claims").  In *Turgeau v. Admin. Review Bd.*, 446 F.3d 1052, 1058 (10th Cir. 2006), the Tenth Circuit explained that statutes of limitations:

> promote justice by preventing surprises through the revival of claims that
> have been allowed to slumber until evidence has been lost, memories
> have faded, and witnesses have disappeared."  *Am. Pipe & Const. Co. v.
> Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)  (quotation
> omitted).  The theory is that even if one has a just claim it is unjust not to
> put the adversary on notice to defend within the period of limitation and
> that the right to be free of stale claims in time comes to prevail over the
> right to prosecute them.

*Id.*  On the other hand, "[t]his policy of repose, designed to protect defendants, is frequently outweighed ... where the interests of justice require vindication of the plaintiff's rights."  *Id.* (quoting *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965)). Equitable tolling restores the proper balance.  *Burnett*, 380 U.S. at 426-27; *see generally Peterson v. City of Wichita*, 706 F. Supp. 766, 773-74 (D. Kan. 1989); *Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995); *Gonzalez-Aller Balseyro v. GTE Lenkurt, Inc.*, 702 F.2d 857, 859 (10th Cir. 1983).

Equitable tolling presumptively applies to private causes of action.  *See John R. Sand & Gravel*, 128 S.Ct. at 755 (affirming that even as to claims against the federal government, tolling is presumed) (citing *Irwin v. Dept. of Vets. Affairs*, 498 U.S. 89, 95-

96 (1990)); *see also Irwin*, 498 U.S. at 95 ("Time requirements in lawsuits between private litigants are customarily subject to 'equitable tolling.'") (citation omitted); *Bowen v. City of New York*, 476 U.S. 467, 480 (1986) (noting "traditional equitable tolling principle").  Consistent with this Supreme Court precedent, the Tenth Circuit has long held that the doctrine of equitable tolling is implied in every federal statute of limitations where its application is "consistent with congressional intent and called for by the facts of the case."  *Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516, 521 (10th Cir. 1988).

The Tenth Circuit applies equitable tolling in three situations:  (1) when defendant has actively misled plaintiff; (2) when plaintiff has in some extraordinary way been prevented from asserting his rights; or (3*) when plaintiff has raised the precise statutory claim in issue but has mistakenly done so in the wrong forum.  Turgeau*, 446 F.3d at 1055-56 (applying equitable tolling doctrine, on third ground, where plaintiff had raised the precise statutory claim in state court when he should have raised it in a federal administrative complaint); *see also Carlile v. S. Routt Sch. Dist.*, 652 F.2d 981, 985 (10th Cir. 1981); *Smith v. Am. President Lines, Ltd.*, 571 F.2d 102, 109 (2d Cir. 1978) (*citing Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976)).  The third basis – filing in the wrong forum – applies here.

*Burnett*, 380 U.S. 424, demonstrates the applicability of the controlling third basis for applying the doctrine.  In that case, the plaintiff filed a claim in state court pursuant to the Federal Employers Liability Act ("FELA"), which was eventually dismissed for improper venue.  Eight days later, plaintiff filed in federal court.  Defendant moved to dismiss the federal suit as untimely because the FELA statute of limitations had run.  The Supreme Court ultimately ruled for plaintiff, holding that the statute of limitations

was tolled while plaintiff's timely state court action was pending. *Id.* at 426.  It said that

when "a plaintiff begins a timely FELA action in a state court having jurisdiction, and

serves the defendant with process and plaintiff's case is dismissed for improper venue,

the FELA limitation is tolled during the pendency of the state suit." *Id.* at 434-35.

*Accord Billings v. Chicago, Rock Island and Pacific Railroad Co.*, 581 F.2d 707 (8th Cir.

1978) (equitably tolling in light of state action dismissed for improper venue).

The same principles applied in *Burnett* after dismissal for improper venue apply

equally (if not more so) in cases where the first action was dismissed for *forum non*

*conveniens*, a far more discretionary basis for dismissal.  *See Reed v. Norfolk and*

*Western Railway Co.*, 635 F. Supp. 1166, 1168 (N.D. Ill. 1986) ("We see no reason to

treat a dismissal for inconvenient forum differently from one for improper venue. The

logic of *Burnett* applies to both procedural dismissals.").  Nor has the fact that the cause

of action in *Burnett* was brought under FELA prevented courts from applying the

doctrine in cases brought under other federal statutes, including RICO.  Indeed, the

Tenth Circuit noted that the "Supreme Court has recognized that equitable tolling may

be available under RICO." *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008)

(citing *Rotella v. Wood*, 528 U.S. 549, 560-61 (2000)).

Equitable tolling applies here.  Defendants concede that the Trustees timely filed

in the District of New Jersey but that court, and the Third Circuit, determined that New

Jersey was the wrong forum.  Because the current Complaint rests on the "same

statutory foundation," and Defendants have at all times been aware of the Trustees'

claims and would not be prejudiced by having to defend their conduct in Colorado, the

limitations period must be deemed tolled with the filing of the New Jersey action.

Finally, *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 961 (10th Cir. 1991), principally relied upon by Defendants (at 30), is readily distinguishable because there the earlier case was voluntarily dismissed, *not filed in the wrong venue,* and thus did not fall within any categories recognized for equitable tolling.[16]

### C.    The Trustees Have Standing And Seek Appropriate Damages.

Defendants' two-pronged contention that the Trustees lack "RICO standing" because (1) the alleged injuries are not "directly" caused by the alleged frauds; and (2) "deepening insolvency" damages are not recognized under RICO does not hold water. The first assertion is based on Defendants' mischaracterization of the Complaint: The Trustees have pled injury resulting directly from Defendants' conduct.  That Defendants choose to turn a blind eye to those allegations is not surprising, but because they do, the line of cases they cite as support turns out to be inapposite.  The second part of the argument is also wrong.  Courts – including courts deciding RICO cases – have indeed recognized that "deepening insolvency" can be a proper measure of damages if, as with any other measure of damages, the facts and expert rationale support it.  It is a perfectly appropriate method for measuring damages in certain circumstances and it is assuredly far too early in this case to say that it lacks applicability here.

### 1.    The Trustees Seek Recovery For Damages Directly Caused By Defendants' Fraudulent Conduct.

The Trustees base their RICO claim on fraudulent conduct perpetrated directly on KPNQwest.  The resulting injuries stem directly from the frauds perpetrated by

---

[16] Indeed, a Title VII claim – at issue in *Brown* – is subject to equitable tolling.  *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350 n.3 (1983).  *Kuiper v. Busch Entertainment Corp.*, 45 F.3d 284 (8th Cir. 1995), cited by Defendants (at 32), is inapt because the outcome of that diversity suit was governed by the Virginia limitations and tolling provision.

Defendants on KPNQwest.  For present purposes, the Trustees stand in the shoes of KPNQwest.  This is all very basic.

Stated simply, through fraud, Defendants caused KPNQwest to take actions that resulted in KPNQwest making bad business decisions and losing a great deal of money – eventually resulting in bankruptcy.  Defendants contend, though, that the real victims of Defendants' alleged conduct are KPNQwest's various creditors, including banks and bondholders, and that any injuries suffered by KPNQwest were indirect and too remote to demonstrate proximate cause.  *See* Defs. Br. at 33.  But this is simply not true and it does not comport with common sense.  Indeed, Defendants have the order of victims reversed: KPNQwest was the direct victim of Defendants' conduct; to the extent there exist injured creditors who have not been paid because of the bankruptcy, their injury is derivative of KPNQwest's, not the other way around.

That the damages will likely be *measured* by the claims of KPNQwest's creditors that have gone unpaid does not change this result.  *See* Complaint ¶ 17.  Collecting damages (or other assets) for the benefit of the estate in order to repay creditors is what trustees in bankruptcy are charged with doing.  That KPNQwest is seeking to recover for a budget deficit, rather than an affirmative loss, makes no difference with respect to the directness of the injury to KPNQwest.  If KPNQwest had had $2.4 billion in the bank and the account had been drained to zero as a direct result of the Defendants misleading KPNQwest and causing it to spend money on things that were improper, no one would question that KPNQwest had suffered damages of $2.4 billion.  It makes no difference that, here, the loss took KPNQwest into the red and resulted in a *deficit* of $2.4 billion; the loss is the same, and the cause is the same.  In either situation,

KPNQwest is out $2.4 billion; it matters not whether the loss is measured by cash it no longer has or debt it cannot pay.[17]   In sum, KPNQwest, having been misled into making bad business decisions, is the direct victim, not the "bondholders, banks, and other creditors" (Defs. Br. at 36) that, on account of bankruptcy, may perhaps not get paid.

To be sure, if individual creditors were individually defrauded by some or all Defendants – as is alleged with respect to one loan in the Cargill litigation – the individual creditors might *also* have claims (though this would not, under bankruptcy law, keep the Trustees from seeking the same amounts, for benefit of all creditors, in connection with their claims).  That individual creditors may have individual claims will does not strip the Trustees of the right to pursue claims for frauds committed on, *inter alia*, KPNQwest.  Indeed, many cases have noted that such a rule would produce a perverse result:  A bankruptcy trustee, by virtue of its position, is charged with asserting claims; its collections benefit all creditors.  It is perverse to suggest that merely because an individual creditor has some sort of colorably related claim, the Trustees' own claim can be displaced.[18]  Thus the fact that some KPNQwest bondholders and creditor banks may have asserted claims *for fraud on them*, is beside the point.  *See* Defs. Br. at 37

---

[17] Incurring debt as a result of wrongful conduct is remediable harm every bit as much as a loss of cash from one's pocketbook. *See*, *e.g.*, *Hamilton v. Water Whole Int'l*, 302 Fed. Appx. 789, 798 n.3 (10th Cir. 2008) ("actual damages . . ., such as . . . debt incurred as a result of the alleged misrepresentations."); *Dolin v. Contemporary Fin. Solutions, Inc.*, No. 08-CV-00675, 2009 WL 890689, at *3 (D. Colo. Mar. 31, 2009) (alleged harm based on debts); *United States v. Cambio Exacto, S.A.,* 166 F.3d 522, 528 (2d Cir. 1999) (bank had standing to challenge seizure of funds in customer accounts because it had an obligation to customers in an amount equal to the forfeited funds); *James v. City of Dallas*, 254 F.3d 551, 565 (5th Cir. 2001) ("actual" and "imminent" injury based in part on imposition of collectible debt).

[18] *E.g.*, *Delgado Oil Co. v. Torres*, 785 F.2d 857, 861-62 (10th Cir. 1986); *In re Silver*, 303 B.R. 849, 864 (B.A.P. 10th Cir. 2004); *Liberty Sav. Bank v. Webb Crane Servs., Inc.*, No Civ. 03-2218, 2005 WL 1846983, at *1 (D. Colo. Aug. 3, 2005); *ANR Ltd. v. Chattin*, 89 B.R. 898, 903-04 (D. Utah 1988); *Matter of S.I. Acquisitions, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir. 1987); *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 133-35 (2d Cir. 1993).

Defendants cite a trio of Supreme Court cases for the proposition that a plaintiff cannot recover under RICO except for damages stemming from injuries directly attributable to the defendant's conduct. *Id.* at 33-35. The weakness in Defendants' argument is not the stated proposition, which is true, but the underlying assumption of the argument, which is that the Trustees have not pled *direct* injuries and resulting damages. As already explained, that assumption is erroneous.

For example *Sedima, S.P.R.L. v. Imrex Co.* states no more than that to recover under RICO, the plaintiff must show injury caused by the RICO predicate offenses, *i.e.*, the fraudulent acts that make up the pattern of racketeering. 473 U.S. 479, 496 (1985).

*Holmes v. Sec. Investor Prot. Corp.* involved a different issue entirely. Plaintiff was the Securities Investor Protection Corporation ("SIPC"), created by federal statute to reimburse customers of registered broker-dealers if the customers' accounts were short. *See* 503 U.S. 258, 261 (1992) (citing 15 U.S.C. §§ 78aaa-78lll). SIPC initiated a RICO claim against defendants, third parties who SIPC alleged had defrauded certain broker-dealers, causing their managed investments to decline in value. SIPC was obligated to cover the shortfall, and sought to recover same from the defendants. *See id.* at 262-63. The Supreme Court held that SIPC could not recover under RICO because, as a matter of proximate cause, the fraud was on the broker-dealers and the SIPC was only indirectly affected. *See id.* at 271-72.

*Anza v. Ideal Steel Supply Corp.* is readily distinguished on the same basis. There, plaintiff alleged injury from defendant's tax fraud on the state, which – so the theory went – resulted in a more advantageous market position for defendant, at the expense of plaintiff, as its competitor. The Court easily concluded that the direct cause

of the plaintiff's injury was defendant's lower prices, which was merely a consequence of the fraud perpetrated upon the state. *See* 547 U.S. 451, 458 (2006).

The other cases cited by Defendants are readily distinguishable on the same basis: each involved a plaintiff who, on the face of the pleadings, suffered an indirect or derivative injury as a result of an alleged fraud on someone else. *See* Defs. Br. at 35 (citing cases). Here, however, the Trustees, on behalf of the estate of KPNQwest, are suing on account of injury resulting from fraud committed on KPNQwest.

### 2. Deepening Insolvency As A Measure Of Damages Is Perfectly Reasonable And Cannot Be Dismissed.

Finally, there is nothing unusual about the Trustees identifying KPNQwest's liquidation deficit, the sum still owed to creditors after liquidation of assets, as a potential (but not necessarily the only) damages measure. Defendants caused KPNQwest to make business decisions that resulted in bankruptcy and an inability to repay creditors. The allegation is that Defendants' fraud caused *at least* the loss reflected as the litigation deficit. That KPNQwest ended up with debt of $2.4 billion on account of Defendants' fraud gives rise to recoverable damages just as clearly as if Defendants defrauded KPNQwest of $2.4 billion in out-of-pocket cash.

Citing secondary authorities, Defendants argue that there is something illogical in allowing a company to recover for those losses. *See* Defs. Br. at 40-41. Defendants rely heavily on cases holding that there is no independent "deepening insolvency" cause of action, *i.e.*, a claim that it is *per se* improper to take on further debt once a company is already legally insolvent. But the Trustees make no such claim.

In contrast, many cases recognize that deepened insolvency *can be* used to measure damages from various causes of action, including in a RICO context. *See*,

*e.g.*, *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983) (approving deepening insolvency measure of damages for RICO and mail fraud); *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (various claims, including RICO); *Tabas v. Greenleaf Ventures, Inc. (In re Flagship Healthcare, Inc.)*, 269 B.R. 721, 728-29 (Bankr. S.D. Fla. 2001) (negligent preparation of valuation report); *Drabkin v. L & L Constr. Assocs., Inc. (In re Latin Inv. Corp.),* 168 B.R. 1, 6 (Bankr. D.C. 1993) (conspiracy to commit, and aiding and abetting, fraud); *Gouiran Holdings, Inc. v. DeSantis*, 165 B.R. 104, 107 (E.D.N.Y. 1994) (negligent preparation of financial statements).  *See also In re Vartec Telecom, Inc.*, 335 B.R. 631, 643-44 (Bankr. N.D. Tex. 2005)(discussing cases recognizing deepening insolvency as damages).

At best, Defendants' attack on a particular damages theory is premature.  For now, it is enough to recognize, as the cited cases dealing with insolvent companies reflect, that it is well-recognized that losses from wrongful acts are recoverable, including losses that manifest in the company having debt, including unpayable debt.  As may be applicable in this case, the basic damages calculation would compare KPNQwest's financial position if the fraudulent acts had not occurred with KPNQwest's financial condition as a result of the fraud.  There is nothing ground-breaking to this.

### CONCLUSION

For the reasons stated, the motion to dismiss should be denied.[19]

---

[19] Pursuant to REB Civ. Practice Standard V.I.1, undersigned counsel certify that they have read and complied with the Practice Standards of this Court governing the formatting and marshalling of this response brief.

June 17, 2009

Respectfully submitted,

CROWELL & MORING LLP

*/s/ Clifton S. Elgarten*
Clifton S. Elgarten
Richard McMillan, Jr.
Daniel W. Wolff
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
celgarten@crowell.com
rmcmillan@crowell.com
dwolff@crowell.com

Richard W. Daily
RICHARD W. DAILY LLC
621 17th Street, Suite 1535
Denver, Colorado 80293-1501
Telephone: (720) 963-1121
Facsimile: (720) 897-2802
rdaily@dailyllc.com

Attorneys for Plaintiffs
Trustees of KPNQwest

## CERTIFICATE OF SERVICE

I certify that on this 17th day of June, 2009, the Plaintiffs' Memorandum in

Opposition to the Defendants' Motion to Dismiss was served on the following through

the Court's electronic filing transmission system:

Kenneth F. Rossman, IV, Esq.
ROTHGERBER, JOHNSON & LYONS LLP
One Tabor Center, Suite 3000
1200 Seventeenth Street
Denver, CO  80202

William C. Jackson, Esq.
BOISE, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., N.W., Suite 800
Washington, D.C.  20015

Ira A. Finkelstein, Esq.
645 Fifth Avenue
New York, NY  10022

Jeffrey E. Gross, Esq.
VANDENBERG & FELIU LLP
110 East 42nd Street, Suite 1502
New York, NY  10017

Service of the same by first-class U.S. mail was made on:

Joel M. Silverstein, Esq.
STERN & KILCULLEN, LLC
75 Livingston Avenue
Roseland, NJ  07068

*/s/ Clifton S. Elgarten*
Clifton S. Elgarten